**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division**

| | |
|---|---|
| **WALTER SCOTT LAMB,** | ) |
| | ) |
| | ) |
| **Plaintiff/Counterclaim** | ) |
| **Defendant,** | ) |
| | ) |
| **v.** | ) **Case No. 6:21CV00055** |
| | ) |
| **LIBERTY UNIVERSITY, INC.,** | ) |
| | ) |
| | ) |
| **Defendant/Counterclaim** | ) |
| **Plaintiff.** | ) |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant Liberty University, Inc. ("Defendant" or "Liberty") by counsel, states as follows for its Answer (as well as for its Affirmative and other Defenses) to the Complaint.[1]

## ANSWER

The Complaint contains various headings and subtitles throughout the document.  (ECF No. 1.)  To the extent that these headings and subtitles are deemed to allege any facts, they are denied.

## PRELIMINARY STATEMENT

1.      Paragraph 1 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 1.

2.      In response to Paragraph 2, Defendant admits that it hired Plaintiff and he started work on or about January 2, 2018 as Vice President of Special Literary Projects.  Defendant admits

---

[1] Defendant has submitted previous to this Answer and Defenses its Motion to Dismiss pursuant to F.R.C.P 12(b)(6). It is not the intent of Plaintiff to waive its pending Motion to Dismiss by submitting this Answer and Defenses.

Plaintiff later held the title Senior Vice President of Communications and Public Engagement. Defendant denies the remainder of the allegations in Paragraph 2.

3.      In response to Paragraph 3, Defendant admits that on or about October 6, 2021, after approximately three years and nine months of employment with Liberty University, Defendant terminated Plaintiff's employment with Liberty University.  Defendant denies the remainder of the allegations in Paragraph 3.

## JURISDICTION

4.      Paragraph 4 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits that the Court has subject matter jurisdiction under 28 U.S.C. § 1331 and denies the remainder of the allegations in Paragraph 4.

## VENUE

5.      Paragraph 5 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits that venue is proper under 28 U.S.C. § 1391(b) and that Defendant is a Virginia corporation subject to personal jurisdiction in the U.S. District Court for the Western District of Virginia.

6.      Paragraph 6 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits that venue is proper in the U.S. District Court for the Western District, Lynchburg Division, and denies the remainder of the allegations in Paragraph 6.

## PARTIES

7.      In response to Paragraph 7, Defendant admits that Plaintiff is an adult man. Defendant admits Plaintiff is a citizen of the Commonwealth of Virginia.

8.      In response to Paragraph 8, Defendant admits the allegations.

9.      In response to Paragraph 9, Defendant admits the allegations.

10.     In response to Paragraph 10, Defendant admits the allegations.

11.     In response to Paragraph 11, Defendant admits it accepts students who pay

tuition, in part, with federal financial aid directly distributed to the students.

12.     In response to Paragraph 12, Defendant admits the allegations.

13.     In response to Paragraph 13, Defendant admits Liberty is accredited by SACSCC,

but it is also subject to the regulatory oversight of other accrediting organizations and agencies.

14.     In response to Paragraph 14, Defendant admits the allegations.

**FACTS**

15.     In response to Paragraph 15, Defendant admits that Plaintiff was hired and he

started work on or about January 2, 2018, as Vice President of Special Literary Projects.

16.     In response to Paragraph 16, Defendant admits the allegation.

17.     In response to Paragraph 17, Defendant admits the allegation.

18.     In response to Paragraph 18, Defendant admits the allegations.

19.     In response to Paragraph 19, Defendant admits that Plaintiff at times during his

employment served as a spokesperson and a media liaison for Liberty.

20.     In response to Paragraph 20, Defendant admits the allegations.

21.     In response to Paragraph 21, Defendant denies the allegations.

22.     In response to Paragraph 22, Defendant admits the allegations.

23.     In response to Paragraph 23, Defendant admits the allegations but denies the list is

a complete list of executive leaders of Liberty University at that time.

24.     In response to Paragraph 24, Defendant admits Jerry Falwell Jr. was President of the University on January 2, 2018 and that he resigned in August 2020 but denies the remaining allegations.

25.     In response to Paragraph 25, Defendant admits that after Mr. Falwell's resignation, the Board of Trustees launched an independent investigation into all facets of Liberty University operations during Jerry Falwell, Jr.'s tenure as President using outside counsel to engage a forensic accounting firm but denies remaining allegations.

26.     In response to Paragraph 26, Defendant admits that the content comes from a Liberty press release and states the referenced document speaks for itself.

27.     In response to Paragraph 27, Defendant admits that four executive leaders at Liberty University have had authority to take corrective measures on the school's behalf relating to the implementation, execution and enforcement of Title IX sexual harassment (including sexual violence) and sex-based discrimination policies and procedures but denies the remaining allegations.

28.     In response to Paragraph 28, Defendant admits contact from Plaintiff Stephen Wesley Burrill but states the referenced document speaks for itself.

29.     In response to Paragraph 29, Defendant states the referenced document speaks for itself.

30.     In response to Paragraph 30, Defendant is without sufficient information to admit or deny the allegation, and therefore denies it.

31.     In response to Paragraph 31, Defendant admits that Scott Lamb informed about five executive leaders at Liberty University that he had been interviewed by outside counsel as part of the investigation.

32.     In response to Paragraph 32, Defendant admits the allegations but denies the number of leadership attendees listed is "three."

33.     In response to Paragraph 33, Defendant admits David Corry joined a meeting with acting President Prevo to provide legal advice but denies the remaining allegations.

34.     In response to Paragraph 34, Defendant denies the allegations.

35.     In response to Paragraph 35, Defendant denies the allegations except to admit that at one point Plaintiff was asked if he was prepared to resign.

36.     In response to Paragraph 36, Defendant admits that a lawsuit, *Does 1-12 v. Liberty University, Inc.*, Case No. 2:21-cv-03964-JMA-ARL (E.D.N.Y. July 20, 2021), was filed and denies the remaining allegations, including the allegation quoted from this lawsuit.

37.     In response to Paragraph 37, Defendant admits that during the October 4 meeting, Jerry Prevo called Plaintiff a "liar" but denies the remaining allegations.

