**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| WALTER SCOTT LAMB, | ) |
| | ) |
| | ) |
| Plaintiff/Counterclaim | ) |
| Defendant, | ) |
| | ) |
| v. | )   Case No. 6:21CV00055 |
| | ) |
| LIBERTY UNIVERSITY, INC., | ) |
| | ) |
| | ) |
| Defendant/Counterclaim | ) |
| Plaintiff. | ) |

**DEFENDANT LIBERTY UNIVERSITY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

Defendant and Counterclaim Plaintiff Liberty University, Inc. ("Liberty"), by counsel, and pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 7, submits the following as its Memorandum of Law in Support of Its Motion for Temporary Restraining Order against Walter Scott Lamb ("Lamb") or, in the alternative, Preliminary Injunction.

## I.   INTRODUCTION

On April 20, 2018 Lamb signed a Confidentiality Agreement gaining access to Liberty board and University confidences in exchange for strict confidentiality. Lamb promised not to disclose any confidential information without Liberty approval and to return all confidential Liberty information upon his departure. These voluntary constraints applied equally to Confidential Information that Liberty maintained and to "information regarding the Board and University" that Lamb prepared.

In the course of handling some of the most sensitive information controlled by the Board and University, Lamb was fired for insubordination, expense mismanagement, and overall poor

performance.   Although many of these materials were likely protected trade secrets, privileged communications or attorney work product protected information, Lamb has admitted that he disclosed them to the media, general public and commercial enemies of Liberty without privilege or prior permission as contractually required.  Perhaps most shockingly, Lamb has demonstrated no regard for the attorney-client privilege, freely discussing privileged advice regarding litigation strategy and other matters on national media.  Liberty must protect itself against Lamb's misconduct with court action or, in the case of attorney client protected communications, risk waiver or loss of the privilege.

Liberty therefore seeks immediate injunctive relief to prevent further irreparable harm and to hold Lamb to his promises.   Specifically, Liberty asks the Court to prohibit Lamb from using or disclosing any Liberty confidential documents or information to any third party.   Liberty wants to enforce the Confidentiality Agreement Lamb willingly signed in order to stop the nefarious use by Lamb of property he agreed he did not own and promised to return.   Moreover, Liberty seeks an order compelling Lamb to identify any electronic devices that may contain any of Liberty's confidential information, and to identify all third parties with whom Lamb has unlawfully shared that information. Finally, Liberty asks this Court to enjoin Lamb from retaining possession of property belonging to Liberty and require Lamb to immediately return to Liberty all Liberty property in his possession, custody, or control, keeping no copies with which Lamb could perpetuate his vengeful plan to destroy Liberty's reputation after Liberty fired Lamb for cause.

## II.   FACTUAL BACKGROUND

### A.   Liberty's Privileged and Confidential Information

Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 7,000-acre campus located at 1971 University Boulevard, Lynchburg, VA.  (Declaration of Robert Ritz ("Ritz Decl.,"

**Exhibit A**) ¶ 2.)    As part of its business, Liberty maintains a variety of valuable privileged and confidential documents and information, and trade secrets, including: student and donor lists; financial information; cost information; publicity strategies; marketing objectives, plans, and timelines; information regarding potential business transactions; and other strategic information. (Ritz Decl. ¶ 7.) This information derives independent, actual, or potential commercial value from not being generally known or readily ascertainable to persons outside Liberty.  (Ritz Decl. ¶¶ 7-8.)  Moreover, Liberty takes reasonable steps to keep this information secret, such as limiting dissemination of such information to individuals on a "need to know" basis, maintaining password protections and encryption on electronic devices that may access privileged, confidential, and trade secret information, and maintaining robust policies and practices concerning the protection of such information. (Ritz Decl. ¶ 8.)

### B.    Lamb's Employment with and Obligations to Liberty

From early 2018 until his employment was terminated on October 6, 2021, Lamb served in communications at Liberty, holding the title of Liberty's Senior Vice President of Communications and Public Engagement at the time of his termination.  (Ritz Decl. ¶ 3.)  As he worked in communications, Lamb had access to privileged and confidential Liberty documents and information.  (Ritz Decl. ¶ 7.)  Lamb agreed to abide by and protect the privileged and confidential nature of Liberty's documents and information in several ways.  (Ritz Decl. ¶¶ 4-9.)

First, as a condition of employment, Lamb agreed to and executed a Confidentiality Agreement (the "Confidentiality Agreement") on April 20, 2018.  A copy of the Agreement is attached as **Exhibit B**.  In the Confidentiality Agreement, Lamb acknowledged that he would "receive" and be "exposed to certain confidential, business, financial, and/or proprietary

information regarding the Board and the University." (Confidentiality Agreement ¶ 1.) Crucially,

Lamb agreed that if his employment was terminated:

> "I shall continue to be bound by the obligations of confidentiality in this agreement and shall promptly return to the University any Confidential Information (and all copies thereof) furnished to me by or on behalf of the University, along with any other information relating to the Confidential Information prepared by me."

