**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| WALTER SCOTT LAMB ) | |
| ) | Case No. 6:21-cv-00055 |
| Plaintiff, ) | |
| v. ) | Hon. Norman K. Moon |
| ) | |
| LIBERTY UNIVERSITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF WALTER SCOTT LAMB'S RESPONSE IN OPPOSITION TO DEFENDANT AND COUNTERCLAIM PLAINTIFF LIBERTY UNIVERSITY'S MOTION FOR TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

Defendant Liberty University's ("LU") most recent filing is part and parcel with the pattern of bullying and overreach that LU and its representatives have engaged in since Plaintiff Walter Scott Lamb began voicing opposition to LU and its officials. Now, more than a month after terminating Mr. Lamb in retaliation for his opposition to LU's ***highly publicized*** mishandling of campus sexual assaults and harassment complaints, LU suddenly rushes to the courthouse to protect its so-called "confidential" information. LU conveniently identifies no specific documents, nor does it verify the confidentiality of those documents that Mr. Lamb supposedly mishandled. Instead, it resorts to blanket claims that each and every document or all communication is LU property and is thus protected from any disclosure. But this hyperbole is unenforceable. As the party seeking confidentiality and asserting privilege, LU has the burden to establish that its confidentiality provisions are narrowly tailored to protect its legitimate business interests and to prove each claim of privilege. LU also bears the burden of establishing the need for the extraordinary remedy of a temporary restraining order or a preliminary injunction. By taking the low road—and with unclean hands—LU has not (and cannot) meet this high equitable burden.

1

**I.      Background**

Walter Scott Lamb joined Liberty University in early 2018 believing in the original mission of the school as founded by Jerry Falwell, Sr. In fewer than four years, Mr. Lamb found himself at a crossroads—faced with mounting evidence that Liberty University was actively mishandling sexual assault and harassment complaints by failing to investigate claims from both students and staff, among other things, and an administration unwilling to hear his call to address the issue truthfully. Mr. Lamb could remain silent or he could speak up. He chose to speak up internally to give the University the opportunity to do the right thing. Then about six weeks ago, on October 6, 2021, Mr. Lamb suffered immediate consequences for his dissent. By continuing to object to LU's handling of Title IX violations and pushing the administration to truthfully address the claims publicly, Mr. Lamb raised the ire of interim University President Jerry Prevo and others in the President's inner circle. And it was this refusal to toe the line that came to a head on October 4 and caused Mr. Lamb's unceremonious termination two days later.

Through its briefing, the University tries to smear Mr. Lamb as an opportunist and a self-promoter because he has responded to inquiries from the press to address his termination and the allegation of Title IX violations that have been swirling around the University for more than a year. Although Mr. Lamb has engaged the media—he is after all a member of the fourth estate, his motivation is not nefarious as LU contends. He understands the power of the press to affect change, now from the outside, when internal channels failed to restore LU to its stated mission.

In his role at the University, Mr. Lamb was just one of many vice presidents. He was not a member of the University President's inner circle or part of the executive leadership tasked with shaping the strategic mission and business plans for the school. His job was to help LU's public image by crafting its messaging for the media as well as current and future students and donors. Because Mr. Lamb's job was so public-facing, Prevo excluded him from most high-level strategy

2

meetings. LU acknowledges, as it must, that Mr. Lamb was not a decision-maker or key figure in University Executive leadership. LU's efforts to gag him now are a transparent bully-tactic to force silence that could not be bought.

## II.     Argument

This Court should deny LU's requested TRO or preliminary injunction because it fails to meet the high standard for extraordinary relief and comes to court with unclean hands. Injunctions under Federal Rule of Civil Procedure 65 are "'extraordinary remedies involving the exercise of [a] very far-reaching power to be granted only sparingly and in limited circumstances.'" *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (quoting *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001)). When, as here, the party seeking the injunction requests mandatory relief rather than preservation of the status quo, such injunctions are "disfavored" and should be granted "only in those circumstances when the exigencies of the situation demand such relief[,]" especially when the relief "in effect operates as deciding the case in favor of the movant." *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 703-04 (E.D. Va. 2000) (internal quotations omitted).

