UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| WALTER SCOTT LAMB, <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY UNIVERSITY <br><br> Defendant. | Case No. 6:21-cv-00055 <br><br> Hon. Norman K. Moon |

**DECLARATION IN OPPOSITION TO LIBERTY UNIVERSITY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Walter Scott Lamb, under penalty of perjury pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of knowledge, information, and belief:

1. I am over the age of 18 and all the facts in this declaration are within my personal knowledge.

2. From January 2018 until my termination on October 6, 2021, I was employed at Liberty University ("LU" or the "University").

3. My first position at LU was as Vice President of Special Literary Projects. I was assigned many new responsibilities and given a substantial pay raise by then-University President Jerry Falwell, Jr. on August 23, 2018. Then, in or around March or April 2019, I was assigned more responsibilities and given the new title of Senior Vice President of Communications and Public Engagement.

4. As Senior Vice President of Communications and Public Engagement, I oversaw three communications outlets for the University: Liberty University News, The Standing for Freedom Center, and the student newspaper, "The Champion".

5. In that capacity, my job responsibilities included serving as spokesperson and media liaison for the University.

6. At the time of my hire, I did not receive a copy of an employee handbook and was unaware that one existed until April 8, 2019, when I was asked by the Office of the Provost to review the provision on faculty communications with the media.

7. At no time during my employment at LU was I asked to sign an acknowledgment of receipt of the employee handbook or other similar document, agreeing to follow the policies contained therein. Nor have I ever been asked to verbally acknowledge and/or agree to abide by the policies contained in the employee handbook.

8. Although I was one of approximately seventeen vice presidents that make up senior leadership at the University, I was not a member of the Executive Leadership, which is comprised of higher-ranking leadership in the University President's inner circle.

9. In my role as vice president for the University, I was invited to attend meetings of the Board of Trustees.

10. At each meeting of the Board of Trustees that I attended, I was asked to sign a document labeled "Confidentiality Agreement" as a condition of attendance. Exhibit B to LU's Memorandum in Support of the Motion for Temporary Restraining Order and Preliminary Injunction appears to be a copy of an agreement signed by me on April 20, 2018.

11. To the best of my knowledge, every guest attendee at each meeting of the Board of Trustees had to sign the same "Confidentiality Agreement". Guest attendees were not necessarily employees of LU, though some were employees. It was my understanding this document applied only to information learned at that meeting.

12. At none of the meetings of the Board of Trustees that I attended, was I ever provided with any documents or materials to be discussed at the meeting.

13. I was not given, nor did I retain or take any documents from any meeting of the Board of Trustees.

14. Information that was not already publicly known, or later made public, was rarely discussed at meetings of the Board of Trustees that I attended. I sat in on the portion of the Board meetings during which the University Vice Presidents, as part of the President's Report to the Board, had an opportunity to present to the Board on topics such as: new academic programs, athletic achievements, enrollment figures, endowment numbers, spiritual reports, and similar accomplishment driven announcements.

15. To the best of my knowledge, Board of Trustees Committee meetings were the venue for specific in-depth discussions of the Committee's area of influence. I attended only a few Committee meetings during my employment at LU. I attended one meeting of the "Financial Audit Committee" at which I believe the Committee selected a new auditing firm, but I do not recall precisely. In addition to the "Financial Audit Committee" meeting, I had occasion to sit in on a couple "Investment Committee" meetings. During one such meeting, several guests presented opportunities for investment to the Committee.

16. I was not given, nor did I retain or take any documents from any meeting of any Committee of the Board of Trustees.

17. Because my role was as spokesperson, material prepared and generated by me was intended for public consumption.

18. Since my termination on October 6, 2021 I have had numerous opportunities to speak to members of the press.

19. At no time have I divulged, disclosed, or disseminated what I believe to be confidential, privileged, proprietary, or trade secret information and/or documents to members of the press or my attorneys.

20. After my termination, I had one telephone call on October 11, 2021, with Jack Larkin, attorney for the Jane Does in the lawsuit filed against Liberty University for Title IX violations.

21. I did not provide Attorney Larkin with any materials or documents. Nor did I divulge, disclose, or disseminate what I believe to be confidential, privileged, proprietary, or trade secret information.

22. I have had no further substantive contact with Attorney Larkin.

Executed this the 17th day of November 2021.

_____
Walter Scott Lamb