CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
3/10/2022
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| WALTER SCOTT LAMB, *Plaintiff,* | CASE NO. 6:21-cv-00055 |
| v. | MEMORANDUM OPINION |
| LIBERTY UNIVERSITY, INC., *Defendant.* | JUDGE NORMAN K. MOON |

Plaintiff Walter Scott Lamb alleges he was fired by Liberty University because of his opposition to Liberty's mishandling of sexual assault and harassment complaints. Dkt. 17 ("Amended Complaint"), ¶¶ 67, 74. But that is all he alleges. Despite repeated opportunities, Lamb has been unwilling or unable to provide the Court with factual allegations identifying what he thought Liberty was doing wrong.

One does not receive job protection from Title IX simply by invoking Title IX. The statute furnishes protection only for employee actions that are justified by a reasonable belief that an employer is violating the statute's requirements. As a practical matter, this means aggrieved employees must tell the court what they found objectionable about their employer's conduct. This is true even at the motion to dismiss phase, where plaintiffs are required to allege sufficient factual allegations, as opposed to legal conclusions, to render their claim to relief plausible.

Without an allegation as to what Lamb thought Liberty was doing (or not doing) to violate Title IX, the Court cannot make the determination incumbent upon it. Liberty's motion to dismiss the Amended Complaint, Dkt. 27, must be granted.

I

The following facts are alleged in Lamb's amended complaint and assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (explaining standard of review). In January of 2018, Liberty hired Lamb to be its Vice President of Special Literary Projects. Amended Complaint ¶ 15. A little over a year later, he was placed in charge of the University's new Office of Communications and Public Engagement and his title was changed to Senior Vice President of Communications and Public Engagement. *Id*. at 16.

Lamb reported directly to the University President, *id*. at ¶ 17, and was considered a member of the University's "leadership team", *id*. at ¶ 21. He held myriad high-level responsibilities in the realm of media and communications—serving as the University's spokesperson and media liaison, *id*. at ¶ 19, overseeing the University's various media outlets, *id*. at ¶ 18, and completing "special projects" such as "speechwriting, ghostwriting for publications, and networking with alumni, donors, parents of students, and representatives of various nonprofit organizations", *id*. at ¶ 20.

During Lamb's third year at Liberty, Jerry Falwell Jr. resigned from his position as President following reports of sexual impropriety. *Id*. at ¶ 24. The University's Board of Trustees subsequently engaged Baker Tilly, an outside law firm, to investigate various facets of University operations. *Id*. at ¶¶ 25, 30. Additionally, Jerry Prevo was made interim President and given authority to "implement any changes necessary to improve the ongoing operations of the University[.]" *Id*. at ¶ 26.

In January of 2021, Lamb participated in 20 to 25 hours of interviews with Baker Tilly. *Id*. at ¶¶ 29–31. During these interviews, Lamb "discussed [Liberty's] lack of meaningful investigation into campus sexual assaults and Title IX violations." *Id*. at ¶ 32.

Separately, on March 11, 2021, an independent journalist contacted Lamb to inquire about Liberty's handling of sexual assault and harassment allegations. *Id*. at ¶ 34. A few weeks later, the same journalist asked Lamb if he would arrange for her to interview University executives about the alleged gang rape of a woman who would later become a plaintiff in a Title IX lawsuit filed against Liberty. *Id*. at ¶ 35. The requests "led to Plaintiff asking questions of University leadership, particularly [General Counsel David M.] Corry." *Id*.

The aforementioned lawsuit was filed on July 20, 2021. *Id*. at ¶ 36. As Liberty's spokesperson and media liaison, Lamb was responsible for crafting the University's messaging around the lawsuit. *Id*. at ¶ 37. Including a speech President Prevo planned to give at the October 2021 convocation, *id*. at ¶ 40, in which Prevo would address the lawsuit and the issue of sexual assaults on campus, *id*. at ¶ 42. Upon reviewing the draft remarks, Lamb urged Prevo not to deliver the speech as written "because it dishonestly implied that the law firm hired to defend the University against the Does' [l]awsuit instead was hired to investigate the allegations." *Id*. at ¶ 43. "Plaintiff also expressed concerns about the entirety of the speech because of its lack of empathy, transparency, and patronizing tone and substance." *Id*. at ¶ 44. Plaintiff provided his feedback in a memo to Prevo and General Counsel Corry[.]" *Id*. While Lamb's memo did not receive a response, *id.*, Prevo did not use the draft remarks. *Id*. at ¶ 45.

On October 4, 2021, Lamb was invited to a meeting with three members of "University leadership", including Prevo. *Id*. at ¶ 47. During that meeting Lamb "expressed dismay over the direction of the University and concern that the University had strayed so far from its original mission." *Id*. at ¶ 48. Moreover, Lamb

> repeatedly stated that he would not be silenced or participate in a cover up of activities within the University that [he] believes contradict the law, including[ ]the Universities' mishandling of many well-publicized reports of sexual assault, harassment, and

>discrimination on campus committed by current and former male students and staff against current and former female students and staff.

