UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| WALTER SCOTT LAMB ) | |
| ) | Case No. 6:21-cv-00055 |
| Plaintiff, ) | |
| v. ) | Hon. Norman K. Moon |
| ) | |
| LIBERTY UNIVERSITY, INC., ) | |
| a Virginia corporation, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**SECOND AMENDED COMPLAINT**

Walter Scott Lamb, through his attorneys, alleges:

**PRELIMINARY STATEMENT**

1. Plaintiff, Walter Scott Lamb, sues Liberty University, Inc. for violating Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, which prohibits educational discrimination on the basis of sex, including retaliation for engaging in protected opposition to Title IX discrimination or participating in a Title IX proceeding.

2. Defendant hired Walter Scott Lamb on or around January 2, 2018, as Vice President of Special Literary Projects. During his employment at Liberty University, Walter Scott Lamb performed his duties as Vice President of Special Literary Projects and, later, as Senior Vice President of Communications and Public Engagement with exemplary integrity and diligence. Despite Plaintiff's achievements in his role, Defendant terminated his employment in retaliation for his opposition to the University's mishandling of Title IX sexual misconduct accusations, including many allegations of sexual assaults by current and former male staff, contractors, and students against current and former male and female students and employees of the University that went uninvestigated, his participation in an independent investigation conducted by outside

1

Exhibit A

counsel of the same, and his opposition to existing practices of the University that Mr. Lamb reasonably believed violated Title IX.

3. On October 6, 2021, after approximately three years and nine months of service to Liberty University, Defendant summarily fired Plaintiff at the direction of the acting University President.

## JURISDICTION

4. This action arises under, *inter alia*, 20 U.S.C. § 1681, which prohibits educational discrimination and retaliation on the basis of sex and thus this Court has subject matter jurisdiction under 28 U.S.C. § 1331 (relating to federal question jurisdiction) and 28 U.S.C. § 1333(a)(3) (relating to equal rights actions).

## VENUE

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because the University is a Virginia corporation subject to personal jurisdiction in this District.

6. Venue is proper in the Lynchburg Division of the United States District Court for the Western District of Virginia because the conduct supporting this action occurred in this Division.

## PARTIES

7. Plaintiff is an adult man and citizen of the Commonwealth of Virginia.

8. Defendant employed Plaintiff from January 2, 2018, to October 6, 2021, during which time he served as Vice President of Special Literary Projects before being promoted to Senior Vice President of Communications and Public Engagement.

9. Upon information and belief, Defendant is a Virginia nonstock corporation.

10. Mr. Jerry Prevo is the President of the University. He served as Chairman of the Board of Trustees since about 2003. He also has served on the executive leadership team of the University since at least 2003.

11. Upon information and belief, Defendant's registered agent is David M. Corry. Upon information and belief, Defendant's registered agent's office is located at 1971 University Blvd., Liberty University, Lynchburg, Virginia 24515-0002.

12. Upon information and belief, Defendant receives federal financial assistance, including, but not limited to, accepting students who pay tuition, in part, with federal financial aid directly distributed to the students.

13. Defendant is a private institution of higher education, offering undergraduate degrees as well as a full slate of graduate programs.

14. Defendant is accredited by the Southern Association of Colleges and Schools Commission on Colleges, among other organizations.

15. Defendant is authorized to confer degrees by the Commonwealth of Virginia.

## FACTS

16. Liberty University is, or promotes itself as, a Christian University. But it is open to students of different faiths and values. In this way, it lives in tension with secular values of the public and some of its students and staff. Additionally, individual students, faculty, and administrators often fail to live out the Christian ideals that Liberty University promotes.

17. Through the years, Liberty University has dealt with these tensions in various ways. It has created a handbook, called The Liberty Way, dictating heavy fines and demerits for various moral shortcomings of the students, including sexual morality and substance abuse. Thus, a woman who violates the alcohol policy and is raped or sexually abused may be reluctant to disclose the abuse for fear of that she may be punished nominally for her own violations. Likewise, Liberty University condemns homosexual acts as sinful, and prohibit them with fines and demerits, thereby

discouraging individuals with homosexual tendencies from reporting acts of homosexual abuse toward them, for fear of being shamed, outed, and punished.

