IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| WALTER SCOTT LAMB, | ) |
|       Plaintiff/Counterclaim Defendant, | ) ) ) ) |
| v. | )   Civil Action No. 6:21-cv-55 |
| LIBERTY UNIVERSITY, INC., | ) ) ) |
|       Defendant/Counterclaim Plaintiff. | ) ) |

**LIBERTY UNIVERSITY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO SCOTT LAMB'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Liberty University, Inc. ("Liberty"), by counsel, submits as follows in opposition to the Motion for Leave to File a Second Amended Complaint (ECF No. 71) submitted by Walter Scott Lamb ("Lamb").

**INTRODUCTION**

In his initial Complaint, Scott Lamb conceded that Liberty fired him after a cocktail of complaints about a variety of supposed "corrupt activities." Lamb then volitionally amended that pleading when confronted with Liberty's opposition memorandum and the obvious absence of requisite "but-for" causation in Lamb's first attempt. Lamb's second effort at a cognizable complaint fared no better. In his First Amended Complaint, Lamb did eliminate references to complaints unrelated to Title IX, but still provided no detail about how he thought Liberty had committed the "Title IX violations" to which he so frequently, but vaguely, alluded. This Court properly dismissed the First Amended Complaint.

Lamb now asks the Court for a third chance. With each retelling, the tale in Lamb's Complaint grows taller. Even imagining Lamb's narrative were true, however, his latest proposed

1

version of events still ignores the Court's admonition that "[o]ne does not receive job protection from Title IX simply by invoking Title IX." (Memorandum Opinion ("Mem. Op.," ECF No. 67) at 1.) Because Lamb still could not state a Title IX retaliation claim even if the Court were to allow him a third attempt to do so, his proposed amendment would be futile. And, in any event, the law in this Circuit is attuned to the reputational and practical harm to defendants from plaintiffs firing off buckshot complaints. A plaintiff who has had "two full opportunities" to state a claim (as Lamb has) need not receive a third. *E.g.*, *Hunters Labs., LLC v. Quest Diagnostics, Inc.*, 2014 WL 1928211, at *11 (E.D. Va. May 13, 2014). Accordingly, the Court should deny Lamb's motion.

## ARGUMENT

### I. Legal Standard

"[G]rant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In considering a motion to amend, the Court must "look to the particular circumstances presented, including previous opportunities to amend and the reason for the amendment." *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018) (internal citation and quotation marks omitted). Thus, a district court may "deny a motion to amend a complaint, so long as it does not outright refuse to grant the leave without any justifying reason." *Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010) (internal citation and quotation marks omitted). Such justifying reasons include prejudice to the opposing party, bad faith by the moving party, or a futile amendment. *E.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).

"Amendment is futile when the proposed amended complaint fails to state a claim upon which relief can be granted." *Booker v. City of Lynchburg*, 2021 WL 519905, at *1 (W.D. Va.

2

Feb. 11, 2021) (Moon, S.J.) (internal citations omitted). To state a Title IX retaliation claim, a plaintiff must plausibly allege that: (1) he engaged in protected activity under Title IX; (2) he suffered adverse employment action; and (3) but-for causal connection between the two. *See Doe v. Washington & Lee Univ.*, 2021 WL 1520001 (W.D. Va. Apr. 17, 2021) (Moon, S.J.). Even at the motion to dismiss stage, federal "pleading standards do not allow courts to rely solely on a plaintiff's characterization of his employer's conduct." (Mem. Op. at 8.) "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice it if tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Notably, for purposes of this case, repeated failure to cure deficiencies by amendments previously allowed is also a reason to deny leave to amend." *Boardley v. Household Fin. Corp. III*, 2015 WL 3486891, at *1 (D. Md. June 1, 2015); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint").

## II. Lamb's Proposed Amendment Is Futile

The Court should not entertain Lamb's third attempt to plead his Title IX claim, for two related reasons. First, Lamb has already tried twice to plead that claim and has failed to plausibly allege adequate facts, even when those facts are solely within Lamb's control. Second, review of Lamb's latest iteration confirms that it suffers from the same flaws as the first two: Lamb still has not plausibly alleged facts sufficient to infer protected activity or but-for causation.

