**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| **WALTER SCOTT LAMB,** | ) |
| | ) |
| **Counterclaim** | ) |
| **Defendant,** | ) |
| | ) |
| **v.** | )      **Civil Action No. 6:21-cv-55** |
| | ) |
| **LIBERTY UNIVERSITY, INC.,** | ) |
| | ) |
| **Counterclaim** | ) |
| **Plaintiff.** | ) |

**LIBERTY UNIVERSITY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SANCTIONS**

Counterclaim Plaintiff Liberty University, Inc. ("Liberty"), by counsel, submits this Memorandum in Support of its Motion for Sanctions against Plaintiff Walter Scott Lamb ("Lamb") in connection with spoliation of material evidence.

**INTRODUCTION**

Lamb sued Liberty on October 25, 2021, asserting that he was unlawfully terminated October 6, 2021 for what Lamb termed his "vocal opposition" to Liberty's handling of sexual misconduct allegations on campus. (ECF No. 1 at pp. 1-7; ¶ 58.) At issue in his lawsuit, then, is the extent and nature of Lamb's actual complaints to Liberty about perceived misconduct. Lamb alleges that much of this "vocalizing" was on the cell phone he constantly used to conduct Liberty business. Lamb pleaded that before his firing, he had "raised Title IX violations to many members of the Executive Leadership team, including but not limited to, President Prevo, his predecessor Jerry Falwell Jr., and General Counsel Corry." (*Id.* at ¶ 58.) Lamb pled that it was a "telephone" conversation with a member of the Executive Leadership team that was the springboard for the processing of his actual termination. (*Id.* at ¶ 46.) Lamb testified at the parties' preliminary

1

injunction hearing that he communicated to former Liberty President and Chancellor Jerry Falwell Jr. "24 hours a day" by cell phone. (ECF No. 52 at p. 226:18-22.) It is clear from pleadings and testimony that Lamb's supposed Title IX protest was driven from his cell phone. Evidence also indicates Lamb claimed his alleged protest was advanced by his personal laptop, communications stored on a hard drive, and an application called "Evernote."

In reaction to Lamb's initial Complaint, Liberty moved for a preliminary injunction to recover its purloined property. Liberty explained that Lamb used his cell phone as a central repository (along with other devices) to squirrel away thousands of records, emails, and audio and video recordings that belonged to Liberty. Liberty charged Lamb with walking off with this material at his exit. Liberty demanded immediate return of this Liberty-owned data and demanded that Lamb cease his rampant distribution of confidential and privileged Liberty materials to the media and unauthorized members of the community. (*See* ECF No. 12.)

Liberty also moved to dismiss that Complaint. On November 11, 2021, with the injunction hearing forthcoming, and with Lamb facing Liberty's Motion to Dismiss, Lamb voluntarily submitted a First Amended Complaint. Lamb tried to correct faults Liberty heralded in its Motion to Dismiss. In his revision, Lamb retained key narrative from his first pleading attempt, reiterating his reliance on his phone to access Jerry Falwell Jr. for work matters. However, Lamb also newly inserted an account of a March 11, 2021 phone conversation between himself and podcaster Julie Roys allegedly related to a request by Roys for an interview with one of the "Jane Doe" women who were in the process of alleging instances of sexual assault at Liberty. (ECF No. 17 at ¶¶ 34, 35.) Lamb once again put the contents of his cell phone and devices at issue.

At the injunction hearing on December 16 and 17, 2021, evidence proved the centrality of Lamb's cell phone and devices to the prospect of proving his Amended Complaint. Much of this

evidence came from Lamb himself.  Lamb testified that he and Jerry Falwell Jr. talked all the time on their cell phones about work, including on weekends:

> Q: And your smartphone, that's something that you would normally use as part of your duties and responsibilities at Liberty?
>
> A: Constantly. Constantly. 24 hours a day, seven days a week, with Jerry Falwell, Jr.

(ECF No. 52 at p. 226:18-22.)  It was Falwell Jr., of course, that Lamb alleges he first complained to regarding Liberty's Title IX compliance.  (ECF No. 1 at ¶ 58.)  Lamb also admitted during the hearing that he saved Liberty email and Falwell's texts on his personal cell phone.

To expound on the processes Lamb used to store Liberty documents, Liberty called to the stand John Gauger, Liberty's Chief Information Officer.  Gauger testified, based on his review of Lamb's technical choices at Liberty, that Lamb had configured his Outlook rules to forward Liberty-sourced emails to his personal cell phone.  Gauger phrased this configuration as follows:

> Q: Is there any evidence that Mr. Lamb forwarded things from his Liberty account to a personal email account in violation of these so-called policies?
>
> A: Yes, sir, his rules.

(ECF No. 52 at pp. 113:24-114:2)  Per these "rules," Lamb surreptitiously arranged to have Liberty emails from important individuals at Liberty forwarded to his cell phone (such as Falwell Jr., one the superiors to whom Lamb would have directed his alleged complaints about Title IX violations).  These emails would "come in as texts" on Lamb's cell phone.  Lamb explained the technical arrangement this way:

> A: It [the Outlook rule] would ping me into my texting application, and I would be alerted to the fact that my boss had just emailed me.
>
> (ECF No. 52 at p. 226:15-17.)

During examination at the injunction hearing, Lamb was asked if his cell phone was in fact his repository of Liberty documents. Lamb confirmed:

> Q: What about your phone? Did you forward Liberty documents to your phone?
>
> A: My personal cell phone?
>
> Q: Yeah.
>
> A: I had a rule in Microsoft Outlook….so that I would get pings….
>
> A: They [the forwarded emails] come in as texts. I – they are just texts to my phone….