38.     In response to Paragraph 38, Defendant denies the allegations.

39.     In response to Paragraph 39, Defendant denies the allegations.

40.     In response to Paragraph 40, Defendant admits that Plaintiff opposed perceptions by others about whether the University's 501(c)(3) restrictions had been exceeded but is without sufficient information to admit or deny the remaining allegation, and therefore denies them.

41.     In response to Paragraph 41, Defendant admits that on October 5 David Corry attempted to present an offer of terms of a separation agreement and to invite any suggestions from Plaintiff but denies the remaining allegations.

42.     In response to Paragraph 42, Defendant admits Jerry Prevo instructed David Corry to meet with Plaintiff to discern if there were acceptable terms for a separation agreement.

43.     In response to Paragraph 43, Defendant lacks sufficient information to admit or deny what Plaintiff "believes" with respect to any alleged severance, and this statement has the effect of a denial.  Defendant denies the remainder of the allegations in Paragraph 43.

44.     In response to Paragraph 44, Defendant lacks sufficient information to admit or deny the allegations, and this statement has the effect of a denial.

45.     In response to Paragraph 45, Defendant admits the allegations.

46.     In response to Paragraph 46, Defendant admits the allegations.

## COUNT I

47.     In response to Paragraph 47, which incorporates by reference Paragraphs 1 through 46, Defendant incorporates by reference its responses to the allegations in Paragraphs 1 through 47.

48.     Paragraph 48 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits the allegations in Paragraph 48.

49.     Paragraph 49 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant does not dispute that its education programs and activities receiving federal financial assistance are subject to Title IX and denies the remainder of the allegations in Paragraph 49.

50.     Paragraph 50 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits it is a private institution of higher education and admits that it operates an education program or activity.

51.     Paragraph 51 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits that it is a recipient of federal financial assistance within the meaning of Title IX and admits that it receives federal student aid, which

some of its students use to pay their tuition.  Defendant denies the remainder of the allegations in Paragraph 51.

52.    Paragraph 52 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 52.

53.    Paragraph 53 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 53.

54.    Paragraph 54 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 54.

55.    Paragraph 55 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 55.

56.    Paragraph 56 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 56.

57.    Paragraph 57 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant admits the allegations in Paragraph 57.

58.    Paragraph 58 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 58.

59.    Defendant denies the allegations in Paragraph 59.

60.    Paragraph 60 contains legal conclusions to which no response is required.  To the extent a response may be required, Defendant denies the allegations in Paragraph 60.

## PRAYER FOR RELIEF

61.    Defendant denies the allegations in the "Prayer for Relief" paragraph, and specifically denies that Defendant is liable to Plaintiff for any reason, in any amount, or upon any theory of liability or damages.

62.     Defendant denies any and all allegations and legal conclusions in the Complaint that Defendant has not expressly and previously admitted in this Answer, to the extent that any further response may be required.

## AFFIRMATIVE DEFENSES

Liberty states as follows for its affirmative defenses reserving the right to supplement in the course of discovery.

1.     The Complaint fails to state a claim on which relief can be granted.

2.     Lamb's claims are barred, in whole or in part, by the doctrines of unclean hands.

3.     To the extent Lamb can prove he has suffered any damages (which is specifically denied), Lamb has caused such damages were caused by Lamb's own negligence or fault or by some other superseding or intervening cause.

4.     To the extent Lamb can prove he has suffered any damages (which is specifically denied), Lamb has failed to reasonably mitigate its damages.

5.     Liberty reserves his right to assert additional affirmative defenses in the event discovery and/or further investigation disclose the existence of such defenses.

## COUNTERCLAIM

Liberty, by counsel, states as follows for its counterclaims against Lamb.

## INTRODUCTION

1.     Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 7,000-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.      From early 2018 until his employment was terminated on October 6, 2021, Lamb served in communications at Liberty, holding the title of Senior Vice President of Communications and Public Engagement at the time of his termination.

3.      Liberty brings this suit for several purposes, including (a) to take on Lamb's defamatory claims and publicly prove them false, (b) to recover University property that Lamb has unlawfully retained post-termination, (c) to protect its confidential information, attorney/client communications, and attorney work product material from Lamb's abuses, and (d) to obtain preliminary and permanent injunctive relief enjoining Lamb from using or disclosing Liberty confidential information, privileged materials, or work product to anyone outside Liberty University without obstructing Lamb from speaking, writing or communicating about matters he may lawfully discuss.

## PARTIES

4.      Liberty is a Virginia non-stock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Boulevard, Lynchburg, Virginia 24515.

5.      Lamb is a citizen and resident of Virginia.

## JURISDICTION

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises, *inter alia*, under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* Accordingly, this Court also has subject matter jurisdiction under 28 U.S.C. § 1367.

## FACTUAL BACKGROUND

7.      Lamb is a pastor, author, and activist who started his career with peripheral positions but aspired to grander importance. Because Lamb has endeavored to be a public person,

his own pronouncements to the press and on social media make it easy to detail his activities of late that comprise the bulk of this Counterclaim.

8.      After training in seminary and serving as a pastor, Lamb grew restless in the role of spiritual advisor.  He seemingly craved more "voice."  To advance this quest, Lamb worked on writing skills, entering journalism as a reporter with the *Washington Times* and later accepting a role as a biographer.

9.      Working in media, Lamb learned how writers seek exclusives from key interview figures, build trust with the goal of gaining information from a subject, and then ask for back-up information to avoid being misled by speculating subjects.  In his career as an author, Lamb has written or co-written biographies of baseball player Albert Pujols, Governor Mike Huckabee, and a book on the spiritual life of Donald J. Trump.  The process of writing and publishing is very familiar to Lamb.

10.      Lamb's writing experience led him to the orbit of Jerry Falwell Jr.  The two had much in common.  Lamb and Falwell Jr. were both raised in conservative Christian homes, and as adults they grew to perceive as alarming the erosion of First Amendment protections for religious liberty and the rise of governmental influence over many areas of life.