> (Confidentiality Agreement ¶ 2.)

Second, like all Liberty employees, Lamb was subject to the Liberty University Employee

Handbook of Policies and Procedures ("Handbook"), which provides the following principles:

- o Section 2.6 of the Handbook provides that "[n]o employee of the University may misuse confidential information or proprietary information or reveal confidential or proprietary information to any outside source."

- o Section 2.7 of the Handbook establishes that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."

- o Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

- o Section 7.3 of the Handbook clearly provides that "[a]ll information created or contained on the University's computers and network, including electronic mail (E-mail), remains the property of the University."

- o Section 7.3 of the Handbook (Computer Use) overtly prohibits the creation of home filing systems for the purpose of an employee exerting dominion over Liberty property, such as Documents and Confidential Information.

- o Section 7.3 of the Handbook also plainly prohibits employees from retaining Liberty property for private use through off-site storage systems, duplicative filing arrangements, servers, or drives.

- o Section 7.15 (Return of Property) dictates that "[o]n or before the employee's last day of work, the employee is required to return all property."

- o By virtue of Section 7.15, Lamb understood that if LU had to repossess its materials by resort to litigation, Lamb would have to pay LU attorney fees.

4

(Ritz Decl. ¶ 6 & Counterclaim Exhibit A.)

Third, Lamb also committed to abide by various "Legal Holds" to which he was subject that were issued during his employment.  Fourth, Lamb committed to abide by Liberty's document retention system and technology security policies.  (Ritz Decl. ¶ 9.)  Fifth, Liberty's Bylaws and Articles of Incorporation, and the Liberty Way, all imposed a duty upon Lamb, as an employee and member of the Liberty community, to abide by all Liberty policies, including document preservation and technology policies.  Sixth, Lamb has a common law fiduciary duty to protect the secrecy of Liberty's privileged and confidential information both during and after his employment, and to refrain from using and disclosing that information except as authorized by Liberty in the scope of his employment.

## C.  Lamb Breaches His Obligations to Protect Liberty's Privileged and Confidential Documents and Information

On October 6, 2021, Liberty fired Lamb for cause.  (Ritz Decl. ¶ 12.)  Now, motivated by revenge and retaliation after a merit-based termination, and bolstered with the skills of public communication, Lamb has already displayed a willingness to flout Liberty's protections and unlawfully disclose privileged and confidential Liberty documents and information.  Although Lamb has disclosed much information to the media and parties hostile to Liberty on multiple occasions, below are three focal instances of misconduct by Lamb that are particularly egregious.

First, in a sit-down interview Lamb arranged with reporter Cynthia Beasley of WSET ABC 13 in Lynchburg on October 27, 2021,[1] Lamb admitted that he has already disclosed likely privileged and confidential Liberty documents and information, and, alarmingly, did so after receiving advice

---

[1] *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

from his own counsel.  Lamb warmed up Ms. Beasley by advising he was giving her an "exclusive" by telling her the advice of counsel he received from outside and in-house counsel with respect to how Liberty's Title IX claims were managed.  When pressed by Ms. Beasely for back-up documents to support his claims, Lamb bragged that he had "already spoken with other media outlets…and some of those things have been put into their hands."  Although denying Ms. Beasley Liberty's documents that day, he confessed proudly to having disseminated them to other competing media outlets. This brazen conduct by Lamb foreshadows the likelihood of future and irreparable disclosure of privileged and confidential documents by Lamb that is to come – whether to WSET or to any of the other media outlets from whom Lamb sought attention.

Second, on October 27, 2021, in the same WSET interview noted above[2] and then to the publication *Salon* on or about November 3, 2021,[3] Lamb revealed the privileged advice given to Liberty by outside counsel that was noted above.  The issue was a benign one – what acting President Jerry Prevo should say at a student convocation about campus assaults and harassment incidents.  President Prevo sought legal input into his remarks, and Lamb was there because it involved public communications.  But, again, this disclosure by Lamb of privileged advice from counsel foreshadows Lamb's continued willingness to weaponize conversations that would be inadmissible in his court case – because Liberty conducted them with attorney client privilege protection – and Lamb flouted Liberty's privilege in direct violation of Confidentiality Agreement and other contractual and common law obligations.

[2] *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.
[3] *Scandal at Liberty University: How a Christian college dismisses students' reports of sexual assault*, SALON (Nov. 3, 2021), https://www.salon.com/2021/11/03/scandal-at-liberty-university-how-a-christian-college-dismisses-students-reports-of_partner/.