LU thus has a "heavier burden" and must show the four factors supporting an injunction "weigh heavily and compellingly in movant's favor[.]" *Id.* at 704 (quoting *Tiffany v. Forbes Custom Boats, Inc.,* 1992 WL 67358, at *6 (4th Cir. Apr. 6, 1992) (per curiam)). For a mandatory preliminary injunction, LU must show "the existence of a *clear and convincing probability* of success[,]" and "if there is doubt as to the probability of plaintiff's ultimate success," a request for preliminary mandatory relief "*must* be denied." *Id.* (emphasis added). Further, the harm must be irreparable and "neither remote nor speculative, but actual and imminent." *Id.* at 702. Unless LU proves irreparable injury, the Court need not balance the equities. *See id.* LU cannot carry this burden on any of its claims and the court should deny the motion.

3

A. The claims of breach of fiduciary duty, breach of contract, and misappropriation of trade secrets are meritless.[1]

LU claims it can succeed on the merits of three theories of liability—breach of fiduciary duty, breach of contract, and misappropriation of trade secrets. LU contends that Mr. Lamb had both a contractual obligation and a common law fiduciary duty not to disclose LU's confidential documents and information. For each of these claims, LU must establish the duty, breach of that duty, and damages as a result of the breach. *See generally Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 424 (E.D. Va. 2011) (stating the elements of a common law fiduciary duty of loyalty) and *PBM Prod., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 398 (E.D. Va. 2009), *aff'd sub nom. PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011) (stating the elements of breach of contract). Confidential commercial information is "information which, if disclosed, would cause substantial economic harm to the competitive position of the entity from whom the information was obtained." *Diamond State Ins. Co. v. Rebel Oil Co.,* 157 F.R.D. 691, 697 (D. Nev. 1994).

LU's claim under the Virginia Uniform Trade Secret Act, is similarly dependent on Mr. Lamb having disclosed material; in this case "trade secrets". To succeed, LU must establish that (1) the information alleged constitutes a trade secret, and (2) that Mr. Lamb misappropriated it. *Microstrategy v. Bus. Objects. S.A.,* 331 F. Supp. 2d 396, 416 (E.D.Va. 2004). Trade secrets must maintain some independent economic value that is not known or readily ascertainable by proper means and be subject to reasonable efforts to maintain secrecy. Va. Code Ann. § 59.1-336; *see Trident Products and Services, LLC v. Canadian Soiless Wholesale Ltd.,* 859 F. Supp. 2d 771, 778

---

[1] Despite LU's claim that it can "readily" prove the likelihood of success on the merits of its "entire counterclaim," LU addresses only three of the eight counts of its counterclaim for "brevity". ECF No. 12 at 9. LU's entire counterclaim is meritless, and Mr. Lamb will address each count fully in his responsive pleading to the counterclaim.

(E.D. Va. 2012). Each of LU's claims (breach of fiduciary duty, breach of confidentiality agreement, and misappropriation of trade secrets) therefore hinge on Mr. Lamb having disclosed or misappropriated protected information or documents.

But LU's claims lack merit for two main reasons: (1) Mr. Lamb's supposed obligations are unenforceable because they are overbroad and not narrowly drawn to protect LU's legitimate business interests; and (2) LU has not specifically identified each confidential, proprietary, or trade secret document and communication, and substantiated the basis for confidentiality or privilege of each so-called document or communication.

> 1. The so-called "Confidentiality Agreement" and other supposed confidentiality provisions are unenforceable and overbroad.

Confidentiality agreements are disfavored restraints on trade that are subject to the same strict requirements as covenants not to compete. *BB&T Ins. Servs., Inc. v. Thomas Rutherfoord, Inc.*, 80 Va. Cir. 174, 2010 WL 7373709 at *3 (2010); *see also Darton Env't, Inc. v. FJUVO Collections, LLC*, 332 F. Supp. 3d 1022, 1030 (W.D. Va. 2018). For these reasons, LU must "show that the restraint is reasonable and no greater than necessary" to protect LU's "legitimate business interest." *Motion Control Systems, Inc. v. East*, 262 Va. 33, 37, 546 S.E.2d 424, 425 (2001). "Any ambiguities in the contract will be construed in favor of the employee." *BB&T Ins. Servs., Inc.*, 2010 WL 7373709 at *3 (citing *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005)). "[T]he threshold question is whether [these agreements are] enforceable." *Darton Env't, Inc.*, 332 F. Supp. 3d at 1028 (quoting *Home Paramount Pest Control Companies, Inc. v. Shaffer*, 282 Va. 412, 420, 718 S.E.2d 762 (2011)).