*Id.* at ¶ 49.

At some point during the meeting Prevo called Lamb a "liar" and demanded his resignation. *Id.* at ¶¶ 50–51. Lamb asked that General Counsel Corry be brought in. *Id.* at ¶ 51. The discussion "became heated" and Prevo once more demanded Lamb's resignation, threatening to fire Lamb if necessary. *Id.* at ¶ 52. Lamb "again asserted that the University needed to address the Title IX violations or, he believed, it would face a wave of allegations centered around Title IX." *Id.* at ¶ 53.

Lamb was fired two days later. *Id.* at ¶ 22.

The Amended Complaint does not provide any factual allegation with respect to what prompted Prevo to call Lamb a liar. It only asserts that "[u]pon information and belief, this epithet reacted to Plaintiff's vocal opposition to the University's handling of what Plaintiff believed to be corrupt practices, which included the University's failure to address Title IX violations[.]" *Id.* at ¶ 50. The Amended Complaint also asserts that Lamb "raised the issue of Title IX violations to many members of the Executive leadership team" throughout his employment. *Id.* at ¶ 54. But the Amended Complaint never elaborates on Lamb's alleged criticisms—it never identifies the facts giving rise to Lamb's belief that Liberty was mishandling sexual assault and harassment complaints.

II

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 211 (4th Cir. 2019). A complaint is considered sufficient if it alleges facts that, taken as true, plausibly state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570. *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

III

A

Lamb brings his claim under Title IX of the Education Amendments of 1972. Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

The Supreme Court has concluded that federally funded universities may be sued under this provision for discrimination on the basis of sex in the form of "deliberate indifference to known acts of [student-on-student sexual] harassment in its programs or activities" where such harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and the institution "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis v. Monroe*

*Cty. Bd. of Educ.*, 526 U.S. 629, 633, 645 (1999). In short, an institution is subject to liability under Title IX when its "response—or lack thereof—to known student-on-student sexual harassment is 'clearly unreasonable[.]'" *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (quoting *Davis*, 526 U.S. at 648).

The Supreme Court has also found Title IX to create an implied private right of action for those who lose their jobs opposing unlawful sex discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005) (holding that "the private right of action implied by Title IX encompasses claims of retaliation" where "the funding recipient retaliates against an individual because he has complained about sex discrimination"). To survive a motion to dismiss on a Title IX retaliation claim, a plaintiff must allege sufficient factual material to render plausible two things: (1) that they engaged in protected activity under Title IX, and (2) that they suffered adverse employment action as a consequence of their protected activity. *Hurley*, 911 F.3d at 694. Because this motion is disposed of on the first factor, the Court focuses its attention there.

Protected activity is limited to oppositional conduct that is prompted by a reasonable belief that an employer is not in compliance with its Title IX obligations. In addition to common sense, this limitation follows from *Jackson*'s explanation of the private right of action, as well as the practice of the federal courts in the context of Title VII retaliation claims.

*Jackson* was premised on the Supreme Court's belief that that effective enforcement of Title IX entails a safeguard for those who oppose Title IX violations. *See Jackson*, 544 U.S. at 180 ("Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished."). It stands to reason that the cause of action should be bounded according to this rational. Baseless accusations of discrimination are, if totally unfounded, unprotected for the simple reason that effective

enforcement of Title IX does not require job-protection for the slanderer. The alternative rule would be overinclusive and, rather than promote effective enforcement, make a farce of this country's antidiscrimination laws. *Cf. Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1998). (highlighting the need to "balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.") (internal quotation marks omitted).

The limitation is further supported by Title VII jurisprudence. *Jackson* left a good deal to be worked out by the lower courts. In doing that work, "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." *Preston v. Com. Of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994). *See also Hurley*, 911 F.3d at 694 (citing *Preston* and reaffirming that since the Supreme Court "has never spelled out the specific elements of [a Title IX] retaliation claim" we may "apply familiar Title VII retaliation concepts to the requirements of a Title IX retaliation claim").

In the context of a Title VII retaliation claim, the Fourth Circuit has consistently dismissed suits brought by plaintiffs who cannot offer a colorable argument that they were opposing unlawful activity when they were fired. Instead, the right to sue for unlawful firing under Title VII has been understood to apply only where an employee faces employment consequences for opposing "an employment practice that the employee *reasonably believes* is unlawful[.]" *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) (emphasis original), *overruled on other grounds by Boyer-Liberato v. Fountainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015). Not only that, but the opposition must be such that "the employer understood or

should have understood" that the plaintiff was opposing a practice barred by Title VII. *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012).