18. At the same time, Liberty University has also tolerated sexual harassment and abuse by administration, faculty, Board members, business partners, and students. It allows certain faculty and staff with known histories of perpetrating sexual abuse or violence to remain employed, for the sake of the public image or efficiencies of the school.

19. The University deliberately maintains and controls certain off-campus housing with a practice of "Don't Ask, Don't Tell" concerning the use of intoxicants or incidents of sexual assault and violence in that housing while branding Liberty as "one of the safest campuses in the nation."

20. These tensions, and the University's compromises, are well-known to the administration and faculty of Liberty University. But these administrators and faculty generally resist appropriate changes.

21. During the course of his employment, Mr. Lamb became aware of tensions and compromises at Liberty University concerning sexual misconduct, including those listed above.

22. He became aware, in 2019, through communications with a coworker of credible allegations against Keith Anderson concerning sexual assault of a student between 2011 and 2013, and Mr. Anderson remains employed by the University. Mr. Lamb knows that the then-President Jerry Falwell, Jr. was aware of these allegations, and believes the Chairman of the Board, Jerry Prevo, was also aware of it at the time.

23. He became aware Board of Trustees member credibly accused of sexual assault, who was then hired by the University and is now in a leadership role within the Office of the Registrar.

24. Plaintiff was hired as Vice President of Special Literary Projects on or about January 2, 2018.

25. In or around April 2019, Plaintiff was assigned more responsibilities and given the new title of Senior Vice President of Communications and Public Engagement in the newly created Office of Communications and Public Engagement.

26. Throughout his employment at Liberty University, Plaintiff reported directly to the Office of the President.

27. As Senior Vice President of Communications & Public Engagement, Plaintiff oversaw three communications outlets for the University: Liberty University News, The Standing for Freedom Center, and the student newspaper, "The Champion".

28. Plaintiff's job responsibilities included serving as spokesperson and media liaison for the University. Additionally, one of his core tasks assigned at the beginning of his employment was to write a full-length history of the University in preparation for the fiftieth year anniversary. Accordingly, he was given directive and authority by the President to interview and hear the stories of the University from anyone past and present that could provide insight into the history of the university – both positive stories and negative. This project was later terminated by the President, but not before the Plaintiff had conducted eighteen months of interviews, both casual and formal.

29. Plaintiff was also tasked with special projects on behalf of the University President such as speechwriting, ghostwriting for publications, and networking with alumni, donors, parents of students, and representatives of various nonprofit organizations.

30. As Senior Vice President of Communications and Public Engagement, Plaintiff was a member of Defendant's leadership team.

31. Plaintiff's employment was terminated on October 6, 2021.

32. Upon information and belief, at the time of Plaintiff's termination, Defendant's Executive Leadership team was composed of President Jerry Prevo, General Counsel David M. Corry,

Provost, and Chief Academic Officer Dr. Scott Hicks, Online Provost Shawn D. Akers, Executive Vice President for Human Resources Laura Wallace, Executive Vice President of Strategic Partnerships and Alliances Glenn Clary, Campus Pastor Jonathan Falwell, Executive Vice President of Enrollment Management & Marketing Ron Kennedy, Director of Athletics Ian McCaw, Executive Vice President of Inclusion, Diversity, and Equity Shon Muldrow, and Chief Financial Officer Robert Ritz.

33. In the summer of 2020, Title IX regulations changed to impose greater requirements on educational institutions, effective August 14, 2020. *See* 34 CFR §§ 106.44 to -.45 This included: If Liberty University had "actual knowledge of sexual harassment" in one of its education programs or activities (which includes "locations, events, or circumstances over which [the University] exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution"), it "must respond promptly in a manner that is not deliberately indifferent." Deliberate indifference is conduct "clearly unreasonable in light of the known circumstances."

34. Upon information and belief, Jerry Falwell Jr. was President of the University at the time of Plaintiff's hire until Mr. Falwell's resignation on August 24, 2020. Mr. Falwell resigned in advance of anticipated media reports of sexual impropriety involving him, family members, and another employee of the University involving someone in one of the University's educational programs. In his position, Lamb became aware the anticipated media report about the other employee, and he brought them to the attention of then-Chairman Prevo. Upon information and belief, the allegation against the other employee was not printed, and the University did not undertake appropriate investigation into the matter under Title IX.

35. In the wake of Mr. Falwell's resignation, the University's Board of Trustees launched an independent investigation into various facets of University operations by engaging outside counsel, referred to herein as the Baker Tilly investigation. Mr. Lamb understood the focus of the investigation would be events that transpired under Mr. Falwell's administration, but Mr. Lamb was instructed to tell media that the independent investigation was, in fact, independent, and were free to investigate any matters.

36. Shortly after this resignation, Mr. Lamb when to Provost Hicks with new information from media reports concerning a prior Title IX violation by a current employee of the University. He was discouraged from addressing any allegations of misconduct concerning the Falwell family, because Laura Wallace, the Executive Vice President of Human Resources, was collecting information about those people who were "disloyal" to the Falwell family, in order to punish them.

37. According to a University press release dated August 31, 2020, Jerry Prevo had "the full range of his presidential authority to implement any changes necessary to improve the ongoing operations of the University and to enrich the spiritual mission of Liberty University, not only for its students but also for every executive, administrator, faculty member, and the entire staff, and for a prospective new president, as well."

38. Upon information and belief, members of the University's Executive Leadership have the authority to take corrective measures on the school's behalf, including related to the implementation, execution, and enforcement of Title IX sexual harassment (including sexual violence) and sex-based discrimination policies and procedures.

39. On or about January 28, 2021, Plaintiff was contacted by Stephen Wesley Burrill, a University staff member in the Department of Strategic Analysis via his University email account to participate in an interview with the outside counsel conducting the independent investigation.

7

University Vice President of Finance and Administration Cindy Gaebe, a member of Senior Leadership, was copied on the email.

40. In the email, Mr. Burrill stated, "The Liberty University Board of Trustees has engaged Baker Tilly to conduct a forensic investigation, and they have the carte blanche to interview employees they select."

41. Plaintiff participated in about 20-25 hours of interviews with outside counsel as part of the independent investigation over eight months, which he understands was far greater than others' participation.

42. During several interview sessions with outside counsel as part of the independent investigation, Plaintiff discussed the lack of meaningful investigation into campus sexual assaults and Title IX violations, including as discussed below. He also discussed his concerns with the practices of Liberty University that inhibit the truthful reporting of sexual harassment or assaults, such as The Liberty Way policies, and its willful disregard of sexual harassment or assaults on the off-campus housing under the control of Liberty University.

43. Meanwhile, beginning in or around February 2021, Mr. Lamb was inundated with a series of media inquiries about sexual assault and sexual harassment at Liberty University, including several concerning current or recent students who were not receiving responses from the University to their recent complaints.

44. On March 11, 2021, independent journalist Julie Roys contacted Plaintiff by telephone in his capacity as Senior Vice President of Communications and Public Engagement with concerns about Liberty University's handling of sexual assaults and harassment.

45. On March 23, 2021, Ms. Roys contacted Plaintiff by email to ask him to facilitate her interviewing several university executives about the alleged gang rape of the woman who would become Jane Doe #2 in a lawsuit filed in July by twelve Jane Does in July 2021.

46. The numerous inquiries prompted the Plaintiff to learn more about the substance of Jane Doe #2's and others' complaints, and how they were processed. His investigations led him to the conclusion that the University was not in compliance with requirements of Title IX, for current complainants. He formed and expressed the opinion that the The Liberty Way knowingly deterred the submission of complaints about both heterosexual and homosexual assault at Liberty University. He formed and expressed the opinion that parts of the off-campus housing were substantially under the control of the University, but the University was not properly regarding it as such for Title IX purposes. He formed and expressed the opinion that leaders of the University were disregarding and covering up known instances of sexual assault and sexual harassment of students by administrators still employed with Liberty. He also learned that several Title IX complainants, including current students, and others with information about potential Title IX violations, contacted the Baker Tilly investigators, consistent with the directions of the University, to speak with investigators, had received no responses. He formed and expressed the opinion that the University was covering up their current Title IX non-compliance out of fear of losing federal funding. Mr. Lamb advocated for these matters to be addressed swiftly, to bring the University into compliance with Title IX. In this, he was opposed by senior leadership of the University. He advocated for these changes with greater and greater frequency and determination until his termination.

47. In or around March or April 2021, in one of these Baker Tilly investigations, the investigators broached the topic about past and current Title IX compliance issues, and Mr. Lamb

9

reported his concerns of noncompliance, including his belief that the then-Chairman Prevo knew about Mr. Falwell's sexual improprieties. Mr. Lamb thereafter, in early May, disclosed to President Prevo that he was uncomfortable that the investigation seemed to be addressing issues under President Prevo's administration, and Mr. Lamb was being compelled to indict President Prevo for at least tacit complicity in the past and present violations of Title IX.

48. Shortly after this conversation, Mr. Prevo then departed from Virginia and was absent for all or parts of May, June, July, August and September 2021. He did, however, instigate an audit of Mr. Lamb's department, which upon information and belief was an early attempt to generate a pretext for terminating Mr. Lamb for his disclosures concerning the Title IX violations in the Baker Tilly investigation and his advocacy for compliance with Title IX, as discussed above.

49. Beginning in June 2021, several media outlets began to release news articles and podcasts accusing Liberty University of past and current violations of Title IX. This led to numerous additional reports of past or current incidents of sexual harassment or sexual assault circulating, including by victims, on social media.

50. On July 20, 2021, twelve Jane Does filed a lawsuit under Title IX against Liberty University in the U.S. District Court for the Eastern District of New York, alleging *inter alia* the University "intentionally created a campus environment where sexual assaults and rapes are foreseeably more likely to occur than they would in the absence of Liberty's policies." *Does 1-12 v. Liberty University, Inc.*, Case No. 2:21-cv-03964-JMA-ARL (E.D.N.Y. July 20, 2021) ¶ 29 ("Does' Lawsuit").

51. As Liberty University spokesperson, Plaintiff's job involved preparing the University's response to media inquiries about the allegations in the Does' Lawsuit. In this capacity, he saw that the University appeared willing to publish false and misleading narratives concerning its Title

IX compliance, and he opposed these false claims. Through these efforts, he repeatedly advocated that the University bring itself into compliance with Title IX and address the policies and culture that heretofore had facilitated sexual harassment and sexual assault on campus, in its off-campus housing under Liberty's control, and in its educational programs.

52. Upon information and belief, outside counsel with Baker Tilly presented a report at a special meeting of the Board of Trustees on or around Wednesday, September 29, 2021, detailing the findings of their independent investigation.

53. University President Prevo was scheduled to speak at LU's convocation on or around Friday, October 1, 2021. This public event would be witnessed live by the student body, broadcast worldwide online, covered by media, and archived for public access viewing. Plaintiff was tasked with reviewing the University President's planned remarks, which he did on or around September 30, 2021.

54. Upon information and belief, a student-led organization called "Justice for Janes" was planning to attend convocation en masse with teal ribbons to support victims of sexual assault at Liberty University. Upon information and belief, the organization has also called for an independent investigation of Liberty University's Title IX office and human resource department's handling of sexual assault and harassment claims.

55. President Prevo was expected to address the issue of sexual assaults on campus due to the news reports of the previous several months, and the pending suit.

56. Plaintiff reviewed President Prevo's planned speech and urged President Prevo not to deliver the speech as drafted because it contained false and misleading statements concerning the Title IX investigation and compliance efforts, and because its lack of empathy, transparency, and patronizing tone and substance.

57. President Prevo did briefly address the issue of sexual assault and harassment on Friday, October 1, 2020, with platitudes about wanting students to feel safe. This inadequate response produced an outpouring of adverse public comments on social media.

58. While reviewing the adverse social media feedback on October 1, 2020, Mr. Lamb saw a public posting by a former student alleging apparent Title IX violations, and forwarded it to the Title IX compliance officer for Liberty University, the General Counsel's office, and the Vice President for Equity, Diversity and Inclusion:



59. He likewise saw a series of posts by Twitter user "Lori K" that he forwarded to the same people:



60. On Monday, October 4, 2021, Plaintiff was called to a meeting, with only forty-five minutes' notice, with members of University leadership, including President Prevo, Chief

12

Financial Officer Ritz, Vice President of Finance and Administration Gaebe, and Executive Vice President of Strategic Partnerships and Alliances Clary.

61. After the events of the recent months, and particularly the recent days, the Plaintiff anticipated that this meeting was likely intended to raise some pretext for terminating his employment, so as to end his increasingly determined advocacy for Title IX compliance. He was correct. President Prevo indicated that the meeting was about Mr. Lamb's management of social media for The Freedom Center, and his previous publication of memes that the University considered to be too political. When Mr. Lamb pointed out that he worked closely, at President Prevo's directive, with a much more experienced Board member, Penny Nance, who opined that the memes were acceptable, President Prevo responded angrily that he doesn't care what Nance thought. When Mr. Lamb pointed out that President Prevo had repeatedly personally directed Mr. Lamb to use the Center to get Republican politicians elected to office, contrary to Mr. Lamb's and other's objections, President Prevo repeatedly called Mr. Lamb a liar. President Prevo threatened to fire him and then demanded his resignation. During this conversation, Mr. Lamb made reference to the way people have been hurt by the University and things have been covered up, implicitly referencing the Title IX violations. Mr. Lamb was then sent from the room. He was allowed to return about forty minutes later, with only a few of the people present, and Mr. Lamb confronted the Title IX violations more directly, telling President Prevo that they needed to be transparent about their past mistakes, and to take true and meaningful steps to correct the current deficiencies. He told President Prevo that the Title IX misdeeds that began under President Falwell, while President Prevo was chairman of the Board of Trustees, were continuing under his presidency. The meeting ended with Mr. Lamb being told to go back to his office and await further instructions about what President Prevo would do with him.

62. The day after the Executive Leadership meeting, October 5, 2021, University General Counsel Corry met with Plaintiff, ostensibly, to negotiate a separation agreement. Upon information and belief, he was acting on President Prevo's behalf, in consultation with the executive leadership. Mr. Corry presented a severance agreement that would have required the Plaintiff not to disclose information concerning Liberty University, to include the Title IX concerns, and not to disparage the University. The Plaintiff rejected the substantial offer the University made, stating that he was concerned about the efforts to cover up Title IX violations, and the failure to investigate complaints of sexual harassment and sexual assault. He would not resign and he would not sign an NDA.

63. The next day, Plaintiff was contacted by Executive Vice President of Human Resources Laura Wallace and instructed to call.

64. Plaintiff telephoned that day Ms. Wallace and she informed him of his immediate termination.

## COUNT I

## RETALIATION IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681.

65. Plaintiff incorporates by reference paragraphs 1 through 62 as fully set forth here.

66. Title IX prohibits sex discrimination in any education program or activity receiving federal financial assistance.

67. Defendant is an educational institution subject to the prohibitions in Title IX.

68. Upon information and belief, Defendant is a private institution of higher education, operating an education program or activity.

69. Defendant is a recipient under Title IX because it receives tuition from students funded with federal financial aid directly distributed to the students.

70. Plaintiff engaged in protected activity by reporting potential Title IX violations and opposing what he reasonably believed to be ongoing noncompliance with Title IX requirements, to include: failing to respond promptly to known incidents of sexual harassment in its education programs or activities; and deliberate indifference to known incidents of sexual harassment in its education programs or activities.

71. Plaintiff also engaged in protected activity by participating in an independent investigation by outside counsel into the University's operations and which purported to include its Title IX practices.

72. The University knew of Plaintiff's protected activity.

73. Upon information and belief, the University's Executive and Senior Leadership have authority to take corrective measures on the school's behalf for violating Title IX.

74. University officials, including, but not limited to, President Prevo and General Counsel Corry had actual notice of and were deliberately indifferent to the misconduct.

75. Plaintiff suffered an adverse employment action when the University, at the direction of President Prevo, terminated his employment.

76. Plaintiff's termination was followed his eight months of participation in the independent investigation into University practices, and advocacy for bringing the school into compliance with Title IX.

77. Plaintiff was terminated for engaging in activity protected under Title IX.

78. Plaintiff has sustained damages as a result of Defendant's conduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgement as follows:

    A. Award Plaintiff for his past and future loss of wages and benefits, plus interest;

B. Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

C. Award to Plaintiff compensatory damages; and

D. Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by jury.

Respectfully Submitted,

Dated: March 22, 2022

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-2105

Ian A. Northon, Esq.
Michigan—P65082
Pennsylvania—207733
Florida—101544
Admitted Only Pro Hac Vice
E. Meaghan Clayton
Admitted Only Pro Hac Vice
Michigan Bar No. P85409
Rhoades McKee PC
55 Campau Ave., N.W., Ste. 300
Grand Rapids, MI 49503
Telephone: (616) 233-5125
ian@rhoadescmkee.com
jjolliffe@rhoadesmckee.com
mclayton@rhoadesmckee.com
Attorneys for Plaintiff