### A. Lamb Has Already Had Ample Opportunity To Plead His Claim.

Virginia federal courts frequently deny leave to amend where a plaintiff has already tried twice to plead his claim and failed. *See Allen v. FCA US LLC*, 2017 WL 1957068, at *4 (W.D. Va. May 10, 2017) (Moon, S.J.) (denying motion for leave to amend where the plaintiff "previously had two full opportunities" to plead her claim via the original complaint and amended complaint); *see also Minor v. Nationstar Mortg., LLC*, 2017 WL 2829620, at *3 (E.D. Va. June 30, 2017) (same); *McLain v. KBR, Inc.*, 2014 WL 3101818, at *7 (E.D. Va. July 7, 2014) (same); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 595 (E.D. Va. 2006) (dismissing complaint with prejudice where "Plaintiff has had two full opportunities to state its claim"); *Travelers Cas. & Sur. Co. v. Danai*, 2005 WL 2045398, at *3 (E.D. Va. Aug. 22, 2005) (denying leave to amend where the plaintiff had twice failed to state a claim).

This rule is particularly apt in cases, like this one, that force trials in the court of public opinion despite clear legal deficiencies. In such cases, there is benefit to limiting the damage of this public vetting process by compelling plaintiffs to launch well-considered causes of action that satisfy pleading rules in early attempts. *Cf. Allen*, 2017 WL 1957068, at *4 (observing that "the Court need not subject Defendant to repeated litigation over the sufficiency of the complaint when Plaintiff was on notice of the complaint's insufficiency, knew or should have known all the facts necessary to state a claim, and yet has repeatedly failed to present an adequate pleading").

Courts across the country have approved this protective approach. *E.g.*, *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 (5th Cir. 2002) (holding that the district court did not abuse its discretion in denying the plaintiff a third opportunity to amend its complaint); *Hitt v. Cardinal Health 100, Inc.*, 2015 WL 13907064, at *1 (C.D. Cal. Jan. 20, 2015) (denying leave to amend because "Plaintiffs have had two opportunities to state a cause of action, [but] have been

4

either unwilling or unable to plead sufficient facts to survive a motion to dismiss"); *Koehler v. Bank of Bermuda (New York) Ltd.*, 1998 WL 790931, at *1 (S.D.N.Y. Nov. 12, 1998) (denying leave to amend where "Plaintiff has had two opportunities to plead the elements of a securities fraud claim but has failed to do so").

As in each of these cases, Lamb had ample notice of the defects in his original Complaint, which Liberty first identified in its November 4, 2021 motion to dismiss. Lamb took the opportunity to try to remedy those defects in filing his Amended Complaint. Yet, Lamb still chose to rely on bare legal conclusions and generalizations to support his claim of protected activity, even though the relevant facts were entirely within Lamb's control. As this Court has observed, the "Court is not required to give Plaintiff unlimited opportunities" to plead facts that "should have been known to Plaintiff at the outset of the case." *Allen*, 2017 WL 1957068, at *4. Rather, the interests of justice weigh in favor of requiring plaintiffs to plead facts in their control, and judicial efficiency cautions against consuming needless time and resources with repeated amendments. Liberty should not be forced to continue to litigate over information that Lamb should have provided in at least one of his first two pleading attempts. For this reason alone, Lamb's motion should be denied.

    **B. Lamb's Requested Amendment Is Futile Because The Proposed Second Amended Complaint Fails To State A Claim.**

Moreover, examination of Lamb's proposed amendment proves that Lamb still has failed to cure the problems the Court identified in its Memorandum Opinion. Although Lamb's critiques of Liberty and its Title IX compliance program have multiplied in the Second Amended Complaint, volume is no substitute for specificity. Even now, Lamb has yet to identify a single specific incident or practice that Lamb (1) reasonably believed violated Title IX; and (2) communicated to Dr. Prevo, whom Lamb identifies as the key decisionmaker in his termination.

5

For this reason alone, his proposed amendment must fail. Liberty addresses each of Lamb's critiques in turn.

First, Lamb alleges that he became aware of "anticipated media reports of sexual impropriety involving [then-President Falwell], family members, and another employee of the University involving someone in one of the University's educational programs," and that Lamb informed Dr. Prevo about the "anticipated media report about the other employee[.]" (Proposed Second Amended Complaint ("Proposed SAC," ECF No. 72-1) ¶ 34.)[1] This cryptic allegation provides no hint that any Title IX violation occurred (or that Lamb reasonably believed as much). The subjective and ambiguous phrase "sexual impropriety" could encompass myriad activities that are not Title IX violations. Plus, Lamb provides no hint about who the employee was, what his or her involvement was in the purported "sexual impropriety," where it occurred, how or why Liberty might have been responsible for that supposed impropriety, whether Liberty had notice and an opportunity to address the alleged impropriety, or how the impropriety could conceivably rise to the level of the intentional sex discrimination prohibited by Title IX. As before, "[w]ithout an allegation as to what Lamb thought Liberty was doing (or not doing) to violate Title IX, the Court cannot make the determination incumbent upon it." (Mem. Op. at 1.) This allegation therefore does nothing to advance Lamb's claim.

Second, Lamb alleges that he forwarded certain information from public media reports and social media accounts to University administrators. (Proposed SAC ¶¶ 36, 58-59.) Specifically,

---

[1] Even earlier in the proposed Second Amended Complaint, Lamb alleges that he "became aware of" two specific allegations of sexual misconduct, one of which occurred long before Lamb's tenure at Liberty, and the other of which occurred at an undisclosed time. (Proposed SAC ¶¶ 22-23.) However, Lamb does not allege that he ever complained to anyone about either of these incidents, nor does he otherwise attempt to connect those incidents in any way to his firing. Liberty therefore does not address these allegations further.

Lamb sent "information from media reports concerning a prior Title IX violation" to Provost Hicks sometime after Falwell's resignation, *id.* ¶ 36, and he later forwarded public "tweets" about alleged sexual misconduct to Liberty leadership, *id.* ¶¶ 58-59. Lamb does not allege that he provided any commentary on these allegations, that he counseled the complainants in any fashion, or that he took any affirmative action to investigate the public information. Basically, Lamb did the spokesman's job for Liberty, and simply passed on certain news reports as part of that job. But merely repeating information that is already public (and third-party hearsay), without more, is not protected activity. *E.g.*, *Bradley v. CMI Indus., Inc.*, 17 F. Supp. 2d 491, 496 (W.D.N.C. 1998) (finding that the plaintiff had not engaged in protected activity and explaining that "it is doubtful that Plaintiff's conduct—merely repeating [another employee's] allegations to his supervisor, Haynes—can legitimately be considered opposition"); *see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 685-86 (S.D.NY. 2007) (holding, in the False Claims Act context, that the plaintiff had not engaged in protected activity by "cobbl[ing] together an FCA complaint out of information that was already in the public record") (internal citation and quotation marks omitted). Were the law otherwise, any employee could claim protected activity simply by forwarding public Internet content to company leadership, regardless of the content's truth and regardless of the employee's role (or lack thereof) in the underlying events. Liberty is unaware of any court that has adopted such a boundless definition of protected activity, and Lamb offers no basis for this Court to be the first to do so.

Third, Lamb claims that he "formed and expressed" certain opinions to unidentified individuals at unspecified times about practices that Lamb believes violated Title IX. (Proposed SAC ¶ 46.) Because Lamb fails to explain whether or how these "opinions" reached the ears of Dr. Prevo, they cannot possibly be relevant to his termination. *O'Brien v. U.S. Postal Serv.*, 2011

7

WL 2471294, at *3 (W.D. Va. June 20, 2011) (Moon, S.J.) (granting a motion to dismiss because the plaintiff failed to allege that any decisionmaker knew she had filed an equal employment opportunity complaint).

In any event, none of the "opinions" that Lamb expressed provides a reasonable basis for Lamb's belief that Liberty violated Title IX. First, Lamb opined (to someone, somewhere, who may or may not even have been affiliated with Liberty) that Liberty's Christian honor code, the Liberty Way, discourages reporting of sexual misconduct because it prohibits premarital sexual activity. (Proposed SAC ¶ 46.) Notably, Lamb does not allege that Liberty has ever actually used the Liberty Way to punish anyone who complained of sexual assault, so his fear appears to be purely speculative. But, even imagining Lamb were right that the Liberty Way discouraged students from reporting sexual misconduct, there is no basis for the Court to infer that the Liberty Way discriminates against students on the basis of sex—to the contrary, the Liberty Way's Christian principles apply equally to all students, regardless of sex or sexual orientation. Nor is there any other basis to conflate disapproval of premarital sex with the intentional sex discrimination that Title IX prohibits. This "opinion" of Lamb's therefore cannot possibly constitute protected activity.

Lamb next formed the "opinion" that Liberty "was not properly regarding" certain "off-campus housing" as under its control "for Title IX purposes[.]" (Proposed SAC ¶ 46.) Again, even if true, Lamb entirely fails to explain how this opinion is relevant to whether he reasonably believed Liberty engaged in intentional sex discrimination. Lamb does not identify any alleged off-campus assaults that were reported to Liberty; he does not even identify the off-campus housing allegedly at issue. Nor does Lamb allege any facts to support his belief that that housing

8

was "substantially under the control of the University[.]"[2] *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 713 (4th Cir. 2018) (Agee, J., concurring in part) ("'there must be some nexus between the out-of-school conduct and the school' . . . there must be some additional proof that the school exercised dominion over the environment in which the alleged harassment occurred") (internal citation omitted). As such, even imagining Lamb had shared this opinion with a decisionmaker (which he has not alleged), there is no basis to conclude that protected activity occurred.

Lamb's remaining "opinions" are similarly conclusory, and echo the claims of "cover-ups" that the Court has already found insufficient in its Memorandum Opinion. (Proposed SAC ¶ 46; Mem. Op. at 10-11.) Nowhere in this paragraph (or anywhere in any of his three complaints) does Lamb specifically identify a single complainant whose story he allegedly championed inside Liberty, or a single incident that might give credence to his repeated cries of "Title IX violations." The mere quantity of the opinions Lamb "formed and expressed" to unnamed listeners cannot overcome their legal insufficiency. Nothing in this paragraph helps Lamb state a claim.

Lamb's remaining allegations are largely familiar. For his fourth alleged protected activity, Lamb reiterates the discussion from his prior Complaints about having participated in an investigation overseen by outside counsel. (Proposed SAC ¶¶ 41-42.) As the Court previously

---

[2] This conclusory allegation appears to refer to the 2020 Title IX regulations, which define an "education program or activity" to include "locations, events, or circumstances over which the recipient exercised substantial control over *both* the respondent and the context in which the sexual harassment occurs[.]" 34 C.F.R. § 106.44(a) (emphasis added). Although Lamb vaguely implies that he believes off-campus sexual assaults have occurred (Proposed SAC ¶¶ 19, 51), he does not identify the basis for that belief; he does not explain why he believes those alleged assaults constituted sexual harassment under Title IX; he does specify whether any such incidents occurred after this regulation's enactment; and he has not otherwise attempted to allege any facts connecting his "opinion" about Liberty's off-campus housing to this definition. Again, Lamb relies exclusively on labels, conclusions, and generalities in an effort to disguise his lack of personal knowledge and involvement. Even at the pleadings stage, this cannot suffice.

9

noted, however, "there is no allegation that anyone in university leadership knew what Lamb said to the firm. Nor does Lamb offer any reason to think that his mere participation in the independent investigation was the cause of his termination, since it was the University that asked him to sit for the interviews." (Mem. Op. at 9 n.1.) These dispositive facts remain unchanged. Lamb's participation in the outside investigation therefore remains irrelevant to his claims of protected activity.

Fifth, Lamb again recounts his clash with Dr. Prevo about a privileged draft speech that Dr. Prevo never gave. (Proposed SAC ¶¶ 55-57.) These allegations, too, remain mostly[3] unchanged from those the Court already found insufficient. Lamb still offers no legal or factual basis to infer that President Prevo could "have exposed his institution to Title IX liability by an address that was misleading and/or lacked 'empathy' and 'transparency' and had a 'patronizing tone and substance.'" (Mem. Op. at 10.) In other words, Lamb could not have reasonably believed that the draft speech violated Title IX. This sequence of events therefore does not rise to the level of protected activity.

---

[3]Lamb's latest version of these events omits any reference to having expressed his thoughts in a "memo" to President Prevo and General Counsel David Corry, as featured in the First Amended Complaint. *Compare* Proposed SAC ¶¶ 55-57 *with* First Amended Complaint (ECF No. 17) ¶ 44. This omission appears tactical. Lamb's counsel seems to be attempting to avoid referencing an unpermitted use of privileged information they potentially obtained pre-litigation. Liberty notes that Lamb's counsel refused to directly answer Liberty's court-authorized written question about how counsel could possibly have alleged the contents of that memo without having received Liberty's privileged information. With the Court's permission, Liberty asked, "did you rely on Plaintiff's account of the 'memo' when pleading it in the First Amended Complaint?" Lamb's counsel declined to answer, stating only that they "undertook what [they] believed to be a reasonable inquiry of the facts before completing the Amended Complaint, which included but was not limited to analyzing Plaintiff's factual assertions." (ECF No. 73 at 5; ECF No. 74 at 5.) Liberty remains concerned that the disappearance from the proposed Second Amended Complaint of references to the memo is another effort by Lamb's counsel to evade this issue. The memo was not a peripheral matter to Lamb. To the contrary, it was Lamb's only factually specific allegation in the First Amended Complaint.

Sixth, Lamb recounts the meeting that occurred on October 4, 2021. (Proposed SAC ¶ 61.) In this iteration, Lamb first referenced Title IX "implicitly" by "ma[king] reference to the way people have been hurt by the University and things have been covered up[.]" (*Id.*) Lamb alleges he then:

> confronted the Title IX violations more directly, telling President Prevo that they [sic] needed to be transparent about their past mistakes, and to take true and meaningful steps to correct the current deficiencies. He told President Prevo that the Title IX misdeeds that began under President Falwell, while President Prevo was chairman of the Board of Trustees, were continuing under his presidency.

(*Id.*)

But this version of Lamb's confrontation with President Prevo describes the purported "Title IX violations" with even less specificity than Lamb's last attempt. Lamb still does not explain what "mistakes," "Title IX violations," or "misdeeds" he was allegedly referring to. Despite the Court's warnings, Lamb still does not say who committed the alleged "misdeeds," what "deficiencies" he identified, or why he reasonably believed those "deficiencies" or "misdeeds" violated Title IX. As the Court observed with regard to Lamb's last description of this meeting, "[o]nce stripped of legal conclusions, these statements amount to a wash." (Mem. Op. at 11.) By failing to remedy this defect despite the Court's prior holding, Lamb has conceded he cannot do so. His proposed amendment would therefore be futile, and the Court should not allow it.

Finally, Lamb cannot cure the flaws in his Amended Complaint regarding causation. In its dismissal opinion, this Court specifically spotted Lamb's absence of explanation for Dr. Prevo calling Lamb a "liar." (Mem. Op. at 4.) Now, Lamb provides the requested rationale—but it has nothing to do with Title IX. Instead, Lamb concedes that the escalation with Dr. Prevo on October 4 was prompted by disagreement about Lamb's "management of social media for The Freedom

11

Center, and his previous publication of memes that the University considered to be too political." (Proposed SAC ¶ 61.) Lamb fatally admits that Dr. Prevo called Lamb a "liar" because Lamb "pointed out that President Prevo had repeatedly personally directed Mr. Lamb to use the Center to get Republican politicians elected to office[.]" (*Id.*) At that point, according to Lamb, is when Dr. Prevo "threatened to fire [Lamb] and then demanded his resignation." (*Id.*) This is largely consistent with the allegation in Lamb's initial Complaint that he confronted Dr. Prevo about purported "corrupt practices," including "certain perceived violations of the University's 501(c)(3) status mandate, among other issues that caused Plaintiff to believe the University and its leadership had deviated from its religious mission." (ECF No. 1 ¶ 40.)[4] Only after Lamb had incensed Dr. Prevo by refusing to take responsibility for the problematic social media posts that he admittedly made did Lamb begin "implicitly" mentioning Title IX.[5] (Proposed SAC ¶ 61.)

In short, Lamb's latest amendment makes explicit what was implied in the prior Complaints: Lamb's heated discussion with Dr. Prevo on October 4 was not about Title IX at all;

---

[4] In the First Amended Complaint, Lamb retreated from this reality; now, he seeks to reframe it. As noted in Liberty's last motion to dismiss, "[a] party cannot advance one version of the facts in its pleadings, *conclude that its interests would be better served by a different version,* and amend its pleadings to incorporate that version." *Suntrust Mortg., Inc. v. Nationwide Equities Corp.*, 2012 WL 4953120, at *4 (E.D. Va. Oct. 16, 2012) (internal punctuation and citation omitted; emphasis in original). Lamb's shifting stories cast serious doubt on his credibility, and his attempts to evade the truth—that his altercation with Dr. Prevo was about the Stand for Freedom Center, not Title IX—imply bad faith. *Cf. Carter v. SNC-Lavalin Constructors, Inc.*, 2019 WL 918382, at *3 (D. Md. Feb. 25, 2019) (denying leave to amend and finding that "the claim of unlawful termination was brought in bad faith" because the underlying allegations were "mentioned for the first time in the proposed second amended complaint[,]" and the plaintiff "omitted from his proposed second amended complaint the allegations which appeared in his amended complaint").

[5] Notably, Lamb relays the first part of this conversation (regarding the Stand for Freedom Center) in great detail, including Dr. Prevo's responses almost word-for-word. But when it comes to stating the pivotal points underlying his claim of Title IX retaliation, Lamb's recall again becomes selective. He resorts to vague generalities, even omitting Dr. Prevo's side of the conversation altogether.

12

it was about the Stand for Freedom Center and the University's political activities. Lamb has disqualified this allegation from consideration because he has expressly disavowed but-for causation. The Fourth Circuit has embraced the requirement of but-for pleading in Title IX cases. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (holding that Title IX's prohibition of discrimination "on the basis of sex" "requires 'but-for' causation").

District courts evaluating multi-factor allegations have for years reached the same conclusion. *E.g.*, *Phillips v. Dukes*, 2018 WL 835709, at *7 (D. Md. Feb. 12, 2018) (dismissing a retaliation claim in part because "the pleadings focus on the alleged racial bias animating the actions, suggesting that retaliation was not the 'but-for cause'"); *Downing v. Lee*, 2017 WL 11489271, at *3 (E.D. Va. Dec. 12, 2017) (finding that a plaintiff had not shown but-for causation based on allegations that "her prior EEO activity 'was certainly a motivating factor' in the non-selections"); *Brown v. SDH Educ. E. LLC*, 2014 WL 468974, at *6 (D.S.C. Feb. 4, 2014) (granting motion to dismiss a retaliation claim because the plaintiff's pleadings "suggest[ed]" that "'issues'" other than her EEOC complaint prompted the complained-of adverse action). For this reason, too, Lamb's proposed amendment would be futile.

In short, Lamb's proposed Second Amended Complaint confirms the wisdom of the protective rule that two full opportunities to plead a claim is enough. The Court has been more than fair to Lamb, and should not grant him a third.

## CONCLUSION

For the reasons above, Liberty respectfully requests that the Court deny Lamb's Motion for Leave to File a Second Amended Complaint.

Dated: April 5, 2022

                                                                          Respectfully submitted,

                                        LIBERTY UNIVERSITY, INC.
                                        BY COUNSEL:

                                          /s/ Scott C. Oostdyk
                                        Scott C. Oostdyk (VSB No. 28512)
                                        Heidi E. Siegmund (VSB No. 89569)
                                        McGuireWoods LLP
                                        Gateway Plaza
                                        800 East Canal Street
                                        Richmond, VA 23219
                                        (804) 775-1000
                                        (804) 775-1061 (facsimile)
                                        soostdyk@mcguirewoods.com
                                        hsiegmund@mcguirewoods.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 5th day of April, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send a true and correct copy to all counsel of record.

                                                     /s/
                                        Heidi E. Siegmund (VSB No. 89569)
                                        McGuireWoods LLP
                                        Gateway Plaza
                                        800 East Canal Street
                                        Richmond, VA 23219
                                        (804) 775-1000
                                        (804) 775-1061 (facsimile)
                                        hsiegmund@mcguirewoods.com

*Counsel for Defendant*