(ECF No. 53 at pp. 57:9-58:21.)

Liberty has proven that Lamb's use of his phone and other devices to catalogue his call records, texts, emails, audio recordings, videos, and/or the texts that Outlook converted to stored emails, made his cell phone the hub of his work communications while with Liberty.  Lamb's cell phone was so central, in fact, that if Lamb were ever to prove a "whistleblower" (as he dubbed himself in media posts), then Lamb's phone was the proverbial "whistle" he blew through.  Liberty expected that evidence so pivotal as Lamb's "whistle" would be carefully preserved by Lamb and his lawyers.  Liberty had every right at law to hold this expectation.

Unfortunately, Lamb has also demonstrated a capacity to flout preservation duties, and even to disrespect the truth under oath.  There are already alarming examples of each.  Amazingly, Lamb confessed in the injunction hearing that he had wiped documents from his Liberty-owned computer without court order or leave of opposing counsel:

> Q: How did you wipe it [your Liberty laptop]?
>
> A: I cleaned up my desktop by putting things, sliding them with my mouse or whatever, to the trash can.

(ECF No. 53 at p. 51:11-14.)  Confessing that he "slid" documents to the "trash" was not a strong way to start out Lamb's trial process.  Lamb continued his scofflaw pattern in a disconcerting engagement with the Court. The encounter started when Liberty cross-examined Lamb about a phone conversation Lamb had with a U.S. Department of Education official named Jim Moore:

> Q: …what did you tell him [Jim Moore]?
>
> A: It was an hour-and-45-minute call, which I probably assume they recorded.  I don't remember all that I told them.  They asked me lots of questions.
>
> Q: Did you tell them about the October 1 memo [a privileged communication in which Lamb commented on Liberty's internal approach to the draft of a Convocation presentation to be be given by President Prevo]?
>
> A: I – I just don't remember what I told them in an hour and 45 minutes.

(ECF No. 53 at p. 102:6-12.)   Just minutes later, however, Lamb's memory mysteriously resurrected.  In an about face, Lamb testified that he did not in fact have an issue with his memory of the Jim Moore conversation; rather Lamb did "not feel comfortable telling [Liberty's counsel] what [he] told the Department of Education."   (*Id.* at p. 103:11-12.)   Lamb's admission of dishonesty under oath prompted the following exchange with the Court:

> The Court: Sir, just a few minutes ago you said you couldn't remember what you told [the Education Department].  Now are you saying you can't tell us because you feel that you shouldn't do it?
>
> The Witness: He was asking me a very – more specifically –
>
> The Court: No, I'm just asking you, am I correct that a few minutes ago you said you couldn't recall what you talked about in the hour and a half [with the Ed Dept.]?
>
> The Witness: Very specific questions, yeah.  I can recall –
>
> The Court: Now you recall, but you don't want to answer –

The Witness: No, I can recall.

The Court: -- because you don't feel comfortable.

The Witness: Your Honor, I can recall what the topic of the conversation was. It was a Title IX investigation and the sexual assault and the rapes.

The Court: Well, if you don't lie, you might – if you told him what you knew about it, you don't lie, so tell us what you know about it that would have been the source of the information you conveyed to the person on the phone.

The Witness: Am I to understand that you want me to convey to you what I conveyed to the Department –

The Court: I want you to tell us what you told the person on the telephone. That's the question. And we don't need to spend another hour getting to it. Let's answer the question. Let's go ahead.

(*Id.* at pp. 103:16-104:17.)

After the troublesome interaction between Lamb and counsel, this Court understandably reacted. Having learned of the centrality of Lamb's cell phone, having witnessed Lamb admit to "trashing" documents, and having heard Lamb obfuscate truth under oath, this Court ordered Lamb to return all Liberty documents, devices, and Liberty information in his possession. (*See* ECF No. 37 at p. 3.) This included documents on Lamb's cell phone. To facilitate the court-ordered return of Liberty's property, this Court further directed the parties to negotiate a Computer Forensics and Document Return Protocol ("Forensics Protocol").

This Court anticipated it would take just a few days for the parties to concur on a protocol. Unfortunately, Lamb's counsel stonewalled, delaying this important undertaking week after week. Liberty had to prod Lamb's counsel on many occasions to pay attention to this imperative process. *See* copies of some of the Meet and Confer process surrounding the progress of the Forensic Evaluation, attached hereto as **Exhibit A**. In retrospect, it seems to Liberty that Lamb's counsel

was employing strategic behavior—trying to wait out the Court's resolution of the pending Motion to Dismiss in hopes that permission of the new pleadings would propel Lamb's case to the discovery stage, reducing the focal impact of the Forensics Protocol and allowing Lamb to siphon from the process damaging Liberty records within his possession.

Lamb had no such luck. On March 10, 2022, this Court flatly rejected Lamb's First Amended Complaint.  This Court ruled that the pleading failed to "tell the court what [Lamb] found objectionable about their employer's conduct," (ECF No. 67 at p. 1), noting that the "[t]he Amended Complaint also asserts that Lamb 'raised the issue of Title IX violations to many members of the Executive leadership team' throughout his employment.' [Complaint] at ¶ 54." (ECF No. 67 at p. 4.)  This Court concluded that the Amended Complaint "never identifies the facts giving rise to Lamb's belief that Liberty was mishandling sexual assault and harassment complaints." (*Id.*)  Further, this Court resolved that Lamb did not identify any statements he made to Liberty's Leadership about "what he thought was being mishandled…" (*Id*. at p. 11.)  In sum, this Court determined that "[d]espite repeated opportunities, Lamb has been unwilling or unable to provide the Court with factual allegations identifying what he thought Liberty was doing wrong." (*Id*. at p. 1.)  This Court struck Lamb's second attempt at a cause of action.

By virtue of this pointed opinion, this Court also put Lamb and his legal team on unmistakable notice that if they were to mount a *third* try at pleading a qualifying claim, then that filing would have to be full of actual allegations of misconduct that Lamb had personally communicated to Liberty leadership pre-termination.  Lamb cannot credibly contend he had no notice to save his cell phone, devices, and their contents.  This preservation directive came from: (1) the law, which requires a plaintiff to preserve exculpatory evidence at the lodging of a Complaint; (2) Liberty's highly-specific outcry over Lamb's devices and data that induced the

injunction hearing; (3) the December 2021 hearing evidence, and exchanges with the Court; (4) the Court's follow-on injunction Order; and (5) the Court's admonitions in its March 10 opinion about the imperative of pointed (and supportable) allegations if Lamb were to try to amend and carry forward a claim (which he has now attempted to do).  (*See* ECF No. 71.)  Moreover, such allegations would have to detail highly-specific incidents of mishandled Title IX claims.  The focal point for Lamb to look to amass any material as support for such a pleading is the purloined material on his devices.  The issue of Lamb's preservation of the evidence on his phone and other data-holding devices is therefore pivotal to Lamb's third pleading attempt.

Despite all this pre-notice, and stored Liberty material, the Lamb team failed fantastically at producing it, as mandated.  Their breaches started when they flouted the very Forensics Protocol they finally signed on March 22, 2022, over three months after the Court's December 17, 2021 preservation Order.  A copy of the finalized Forensics Protocol is attached hereto as **Exhibit B**. The Forensics Protocol states on its face that its purpose is "to prevent the inadvertent or improper retention of any materials belonging to either party."  (Ex. B at p. 1.)  To accomplish this remedial objective reliably, Lamb agreed to *physically* furnish to the parties' chosen forensic Expert, Christopher Racich, the following: "[a]ll *personal computers*, *cell phones*, and *tablets* in Lamb's possession, custody, or control, or to which Lamb has access, that currently contain documents that Lamb created or obtained by virtue of his employment with Liberty."  (*Id.* at pp. 1-2) (emphasis added).  Clearly, by reference to Lamb's control of "Liberty" "documents," the purpose of the Forensics Protocol was for Lamb to provide a "before" picture of the contents on Lamb's phone and devices.  The purpose was for Liberty to be able to (1) know the universe of what Lamb kept that was Liberty's property; (2) track and verify that Lamb purged this material after this examination and recovery of the contraband material by the Expert; and (3) monitor what future

8

use Lamb might be making of any material wrongly retained, because in this scenario Liberty would have had a total record of what Lamb had purloined.

Because of Lamb's admission that he used the Outlook rule to stockpile documents on his cell phone, and stored Liberty data on other devices, the Forensics Protocol specified how this "before" picture would be reliably accomplished.  It provided that "Lamb will make his personal computers and cell phone available to Expert, and the Expert's search of Lamb's cell phone shall be confined to Liberty texts or emails sent to Lamb's personal device from Liberty's Microsoft Outlook servers or Liberty's software via Microsoft's Rules feature." (*Id.* at p. 6.)  It also provided, separately, that Lamb was to supply the Expert with *all* his devices—namely Lamb's laptop, his hard drive, and his Evernote account content.  (*Id.* at p. 1-2.)

Plainly, Liberty was the preferred party that this Forensics Protocol was designed to shield. Accordingly, the parties agreed that upon completion of the Expert's search, the Expert would then "provide the results of this search to Liberty's counsel." (*Id.*)  After all, this was the very cell phone on which Lamb communicated with Jerry Falwell Jr. "24 hours a day, seven days a week." Such communications by Lamb with Liberty's CEO would either confirm Lamb's protest over Liberty's Title IX policy and practice, or—more likely—confirm Liberty's stance that Lamb was in accord with and supportive of Liberty's case, and that Lamb only started referencing Title IX when he needed an alternate explanation for his firing over departmental mismanagement.

The proof of the breadth to the parties of this Forensic Protocol was the fact that, on April 4, 2022, Lamb's counsel specifically advised Liberty that Lamb would be providing his "devices" to the Expert.  Evidence of this well-understood and mutual purpose is that Lamb provided to the Expert a laptop, his hard drive, and his Evernote to Liberty on April 13, in addition to his physical cell phone.  A true and correct copy of the April 4, 2022 email is attached hereto as **Exhibit C.**

To Liberty's alarm, when Lamb turned over his devices, the Expert determined the phone was a fake and the devices were gutted and altered.  Lamb had destroyed the Liberty contents of those devices.  Stunningly, the phone Lamb surrendered for inspection was not the one that was the subject of the injunction hearing, or the Court's preservation Order.  As reported to Liberty by the mutually-selected Expert, Christopher Racich, *Lamb intentionally destroyed his cell phone and its contents*.  (*See* Declaration of John Gauger, attached hereto as **Exhibit D**, ¶¶ 12-13.)  According to Racich, the phone that Lamb turned in had an operating system that was newly installed on March 2, 2022.  (*Id*. at ¶ 14.)  Lamb thus destroyed the putative "whistle" at the center of this case.

Racich ominously reported that Lamb had also contorted his laptop, hard drive, and Evernote application.  There were aberrations in each of these devices when Lamb turned them in.  (*See* Declaration of Christopher Racich, attached as **Exhibit E**.)  According to Racich, the Evernote data that Lamb funneled to the Expert amounts to only 87 megabytes of data.  (Racich Decl. ¶ 13.)  That is a tiny fraction of what Racich recovered from Lamb's Liberty computer after Lamb surrendered it to his employer weeks after termination.  (*Id*.)  Lamb cleaned off Liberty data from his Evernote account after the injunction hearing that culminated in the Court's preservation Order, based on how far out of parallel Lamb's Liberty laptop and Evernote were on Racich's inspection.  Moreover, the Lamb computer has a setup date of March 12, 2022.  (*Id*. at ¶ 7.)  Thus, around the same time that Lamb wiped his phone, March 2, 2022, and before the parties executed the Forensic Protocol, Lamb tampered with his personal laptop.  On April 9, 2022, (the day <u>after</u> Lamb's lawyers told Liberty that Lamb had "packed the devices for [the] delivery" that occurred April 13), Lamb appears to have added to his computer a folder called "Liberty files," using data drawn from somewhere (it is unclear where).  (*Id*. at ¶ 8.)  Lamb then appears to have copied that same folder to the hard drive.  (*Id*. at ¶ 9.)  There is no data on the

hard drive that contains a creation date prior to April 9. (*Id.*) There is no data extending back to December 2021, or earlier, on any of the devices or accounts Lamb surrendered. (*Id.* at ¶¶ 7-12.)

In sum, it appears that Lamb wiped all of his devices/accounts but saved some things that he thought Liberty and this Court would be expecting to see (possibly on another external device that Lamb has still retained). Lamb then placed that selected data *back* on his computer and on the hard drive before turning them over to the Expert, as mandated by the Forensics Protocol. Lamb was obviously selectively ditching and preserving documents.

Lamb's alteration of the devices while under clear preservation requirements is particularly invidious because Lamb's intent was to hide and destroy content. The material missing from Lamb's dummy phone is no doubt damning to Lamb. From his experience as Liberty's chief technical officer, Gauger was able to reconstruct the nature of the documents that were likely on Lamb's phone. Per Gauger, these devices would have included a complete history of Lamb's business texts, a complete history of emails exfiltrated by Lamb to his personal control, audio recordings Lamb made of Liberty meetings or conversations with Liberty employees, a complete backup of Liberty's Evernote data, screenshots and photographs of Liberty's business data, and Liberty data stored in non-Liberty email accounts. (*See* Gauger Decl. ¶ 19.)

Liberty is alarmed that Lamb wishes to pursue a damages action while having spoliated the record of what conduct he claims to have been complaining about to Liberty. To the extent Lamb was a Liberty-targeted whistleblower (his alleged case) as opposed to a failed employee (Liberty's case), the proof was on the phone he destroyed and devices that he compromised.

When it discovered Lamb's actions, Liberty was shocked and moved immediately to gain understanding of the likely spoliation. On April 14 and 15, 2022, Liberty attempted to meet and confer with Lamb's counsel using email. Specifically, Liberty sought to confirm whether the

phone that the Expert received was different than the phone Lamb used for Liberty business, and if so, what happened physically to the device Lamb referenced at the injunction hearing.  Liberty further tried to discern if any Liberty-owned information on the real Lamb phone had been destroyed irreparably by the Lamb team.

Liberty got nowhere in its meet-and-confer attempt.  In a series of emails, Lamb's counsel rebuffed all of Liberty's efforts to clarify the content and location of the Lamb phone.[1]  A copy of this meet and confer email chain is attached hereto as **Exhibit F**.  After Lamb's counsel refused to answer these clarifying questions, Liberty filed a Motion for Status Conference.  This Court then directed the parties to appear at a video-conference hearing, which took place on April 22, 2022.  At this hearing, counsel for Liberty asked Ian Northon to explain the situation surrounding the dummy cell phone and altered devices.  Mr. Northon again refused to answer Liberty's probing inquiries.  Importantly, Mr. Northon did not dispute that the cell phone that the parties' Expert received contained an operating system that had just been set up March 2, 2022.  When pushed by counsel and this Court to explain what happened to Lamb's subject work cell phone, Mr. Northon pivoted.  Mr. Northon brazenly attempted to justify his client's spoliation by arguing that Liberty bargained only to have Lamb wipe his cell phone of all Liberty documents and not to have Lamb show Liberty and the Expert the "before" condition of the cell phone.  There is zero support for this callous interpretation in the Forensics Protocol or in the actions of Lamb's counsel in collecting devices from Lamb and ensuring their transport to the Expert on or before April 13,

---

[1] This non-engagement mirrored the process back in October 2021 by which Liberty tried to determine if, as suspected, Lamb's lawyers reviewed privileged Liberty documents within Lamb's control.  Lamb's Michigan-based lawyers refused to respond to inquiries on that point, which forced Liberty to approach this Court to compel responsiveness.  It is still unclear if Lamb's out-of-state lawyers made a complete accounting of their access, even after this Court compelled accountability.

2022.  This position completely ignores the context within which the Court's preservation Order was issued--a Motion for a Preliminary Injunction hearing aimed, in part, at compelling Lamb to return to Liberty all of his Liberty documents, data and work-product, including that which was created by Lamb on the job.  Liberty was seeking all its property back, not for Lamb to destroy any of it.

Because of Lamb's non-compliant actions, Liberty has not only had its property destroyed, but also been deprived of the opportunity to view fully all the evidence formerly stored on Lamb's phone and devices and prove definitively what Lamb exchanged with Falwell and others outside the Liberty document retention system.  Specifically, but without limitation, Liberty is unable to view any business text messages Lamb retained, determine what emails Lamb forwarded to his personal cell phone through his Outlook rules, review any voice memo files Lamb might have created to determine where Lamb stored voice recordings of Liberty meetings or conversations with Liberty employees, and/or determine what information Lamb deleted from the shadow copy of the Evernote data stored on his phone.  (Gauger Decl. ¶¶ 21-26.)

As a result of the Lamb team's election to engage in intentional non-compliance with the court's Order and the Forensics Protocol, Liberty has been materially and permanently prejudiced in its defense of Lamb's putative whistleblower case.  Were Lamb to be permitted a third chance at framing a Complaint, Liberty would be impaired because Lamb took knowing steps to ensure that his "whistle" would not be evaluated forensically.  A movant's good faith in approaching the Court is an element in whether courts should consider allowing amendment of pleadings.  *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980).  Lamb and his counsel have untethered from any notion of good faith, and instead adopted sharp and obstructive electronic

data practices.  Their overall pattern of "contumacious conduct" toward Liberty and this Court

warrants redress.  *See Chambers v. NASCO*, 501 U.S. 32, 45 (1991).

It is toward this end that Liberty files this motion to address Lamb's spoliation with

appropriate sanctions.  Liberty respectfully asks that, in addition to other potential remedies, this

Court deny Lamb's Motion for Leave to File a Second Amended Complaint as an initial censure

for his spoliation of evidence, and wider contumacious conduct. [2]

## ARGUMENT

### I.    Liberty is Entitled to Sanctions for Lamb's Spoliation of Evidence and Contumacious Conduct

In a legal process, a commitment to retain and protect core evidence is an essential

imperative.  Spoliation is the "destruction or material alteration of evidence or…the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  "To make a finding of

spoliation, the court must be satisfied that the party alleged to have spoliated evidence had a duty

to preserve relevant evidence, which the party then breached through the destruction or alteration

of the evidence."  *E.I. du Pont Nemours and Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 496

(E.D. Va. 2011) (internal quotations and citations omitted).  When an act of spoliation is part of a

proven pattern of irregular litigation conduct, courts term this type of repeated malfeasance

"contumacious conduct."  *Chambers v. NASCO*, 501 U.S. 32, 45 (1991).  The sanction for

contumacious conduct can include the dismissal of a pending Complaint. *See Zaczek v. Fauquier*

---

[2] For the reasons explained in this Memorandum, Liberty's Motion for Sanctions is intertwined with Lamb's Motion for Leave to File a Second Amended Complaint.  As such, because Liberty asks that Lamb's Motion be denied as a sanction for his bad faith conduct, Liberty requests that the Court stay Lamb's Motion for Leave to File a Second Amended Complaint pending the resolution of Liberty's Motion for Sanctions.

*Cty., Va.*, 764 F. Supp. 1071, 1073 (E.D. Va. 1991).  Similarly, the sanctions available to courts for spoliation certainly encompass the denial of a motion for leave to amend.  *See Smith v. Westchester Cty. Dept. of Corrections*, 2012 WL 1174663, at *2 (S.D.N.Y. Apr. 9, 2012).  An element of a petition to amend is the party's good faith in approaching the Court to continue a cause based on its implied representation of provable evidence from which the claim can be decided, and the alteration of that evidence debases the motion.

There are clear reasons for these common-sense anti-spoliation rules.  Misconduct during evidentiary preservation is especially impactful.  This is because of the havoc and unfairness the offending party introduces into the litigation process when it scuttles evidence.  No Court should countenance spoliation or permit an amended complaint when the lack of evidentiary integrity will mar the opponents' preparation of a defense through the course of the case it hopes to revive.

### A. Lamb had an absolute duty to preserve evidence, and he breached that duty

Generally, the "filing of a lawsuit usually triggers the duty to preserve evidence." *Haysbert v. Bloomin' Brands, Inc.*, 2021 WL 5003284, at *5 (E.D. Va. July 9, 2021); *see also Bhattacharya v. Murray*, 2022 WL 875032, at *2 (W.D. Va. Mar. 23, 2022) ("The broad contours of the duty to preserve evidence are relatively clear, and flow logically from a civil litigant's obligation to disclose and produce discoverable materials relevant to any party's claim or defense after a complaint is filed.") (internal quotations and citations omitted).  However, the "duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591.  Courts in the Fourth Circuit have also "found that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue

a claim will all trigger the duty to preserve evidence." *Johns v. Gwinn*, 503 F. Supp. 3d 452, 465 (W.D. Va. 2020) (internal quotations and citations omitted).

Additionally, the evidence that was allegedly spoliated must have been relevant. *Kolon Indus., Inc.*, 803 F. Supp. 2d at 496. Lost or destroyed evidence "is relevant if a reasonable factfinder could conclude that the lost evidence would have supported the claims *or defenses* of the party that sought it." *Johns*, 503 F. Supp. 3d at 467 (internal quotations and citations omitted; emphasis added). Furthermore, "if the record shows that a party destroyed or materially altered documents or materials in bad faith, that establishes, without more, that the destroyed documents or materials were relevant." *Kolon Indus., Inc.*, 803 F. Supp. 2d at 499. Moreover, when the object destroyed was not only evidence of the claim, but the very subject of litigation over who was the rightful owner or possessor of the object, the relevance of such an object cannot be disputed and the duty to preserve it is undisputable. *Id.* at 499–501.

After a court "concludes that a party was obliged to preserve relevant materials and documents, it must then consider whether the party breached this obligation, either by failing to preserve, or by destroying or altering, relevant materials or documents with a culpable state of mind. In the Fourth Circuit, any level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence, suffices to support a finding of spoliation." *Kolon Indus., Inc.*, 803 F. Supp. 2d at 497. In addition, the court must find that the "moving party was actually prejudiced by the spoliation." *Johns*, 503 F. Supp. 3d at 470. To evaluate prejudice, the court must discern "the information's importance in the litigation. Although the moving party cannot be expected to demonstrate with certainty the content of the lost evidence, the moving party must demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case." *Id.* (internal quotations and citations omitted).

Here, Lamb had a duty to preserve his physical cell phone, and to safeguard the evidence on it. When Lamb filed his Complaint on October 25, 2021, Lamb was deemed by law to observe this duty. Suspecting that Lamb's counsel had accessed Liberty's privileged documents, Liberty sent counsel cease and desist emails on October 22 and 29, 2021, and included preservation notices in those communications. A copy of this correspondence is attached hereto as **Exhibit G**. When Liberty filed its Counterclaim seeking, in part, return of all its property created and held by Lamb and an end to his misuse of it, that also triggered a preservation duty of all such property as well as evidence of its use. Moreover, the Court's March 10, 2022 opinion warned Lamb that the procedural defect in his pleading was the absence of supportable allegations of wrongdoing by Liberty in the Title IX space. Lamb had a duty to preserve evidence of such allegations. Finally, the Forensics Protocol contains an actual surrender obligation pertaining to Lamb's cell phone, which is central to his putative "whisteblower" Complaint and Liberty's pending Counterclaims.

These notices, coupled with Lamb's admission under oath that he wiped his Liberty laptop computer of some physical evidence, and the firestorm that Lamb's rogue actions elicited during the injunction hearing by his unwillingness to be totally truthful, should have deterred Lamb's conduct if he tried to further destroy pivotal evidence. (*See* ECF No. 53 at pp. 45-55.)

To add more fuel to the roaring fire of misconduct, there is the issue of impending fact discovery. On March 22, 2022, Liberty served on Lamb a set of Requests for Production of Documents. A copy of these Requests is attached as **Exhibit H**. Among other documents, Liberty broadly asked Lamb to produce "[a]ll documents currently in your possession, custody, or control belonging to Liberty," and "[a]ll other documents that you received and/or otherwise obtained by virtue of your employment with Liberty." (Ex. H at p. 5.) As of March 22, 2022, Liberty's counsel obviously believed Lamb still possessed his intact cell phone and devices, as Lamb's counsel

agreed in the Forensics Protocol to turn that phone in to the Expert.   However, despite an overdue duty, Lamb has not adequately responded to Liberty's pending discovery requests.  Liberty has yet to redress this lapse with this Court—based on counsel's evasion during the April 22 hearing.

Given that he wiped his Liberty laptop, scotched his cell phone, and tampered with his data-storing devices, it will be impossible for Lamb to comply fully with Liberty's discovery requests and may have impaired Liberty's ability to get complete relief on its Counterclaim for return of its property to the extent that property was solely in Lamb's possession.  Lamb had a clear duty, drawn from multiple sources, to preserve the evidence on his devices and not destroy Liberty's property.  Lamb breached this duty by intentionally altering or wiping the data on his cell phone on or before March 2, 2022 and altering his devices on or before March 12, 2022.  According to Racich and Gauger, the dummy phone Lamb turned in contains an operating system only set up on March 2, 2022, and the computer on March 12.  That Lamb turned in a fake phone and wiped devices proves he knew of his duty to physically produce to Liberty these devices.  Lamb's cynical approach to those obligations is palpable obstruction.

To prove prejudice, Liberty has compiled a list of what Liberty reasonably believes to be the information and evidence that Lamb has scuttled.  Missing from the prop phone Lamb surrendered was a complete history of his Liberty-related texts with Falwell Jr., a complete list of his business text messages, a complete history of Liberty emails exfiltrated by Lamb using his Outlook rules, all audio recordings of Liberty business meetings and/or conversations with Liberty employees, a complete backup of Liberty's Evernote data, screenshots and photographs of Liberty's business data, and Liberty data stored in non-Liberty email accounts.  The alteration of the devices creates similar disability impacting Liberty. (Gauger Decl. ¶ 19.)

The missing Lamb/Falwell Jr. texts and text history are perhaps the most damning of the evidence Lamb has destroyed. For some time, Liberty has been taking deliberate strides to corral Falwell Jr.'s correspondence, which the former President and Chancellor used his power to segregate from the Liberty archives. To remedy this, on April 15, 2021, Liberty sued Falwell Jr. in state court for, among other things, refusing to return to Liberty the emails, text messages, and documents that Falwell Jr. generated and/or received while at Liberty. That Falwell suit mirrors Liberty's efforts to identify and strip Lamb's purloined materials here. Falwell Jr., as CEO, set up an elaborate system of offline servers to run his Presidential communications, and he did not, as required, feed those communications into the Liberty retention system. Lamb knew Falwell Jr. was operating off the Liberty grid, and he was reminded of the fact every time Lamb emailed Falwell Jr. The only email address Falwell Jr. used, was an "earthlink.net" account—the account at which Lamb would have emailed Falwell Jr.—not Falwell's "liberty.edu" account. Falwell Jr. refused to use his liberty.edu address for Liberty communications, including those sent to Lamb.

Count III of Liberty's widely-reported suit against Falwell Jr. solicits back the Liberty communications Falwell Jr. has hoarded. A copy of the *Liberty v. Falwell* Complaint is attached hereto as **Exhibit I**. The success of Liberty's effort to reclaim from Falwell Jr. his Liberty-related communications is in process and Judge Watson's full resolution of the matter in the Circuit Court could take a substantial amount of time. Accordingly, Lamb's emails and texts with Falwell Jr. might end up being the *only* source of such material available to the parties in this Lamb litigation. Those Falwell Jr. emails are critical evidence to the complaints Lamb might have made or did not make about Title IX matters, which is why Lamb was motivated to erase and destroy them.

Additionally, Lamb claimed to have routinely made and saved recordings of business meetings and phone calls with Falwell, Jr. Those recordings are the only known recordings of

such communications to exist.   Those recordings of business communications could have significance and evidentiary value of the highest order in the *Liberty v. Falwell* case, notwithstanding their value in the case at bar.   Lamb has seen to it that Liberty can never realize that value in its own property by destroying it instead of returning it.

After learning that Lamb fed Liberty a fake phone and altered devices, Liberty moved swiftly to seek redress.   In April, Liberty promptly petitioned for an expedited hearing.   During the ensuing April 22 video conference, Mr. Northon did not dispute that Lamb wiped his phone on or before March 2, 2022.   Nor did he claim Lamb never moved documents around on his devices.   Although the exact mechanism of how Lamb wiped or caused the phone and devices to be wiped is as-of-yet uncertain, it is crystal-clear that Lamb flouted his basic and overt duty to preserve material evidence as well as property that was the subject matter of the case.

Further, although Liberty cannot and is not required to specifically detail the content of the Lamb-lost evidence, Liberty's professionals can reconstruct a likely menu of this compromised data.   The record indicates that Lamb's cell phone contained Liberty emails, texts, audio recordings, photographs, and backup Evernote data.   Lamb admitted to copious texts and other written and recorded communications with Falwell Jr., and this evidence would be directly probative of whether Lamb ever reported specific mishandling at Liberty of sexual misconduct matters.   Lamb's other devices likewise contained similar contraband.   There is no doubt that such evidence was relevant to Liberty's existing Counterclaim, which concerns Lamb's wrongful retention and misuse of Liberty-owned materials and information.   (*See* Gauger Decl. ¶¶ 21-26.) Liberty would have used the Falwell texts and other evidence to support its claims and defend against Lamb's claim by showing his complete absence of any concern with Title IX matters until he knew he was on the verge of being fired for mismanagement and insubordination.   The missing

material would also have been pivotal to the proper conduct of Lamb's Second Amended Complaint, were this Court to allow the amendment (as it should not).

To restate and conclude the point, Liberty believes Lamb's phone would have revealed no evidence of any instance in which Lamb acted as a whistleblower. Instead, the phone likely would have contained evidence of Lamb's support and defense of Liberty in its Title IX compliance. This is likely why Lamb destroyed the phone. Scuttling this kind of evidence is actionable. *See Kolon Indus., Inc.*, 2011 WL 1597528, at *12 ("[L]ost or destroyed evidence is relevant if a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."). Lamb's spoliation of evidence is highly prejudicial to Liberty. Because of Lamb's spoliation, Liberty is unable to view any text messages between Lamb and Falwell Jr. related to Liberty business, determine what emails Lamb forwarded to his personal cell phone, review any voice memo files to determine where Lamb stored voice recordings of Liberty meetings or conversations with Liberty employees, and determine what information Lamb deleted from the shadow copy of the Evernote data stored on his phone. (Gauger Decl. ¶¶ 21-26.) And, as the only repository of certain recordings, documents and other data, because of Lamb's spoliation, Liberty has been forever dispossessed of certain business records it sought to recover in this action, which cannot be used to assist with internal and external investigations, as evidence in other pending or future legal actions, or to rebut false claims made by Lamb and others in the public square.

**B. The Court should deny Lamb's Motion for Leave to File a Second Amended Complaint as a sanction for his spoliation and contumacious conduct**

Once a court determines that spoliation has occurred, it "must fashion an appropriate remedy." *Paul v. W. Express, Inc.*, 2022 WL 838121, at *2 (W.D. Va. Mar. 21, 2022). "A court's power to sanction spoliation derives from two sources: (1) Fed. R. Civ. P. 37(e), which policies discovery, and (2) this Court's inherent power to redress conduct which abuses the judicial

process." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103 (E.D. Va. May 1, 2018). "The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri*, 271 F.3d at 590.  As part of this inherent power, courts have discretion to impose "a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Id.* (internal quotations and citations omitted); *see also Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 285 (E.D. Va. 2001) (observing that, "in addressing spoliation, district courts have considerable discretion").  The sanction imposed by the court "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590 (internal quotations and citations omitted).

Similarly, district courts enjoy considerable discretion to remedy bad faith behavior and contumacious conduct by fashioning appropriate sanctions.  *See Chambers*, 501 U.S. at 45 (recognizing courts' broad powers to fashion remedies for contumacious conduct); *Large v. Mobile Tool Intern., Inc.*, 2008 WL 2116967, at *7 (N.D. Ind. May 20, 2008) ("[C]ontumacious conduct merits strong sanctions, and when the court uses its inherent power to root out contumacious conduct, no showing of willfulness, bad faith, fault or even prejudice is required."); *Voskuil v. Environmental health Center-Dallas*, 1999 WL 393467, at *2 (N.D. Tex. June 11, 1999) (recognizing that "contumacious conduct. . . . requires appropriate sanctions").

One such sanction is denial of leave to amend by the spoliator. *See*, *e.g.*, *Smith v. Westchester Cty. Dept. of Corrections*, 2012 WL 1174663, at *2 (S.D.N.Y. Apr. 9, 2012) ("Even assuming there was spoliation and a failure to produce, the appropriate sanction is not granting plaintiff leave to amend…."); *Simmons v. Pierce*, 833 N.Y.S.2d 800, 801 (N.Y. App. Div. 2007)

(holding denial of leave to amend answer was a proper sanction for spoliation); *Ihli v. Lazzetto*,

2015 ND 151 (ND 2015) (leave to amend to add claim denied based on spoliation).

Following dismissal of his First Amended Complaint for failure to state a claim, Lamb

filed a Motion for Leave to File a Second Amended Complaint, which is currently pending before

this Court.  (*See* ECF No. 71.)  *Citing Davis v. Piper Aircraft Corp.* in his accompanying brief,

Lamb accepted the burden to prove that his attempt to amend was not in any way cloaked in

"prejudice" to Liberty, or was in any way impacted by his "bad faith."  To discharge his burden,

however, Lamb merely offered this conclusory sentence: "[t]here is no material prejudice to

Liberty University in granting this amendment." (ECF No. 72 at p. 3.)  Lamb followed this self-

serving statement with an even more self-supporting pronouncement of his subjective good faith:

> There is no bad faith by Mr. Lamb in submitting this second
> amended complaint. He has tried to plead his claim in a manner that
> is both adequate and respectful [of] Liberty University's legitimate
> interest. While the parties may disagree about the scope and
> protections Liberty University would be entitled to in connection
> with the allegations, Mr. Lamb has not demonstrated bad faith.

(*Id.* at p. 4.)  Stunningly, Lamb made this representation to the Court on March 22, the very day

he committed to follow the Forensics Protocol.  Lamb did so, affirmatively, even though he knew

that as of March 2 he had already wiped his phone of evidence and altered his devices.  On that

phone and other devices was much of the material Liberty would have to rely upon to disprove

that Lamb was a constant and vociferous internal critic of Liberty's implementation of Title IX,

material that constituted Liberty's own business records.

Courts in this Circuit and around the country have addressed the precise question of when

to deny a party's ability to support its pleadings as a sanction for spoliation.  They uniformly limit

the privilege to proceed by litigants that have scoffed at the obligation to preserve potentially

exculpatory evidence. A good example is *Quetel Corp. v. Abbas*, 819 F. App'x 154 (4th Cir. July

16, 2020), a recent unpublished decision from the Fourth Circuit.  In *Quetel*, the Court reviewed a district court's decision to strike two counts from a pending pleading.  *Id.* at 156.  The basis was the defendant's failure to disclose its destruction of a material computer until confrontation from opposing counsel, and its in-discovery deletion of a source code control system the defendant was on notice to preserve and produce.  *Id.*  This scuttled source code system would have permitted a reviewer to "review older versions of the program's code."  *Id.* at fn. 2.  This destroyed system thus served as a forensic tool, in addition to capturing material evidentiary information.  *See also Ashton v. Knight Transp., Inc*., 772 F. Supp.2d 772, 805 (N.D. Tex. 2011) (pleadings struck because of spoliation to "maintain institutional integrity…and deter[] future misconduct"); *Lentini v. Weschler*, 992 N.Y.S.2d 135 (N.Y. App. Div. 2014) (paving over walkway post-inspection warranted striking of answer and affirmative defenses).

The Fourth Circuit employs the "abuse of discretion" standard to review a district court's decision to grant a motion for sanctions based on spoliation.  *Turner v. United States*, 736 F.3d 274, 281–82 (4th Cir. 2013). "A district court abuses its discretion if it relies on an error of law or a clearly erroneous factual finding." *SAS Inst., Inc. v. World Programming Ltd*., 952 F.3d 513, 523 (4th Cir. 2020) (internal quotation marks omitted).  Thus, this Court would be within its discretion to deny Lamb's leave to amend after he knowingly destroyed such material evidence.

In addition to losing his motion on the basis of spoliation and contumacious conduct, Lamb should be denied leave because of his bad faith given his intentional spoliation of the evidence on his cell phone.  *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend may be denied for, *inter alia*, "bad faith…on the part of the movant").  Thus, this Court, through its broad discretion, should deny Lamb's Motion for Leave to File a Second Amended Complaint as a

sanction for his spoliation of evidence.[3]  *See Johns*, 503 F. Supp. 3d at 474 (observing that "the Court has broad discretion to choose the appropriate sanction for a party's spoliation") (internal quotations and citations omitted).

The pattern of obstruction here is well-formed. Throughout this matter, Lamb and his counsel have taken one step after another to obstruct the return of Liberty's property and to shield relevant evidence from Liberty.

## **CONCLUSION**

For the reasons above, Liberty respectfully requests that the Court grant Liberty's Motion and enter an Order denying Lamb's Motion for Leave to File a Second Amended Complaint.

Dated:  May 27, 2022

Respectfully submitted,

LIBERTY UNIVERSITY, INC.
BY COUNSEL:

  __/s/ Scott C. Oostdyk_____
Scott C. Oostdyk (VSB No. 28512)
Heidi E. Siegmund (VSB No. 89569)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
hsiegmund@mcguirewoods.com

---

[3] Liberty reserves the right to seek additional sanctions for Lamb's spoliation of evidence, including, but not limited to, an adverse inference jury instruction and attorneys' fees.  *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995); *Sines v. Kessler*, 2021 WL 5492826, at *3 (W.D. Va. Nov. 19, 2021) (adverse inference jury instruction for spoliation).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of May, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send a true and correct copy to all counsel of record.

_____/s/_____
Heidi E. Siegmund (VSB No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
hsiegmund@mcguirewoods.com

*Counsel for Counterclaim Plaintiff*