11.      A major difference between the two, however, was their positioning.  Falwell Jr. had a father who created a national university to which Presidential candidates came to pitch, Christian leaders came to confer, and students flocked for first-class education in a Biblical setting. Lamb had an itch to be influential, but his personal platform was portraying other people's ideas in books, and reporting on their views and news.  More than just writing stories, Lamb apparently yearned to *be* the story.

12.     In Falwell Jr., Lamb identified an emerging figure to serve, a leader who was at the crossroads of faith and the changing culture – and on center stage. Moreover, Lamb claims Falwell Jr. needed someone to speak truth to his power.  Attracted to the role, Lamb sought and accepted a position at Liberty.

13.     Lamb joined Liberty on January 2, 2018 with the title of Vice President of Special Literary Projects, but fulfilled a dual role. He was *aide de camp* to Falwell Jr. on media matters, and he was to be deployed to write books himself and to assist in securing publication for an emerging cadre of authors at Liberty with bold new ideas to advance conservative Christian influence.

14.     By his own admission, Lamb's duties at LU never included such matters as the investigation of concerns under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., or the management of compliance with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f).  Lamb had no official role in Title IX matters at LU at all, except to receive inquiries from reporters, and to communicate statements to the public that occasionally crossed over into the area of Title IX.

15.     While uninvolved in the merits of Title IX matters, Lamb did have extensive access to Liberty's valuable trade secret and confidential and proprietary information, including student and donor lists, financial information, cost information, publicity strategies, marketing objectives, plans, and timelines, student records, information regarding potential business transactions, and other strategic information.

16.     This information derives independent, actual or potential commercial value from not being generally known or readily ascertainable to persons outside Liberty.

17.     Because of the valuable nature of such material, Liberty takes reasonable steps to keep LU's confidential information private, doing such things as limiting dissemination of such information to individuals on a "need to know" basis, requiring key employees to sign confidentiality agreements, maintaining password protections and encryption on electronic devices that may access confidential and trade secret information, and maintaining robust policies and practices concerning the protection of confidential information.

18.     As a Liberty employee, Lamb knew that he was subject to those rules, which were communicated to him in several ways.

19.     Like all LU employees, Lamb was subject to the authority of the Liberty University Employee Handbook of Policies and Procedures ("Handbook," Exhibit A), which includes the following principles:

a.      Section 2.6 of the Handbook provides that "[n]o employee of the University may misuse confidential information or proprietary information or reveal confidential or proprietary information to any outside source."

b.      Section 2.7 of the Handbook establishes that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."

c.      Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

d.      Section 7.3 of the Handbook clearly provides that "[a]ll information created or contained on the University's computers and network, including electronic mail (E-mail), remains the property of the University."

e.      Section 7.3 of the Handbook (Computer Use) overtly prohibits the creation of home filing systems for the purpose of an employee exerting dominion over Liberty property, such as Documents and Confidential Information.

f.      Section 7.3 of the Handbook also plainly prohibits employees from retaining Liberty property for private use through off-site storage systems, duplicative filing arrangements, servers, or drives.

g.   Section 7.15 (Return of Property) dictates that "[o]n or before the employee's last day of work, the employee is required to return all property."

h.   By virtue of Section 7.15, Lamb understood that if LU had to repossess its materials by resort to litigation, Lamb would have to pay LU attorney fees.

20.   Lamb also committed to abide by various "Legal Holds." Legal Holds required employees to refrain from destroying information potentially relevant to LU legal matters. These materials could be subject to subpoenas, court ordered document productions, or mandatory disclosure demands. At least the following Legal Holds were applied specifically to Lamb during the duration of his LU employment:

a.   A Legal Hold related to litigation concerning fee refunds during the COVID-19 pandemic;

b.   A Legal Hold related to litigation involving *The New York Times*;

c.   A Legal Hold related to litigation filed against Liberty by Jerry Falwell Jr.; and

d.   Two Legal Holds related to litigation involving Title IX.

21.   Lamb also committed to abide by the LU document retention system, which obligated employees to preserve and archive specified information for prescribed periods of time.

22.   As a manager at LU and a Department Head, it was Lamb's duty to enforce these various Handbook, Legal Hold, and document retention rules upon the staff who were subordinate to him within his own Department. During the course of his employment, Lamb never indicated any disagreement with these common-sense constrictions in the Handbook and other employee policies.

23.   Perhaps Lamb's most serious and solemn commitment was the one he volitionally undertook as a condition of participating in meetings of the LU Board of Trustees. On April 20,

2018, Lamb executed a Confidentiality Agreement whereby he agreed not to disclose without permission any proprietary or confidential information he received, such as business, financial and proprietary information "regarding the Board and the University." This is the manner in which the Confidentiality Agreement defined "Confidential Information."

24.     In a broad statement of intent by the parties to protect decisional information, the Confidentiality Agreement extended to "any other information furnished to [Lamb] by or on behalf of the University, along with any other information relating to the Confidential Information prepared by [Lamb]." Lamb expressly agreed that this sweeping obligation bound him when he no longer worked at Liberty and compelled him to "promptly return information at departure," inclusive of "all copies thereof." *See* Confidentiality Agreement, attached as Exhibit B.

25.     In addition, Lamb had (and still has) a fiduciary obligation to protect Liberty's confidential information and to use that information only in Liberty's best interests.

## The Lion and Lamb

26.     After Falwell Jr. endorsed Donald Trump in the 2016 Presidential race and gained national attention, Falwell Jr. launched a policy center at Liberty. Lamb claims responsibility for branding it "The Falkirk Center." Lamb indicates he brought the idea to Falwell Jr. after watching protagonist William Wallace in "Braveheart" – a favorite film of Falwell Jr. Wallace prevailed against tyranny in the depicted battle of Falkirk and embraced personal freedom as a motto for his cause. Lamb also sold the branding to Falwell as a play on the names of the two principals of the Center, Jerry Falwell Jr. and Charlie Kirk. https://shows.cadence13.com/static.img/gangster-capitalism/C13_GC_S3_E8_FINAL_GO.pdf.

27.     Lamb has proclaimed himself one of Falwell Jr.'s most trusted advisors in the era of 2018 to 2020. Lamb told a local ABC News affiliate just last week that he was Falwell Jr.'s

most influential aide in the shaping of the President's press positions and proclamations, obtaining close personal access to Falwell and his family during this time.

28.  Media recognized this symbiotic role. *See Who is Scott Lamb from Liberty University?*, WIKI (https://www.wiki.ng/en/wiki/who-is-scott-lamb-from-liberty-university-age-wiki-wife-why-was-he-fired-681492 (last visited Oct. 30, 2021) ("Scott Lamb, who was the school's senior Vice President of communications until October 6, *was described as the right-hand man to former president Jerry Falwell Jr.*, who resigned after the series of controversial activities") (emphasis added).

29.  With Lamb's access and devotion to Falwell Jr. came opportunity and visibility – a posting Lamb could hold on to only so long as he protected the public image of Falwell Jr.  To maintain his station, Lamb never publicly attacked or criticized Falwell Jr., which by his own admission would have been a surefire ticket to departure.

30.  Accordingly, Lamb claims he was either the first-approver or soft critic of Falwell Jr.'s many tweets, releases, and speeches.  Lamb embraced and expanded the Falwell Jr. agenda in demonstrable and emphatic ways, for example:

- Lamb was spokesman for Falwell Jr.'s musings about involving the FBI in assessing whether certain former board members of Liberty took positions askance to Falwell Jr.; *Jerry Falwell Jr. wants FBI to probe 'criminal conspiracy' against him*, NBC NEWS (Sept. 9, 2019), https://www.nbcnews.com/news/us-news/jerry-falwell-jr-wants-fbi-probe-criminal-conspiracy-against-him-n1052076.

- Lamb was spokesman when Falwell Jr. spotlighted the Governor of Virginia in terms of his alleged portrayal in blackface in a medical school yearbook; *Falwell's Blackface Tweet Brings Racial Dissent to Liberty University*, THE NEW YORK TIMES (June 8, 2020), https://www.nytimes.com/2020/06/08/us/politics/jerry-falwell-blackface.html.

- It was Lamb who was accused of "berat[ing]" an LU student who protested some University COVID policies on Facebook. *'Blinded and naïve': Liberty students claim culture of suppression under Falwell leadership (August 14, 2020)*, https://www.washingtonexaminer.com/news/blinded-and-naive-liberty-students-claim-culture-of-suppression-under-falwell-leadership.

**Silence from Lamb**

31.     At some point during his unyielding support of Falwell Jr., the contradictions in Falwell Jr.'s personal behavior and public life closed in on Lamb.  In media communications, Lamb has indicated he had a ringside seat at the President's personal erosion.

32.     In a comprehensive podcast appearance on or about Friday October 29, 2021, Lamb indicated he would often talk with Falwell Jr. on weekends regarding LU business.  Lamb indicated Falwell Jr. had more time then but was also more likely to be under the influence.  *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.

33.     Some in the community called Lamb out for duplicity in turning a blind eye professionally to the personal plight of Falwell Jr.  For example, on October 25, 2021, a Twitter user named Austin Edwards criticized Lamb for speaking personally to Edwards about "Falwell improprieties" but conveying a strident "level of dismissal" to concerned alums and to Edwards, tweeter, a veteran of "PR at a top 3 TV network." https://twitter.com/mbdbaggett/status/1449419030117376010 (last visited Oct. 30, 2021).

34.     As Falwell Jr.'s public missteps multiplied, eventually leading to his resignation, Lamb's reaction was silence – though concededly suborning Falwell's actions, personally and professionally.

**A Wolf in Lamb's Clothes**

35.     At some point during this drama, a conflicting dilemma came to Lamb.  He was offered a lucrative contract to write a tell-all book about Falwell Jr.  Previously, Lamb was in discussions with Falwell Jr. himself to write a friendly portrait, showcasing Falwell Jr.'s status,

standing, and vision.  It is not apparent whether Lamb disclosed to Falwell Jr. the double agency and duplicity toward Liberty that was beginning to spawn within the Lamb camp.

36.     In one of his numerous recent dips into the media pool, Lamb confessed to contradictory roles that he knowingly brought into the digital disclosure sessions.  In a moment of soul searching, Lamb confessed to being one of two things: either an operating activist embedded within Liberty's structure, or a growingly disaffected activist awaiting his opportunity to capitalize by debunking aspects of LU.  *See* https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.  At the time of  Falwell Jr.'s departure from LU on August 26, 2020, Lamb was wielding the tools of activism with  intensity.

37.     In the vacuum created by Falwell Jr.'s departure, Lamb ramped up his efforts to monetize his activism.  Lamb started with cataloguing LU information.  In the course of his role as communications director, Lamb for a long time had protectively and with permission recorded many of Falwell Jr.'s media calls.  On information and belief, Lamb recorded other calls, meetings, and events on the sly.  Lamb grew to expand his intrusions beyond the scope of his job, quietly recording meetings, discussions, and audiences with Falwell Jr. to further whichever Falwell book he would eventually write for personal profit.

38.     As Lamb's workplace espionage grew to be a more comfortable endeavor for him, Lamb widened his devotion to secret recordings.  Lamb started recording his meetings with Acting President Jerry Prevo and other LU executives. This conduct disregards standards that courts indicate a Virginia employer has a right to expect from employees.

39.     Without permission, Lamb used Liberty time and resources to make secret recordings which, upon their creation, became Liberty documents by standards that Lamb

embraced as a condition of his employment. Lamb likely stored, communicated, or managed these recordings on LU devices, systems, or platforms.

40.     Without permission, Lamb admits that he configured a redirection software to start transferring to his personal email account emails that he received on his LU devices and systems. These e-mails, which Lamb received by virtue of his job at Liberty, were and are still Liberty's property, and Lamb was not authorized to take them.

41.     Without permission, Lamb built a home storage collection of draft press releases, position documents, and legal advice issued by LU and outside counsel (including recorded conversations with LU in-house and outside counsel) that he could use to promote his expositional agenda, depending on how events evolved.

42.     Events did in fact unfold adversely for Lamb during this time period. After Falwell Jr. had to resign his Presidency in August 2020, Jerry Prevo was named acting President of LU. The Falkirk Center (rebranded the Stand For Freedom Center post-Falwell under Lamb), came under strategic review. The Center was drifting under Lamb, who personally fired Charlie Kirk from the enterprise. *Charlie Kirk out at Liberty University's Falkirk Center*, RELIGION NEWS (March 17, 2021), https://religionnews.com/2021/03/17/charlie-kirk-out-at-liberty-universitys-falkirk-center/.

43.     In October 2021, Lamb's management and oversight of the Center came under criticism by an internal strategic analysis group, both for lack of specific authority to spend money on Department projects and for fundamental administrative sloppiness. Lamb has publicly defended his performance by resorting to a telephone call that occurred back in July 2021 in which acting President Prevo affirmed aspects of Lamb's performance. Lamb confesses that he recorded the July call without informing Prevo. *Scott Lamb Talks Lawsuit Against Liberty University and*

*Title IX Allegations*, WLNI (Oct. 28, 2021), https://wlni.com/scott-lamb-talks-lawsuit-against-liberty-university-and-title-ix-allegations/.

### A Bleating Lamb

44.     Lamb left Liberty University on October 6, 2021, and took with him a reservoir of electronic information, documents, and recordings that he was prohibited by LU policy and procedure from taking.  At least some of this material was recorded or otherwise created by Lamb to discredit LU and potentially line his pockets as he developed commercial opportunities to use his former-insider status for personal profit.

45.      On October 22, 2021, Liberty provided Lamb a carefully-crafted letter to educate him on his obligations to LU, to ask for return of Liberty's documents and information, and to admonish him on his risk were he to misuse Liberty property. *See* Exhibit C.

46.     On October 29, 2021, Lamb's local and national counsel both received letters from Liberty imploring counsel to respect Liberty's privileges and to have Lamb do the same.  *See* Exhibits D and E.

47.     Since his separation from Liberty, Lamb has taken to an amateurish media tour to attempt to rehabilitate his tattered reputation within Liberty and to the public.

48.     In this pursuit, he has improperly weaponized his access to LU property and confidential information, deploying it as if he had acquired the right to make it his own.  The following are among Lamb's misuse of LU confidential information and materials:

- On October 16, 2021, Lamb posted to his Twitter account an October 4, 2021 redacted screen shot of work communication from his Liberty email account regarding publication of an article.  *See* Exhibit F.

- On October 22, 2021, Lamb posted to his Twitter account the concededly "confidential" communication he received from acting President Prevo that provided him with information about Liberty's internal investigation into Jerry

Falwell Jr.'s financial stewardship of Liberty and requested his full cooperation. *See* Exhibit G.

- To the publication *ProPublica* on or before October 24, 2021, Lamb referred to a May 7, 2021 e-mail he generated for management, that was the property of LU; *"The Liberty Way": How Liberty University Discourages and Dismisses Students' Reports of Sexual Assaults*, PROPUBLICA (Oct. 24, 2021), https://www.propublica.org/article/the-liberty-way-how-liberty-university-discourages-and-dismisses-students-reports-of-sexual-assaults.

- To the ABC 13 outlet WSET on October 27, 2021, though admitting on camera to prior subject matter advice by his personal counsel that he should exercise care with LU documents, Lamb disgorged the privileged legal advice that he was acquired from both in-house LU and outside counsel regarding legal strategy on pending court cases. Lamb pridefully termed this giveaway of LU privileged material an "exclusive" to WSET. *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

- To WSET, on October 27, 2021, Lamb revealed confidential communications regarding the Liberty legal advice he learned about from outside counsel regarding Title IX actions. *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

- Also to WSET on October 27, 2021, Lamb confessed that he has released other LU property in the form of documents and recordings he provided to media outlets. *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

- To the publication *Politico* on or about October 27, 2021, Lamb supplied unauthorized recordings that he secretly made of his LU management meetings with Acting President Prevo. *Liberty U president says on tape that 'getting people elected' is his goal*, POLITICO (Oct. 27, 2021), https://www.politico.com/news/2021/10/27/liberty-university-jerry-prevo-influence-517303.

- On a podcast presented by Julie Roys on October 29, 2021, Lamb made a number of unpermitted disclosures of LU property. *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021),

<u>https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.</u>

49.     As if these dramatic acts of defiant abuse of protected Liberty communications were not enough, on November 1, 2021, Lamb sent numerous members of the LU Board an email that catalogued each and every media story resulting from his media tour (several of which were for the purpose of disclosing Liberty's privileged and protected communications).   Ironically, Lamb himself has catalogued the extent to which he has gone to in derogation of rights he was obligated legally to protect.  *See* Exhibit H.

## COUNT I: DEFAMATION

50.     Liberty incorporates paragraphs 1 to 49 above as if stated within this section.

51.     After Liberty fired Lamb on October 6, 2021, Lamb engaged in numerous interactions with print and video media purporting to explain the circumstances of his firing.

52.     In point of fact, Lamb was fired because he was insubordinate, failed to obtain requisite expense approvals, and failed to conduct the business affairs of his department to the standards set by Liberty.  As Liberty told *Politico:*

> While we are generally reticent to comment on personnel matters, we would like to make it clear that Lamb's advice on how to publicly respond to the Jane Doe Title IX lawsuit played no role in his termination….His termination was the result of a meeting about a recent review of the area under his management**.**

https://www.politico.com/news/2021/10/25/liberty-university-fired-sexual-assault-517105

53.     Nonetheless, in numerous communications to the media, Lamb falsely stated that he was fired for reasons related to Title IX.  While many reporters heard these statements and reported on them, the following are a few such statements recorded verbatim:

> a.     In an interview with WSET on October 27, 2021, Lamb said, "Here's the thing, even after I was fired, I had a Vice President call me up, 'What's your beef?' And I said, 'Well, that. The Title IX accusations, they have not been

looked into'." *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

b.  On a podcast presented by Julie Roys on October 29, 2021, Roys, in discussing Lamb's October 4, 2021 meeting referenced in his Complaint, asked Lamb, "Did you discuss the Title IX mishandling as well? Tell me about that." In response, Lamb said, "The thing is, I've been discussing that all spring.  Like this 501(c)(3) dance is small potatoes...But the Title IX is where it all gets. . . ." *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.

54.  Taken together, these statements by Lamb present a false factual narrative in which Lamb states to the media that he was fired by Liberty because he spoke up about Title IX allegations.  These false statements will be referred to collectively as the "Defamatory Statements."

55.  Lamb is professionally skilled in media communications, and acutely knowledgeable about the process of placing with media outlets statements designed to create maximum impact and impact with consumers of media in target audience.

56.  As a former news reporter for the *Washington Times* and former Liberty spokesman, Lamb was highly knowledgeable about the types of statements, issues, representations, and attributions that would have maximum impact on hearer in the evangelical, university, Liberty, and journalistic communities.

57.  Lamb himself made and published the Defamatory Statements, which are statements of false facts concerning Liberty and the actions of its acting President, Jerry Prevo. These statements are objectively false and, when relied upon by readers or hearers unacquainted with the truth, exposed acting President Prevo to a diminished reputation for leadership, dedication

to the well-being of Liberty students, commitment to principles of administrative fairness, and devotion to the truth, all of which defame and diminish the reputation of Liberty.

58.     Lamb made the Defamatory Statements knowing they would potentially be distributed throughout Lynchburg, throughout Virginia, throughout America, and throughout the world.

59.     Lamb made and published the Defamatory Statements without any applicable privilege.

60.     Lamb made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

61.     As a direct and proximate result of the Defamatory Statements, Acting President Prevo has suffered damage to his reputation, has suffered damage to his standing for veracity and leadership in the evangelical community, damage to his standing with the student body, alumni network and supports of Liberty, damage to his profession, personal anguish, and has suffered other pecuniary damage.

62.     Lamb's conduct has damaged Liberty in excess of $75,000, an amount it may have to revisit as discovery progresses.

## COUNT II: BREACH OF CONTRACT

63.     Liberty incorporates paragraphs 1 to 62 above as if stated within this section.

64.     As a "condition" of any access to any Board meetings of LU, Lamb was obligated to enter into a "Confidentiality Agreement."  Lamb freely did so on April 20, 2018.  *See* Exhibit B.

65.     The Confidentiality Agreement was a bilateral contract that stated as its consideration Lamb's access to LU Board meetings and access to "proprietary information regarding the Board and the University…."   Collectively, this information was termed "Confidential Information" in the Confidentiality Agreement.

66.     In exchange for access to high level and sensitive information about the Board and the University's duties and actions, Lamb agreed to the following strictures:

    a.    He would not volitionally disclose any Confidential Information without the University Chancellor's prior written permission;

    b.    If compelled in a legal process, he would not disclose Confidential Information until he had first provided the LU General Counsel notice in writing so he or she had the chance to obtain a prophylactic protective order;

    c.    He was obligated to return on his departure all the Confidential Information in his possession and "any other information relating to the Confidential Information prepared by [Lamb]"; and

    d.    As to the Confidential Information and all information Lamb prepared related to it, he had to surrender on departure not just the material but "all copies thereof."

67.     By its express terms, the Confidentiality Agreement survived Lamb's separation from LU, obligating him to "continue to be bound by the obligations of confidentiality in this agreement."

68.     Lamb left Liberty on October 6, 2021.  He violated the Confidentiality Agreement by taking with him Confidential Information, copies of Confidential Information, and information he prepared that related to Confidential Information.

69.     Lamb also breached the Confidentiality Agreement when he disseminated Confidential Information and related content prepared by him to media outlets, activist attorneys, and community members without prior written permission of the University Chancellor or contractual justification.

70.     Lamb's actions have damaged Liberty in an amount to be proven at trial.

71.     Lamb's breach of the Confidentiality Agreement was willful and wanton, vexatious and oppressive, and designed to do intentional harm to Liberty's reputation, operations, and commercial interest.  This situation is the unusual case where contractual breach is sufficiently outrageous as to give rise to punitive damages.

72.     Lamb's conduct has damaged Liberty in excess of $75,000, an amount it may have to revisit as discovery progresses.

## COUNT III: BREACH OF FIDUCIARY DUTY

73.     Liberty incorporates paragraphs 1 to 72 above as if stated within this section.

74.     As Liberty's Senior Vice President of Communications and Public Engagement and, thus, a member of Liberty's Executive Leadership, Lamb had a fiduciary duty to protect confidential Liberty information, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

75.     During his employment with Liberty, Lamb was afforded access to a wide variety of key Liberty documents and information, including, but not limited to: email, letters, correspondence, memoranda, notes, reports, compilations, data, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, instructions, sketches, photographs, diaries, advertising literature, agreements, meeting minutes, other machine producible records including films, video and sound reproductions, printout sheets, electronic records such as text messages, summaries or records of telephone conversations, personal conversations or interviews, and other documents ("Documents and Confidential Information").

76.     The Documents and Confidential Information to which Lamb was afforded access include, without limitation, business plans, personnel, donor, alumni, and student information, financial information strategies, marketing plans, preliminary and draft work, and other proprietary information.

77.     The Documents and Confidential Information also include attorney/client privileged information, attorney work product material, and other forms of sensitive information.

78.     As a Liberty employee, Lamb had a duty to keep confidential and, upon termination of employment, return all Liberty property, including Documents and Confidential Information.

79.     The duty to protect and return all Liberty property was imposed upon Lamb from several sources rooted in employment policies and obligations.

80.     First, as an at-will employee, Lamb was obligated to abide by the document and technology policies contained in the Liberty University Employee Handbook of Policies and Procedures ("Handbook").  For example:

      a.     Section 2.6 of the Handbook provides that "[n]o employee of the University may misuse confidential information or proprietary information or reveal confidential or proprietary information to any outside source."

      b.     Section 2.7 of the Handbook provides that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."   Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

      c.     Section 7.3 of the Handbook (Computer Use) prohibits the creation of home filing systems for the purpose of an employee exerting dominion over Liberty property, such as Documents and Confidential Information.  Section 7.3 also prohibits employees from retaining Liberty property for private use through off-site storage systems, duplicative filing arrangements, servers, or drives.  Section 7.3 provides that "[a]ll information created or contained on the University's computers and network, including electronic mail (E-mail), remains the property of the University."

       d.      Section 7.15 of the Handbook (Return of Property) provides that "On or before the employee's last day of work, the employee is required to return all property."

81.     Second, the technology security policy governing all Liberty-affiliated technology, to which all users must consent as a condition to accessing Liberty-owned technology, ensures that all Documents and Confidential Information remain Liberty's property.

82.     Third, Liberty's general document preservation and retention policy, incorporated by the Handbook, imposed a duty upon all Liberty employees, including Lamb, to preserve and, upon termination of employment, return all Liberty Documents and Confidential Information.

83.     Fourth, Liberty's Bylaws and Articles of Incorporation and the Liberty Way all imposed a duty upon Lamb, as an employee and member of the Liberty community, to abide by all Liberty policies, including document preservation and technology policies.

84.     Fifth, throughout his employment, Lamb was subject to various "Legal Holds" that imposed a duty to preserve all documents related to ongoing litigation impacting Liberty.

85.     Sixth, Lamb has a common law fiduciary duty to protect the secrecy of Liberty's confidential information both during and after his employment, and to refrain from using and disclosing that information except as authorized by Liberty in the scope of his employment.

86.     Thus, Lamb had a duty, drawn from multiple sources, to preserve and, upon termination, return all Liberty property in his possession or control, including Documents and Confidential Information.

87.     Lamb breached his fiduciary duties through the following actions:

       a.      At some point during his employment, Lamb began surreptitiously recording confidential conversations with current and former Liberty executives for his own personal benefit.

   b.   Lamb created or deployed a system through which he automatically forwarded Liberty emails and documents received at his liberty.edu email address to a private, personal account.

   c.   Upon his termination, Lamb failed to return all Liberty property in his possession or control, including Documents and Confidential Information.

   d.   On multiple occasions thus far, Lamb has disclosed Liberty Documents and Confidential Information to third parties for his own personal gain.

88.   The actions of Lamb in breach of his fiduciary duties have caused and will continue to cause Liberty immediate and irreparable harm if Lamb is allowed to wrongfully retain Liberty Documents and Confidential Information and disclose the same to third parties.

89.   The irreparable harm to Liberty consists of potential loss of business, reputation, goodwill and trade secrets, all of which cannot be compensated by money damages.

90.   Lamb's calculated actions in breaching the fiduciary duties he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

91.   Section 7.15 of Liberty's Employee Handbook provides that Liberty may seek "reimbursement of attorney's fees" if Liberty has to pursue unreturned property after an employee's employment relationship ends.

92.   On information and belief, Liberty has been damaged in an amount in excess of $75,000, an amount it may have to revisit as discovery progresses.

## COUNT IV: CONVERSION

93.   Liberty incorporates paragraphs 1 to 92 above as if stated within this section.

94.   The property described above, including Documents and Confidential Information, is the property of Liberty.

95.   Lamb came into control of this property, but he has failed to return the Documents and Confidential Information in full.

96.     Lamb's acts of dominion have deprived Liberty of the possession of this property in derogation of Liberty's rights and privileges.

97.     On information and belief, Liberty has been damaged in an amount in excess of $75,000, a number it may have to revisit as discovery progresses.

## COUNT IV:  DETINUE (in the alternative)

98.     Liberty incorporates paragraphs 1 to 97 above as if stated in this section.

99.     Liberty is the sole lawful owner of the property described above, including Documents and Confidential Information.

100.    For the reasons enumerated above, Liberty has an immediate right to possession of this property, including Documents and Confidential Information, because Lamb's employment with Liberty was terminated on October 6, 2021.

101.    Liberty's Documents and Confidential Information are easily identifiable because they are currently or were at one time located or stored on devices or systems created or provided by Liberty.  Lamb also knows of their identity and location.

102.    Liberty's Documents and Confidential Information are highly valuable to Liberty because they contain confidential and proprietary information related to a variety of deals, strategies, and negotiations impacting Liberty's business.  They are also necessary for Liberty to defend and prosecute various lawsuits, both pending and contemplated.

103.    Liberty has asked for the return of its Documents and Confidential Information, but Lamb has failed to fully return all such property that remains in his possession and/or control.

104.    On information and belief, Liberty has been damaged in an amount in excess of $75,000, a number it may have to revisit as discovery progresses.

## COUNT V:  VIRGINA STATUTORY CONSPIRACY

105.    Liberty incorporates paragraphs 1 to 104 above as if stated within this section.

106.    Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

107.    In a public profession on a podcast that dropped October 29, 2001, Lamb admits that he has reached out to consult with Jack Larkin, a plaintiffs' lawyer suing Liberty in a case known *as Jane Does 1-12 v. Liberty University*. *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b. Specifically, Lamb claimed, "I'm in consultation with Jack Larkin. I'll be giving him things that I know, telling him things that I know."

108.    Larkin is currently engaged in bringing legal claims to injure Liberty in its trade or practice.  In addition to publishing them broadly in the media, on information and belief, Lamb has already shown or given additional privileged LU documents, communications, records, or recordings to Larkin or his associates.  These materials may be the highly-protected and likely privileged or work product property of Liberty University. Larkin could never access such material through the litigation process absent rising above the high bar of "substantial need."  To the extent they are attorney client privileged materials, they would never be available through litigation discovery.

109.    On information and belief, Lamb and Larkin and/or members of his firm acted intentionally, purposefully, and without lawful justification to injure Liberty, and thus with legal malice.

110.     Lamb had a fiduciary duty to refrain from actions that were false, damaging, and disruptive to the interests and well-being of Liberty, and Lamb committed conversion and detinue, tortious conduct in derogation of the rights of Liberty as to its documents, materials, things and information.

111.     The actions of Lamb in leading this anti-Liberty conspiracy with Larkin and the Larkin firm have injured Liberty in irreparable ways in litigation defense and in the control and maintenance of its confidential, privileged and/or work product information.

112.     By operation of Va. Code 18.2 §500(A), the damages of Liberty as a result of Lamb's tortious conduct in rogue document handling are to be trebled by the Court following trial. That code section also provides for Liberty to recover reasonable attorneys' fees incurred. *See* Va. Code 18.2 §500 (A) and (B).

113.     Lamb's calculated actions were willful, wanton, vexatious and oppressive in disregard of the rights of Liberty, thus exposing him to punitive damages.

114.     Liberty seeks $1 million in compensatory damages for statutory conspiracy damages, trebled to $3 million as provided by statute. Liberty further seeks punitive damages in the amount awarded by the jury and entered by the Court. Liberty additionally seeks pre-judgment and post-judgment interest, and its reasonable attorneys' fees.

## COUNT VI: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1831, *et seq.*

115.     Liberty incorporates paragraphs 1 to 114 above as if stated within this section.

116.     Lamb accessed, copied, and has wrongfully retained Liberty Documents and Confidential Information.

117.     Since his termination, Lamb has already unlawfully disclosed Liberty Documents and Confidential Information to third parties on at least two occasions.

118.    Certain of Liberty's Documents and Confidential Information qualify as "trade secrets" under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq*., because they have independent economic value, are not publicly known, and are subject to reasonable efforts to maintain secrecy.

119.    Liberty's trade secrets are not generally known or available to the public, and are not readily ascertainable by other means.

120.    Lamb acquired knowledge of Liberty's trade secrets in his capacity as Liberty's Senior Vice President of Communications and Public Engagement, and he thus owed and continues to owe Liberty a duty to maintain the secrecy of such documents and information.

121.    Lamb accessed, copied, disclosed, and wrongfully retained Liberty's trade secrets in violation of his legal obligations to Liberty.

122.    Liberty has demanded that Lamb return all Liberty documents and information (including trade secrets) and cease and desist from utilizing the same for his own benefit and/or the benefit of any third party.

123.    Without any appropriate basis, Lamb has not returned and refuses to fully return Liberty's trade secrets.

124.    As a direct and proximate result of Lamb's actions, Liberty has sustained substantial damages in an amount that will be established at trial of this matter.

125.    Lamb's actions in converting and misappropriating Liberty's trade secrets for his own gain were willful, wanton, and malicious, and were taken with reckless disregard for Liberty's rights.

126.    Lamb's actions have also caused and will continue to cause Liberty irreparable harm if not preliminarily and permanently enjoined.

127.    The irreparable harm to Liberty consists of potential loss of business, reputation, goodwill and trade secrets, all of which cannot be compensated by money damages.

128.    Liberty has no adequate remedy at law because Lamb's actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

## COUNT VII: VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT

129.    Liberty incorporates paragraphs 1 to 128 above as if stated in this section.

130.    Lamb's actions described above violate both § 18.2-152.3 and 18.2-152.4 of the Virginia Computer Crimes Act.

131.    Without authorization, Lamb used Liberty computers to convert for himself Liberty's sensitive, confidential, and proprietary information in violation of his legal obligations to Liberty.

132.    On information and belief, without authorization, Lamb used Liberty computers to create a system through which he automatically forwarded Liberty emails and documents received at his liberty.edu email address to a private, personal account.

133.    As a result of Lamb's actions, Liberty has been and continues to be significantly damaged and has suffered and continues to suffer severe and irreparable harm.

## REQUEST FOR INJUNCTIVE RELIEF

134.    Liberty incorporates paragraphs 1 to 133 above as if stated in this section.

135.    Unless Lamb is enjoined from further disclosing any Liberty Documents or Confidential Information to third parties, Liberty will be irreparably harmed in the marketplace by having its confidential information improperly, unlawfully and competitively used against it.

136.    Lamb will not suffer any harm if he is ordered to return to Liberty property over which he has no claim of ownership.

137.     Liberty is likely to prevail on the merits because all Liberty Documents and Confidential Information are undisputedly the sole property of Liberty, and Lamb has wrongfully retained such property.

138.     Liberty has no adequate remedy at law for Lamb's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by Lamb's misconduct.

139.     Liberty has a clear legal right to the requested relief, and the balance of equities weighs heavily in Liberty's favor.

140.     The public interest favors entry of an injunction to protect the legitimate business interests of parties from disgruntled, self-interested former employees.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Liberty requests that the Court:

a.   Order Lamb to deliver to Liberty all documents or other information, including all privileged, confidential, and/or trade secret information, in Lamb's possession, custody, or control to the undersigned counsel within 24 hours, together with a signed representation that Lamb has returned all such documents and other information and no longer has any such documents other information in his possession, custody, or control;

b.   Order Lamb to preserve all information currently stored on his computers and other electronic storage devices, including any information stored on backup media or on iCloud, Google Drive, or similar electronic storage methods that may relate in any way to the issues raised in Liberty's Counterclaim;

c.   Require Lamb to identify all electronic devices and accounts in his possession, custody, or control that currently contain, previously contained, or from which Lamb has accessed confidential, proprietary, privileged and/or trade secret information belonging to Liberty;

34

d.  Require Lamb to identify all persons to whom he has disclosed any confidential, proprietary, privileged and/or trade secret information belonging to Liberty;

e.  Require Lamb to comply with his fiduciary obligations to Liberty and his contractual obligations under the Confidentiality Agreement described in and attached to Liberty's Counterclaim, including, without limitation, by requiring Lamb to refrain from using or disclosing any confidential, proprietary, privileged and/or trade secret information belonging to Liberty without Liberty's prior express consent;

f.  Require Lamb to make available for third-party forensic review all electronic devices and accounts in his possession, custody, or control that contain or previously contained Liberty confidential information;

g.  Order disgorgement of all amounts wrongfully attained by Lamb as a result of his misconduct;

h.  Award Liberty the damages identified above;

i.  Award Liberty its attorneys' fees;

j.  Award Liberty punitive damages;

k.  Award Liberty pre- and post-judgment interest; and

l.  Provide any other relief this Court deems just and appropriate.

Liberty demands trial by jury on all issues so triable.

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

 /s/ Scott C. Oostdyk
Scott C. Oostdyk (VSB # 28512)
Heidi Siegmund (VSB# 89569)
MCGUIREWOODS LLP
800 East Canal Street

Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
hsiegmund@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which shall send a true and correct copy to all

counsel of record.


_____/s/_____
Heidi E. Siegmund (VSB No. 89569)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
hsiegmund@mcguirewoods.com

*Counsel for Defendant*