Third, in a podcast with *The Roy Report* on October 29, 2021,[4] Lamb admitted that he has reached out to consult with Jack Larkin, the Pennsylvania plaintiffs' lawyer who is suing Liberty in a case known as *Jane Does 1-12 v. Liberty University*. Specifically, Lamb claimed, "I'm in direct consultation with Jack Larkin for the purpose of their future affiliation around the information Lamb knows on account of his Board and University interactions, and Lamb's related consolidation of documents and materials that belong to Liberty. Promised Lamb on the Roy podcast, "I'll be giving [attorney Larkin] things that I know, telling him things that I know."

This is an outrageous breach of Liberty's rights by Lamb. Larkin is engaged at this very moment in bringing legal claims against Liberty. On information and belief, as an inference from Lamb's own communicated statements, Lamb has already shown to Larkin's team or given to Larkin and his associates privileged Liberty documents, communications, records, or recording. Although Liberty has nothing to fear from the content of these materials, they are not Lamb's to purvey for personal or financial advantage and they do not contain Lamb's privileges to potentially waive. These materials Lamb may have slipped to Larkin are likely highly-protected and likely privileged or work product property of Liberty. In the case of work product, Mr. Larkin could never access such material from Liberty through the litigation process, absent proving "substantial need" – an extremely high bar. To the extent they are attorney client privileged materials, they would never be available through litigation discovery at all.

The best indication of the trajectory of noisy document-dissemination that Lamb plans is the letter Lamb just spread around various key members of the Liberty Board on November 1, 2021. Lamb e-mailed numerous Liberty Board members that day a summary of the numerous media reports

---

[4] *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.

about his grievances with Liberty that he had either conducted personally or caused to be effected as he tried his new case in the press. Lamb proudly catalogued dozens of media stories initiated by his effort to intimate Liberty by how much media interest he could sustain – as he did with Ms. Beasley at WSET ABC 13 – by offering drips of Liberty documents Lamb unlawfully possesses. *See* **Exhibit C**.

Many of the media stories referenced by Lamb in his road-show email are ones in which he has concededly disclosed privileged or confidential Liberty documents or information. Liberty has the right—and the duty—to protect against such abuses of its privileged and confidential material by Lamb. Lamb should not be allowed to entice the media into being his bulletin board, and use this form of pressure against Liberty, when Lamb has no right to possess Liberty's privileged information, much less use or obtain it in litigation.

Lamb has also committed other unlawful disclosures and uses of privileged and confidential Liberty documents and information, including the following:

- On October 16, 2021, Lamb posted to his Twitter account an October 4, 2021 redacted screen shot of work communication from his Liberty email account regarding publication of an article. *See* **Exhibit D**.

- On October 22, 2021, Lamb posted to his Twitter account the concededly "confidential" communication he received from Acting President Prevo that provided him with information about Liberty's internal investigation into Jerry Falwell Jr.'s financial stewardship of Liberty and requested his full cooperation. *See* **Exhibit E**.

- To the publication *ProPublica* on or before October 24, 2021, Lamb referred to a May 7, 2021 e-mail he generated for management, that was the property of Liberty; *"The Liberty Way": How Liberty University Discourages and Dismisses Students' Reports of Sexual Assaults*, PROPUBLICA (Oct. 24, 2021), https://www.propublica.org/article/the-liberty-way-how-liberty-university-discourages-and-dismisses-students-reports-of-sexual-assaults.

- To the publication *Politico* on or about October 27, 2021, Lamb supplied unauthorized recordings that he secretly made of his Liberty management meetings with acting President Prevo. *Liberty U president says on tape that*

*'getting people elected' is his goal*, Politico (Oct. 27, 2021),
https://www.politico.com/news/2021/10/27/liberty-university-jerry-prevo-
influence-517303.

## III.   ARGUMENT

Lamb's egregious misconduct violates both his contractual and common law obligations
to Liberty.  Moreover, his unauthorized retention and disclosure of Liberty documents, confidential
information, and trade secrets has already harmed—and is continuing to harm—Liberty.  If Lamb
is not promptly enjoined from his misconduct, Liberty will suffer further irreparable harm.

### A.  Standard for Injunctive Relief

"The standard for granting either a TRO or a preliminary injunction is the same."  *Moore
v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) (internal quotations and citation
omitted).  To obtain a TRO or preliminary injunction, a plaintiff must "establish that (1) they are
likely to succeed on the merits of their case; (2) they are likely to suffer irreparable harm in the
absence of injunctive relief; (3) the balance of the equities tips in their favor; and (4) an injunction
would be in the public interest."  *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).
Liberty easily satisfies each of the four elements necessary to justify the relief it seeks.

### B.  Liberty Is Likely to Succeed on the Merits of Its Claims against Lamb

Although Liberty needs only show a likelihood of success on *one* of its claims against
Lamb, *Nabisco Brands, Inc., v. Conusa Corp.*, 722 F. Supp. 1287, 1292 n.4 (M.D.N.C. 1989),
Liberty can readily clear that bar on its entire Counterclaim.  For brevity, this Motion focuses on
Liberty's breach of fiduciary duty, breach of contract, and trade secrets claims.  As detailed below,
the overwhelming evidence of Lamb's misconduct ensures that Liberty is likely to succeed on the
merits of its various claims.

## 1.   <u>Liberty is likely to prevail on its breach of fiduciary duty claim</u>

Lamb breached his fiduciary duty to Liberty by misappropriating and disclosing Liberty's privileged and confidential information and its trade secrets. In Virginia, an employer has the right to expect loyalty from its employees. *Nat'l Legal Research Grp. v. Lathan*, No. 92-0031-C, 1993 WL 169789, at \*5 (W.D. Va. May 17, 1993). Accordingly, employees are fiduciaries "with respect to the information which comes to [them] in the course of [their] employment." *Id.* An employee's duty not to disclose or use the confidential information he obtained from his employer does not end at termination. Rather, a former employee has a continuing duty not to reveal his former employer's confidential information, even in the absence of an agreement providing for the same. *See Bull v. LogEtronics*, Inc., 323 F. Supp. 115, 133 (E.D. Va. 1971).

Lamb owed and still owes Liberty a fiduciary duty not to reveal the privileged and confidential information to which he was privy while a Liberty employee. Lamb breached this duty because he: (1) surreptitiously recorded confidential conversations with current and former Liberty executives, and then shared such recordings with the media (Ritz Decl. ¶ 16); (2) created or used a system through which he automatically, and without authorization, forwarded Liberty emails and documents received at his liberty.edu email address to a private, personal email account (Ritz Decl. ¶ 10); (3) refused to return Liberty documents and confidential information upon his termination (Ritz Decl. ¶ 12); and (4) has disclosed, on multiple occasions, privileged and confidential Liberty documents and information to third parties for his own personal gain. (Ritz Decl. ¶¶ 13-17); *see also Audio-Video Grp., LLC v. Green*, No. 1:14cv169, 2014 WL 793535, at \*3 (E.D. Va. Feb. 26, 2014) (holding employer was likely to succeed on the merits of its fiduciary duty claim where it introduced evidence that former employee had acted disloyally).

Accordingly, Liberty is likely to succeed on the merits of its breach of fiduciary duty claim.

10

## 2.    Liberty is likely to prevail on its breach of contract claim

To prevail on its breach of contract claim, Liberty must show: (1) the existence of a valid contract; (2) Liberty's breach of that contract; and (3) injury or damage caused by Liberty's breach. *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).  Liberty can show all three elements.

First, the April 20, 2018 Confidentiality Agreement between Lamb and Liberty is a valid and enforceable contract.  It is supported by adequate consideration in the form of continued employment and Lamb's access to sensitive Board and University proceedings (*Phoenix Renovation Corp. v. Rodriguez*, 461 F. Supp. 2d 411, 425 (E.D. Va. 2006)), and the confidentiality obligations that it imposes are reasonable.  *Brainware, Inc. v. Mahan¸* 808 F. Supp. 2d 820, 825–26, 828–29 (E.D. Va. 2011).

Operating in a highly competitive marketplace, Liberty has a legitimate business interest in safeguarding its confidential business information.  The Confidentiality Agreement, which protects from disclosure only confidential information, asks Lamb to do several easy things: refrain from publishing Liberty's secrets outside the Board-level community, refrain from using them for any reason without prior Liberty clearance, and return originals, copies, and all related communications and materials upon departure.  (**Exhibit B**.)  This is an enforceable means for Liberty to protect its legitimate business interests.  *Mahan¸* 808 F. Supp. 2d at 825–26, 828–29 (finding enforceable a confidentiality agreement "narrowly limited to actual confidential information" and which "would [not] prohibit defendant from telling a neighbor for the rest of his life anything about plaintiff corporation, including information that is not proprietary in nature") (internal quotation marks omitted).  District courts readily enforce such agreements in TRO proceedings because these type of contracts have been determined to be in the public interest.  *E.g.,*

*Audio-Visual Group, LLC v. Green*, Case No. 11:14-cv-169, 2014 WL 793535 (E.D. Va. Feb. 26, 2014); *see also XPO Logistics, Inc. v. Northrop*, 2019 WL 3543877, at *8 (W.D.N.C. Aug. 2, 2019) (granting preliminary injunction to prevent breaches of an employee's confidentiality agreement).

Second, Lamb has brazenly breached the Confidentiality Agreement. He surreptitiously recorded confidential conversations with current and former Liberty executives, and has since disclosed at least one such conversation to the media. (Ritz Decl. ¶¶ 13-17.) He created or used a system through which he automatically forwarded confidential Liberty emails and documents received at his liberty.edu email address to a private, personal email account without authorization. (Ritz Decl. ¶ 10.) He failed to return the documents and confidential information that he had surreptitiously taken after Liberty fired him. (Ritz Decl. ¶¶ 10-17.) And, he has disclosed, on multiple occasions, privileged and confidential Liberty documents and information to third parties such as media outlets and plaintiffs' lawyers – all for his own personal gain. As such, there can be no doubt that Lamb has breached the Confidentiality Agreement. *See, e.g.*, *Capital One Fin. Corp. v. Sykes*, No. 3:20cv763, 2021 WL 2903241, at *12 (E.D. Va. July 9, 2021) (holding plaintiff was likely to succeed on the merits of its breach of contract claim where it alleged that defendants breached provisions of their contracts through "the disclosure of confidential information"); *PC Connection, Inc. v. Mereos*, 2017 WL 1078121, at *4 (D. Md. Mar. 22, 2017) (granting *ex parte* temporary restraining order where employee had breached his confidentiality obligations by forwarding confidential documents to a personal e-mail address).

Finally, Lamb cannot legitimately dispute that his actions have damaged Liberty. He has deprived Liberty of the documents and information he has wrongfully retained after his termination. His actions have also required Liberty to expend significant resources to uncover and

attempt to rectify his violations.  Last, and perhaps most importantly, his already-documented disclosure of privileged and confidential Liberty documents and information is a bell that cannot be un-rung.  Accordingly, Liberty is likely to succeed on the merits of its breach of contract claim.

### 3.        Liberty is likely to prevail on its trade secret misappropriation claims

Liberty similarly is likely to succeed on the merits of its claims that Lamb misappropriated Liberty's trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA") and the Defend Trade Secrets Act ("DTSA").[5]  To establish trade secret misappropriation under either statute, Liberty must show: "(1) the existence of a 'trade secret'; and (2) the 'misappropriation' of that trade secret by [Lamb]."  *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012) (citing *MicroStrategy Inc. v. Li*, 601 S.E.2d 580, 588 (2004)).  Liberty satisfies both elements.

The DTSA and VUTSA define a "trade secret" as information, including but not limited to a formula, pattern, compilation, program, device, method, technique or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Va. Code Ann. § 59.1-336; 18 U.S.C. § 1839(3).  This is a broad definition— in fact, one court in the Eastern District of Virginia has concluded that "just about anything can constitute a trade secret under the right set of facts."  *Audio-Visual Grp.*, 2014 WL 793535, at *4 (internal citation and quotation marks omitted).

During his employment with Liberty, Lamb was afforded access to a wide variety of privileged, confidential, and proprietary documents and information.  (Ritz Decl. ¶ 7.)  These

---

[5] The elements necessary to prove a DTSA claim and a VUTSA claim are the same. *E.g.*, *Bonumose Biochem, LLC v. Yi-Heng Zhang*, 2018 WL 10069553, at *12 (W.D. Va. May 21, 2018).

documents and information included, among other things: student and donor lists; financial information; cost information; publicity strategies; marketing objectives, plans, and timelines; information regarding potential business transactions; and other strategic information. (Ritz Decl. ¶ 7.); *see also Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) (ruling that a customer list, "old and new product prices," and other information related to product requests were trade secrets); *Telogis, Inc. v. InSight Mobile Data, Inc.*, 2014 WL 7336678, at *3 (D. Md. Dec. 19, 2014) (finding that "customer lists, client contact information, contract terms, and pricing information" qualify as trade secrets).   In essence, the documents and confidential information contain Liberty's "keys to the shop."  *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (noting that customer lists, pricing information, information about products and similar information can qualify as "trade secrets").

In addition, Liberty took reasonable steps to protect the secrecy and value of this information, such as limiting dissemination of such information to individuals on a "need to know" basis, requiring key employees to sign confidentiality agreements, using password and encryption systems on electronic devices, and maintaining robust policies and practices concerning the protection of confidential information. (Ritz Decl. ¶ 8.)  These steps are reasonable as a matter of law.  *E.g.*, *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 843 (C.D. Ill. 2014) (granting summary judgment to a plaintiff-employer who protected its trade secrets by "limiting [network] access to those with company-provided access codes," "employing confidentiality agreements," and making sure employees understood their confidentiality obligations); *APC Filtration, Inc. v. Becker*, 2008 WL 3008032, at *10 (N.D. Ill. Aug. 4, 2008), *reconsidered in part on other grounds*, 646 F Supp. 2d 1000 (N.D. Ill. 2009) (finding trade secret protection reasonable as a matter of law where the plaintiff required employees to sign non-disclosure agreements, enacted a

confidentiality policy, restricted network access, and used password protection for electronic information). As such, Liberty can establish the existence of trade secrets.

Liberty also can establish Lamb's unlawful misappropriation of those trade secrets. Misappropriation includes both (1) improper acquisition of a trade secret, and (2) disclosure or use of a trade secret. *See* 18 U.S.C. § 1839; Va. Code Ann. § 59.1-336. Misappropriation through acquisition occurs when a trade secret is acquired through improper means, including use of a computer or computer network without authority or breach of a duty to maintain secrecy. *Id.* Misappropriation through disclosure or use occurs when a trade secret is "disclosed or used without consent by a person who, 'at the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was' derived via improper means, in violation of a duty of confidentiality or acquired by accident or mistake." *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, No. 1:10cv651 (JCC), 2010 WL 4645791, at *5 (E.D. Va. Nov. 8, 2010) (quoting Va. Code § 59.1-336). The VUTSA and DTSA prohibit both actual and threatened misappropriation.

As described above, without authorization and in violation of his contractual and other legal obligations to Liberty, Lamb accessed, copied, and wrongfully retained Liberty's trade secrets after his employment was terminated. Lamb's misappropriation included forwarding numerous confidential Liberty documents and communications to his personal e-mail account. (Ritz Decl. ¶ 10.) These actions alone constitute unlawful misappropriation. Lamb, however, also disclosed and threatens to continue to expose Liberty's trade secrets to third parties. These actions are the essence of unlawful misappropriation. *E.g.*, *MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509, 528-30 (Chesterfield Cnty. 2013). As such, Liberty is likely to succeed on its federal and state trade secret misappropriation claims. *See API Tech. Servs., LLC v. Francis*, No. 4:13cv142,

15

2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (holding employer was likely to succeed on the merits of its VUTSA claim where it alleged that its former employees improperly "disclosed [trade] secrets" even though "they were under a duty to maintain their secrecy").

### C. Without Injunctive Relief, Liberty Will Suffer Irreparable Harm

#### 1. Injunctive relief is necessary to protect Liberty from further disclosure of privileged and confidential documents and information

Liberty will suffer irreparable harm from Lamb's egregious misconduct unless this Court issues injunctive relief.  The loss of a company's confidential, proprietary and trade secret information constitutes the requisite irreparable harm to support an injunction. *Home Funding Grp., LLC v. Myers*, No. 1:06cv1400 (JCC)*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) ("... this factor weighs heavily in Plaintiff's favor. Without injunctive relief, Defendants will continue to engage in behavior in violation of the non-competition clause, divulging trade secrets and confidential information. The disclosure of trade secrets establishes an immediate irreparable harm because a trade secret, once lost is, of course, lost forever. The same conclusion logically applies to the disclosure of confidential information as well") (internal quotation marks and citation omitted).

Here, Lamb has already disclosed Liberty documents and confidential information to unauthorized third parties on multiple occasions since his termination on October 6, 2021.  For example, to WSET on October 27, 2021,[6] Lamb admitted that he has already disclosed likely privileged and confidential Liberty documents and information after receiving advice from his own counsel.  Specifically, when asked whether he could provide WSET with any emails or recordings to corroborate his story, Lamb admitted: "I've already spoken with other media

---

[6] *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

outlets…and some of those things have been put into their hands." This foreshadows continued irreparable disclosure of privileged and confidential documents in the future.

Also to WSET on October 27, 2021,[7] and to the publication *Salon* on or about November 3, 2021,[8] Lamb revealed privileged advice given to Liberty by outside counsel about what acting President Jerry Prevo should say at a student convocation that led Prevo to alter his remarks. This disclosure of privileged advice by counsel foreshadows Lamb's continued willingness to weaponize inadmissible conversations and information in direct violation of his contractual and legal obligations.

Additionally, in a podcast with *The Roy Report* on October 29, 2021,[9] Lamb admitted that he has reached out to consult with Jack Larkin, a plaintiffs' lawyer suing Liberty in a case known as *Jane Does 1-12 v. Liberty University*. Specifically, Lamb claimed, "I'm in consultation with Jack Larkin. I'll be giving him things that I know, telling him things that I know." Lamb also reiterated on this podcast advice he had received from both in-house and outside counsel about Liberty's strategy for pending litigation. On information and belief, Lamb has already shown or given privileged LU documents, communications, records, or recordings to Larkin or his associates. These materials are likely privileged or work product property of Liberty. Larkin could never access such material through the litigation process absent rising above the high bar of "substantial need." Attorney-client privileged materials would never be available through

---

[7] *Former Liberty University VP: Investigative firm did not interview sexual assault accusers*, WSET (Oct. 27, 2021), https://wset.com/news/abc13-investigates/former-liberty-university-vp-investigative-firm-did-not-interview-sexual-assault-accusers-jane-doe-scott-lamb-title-ix-lawsuit.

[8] *Scandal at Liberty University: How a Christian college dismisses students' reports of sexual assault*, SALON (Nov. 3, 2021), https://www.salon.com/2021/11/03/scandal-at-liberty-university-how-a-christian-college-dismisses-students-reports-of_partner/.

[9] *Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.

litigation discovery.  This egregious breach of Lamb's obligations to Liberty foreshadows continued future attempts by Lamb to caucus with the plaintiff's bar on Title IX matters.

Additionally, Lamb also made other unlawful disclosures and uses of privileged and confidential Liberty documents and information:

- On October 16, 2021, Lamb posted to his Twitter account an October 4, 2021 redacted screen shot of work communication from his Liberty email account regarding publication of an article.  *See* **Exhibit D**, attached hereto.

- On October 22, 2021, Lamb posted to his Twitter account the concededly "confidential" communication he received from Acting President Prevo that provided him with information about Liberty's internal investigation into Jerry Falwell Jr.'s financial stewardship of Liberty and requested his full cooperation. *See* **Exhibit E**, attached hereto.

- To the publication *ProPublica* on or before October 24, 2021, Lamb referred to a May 7, 2021 e-mail he generated for management, that was the property of Liberty; *"The Liberty Way": How Liberty University Discourages and Dismisses Students' Reports of Sexual Assaults*, PROPUBLICA (Oct. 24, 2021), https://www.propublica.org/article/the-liberty-way-how-liberty-university-discourages-and-dismisses-students-reports-of-sexual-assaults.

- To the publication *Politico* on or about October 27, 2021, Lamb supplied unauthorized recordings that he secretly made of his Liberty management meetings with Acting President Prevo. *Liberty U president says on tape that 'getting people elected' is his goal*, POLITICO (Oct. 27, 2021), https://www.politico.com/news/2021/10/27/liberty-university-jerry-prevo-influence-517303.

Particularly troubling and harmful is Lamb's complete disregard for attorney-client privilege, which he has no right to waive.  The "attorney-client privilege is one of the oldest recognized privileges for confidential communications.  The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and the administration of justice.'"  *Swidler & Berlin v. U.S.*, 524 U.S. 399, 403 (1998) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  Similarly, the principle of confidentiality is essential to the operations of a corporation.  *See Home Funding Grp.*, 2006 WL 6847953, at *2.  The

privilege is fragile, so parties must act affirmatively to protect it when they perceive waiver. And, loss of privilege—like that Lamb seeks to inflict on nearly a daily basis—is classic irreparable harm. *E.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 175 (4th Cir. 2019) ("Crucially, the court failed to recognize that an adverse party's review of privileged materials seriously injures the privilege holder"); *United States v. Philip Morris Inc.*, 314 F.3d 612, 622 (D.C. Cir. 2003) (concluding that a party had demonstrated the likelihood of irreparable harm predicated on "the general injury caused by the breach of the attorney-client privilege and the harm resulting from the disclosure of privileged documents to an adverse party"), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 103 (2009).

As such, these instances of misconduct are merely precursors to continued unlawful use and disclosure, by Lamb, of privileged and confidential Liberty documents and information.  Without a TRO or injunction, Lamb will continue to flout these obligations and disclose privileged Liberty documents, confidential information, and trade secrets.  *See Capital One Fin. Corp.*, 2021 WL 2903241, at \*13–14 (plaintiff adequately showed likelihood of irreparable harm where it showed that defendants could "continue using the confidential information to the detriment of" the plaintiff).

### 2. Injunctive relief is necessary for Liberty to fulfill its legal obligations under the Family Educational Rights and Privacy Act

Lamb has publicly stated that he has joined forces with attorney Jack Larkin, who represents several women currently suing Liberty for alleged Title IX violations. Said Lamb, "I'm in consultation with Jack Larkin. I'll be giving him things that I know, telling him things that I know." *See Fired Liberty U Spokesman Tells Inside Story Behind Lawsuit*, THE ROYS REPORT (Oct. 29, 2021), https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit?mc_cid=7ee6a9ac39&mc_eid=774431752b.    Moreover, in the context of

discussing one of the Jane Doe Plaintiffs' request for documents and her personnel file from Liberty while Lamb was still employed, Lamb said, "I do not believe, humanly speaking, that she [the plaintiff] would even know about that other pile of documents if it weren't for me…"

These statements, taken together and at face value, implicate the potential by Lamb to disclose student education records in violation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. Part 99.   By federal law, Liberty must fulfill its legal obligations under FERPA.   Accordingly, Liberty must attempt to prevent Lamb in his obvious zeal to be noticed from disclosing information in student education records to the media and others.

As a condition of receiving federal funds from the U.S. Department of Education, Liberty must comply with FERPA.   20 U.S.C. § 1232g(a)(1)(A).   FERPA protects the privacy of students' education records.   20 U.S.C. § 1232g(b)(1).   Education records are records, files, documents, and other materials which "contain information directly related to a student" and "are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A)(i)-(ii).   Any records related to sexual assault or harassment complaints or proceedings are education records as these records directly relate to a student, and these records must be maintained by Liberty University pursuant to FERPA's recordkeeping requirements, 34 C.F.R. § 106.45(b)(10).

FERPA generally forbids the disclosure of personally identifiable information in students' education records without the student's prior, written consent, with some exceptions, such as an exception for school officials "who have been determined by such agency or institution to have legitimate educational interests."   20 U.S.C. § 1232g(b)(1)(A).   No student has given Liberty

permission to reveal the contents of their student records to the reporters with whom Lamb has openly discussed their contents.

A preliminary injunction is therefore necessary to prevent Lamb from disclosing any personally identifiable information from education records, and to allow Liberty to protect its students' information as required by FERPA. Liberty, therefore, has satisfied the irreparable harm element for injunctive relief.

### D.  The Balance of Equities Weighs Heavily in Liberty's Favor

Liberty will suffer irreparable harm from Lamb's egregious misconduct unless this Court issues injunctive relief. The balance of equities weighs heavily in Liberty's favor. Without injunctive relief, Liberty will continue to be harmed by Lamb's unlawful conduct. In contrast, the requested relief will only require that Lamb cease and stop benefiting from his egregious breaches of the contractual and common law obligations he owes Liberty, something that courts have held does not present any likelihood of harm to Lamb. *See Home Funding Grp.*, 2006 U.S. Dist. LEXIS 90285 at *6 ("Essentially, injunctive relief only will prohibit defendants from engaging in any continued illegal or unethical activity. Therefore, this Court does not find any likelihood of harm to the defendants if relief is granted."); *JTH Tax, Inc. v. Donofrio*, No. 2:06cv47, 2006 WL 2769841, at *5 (E.D. Va. Sept. 26, 2006) ("With respect to the second prong of the four factor test, the Court finds that defendant will not be harmed if the permanent injunction is granted. An injunction will do nothing more than enforce defendant's contractual obligations."); *HotJobs.com, Ltd. v. Digital City, Inc.*, No. 164237, 2000 WL 33333529, at *7 (Va. Cir. Ct. 2000) (holding that defendant could not "complain that it [would] suffer irreparable injury if a preliminary injunction is issued because it brought the harm on itself"). Accordingly, Liberty also satisfies this element.

21

### E.   The Public Interest Favors Granting Liberty's Request for Injunctive Relief

Finally, the public interest strongly favors Liberty's request for injunctive relief.  Courts have long recognized that protecting trade secrets, and privileged and confidential information from misappropriation serves the public interest.  *Dionne v. Se. Foam Converting & Packaging, Inc.*, 397 S.E.2d 110, 113–14 (Va. 1990).  As the court in *Home Funding Group* noted, "[t]he public interest is served by allowing firms to protect trade secrets and confidential information, and by providing a forum to seek temporary injunctive relief to enjoin any further breach or disclosure, potentially causing irreparable harm and destroying incentives to innovate." 2006 WL 6847953, at *3.  In addition, it is in the public interest to use injunctive relief to stop threats of continuing violations of contractual and legal obligations.  *See JTH Tax, Inc.*, 2006 WL 2769841, at *5 (citing *Music City Music. v. Alpha Foods, Ltd.*, 616 F. Supp. 1001, 1003 (E.D. Va. 1985)).

As detailed above, Liberty's requested injunctive relief is necessary to protect its trade secrets, and privileged and confidential information, to ensure its contractual rights, to prohibit Lamb from benefiting from his illegal conduct, and to stop the threat of ongoing violations. Accordingly, the injunctive relief requested by Liberty strongly serves the public interest.

### F.   Liberty Should Not Be Required to Post Bond or to Post Only Nominal Bond

For the reasons discussed above, Liberty has established the elements necessary for a temporary restraining order and/or a preliminary injunction.  Liberty therefore respectfully requests that the Court issue injunctive relief with no or only nominal bond.

Under Fed. R. Civ. P. 65(c) a court can issue a preliminary injunction only if the moving party posts a bond.  Fourth Circuit precedent, however, establishes that the court properly can set security at a low or nominal amount. *See Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 139 (4th Cir. 2001); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421

n.3 (4th Cir. 1999); *cf. Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming district court's decision to require no security "because of the strength of [the movant's] case and the strong public interest involved."). The facts in the case warrant requiring Liberty to post no or only nominal security. As in *Moltan*, the potential for damage to Lamb from the entry of the injunctive relief is limited. Lamb has no right in the first instance to engage in the unlawful conduct that is the subject of this motion. In contrast, the irreparable harm to Liberty, the likelihood that Liberty will succeed on the merits, and the public interest all weigh decidedly in Liberty's favor.

## V.   CONCLUSION

For the reasons outlined above, Liberty respectfully requests that this Court grant its Motion for Temporary Restraining Order, or in the alternative, Preliminary Injunction.

**LIBERTY UNIVERSITY, INC.**
By Counsel

  /s/ Scott C. Oostdyk
Scott C. Oostdyk (VSB # 28512)
Heidi Siegmund (VSB# 89569)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
hsiegmund@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send a true and correct copy to all counsel of record.

_____/s/_____

Heidi E. Siegmund (VSB No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
hsiegmund@mcguirewoods.com

*Counsel for Defendant and Counterclaim Plaintiff*