LU has not shown that any of the six supposed sources of confidentiality binding Mr. Lamb are reasonable and no greater than necessary to protect LU's legitimate business interest.

First, LU misapprehends that the so-called "Confidentiality Agreement" that Mr. Lamb signed on April 20, 2018 was a "condition of his employment." *See* ECF No. 12 at 3. The document itself provides that is "[a]s a condition of being permitted to observe or participate in Board meetings[.]" ECF No. 12-2 at 2. LU's own declarant confirms this fact. ECF No. 12-1 ¶4. It is signed—not in his capacity as an employee—but as "an observer of and/or participant in" LU Board meetings. *Id.* Mr. Lamb signed these "Confidentiality Agreements" to attend each Board meeting like all guest attendees whether employed by LU or not. (Exhibit A, Declaration of Plaintiff Walter Scott Lamb ("Pl's Decl.") ¶¶ 10-11.) Because he signed a new agreement for each meeting, Mr. Lamb believed it applied only to information learned at that meeting. (*Id.* ¶ 11.)

Like LU's overstatement of its purpose, the April 20, 2018 "Confidentiality Agreement" is stunningly overbroad. It defines "Confidential Information" as "certain confidential, business, financial, and/or proprietary information regarding the Board and the University". ECF No. 12-2 at 2. It also mandates that the signatory return to the University any Confidential Information "along with any other information relating to the Confidential Information prepared by me." *Id*. To be enforceable, confidentiality agreements must be limited to "actual/proprietary information" rather than "any information" related to the employer. *Chmura Econ. & Analytics, LLC v. Lombardo*, No. 3:19-CV-813, 2021 WL 3234607, at *8 (E.D. Va. July 29, 2021).

Rather than appropriately limiting the scope of the agreement to only proprietary or confidential information, LU effectively prohibits retention or disclosure of a vast quantity of information that is not proprietary or worthy of confidence. Indeed, in his role as a press liaison and mouthpiece for the University, Mr. Lamb would have prepared a great deal of public information that would have to be "returned" under this provision. Perhaps, all the material that Mr. Lamb prepared during his employment could be construed as "relating" to Confidential

Information under this definition. LU has not even tried to show that this agreement is reasonable and narrowly tailored to protect LU's legitimate business interest.

Not only is this "Confidentiality Agreement" overly broad and not narrowly tailored to protect the legitimate business interest of LU, but it fails for another reason—it is unlimited in temporal scope. *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 341 (E.D. Va. 2015), *aff'd*, 690 Fed.Appx. 822 (4th Cir. 2017) (noting "the confidentiality agreement ... purported to restrict May in perpetuity, as it contained no time restrictions. Accordingly, because the confidentiality provision was not narrowly tailored to protect IDM's legitimate business interests, the court ruled that it was unenforceable under the applicable law."); *Darton Env't, Inc.*, 332 F. Supp. 3d at 1030. Even if the "Confidentiality Agreement" were narrowly tailored and limited in temporal scope, Mr. Lamb did not receive, take, or retain any materials or documents from any Board meeting. (Pl's Decl. ¶¶ 12-13.) And information that was not already publicly known, or later made public, was rarely discussed at the Board meetings that Mr. Lamb attended. (*Id.* ¶ 14.)

Second, LU refers to various provisions of the Liberty University Employee Handbook of Policies and Procedures as binding Mr. Lamb to secrecy. Yet by its own terms, the handbook disclaims any intention to create contractual obligations or alter the status of employment. *See* ECF No. 10-1 at 13. Although adherence to the policies is a condition of continued employment, nothing in the handbook can or would impose a contractual obligation on Mr. Lamb post-termination. *See id.* Notably, LU has presented no evidence that Mr. Lamb received this (or any other) employee handbook when he joined the University. In fact, Mr. Lamb had never seen this handbook until more than a year after LU hired him when the University Provost asked him to review provisions covering faculty communications with outside media. (Pl's Decl. ¶ 6.)

Even if Mr. Lamb had received the handbook as part of his onboarding at LU (which he did not), it would not be enforceable as a contract. The definition of "Confidential Information" in the LU employee handbook is even more sweeping than the "Confidentiality Agreement" and includes "***[a]ny and all materials and information*** ('Confidential Information')". ECF No. 10-1 at 22. Virginia courts have held similar provisions too broad and unenforceable as a matter of law. *See e.g, Lasership Inc. v. Watson*, 79 Va. Cir. 205, 2009 WL 7388870, at *8 (2009) (invalidating a clause that precludes an employee from "disclos[ing] to *any* person… any information… concerning the business of Lasership.") (emphasis in original).

LU then enumerates several other supposed bases for gagging Mr. Lamb without further development of the argument. *See* ECF No. 12 at 5. This Court should consider such perfunctory and undeveloped arguments as waived. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (citing *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010)). As a result, LU has no valid and enforceable agreement on which to base its contract claims.

        2.        No confidential or privileged documents, communications, or trade secrets have been revealed.

Another reason for this Court to deny injunctive relief is the lack of evidence that confidences have been betrayed. As stated above, there is no contractual confidentiality. But even if there were some valid and enforceable agreement requiring Mr. Lamb to maintain confidentiality of certain documents and information, LU has identified no specific confidential, privilege, trade secret, or proprietary documents or information that have been improperly disclosed or distributed. This requirement applies equally to LU's common law and statutory claims. *See Informatics Applications Grp., Inc.*, 836 F. Supp. 2d at 424; *PBM Prod., LLC*, 678 F. Supp. 2d at 398; *Microstrategy*, 331 F. Supp. 2d at 416.

      a)    *The Interview with Cynthia Beasley and Salon reveals nothing.*

Contrary to LU's assertion, Mr. Lamb did not reveal any confidential or privileged information during his interview with Cynthia Beasley. And LU concedes that fact when Ms. Beasley requested privileged and confidential documents, but Mr. Lamb refused to give her any documents. *See* ECF No. 12 at 6. "A claim of privilege cannot be a blanket claim, but must be made and established on a document-by-document basis." *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.,* 145 F.R.D. 64, 86 (N.D. Ill. 1992) (citing *United States v. White,* 950 F.2d 426, 430 (7th Cir. 1991)). Rather than identify any document, LU accuses Mr. Lamb of revealing privileged information in his interviews. Yet LU's claims are unfounded. There is no basis to conclude that Mr. Lamb's remarks revealed communications subject to attorney-client privilege. Mr. Lamb simply referred to a recommendation that Mr. Lamb (who is not an attorney) made to Prevo to not use a particular draft of a speech and outside counsel agreed with that recommendation. This is the same allegedly privileged comment that LU accuses Mr. Lamb of disclosing to *Salon*.

"The burden is on the proponent of the attorney-client privilege to demonstrate its applicability." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). LU's only effort to meet its burden is a bare assertion that "President Prevo sought legal input into his remarks." ECF No. 12 at 6. But not every communication involving counsel is protected by privilege. Indeed, among other requirements, the communication must be for securing mainly either "(i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding[.]" *Hawkins*, 148 F.3d at 383. The mere fact that outside counsel may have later agreed with Mr. Lamb's non-legal opinion that a draft speech should be abandoned because it suggested that outside counsel was hired by Liberty to investigate the allegations of Title IX violations raised by the Jane Doe plaintiffs in a lawsuit filed against LU

9

when counsel was in fact hired to <u>defend</u> the University against those claims is in no way to secure a legal opinion or legal service and was not for assistance in a lawsuit. Even if this comment could be construed as privileged (it cannot), LU admits the disclosure was "benign". ECF No. 12 at 6.

        b)      *The Roy Report betrays no confidence.*

Similarly inauspicious is LU's claim that Mr. Lamb's reference on a podcast, The Roy Report, to having consulted with Jack Larkin, one of plaintiffs' attorneys in the Jane Doe lawsuit filed against LU for Title IX violations, is somehow privileged.[2] Rather than point to a particular confidential work product document or privileged communication, LU speculates "[o]n information and belief, as an *inference*" that Mr. Lamb has already given to Larkin "privileged Liberty documents, communications, records, or recording [*sic*]." ECF No. 12 at 7. As it must, LU concedes that it does not know whether Mr. Lamb in fact provided anything to Attorney Larkin (and simply speaking to an attorney, even one suing your former employer, is not improper or illegal) by equivocally admitting that Mr. Lamb only "<u>may</u> have" provided materials to Attorney Larkin. *Id.* (emphasis added). Undeterred, LU baselessly asserts these materials are "likely" "<u>highly</u>-protected" (whatever that means) and "<u>likely</u> privileged or work product property of Liberty." *Id*. (emphasis added). In fact, Lamb did not provide Attorney Larkin with <u>any</u> materials or documents. (Pl's Decl. at ¶ 21.) LU's mere speculation and lack of evidence that Mr. Lamb gave anything—let alone <u>privileged</u> documents or communications to Attorney Larkin—falls well short of its high burden. LU invites this Court to enter a TRO based on conjecture

As noted above, LU must establish that each communication or document is protected by privilege. *See Jones*, 696 F.2d at 1072. Likewise, to claim work product protection, LU must prove

---

[2] Mr. Lamb spoke to Attorney Larkin once, by telephone. (Pl's Decl. ¶ 20.) Mr. Lamb has had no further substantive contact with Attorney Larkin. (*Id.* ¶ 22.)

10

that the documents sought to be protected were created "in preparation for litigation." *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011) (quoting *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994)). LU has done neither and this Court should decline LU's hasty invitation to enter TROs based on blatant and unfounded speculation or conjecture.

c) *Letters to the Board of Trustees are not improper*

Next, LU suggests that Mr. Lamb's post-termination letters to members of the LU governing Board of Trustees was an effort to "intimate [*sic*] Liberty by how much media interest he could sustain[.]" A review of the form letter reveals no more than Mr. Lamb proclaiming that he will always tell truth to power and that he came to Liberty out of a personal conviction that it was built by God. This proclamation is followed by several Bible verses and a list of media coverage of LU. Admittedly braggadocios in the Lord, the letter lacks any material that this Court could even remotely construe as confidential, propriety, or trade secret. And, thus, is not a valid basis to infer that Mr. Lamb has disclosed or disseminated any protected information.[3]

d) *"Other Unlawful Disclosures"*

On top of the above communications from Mr. Lamb, LU includes four bullet points, claiming they constitute "other unlawful disclosures". They are nothing of the sort. The first bullet refers to a screenshot on Mr. Lamb's Twitter account. It is unclear on what basis LU asserts confidentiality. The image appears to show a redacted email with only Mr. Lamb's LU email address and line "Title IX ARTICLE NOT APPROVED AND WOULD BE A BIG MISTAKE

---

[3] Plaintiff also notes that he is an ordained Baptist Pastor and was hired, in part, because of his Christian *bona fides* and qualifications. And while the idea that a preacher may "tell the truth" and "quote the Bible" may be offensive to some, it was protected activity under LU's stated anti-retaliation provisions when Mr. Lamb was an employee (the President and inner circle Lamb often complained of reports to LU's governing Board of Trustee) and remains protected post-termination under long-standing First Amendment guarantees.

11

TO PRINT. SO DON'T PRINT IT." There is no explanation in the image that suggests why printing the article would be a mistake. Perhaps it teemed with typos. Maybe it just did not strike the right tone. But in any event, it reveals nothing confidential except in the most generic and uncontroversial sense, that LU uses email. Given Mr. Lamb's role as Senior Vice President of Communications and Public Engagement, it may simply refer to a preliminary draft unready for public release. But even that is not clear from the face of the image. In short, there is nothing "unlawful" about this image or its release.

The second bullet refers to another post from Mr. Lamb's Twitter account. This one reproduces a document titled "Confidential Employee Authorization". Again, LU fails to establish a basis for claiming this is confidential apart from it being labeled as such. The document, signed by University President Jerry Prevo in September is an express authorization from the University to affirmatively <u>disclose</u> confidential information to third parties "even if that information may be considered critical of disparaging of the University or one or more current or former trustee, officer, employee, agent independent contractor, consultant or vendor of the University[.]" ECF No. 12-5. Such voluntary disclosure typically waives any claim for confidentiality. *See Jones*, 696 F.2d at 1072 ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."). The authorization also promises that the University will not retaliate against employees for participating in the independent investigation, which is exactly what LU did. One would think LU would want it known that it was encouraging full cooperation with the independent investigation and had disavowed retaliation against employees that participated. Apparently, they wanted to keep that quiet too.

In bullet three, LU asserts that an email Mr. Lamb purportedly sent to "management" was the "property of Liberty." Using the same broad definition of confidential information, LU evidently claims that ***any*** materials, documents, communications prepared during Mr. Lamb's employment at LU are somehow protected from disclosure because they are University "property." Indeed, LU's policies define University "property" as "[a]ny and all materials and information ('Confidential Information') provided by the University…" and "[a]ll information created or contained on the University's computers and network, including electronic mail (E-mail)[.]" ECF No. 12 at 4. Such overly broad confidentiality mandates are unenforceable as a matter of law. *See Chmura Econ. & Analytics, LLC*, 2021 WL 3234607.

Yet the substance of the May 7 email refers to a cultural pattern that Mr. Lamb identified surrounding accusations of sexual assault directed at public figures and expressed fear that LU would be found guilty in the court of public opinion. This communiqué simply expresses Mr. Lamb's public relations opinion on a matter of public importance. He is not attorney. It provides no legal advice and does not discuss any legal strategy or recommendation to University leadership. On what conceivable basis LU claims confidentiality is unclear from the record.

Lastly, LU points to a recording that Mr. Lamb ***lawfully*** made of a conversation between himself and President Prevo. *See* Va. Code Ann. § 19.2-62(B)(2) (excluding from criminal prohibition the intercept of a conversation by a participant); *see also United States v. Smallwood*, 365 F. Supp. 2d 689, 698 (E.D. Va. 2005) (finding it is not unlawful for a party to a conversation to record the conversation). Although the recording presents President Prevo as fickle and arguably in a bad light—suggesting a willingness to flout 501(c)(3) regulations—LU does not purport to provide a basis for its confidentiality. And as a participant, Mr. Lamb was free not only to record the call but use it to shield himself from President Prevo's later retaliatory acts.

13

In context, therefore, LU's claim that Mr. Lamb breached a confidentiality agreement must fail because the supposed agreements were not valid and enforceable. Additionally, LU cannot establish that any of the alleged disclosures are of confidential, privileged, proprietary, or trade secret information. This Court should find that LU has not shown a likelihood of success on the merits, and certainly not a "clear and convincing probability" of such success. *See Cornwall*, 99 F. Supp. 2d at 704.

    B.    No irreparable harm can come from concededly "benign" communications or speculative accusations of "foreshadowing" speculative future conduct.

Even if LU could establish that it is likely to succeed on the merits of its claims, LU has <u>shown no harm</u> caused by Mr. Lamb. To obtain the extraordinary relief sought, LU must not only prove harm, but must show that the harm is <u>irreparable</u> and "neither remote nor speculative, but actual and imminent." *Cornwall*, 99 F. Supp. 2d at 702. LU must make a "clear showing" of <u>immediate</u> <u>irreparable</u> harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Rather than make the requisite "clear showing" of what harm has befallen LU, the University relies on conclusory allegations that irreparable harm is a *fait accompli* from disclosure of privileged information and trade secrets without having first established that any documents or communications were in fact privileged or trade secrets and that Mr. Lamb disclosed said documents. LU also concedes that at least two of the supposed disclosures of privileged information were "benign." A "benign" disclosure is surely not <u>irreparable</u> harm.

Additionally, throughout its brief, LU reveals that its bare accusations of harm are remote and speculative. For example, LU contends at least five times that Mr. Lamb was "foreshadow[ing]" future disclosures. Whether or not Mr. Lamb was alluding to possible future events while posturing for the press—he is after all skilled at developing media interest stories—is not evidence of "***actual*** and ***imminent***" irreparable harm. LU also repeatedly refers to harm "on

14

information and belief" and drawing an "inference" from Mr. Lamb's talking points that he "may" reveal materials to third parties. But this is pure unsupported conjecture. *Cf. Variable Annuity Life Ins. Co. v. Coreth*, No. 3:21CV223, 2021 WL 1566447, at *11 (E.D. Va. Apr. 21, 2021) (finding irreparable harm only when it was not speculative where former financial advisors had admitted in affidavits to retaining client lists, including contact information and account values). Mr. Lamb makes no such admissions and LU has offered no concrete harms to this Court, only conjecture.

Further undercutting the need for immediate relief for imminent irreparable harm, is LU's unclean hands and long delay in bringing this motion for temporary restraining order or preliminary injunction. *See, e.g.*, *Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*, 684 F. Supp. 2d 1152, 1158 (D.S.D. 2010) ("The delay in filing the TRO motion may be viewed as indicating that the Plaintiffs would not suffer irreparable harm without the injunctive relief."); *see also RelaDyne Reliability Servs. Inc. v. Bronder*, No. 2:20CV377, 2020 WL 5745801, at *2 (E.D. Va. Aug. 4, 2020) (finding delay belies the emergency nature of the request). LU terminated Mr. Lamb about six weeks ago. And it agreed to a hearing almost two months from the original incident on October 4 even though this Court offered to hear the motion on an expedited basis. LU is well aware from Mr. Lamb's role within the University that he would speak to members of the press about his termination. Yet LU waited until nearly two weeks had passed since Mr. Lamb filed his Complaint to seek injunctive relief. Moreover, when the court reached out to counsel on Friday, November 5, 2021, to ask about scheduling a hearing on the motion, counsel for LU made no effort to confer with counsel for Mr. Lamb as directed by the court until the following Tuesday. If the need to protect confidential, privileged or trade secrets from disclosure was so great as to warrant a mandatory injunction, then why the delay in pursuing relief? The answer is, of course, there was

15

no danger of immediate harm because Mr. Lamb has not disclosed any confidential, privileged or trade secret information.

Worse, LU's counsel arguably used the delay to engage in heavy-handed maneuvers against Mr. Lamb. LU directed uniformed Liberty University Police Department officer to "hand deliver" a threatening letter to Mr. Lamb's son as he attempted to return Mr. Lamb's work laptop in his father's stead.[4] The October 22, 2021 letter addressed from Attorney Oostdyk directly to Mr. Lamb threatens to seek among other things "preliminary and permanent injunctive relief." The very thing LU seeks with this Motion. But importantly, the letter came only after the undersigned had repeatedly identified himself to LU as Mr. Lamb's counsel. At best, this was a misguided effort by LU's in-house and outside counsels. At worst, LU conduct suggests an aggressive and unethical contact with a represented party—violative of the Virginia State Bar Rules of Professional Conduct 4.2.[5] Neither Mr. Lamb nor the undersigned consented to such a communication.[6] Whether LU and its counsel toed the line or crossed it goes beyond the scope of this Response. Either way, however, LU's conduct suggests LU comes to this Court unfairly, and with unclean hands. This is yet another reason for this Court to deny any of LU's requests for equitable relief.

---

[4] Four of Mr. Lamb's six children had been admitted to LU when the Complaint was filed and three remain enrolled as of this Response.

[5] "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." (emphasis added).

[6] That the letter was dressed up and hand-delivered by a uniformed law enforcement officer also dances painfully close to Rule 3.4(i) and the State's prohibition, "A lawyer shall not:…present or threaten to present criminal or disciplinary charges solely to obtain an advantage in a civil matter."

Lastly, according to LU, injunctive relief is also necessary for the University to fulfill its legal obligations under the Family Educational Rights and Privacy Act ("FERPA"). But FERPA protects students' educational records. 20 U.S.C. § 1232g(b)(1). LU's contentions reveals this claim as baseless. First, LU asserts that Mr. Lamb's comment about a Jane Doe's request for her "personnel file" does not implicate student educational records. LU is obviously referring to an employee or former employee. And that Jane Doe staff member would have a right to access her personnel file, including records relating to "injuries." Va. Code Ann. § 8.01-413(B) Second, Mr. Lamb is no longer employed by the University and cannot access student records. So, there is no evidence that Mr. Lamb has now or in the past retained or revealed any student records nor could he in the future. There is no potential threat of harm to LU's obligations under FERPA.

    C.    Even if "foreshadowing" and the revelation of "benign" communications could establish immediate irreparable harm on a meritorious claim for breach of fiduciary duty, contract, and misappropriation of trade secrets (it cannot), the balance of equities weighs against the extraordinary and affirmative relief being sought.

As described above, this Court should not even reach the balancing test for injunctive relief because LU has not made a clear showing of immediate irreparable harm. *Cornwell*, 99 F. Supp. 2d at 702. In any event, LU cannot show that the "balance of equities" weighs in its favor. To make that showing, LU must show that it will suffer greater injury without the injunction than Mr. Lamb will suffer if the injunction is imposed. *See Sarsour v. Trump*, 245 F. Supp. 3d 719, 740 (E.D. Va. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Although the improper use or disclosure of confidential information could constitute irreparable harm (i.e., an injury that monetary damages cannot adequately remedy), LU has not shown that it is likely to suffer any harm. *See Pari Respiratory Equip., Inc. v. Groskopf*, No. CIV.A. 3:07-CV-446, 2007 WL 2745322, at *2 (E.D. Va. Sept. 18, 2007) (citing *Ruckelhaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983)). And LU has not shown that Mr. Lamb retained, took,

17

disclosed, or distributed any confidential, proprietary, privileged, or trade secret information or documents. By contrast, the relief requested by LU is overreaching and would unfairly stifle Mr. Lamb. Among other affirmative actions, LU demands that Mr. Lamb "deliver to Liberty ***all documents or other information***, including all privileged, confidential, and/or trade secret information, in Lamb's possession, custody, or control… within 24 hours[.]" Much like its overly broad and unenforceable confidentiality provisions, LU's request is impermissibly harmful. LU's Chicken-Little predictions about future disclosure (of unidentified, unknown documents and information) is based purely on speculation, inference, and surmise derived solely from Mr. Lamb's penchant for publicity. This type of reliance on conjecture cannot establish that the balance of equities favors LU. *See Pari Respiratory Equip., Inc.*, 2007 WL 2745322, at *3 (declining to find the balance of equities in favor of the plaintiff based on speculation that the defendant would not be harmed by the injunction). Further, like the plaintiff in *Pari Respiratory Equip., Inc.*, LU's conclusion that Mr. Lamb will not suffer harm turns on the assumption that he acted wrongly. *Id*. On that issue, LU has offered little evidence but plenty of speculation to support its accusations.

LU must also establish that the issuance of an injunction is in the public interest. *Sarsour¸* 245 F. Supp. 3d at 742 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). Without a doubt, protecting trade secrets and privileged and confidential information from misappropriation serves the public interest in fostering innovation. *See Dionne v. Se. Foam Converting & Packaging, Inc.*, 397 S.E.2d 110, 113-14 (Va. 1990). Courts likewise find that preserving contractual obligations is in the public interest in the face of ongoing, continuing violations of those obligations. *See, e.g.*, *JTH Tax, Inc. v. Donofrio*, No. CIV A 2:06CV47, 2006 WL 2796841, at *5 (E.D. Va. Sept. 26, 2006). These interests, however, are not served where there

has been no misappropriation and there has been no violation of a contractual obligation. *See Pari Respiratory Equip., Inc.*, 2007 WL 2745322, at *3. But the public interest is also served by whistleblowers and people willing to tell the truth to prevent worse harms or cover-ups as Mr. Lamb alleges in the Complaint. On balance, therefore, the equities favor Mr. Lamb—an ordained Baptist Pastor committed to telling the truth, not LU who has shown a cultural and unfortunate drift from its founding principles and overaggressive effort to silence critics who refused to sign non-disclosure agreements.

### III. CONCLUSION

Because LU has identified no specific documents or communications subject to valid and enforceable confidentiality provisions or that are privileged communications or trade secrets, a breach, or misappropriation necessary to succeed on the merits of its claims, the court should deny LU's motion. Additionally, because no confidential, privileged, proprietary trade secrets have been disclosed or misappropriated, and LU only speculates about the potential for immediate imminent harm, it cannot show the requisite harm to justify the extraordinary relief requested. Lastly, even if it could meet its burden on the first two factors to support an injunction, it comes to this Court with unclean hands and has not shown that the balance of equities or the public interest warrants enjoining Mr. Lamb. For these reasons, Mr. Lamb asks this Court to deny the University's motion for temporary restraining order and preliminary injunction.

Respectfully Submitted,

Dated: November 17, 2021

RHOADES MCKEE PC
By:   /s/ Ian A. Northon
Ian A. Northon, Esq.

*Admitted Only Pro Hac Vice*
Michigan—P65082
Pennsylvania—207733
Florida—101544
55 Campau Ave., N.W., Ste. 300
Grand Rapids, MI 49503
Telephone: (616) 233-5125
ian@rhoadescmkee.com
jjolliffe@rhoadesmckee.com
mclayton@rhoadesmckee.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2021, we served a true copy of this Response Brief in Opposition to TRO/PI through the Court's Electronic Filing System on all counsel of record.

/s/ Ian A. Northon