In *McNair v. Comput. Data Sys., Inc.*, the Fourth Circuit affirmed summary judgment against a Title VII retaliation claim due to the employee's "failure even to show that the activity she had engaged in was protected from retaliation under the terms of Title VII." 172 F.3d 863, *4 (4th Cir. 1999) (unpublished). The employee had pointed to a letter in which she objected to a change in her title. *Id*. at * 4. But she offered no evidence that the letter "contained even implicit or indirect opposition to racial or sexual discrimination by anyone[.]" *Id*. at *5. "Rather the court had before it . . . only appellant's *characterization* of the letter's content and purpose." *Id*. (emphasis original). *See also id.* (explaining that an "employee [must] at least have actually opposed employment practices made unlawful *by Title VII*" to succeed on a Title VII retaliation claim. "That is to say, [Title VII] protects opposition neither to all unlawful employment practices nor to employment practices the employee simply thinks are somehow unfair.") (emphasis original).

Even at the motion to dismiss stage, our pleading standards do not allow courts to rely solely on a plaintiff's characterization of his employer's conduct. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice it if tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citations omitted).

## B

The Amended Complaint does not allege the factual raw material necessary to raise a plausible claim of protected activity. As in *McNair*, the Court has only Lamb's characterizations.

The Amended Complaint connects Lamb's firing to three activities: (1) Lamb's inquiries to University leadership following media attention around the Title IX lawsuit; (2) Lamb's edits of President Prevo's draft convocation speech; and, (3) Lamb's criticism of Liberty's mishandling of sexual assault and harassment allegations, particularly at the October 4 leadership meeting.[1]

Lamb's allegation that he "ask[ed] questions of University leadership" following the prompting of an independent journalist, Amended Complaint ¶ 35, is to no purpose because it does not tell us what those questions were, or even whether they were critical in nature. In other words, there is no allegation Lamb was opposing a discriminatory practice by these questions—let alone one prohibited by Title IX. It is equally logical to infer that Lamb was gathering the information he needed to respond to the journalist's requests for information and for an interview with Liberty executives. "As Liberty University's spokesperson, Plaintiff's job involved preparing the University's response to media inquiries about the allegations in the Doe's [l]awsuit." *Id*. at ¶ 37.

Lamb's allegation with respect to the convocation speech is an improvement in that it at least provides some factual detail. We are told that Lamb sought to make the speech more respectful of victims of sexual assault in various ways. However, opposing the speech as written

---

[1] The Court does not include the interviews with Baker Tilly in this list because there is no allegation that anyone in university leadership knew what Lamb said to the firm. Nor does Lamb offer any reason to think that his mere participation in the independent investigation was the cause of his termination, since it was the University that asked him to sit for the interviews. Amended Complaint ¶ 29.

could constitute protected activity only if it was reasonable to believe that the speech as written discriminated on the basis of sex in violation of Title IX.

The Court is unaware of any case in which a university administrator was found to have exposed his institution to Title IX liability by an address that was misleading and/or lacked "empathy" and "transparency" and had a "patronizing tone and substance." *Id*. at ¶ 44. Neither does Lamb's briefing offer any basis for the Court to draw this novel conclusion.

Even assuming such a speech could constitute deliberate indifference to sexual harassment, the limited factual allegations provided by Lamb do not render it reasonable to conclude that it did so here. In the typical case, "[s]chool administrators are entitled to communicate freely with students and faculty regarding the existence and severity of potential safety risks on the school's campus without fear of creating future liability." *Hurley*, 911 F.3d at 698 (denying plaintiff's claim that university president's letter downplaying risk of threats to student feminist group constituted Title IX retaliation). Perhaps there might be some factual context in which this would not be true. But Lamb does not present it.

Finally, Lamb alleges that throughout his employment he "raised the issue of Title IX violations[.]" Amended Complaint ¶ 54. Especially in the October 4 leadership meeting, in which he:

- "expressed dismay over the direction of the University and concern that that University had strayed so far from its mission." *Id*. at ¶ 48.

- "repeatedly stated that he would not be silenced or participate in a cover up of activities within the University that [he] believes contradict the law, including[]the Universities' mishandling of well-publicized reports of sexual assault, harassment, and discrimination on campus[.]" *Id*. at ¶ 49.

– 10 –

- "asserted that the University needed to address Title IX violations or, he believed, it would face a wave of allegations centered around Title IX." *Id.* at ¶ 53.

Once stripped of legal conclusions, these statements amount to a wash. Because Lamb does not tell us what he thought was being mishandled, there simply is no way to tell whether his actions were justified by a reasonable belief that Liberty was violating Title IX.

To be clear, this memorandum opinion is not a comment on Liberty's compliance with Title IX. Only a finding that Lamb has not alleged facts stating a Title IX claim as to him. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (noting the longstanding rule that "extrinsic evidence should not be considered at the 12(b)(6) stage"). Liberty's motion to dismiss the Amended Complaint, Dkt. 27, will be granted.

****

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __10th__ day of March 2022.

*[signature]*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE