# EXHIBIT I

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG**

LIBERTY UNIVERSITY, INC.

                Plaintiff,

v.

JERRY L. FALWELL, JR.,

                Defendant.

Case No. CL21000354-00

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

### INTRODUCTION

1.      Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.      Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3.      Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4.      Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: (a) a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and (b) a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5.      In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6.      In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family.  He stated he and Becki had been "suffering in silence" over it.  He confessed he had wrongly been "bearing those burdens on [his] own."  The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time."  The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the years-long series of attacks the couple has faced."

7.      On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.")  In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012.  Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.")  Complaint ¶41. When Becki and Falwell Jr. first met Granda, he was a 20-year old working at the high-end resort hotel at which the Falwells stayed while on one of their frequent

family vacations in Miami. Complaint ¶40. Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8.      Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9.      In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship. Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University.*" Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty. Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10.     In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community...." In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda. Complaint ¶42.

11.     By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint. Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12.     Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement.  He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

### The Liberty Way

13.     The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell.  Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14.     In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students.  In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty.  Today, as noted, Liberty trains more than double that number.

15.     In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right."  The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

16.     At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability – was the Biblical notion of inter-accountability among the Christians who make up the Liberty community. Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17.     The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle: "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ." Articles, Exhibit A at 1. The Faculty Handbook repeats this quote at paragraph 42.

18.     The Liberty University honor code – the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: ***"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."***

(Emphasis in original.)

19.     The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the

philosophy of education which first gave rise to the university and which is summarized in the following propositions:

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.

- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.

- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20.     It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college.  Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual exemplar.  During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21.     This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role.  It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence." Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22.     Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline.  Liberty's Board of Trustees was and is obligated to espouse Biblical principles.  After all, it was the Trustees that fashioned "Board policy" for Liberty. *See* Bylaws, Article II, Section 4.

6

23.     Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007. From that point onward, Dr. Falwell's chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles. Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees. Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board. Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty. He has since acceded to the role of campus pastor at Liberty.

24.     In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty. He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25.     One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty. Effective January 1, 2016, Falwell Jr. extended to his firstborn son Trey Falwell a key employee services agreement ("Trey's Contract"). It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26.     In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195,000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits. In this

new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty. Under the new agreement, Trey was an at-will employee of Liberty.

27.     As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019. The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28.     During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

### The Granda Allegations

29.     Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship. In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30.     In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus. In a keepsake photo capturing the occasion, Granda (right) posed with the future

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.



31.    By participating in close family contact with the Falwells, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki. Granda became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct and provided Granda with a tactical opening.

32.    According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period. For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired. Complaint ¶45. (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.) Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells. *Id.*

33.    On information and belief, Falwell Jr. was able to quell this particular controversy over the racy photos. According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

34.     The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35.     According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells. Complaint ¶46. The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way – otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.* Reuters has released the contents of one such FaceTime call. https://mobile.twitter.com/Reuters/status/1297941806970220545

36.     By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47. Granda allegedly demanded hush money ranging from $600,000 to $2 million. *Id.* Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37.     The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University." Complaint ¶¶43, 54, 62. To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot. Complaint ¶¶43, 54. It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38.     On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

39.     The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell Jr., who loaned the venture $1.8 million.  Ownership of the enterprise was given to Becki, Trey, and Granda.  Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

40.     When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions.  On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

41.     Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

42.     There is little doubt that Granda maintains a cache of material harmful to the Falwells.  At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility.  Granda has implied in the media that he has more such information within his possession.

43.     Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material.  In his Complaint, in fact, Falwell Jr. emphasizes that

at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally. See Complaint ¶¶44, 45, 46, 47.

44.     Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time. From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive." Complaint ¶¶42, 44, 48, 49.

45.     Falwell Jr. further accumulated some third-party assessments of Granda's state of mind. In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house. Complaint ¶¶49, 50.

46.     Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done.   After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

### Falwell Jr.'s "Granda Plan"

47.     Instead of divulging to Liberty's Board of Trustee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct.   As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

48.     The Falwells knew they shared a unity of interests with Granda.   They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence

from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

49.     Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak.  If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost. Granda's scheme for a pay day from Falwell Jr would be valueless.  Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

50.     Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever.  Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection.  He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

51.     To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

52.     The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan."  They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

53.     For six years – from 2014 to 2020 – the Granda Plan worked.  Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him.  Complaint ¶44.  It is evident that the

Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time. *Id.* According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior…."

54.    The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

a.    The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;

b.    Granda joined the Falwells in the Florida Keys. During this trip, Falwell Jr. posed with Granda paternalistically – arm around the him, drink in hand:



c.    Posing outside the Liberty jet, the Falwells took pictures with Granda and former Miami business partner Gordon Bello.



d.    The Falwells also brought Granda along for other family excursions, pairing him with Trey. For example, on September 6, 2018, the Falwells arranged

for then-Congressman Bob Goodlatte to host them on a tour of the U.S Capitol.   Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah. Granda once again appeared in the family photos – one set on a rooftop vista atop the Capitol, and another of the group gathered in front of the Thomas Jefferson statute.



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

      e.      Finally, the Falwells befriended some of Granda's girlfriends.  These proactive relationships helped the Falwells amass useful information about Granda, permitting them to understand his tendencies and manage Granda with more awareness.  Complaint ¶¶ 48-50.

55.     As 2019 began, Falwell Jr. had shrewdly controlled Granda for nearly five years. In that span, Granda had not disclosed externally the sensitive information about the Falwells. Given what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell Jr. had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

56.     Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy.  The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

**Outside Pressures on the Falwell Presidency**

57.     While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues.  But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

58.     In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

59.     According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

60.     The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals. Falwell Jr. took steps to redress this challenge. Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

61.     To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him. Like Jesus, Falwell Jr. exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

62.     Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

      a.     In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect." Embracing evangelical

doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

b.    In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

c.    On January 25, 2018, Falwell Jr. returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive."

https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d.    Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness."

https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

63.    As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44. In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down. At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his

value to Liberty as a business asset. Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness. Falwell Jr. was wracked with "constant anxiety." *Id.* He desperately needed to cut Granda off completely, a course fraught with substantial risk. Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

64.     To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty. In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty. There could come a time when the school might need to separate from Falwell Jr. for non-material actions. Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract. Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action. In 2019, Falwell Jr. acted on this undertaking.

### The 2019 Falwell Jr. Employment Agreement

65.     On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement"). This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises. It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

66.     The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

67.     By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's Executive Committee did not know that fact. Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

68.     True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President. Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

69.     After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause." Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

70.     Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement. Falwell Jr. said nothing of his belief that procuring Granda's silence might in time require a higher price unless Granda was confronted and completely managed. To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

### Falwell's Auspicious Acts of August of 2020

71.     The pressure of Granda's threats was increasingly getting to Falwell Jr. With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell Jr. had an opportunity to take a firmer stand against his blackmailer.

72.     Emboldened by the financial security that he had negotiated for himself, Falwell Jr. struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end. Complaint ¶¶55, 56.

73.     To manage his stress, Falwell Jr. began drinking significantly. There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

74.     The Falwell family took some floating vacations on yachts provided by business partners of Liberty. One such excursion took place during late July 2020. During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys*. https://www.swearnet.com/shows/trailer-park-boys. Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence

stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

75.     The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke in his hand.  Julian runs illegal businesses.  A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel."  The little boy became nicknamed "Mo."

76.     Falwell Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing.  Falwell Jr. also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip.  During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy.  Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition.  "Julian" toted his obligatory tumbler of black liquid in his left hand.

77.     Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned.  Falwell Jr. promised not to show this photo to others.

78.     On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this image with his entire Instagram following.  The picture went viral and became an immediate internet sensation.  It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that

also went viral on the internet.  https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-pictures-were-from-trailer-park-boys-themed-party/.

79.     Following is Falwell Jr.'s Instagram post, and one commentator's reaction.



80.     Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post, and *Politico*, and from commentators on CNN and the View.

81.    One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way*. The analyst concluded there were 63 counts of potential violation, which would conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

82.    Realizing that he had made a serious mistake – Falwell Jr. deleted the Instagram post shortly after its August 3rd release. But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up. He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

83.    Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

84.    At this low juncture for Falwell Jr., his wife Becki stepped in. After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol. She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions. She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on

Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

85.   On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually. In the meeting, Falwell Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions. He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

86.   Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

87.   On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19. Falwell conceded he had been doing silly things that he should not have let distract him. The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

88.   The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one. The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

89.    True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly.  Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees.  The Executive Committee then proceeded toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

90.    As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined.  By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

91.    If there was a breaking point in Falwell Jr.'s relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it.  Falwell Jr.'s change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

92.    On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path.  On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner,* his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters.* This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

93.    Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy.  The Executive Committee had expressly

forbidden a post about Falwell's sabbatical. Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary. In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

94.     In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family. He admitted that "the Liberty community deserved to hear" the salacious story directly. He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public." He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from mental health professionals...." Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

95.     Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

96.     By choosing to release the Statement to the public before fully vetting the Granda Allegations to Liberty, Falwell Jr. deprived Liberty of the ability to handle this matter as a purely internal Liberty employment affair.

97.     At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the

severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

98.     On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article. https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

99.     Granda struck out at Falwell Jr. while the Liberty President was being pilloried in the media. Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

100.    Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr.  These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

101.    After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign. After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

102.    The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse

that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

103.    On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest.  He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

104.    While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that…I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation … and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

### Falwell Migrates From Forgiveness-Seeker to Fighter

105.    Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell Jr. – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO.  The subject matter of the interaction with *Liberty's* chosen

counsel was Falwell Jr.'s personal employment rights *against Liberty.* As Falwell Jr. knows, Virginia ethics laws do not permit such consultation.

106.   Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation. Falwell Jr. improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

107.   Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

108.   On August 28, 2020, the Executive Committee agreed to satisfy Falwell Jr.'s demand for a "Good Reason"- resignation, together with its severance payout.   Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

### Falwell Jr.'s Hard Fall

109.   A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended. Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises.   While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

110.    Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today.  On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

111.    In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up.  He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

### COUNT ONE: BREACH OF CONTRACT

112.    Liberty incorporates paragraphs 1 to 111 above.

113.    The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ('Confidential Information.')  Confidential Information remains the property of LU."

114.    During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty.  He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above.

115.    Falwell Jr. also had access to a wide variety of key Liberty documents including, but not limited to: email, letters, correspondence, memoranda, telegrams, notes, reports, compilations, data, notebooks, laboratory, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings (including

engineering, assembly and detail drawings), sketches, photographs, diaries, sales literature, advertising literature, agreements, meeting minutes, punch cards, magnetic tape or wire, other machine producible records including films, video and sound reproductions, printout sheets, electronic records such as text messages, summaries or records of telephone conversations, personal conversations or interviews, and any and all other writings, typings, printings, drafts, copies and/or mechanical, magnetic, optic, or photographic reproductions or recordings ("Documents").

116.   There are several distinct but intersecting sources rooted in employee and contractual obligations that imposed a duty upon Falwell Jr. to preserve and return Liberty property, including Documents and Confidential Information.

117.   First, as Liberty's Chief Executive Officer, Falwell Jr. was tasked with abiding by and administering the enforcement of Liberty's technology policies, including those related to computer data and storage policies.  For example:

    a.    Section 2.7 of the Liberty University Employee Handbook provides that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."  Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

    b.    -Section 7.3 of the Handbook (Computer Use) provides that "All information created or contained on the University's computers and

network, including electronic mail (E-mail), remains the property of the University."

c.   Section 7.15 of the Handbook (Return of Property) provides that "On or before the employee's last day of work, the employee is required to return all property."

118.   Second, the technology security policy governing all Liberty-affiliated technology, to which all users must consent as a condition to accessing Liberty-owned technology, ensures that all Documents and Confidential Information remain the property of Liberty.

119.   Third, to cater to Falwell Jr.'s executive convenience, on information and belief, Liberty paid for and provided Falwell Jr. with a variety of devices and systems which allowed Falwell Jr. to store Documents and Confidential Information both within and outside of Liberty's technology systems. These devices and systems include, but are not limited to: (a) an Aruba Cape Sensor and yearly technical support; (b) Lumos Inc. internet wiring; (c) a Surface Pro 3 laptop, bearing serial number 57462443253; (d) an Apple MacBook Pro 11 with expanded storage memory, bearing serial number C02LG708FH00; (e) an HP EliteOne 1000 G2, bearing serial number 8CC9204VH0; (f) an Apple iMac 27" with expanded storage memory, bearing serial number C02YH3HRJV40; (g) a Carbonite Backup cloud backup system for which Liberty was paying as early as August 2, 2016; (h) a Dropbox cloud storage account for which Liberty was paying as early as January 27, 2018; and (i) a personal Earthlink email account to which Falwell Jr. forwarded all emails that he sent and received at his assigned liberty.edu email address.

120.   Falwell Jr. used these Liberty-provided devices and systems, among others, to create, receive, and store Liberty Documents and Confidential Information.

121.    Fourth, Liberty's general document preservation and retention policy imposed a duty upon all Liberty employees, including Falwell Jr., to preserve and, upon termination of employment, return all Liberty Documents and Confidential Information.

122.    Fifth, Section 3.8 of the 2019 Employment Agreement expressly provides that "Confidential Information remains the property of LU."

123.    In addressing the timing of the return of Confidential Information, the Agreement treats tangible and non-tangible information differently.  Specifically, Section 3.8 provides that "[a]ny Confidential Information in tangible form shall be *immediately* returned to LU upon request" (emphasis added).  Section 3.8 thus required Falwell Jr. to return any tangible property immediately upon demand, and any non-tangible property within a reasonable time frame thereafter.

124.    Six, Liberty's governance documents, including its Bylaws and Articles of Incorporation, imposed a duty upon Falwell Jr. to administer and follow all Liberty policies.  For example, Article III, Section II of Liberty's Amended and Restated Bylaws provides that the "President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University."  Such policies include technology and property preservation and retention policies.

125.    Seventh, during his employment with Liberty, first as General Counsel, then as President and Chancellor, Falwell Jr. was subject to various legal holds.  These legal holds imposed a duty upon Falwell Jr. to retain and preserve certain Liberty Documents and Confidential Information.

126.     Thus, upon termination of his employment, Falwell Jr. had a contractual duty, drawn from multiple sources, including those specified above, to return all Liberty property, including Documents and Confidential Information.

127.     Falwell Jr. breached his contractual duty by failing to fully return all Liberty property after termination of his employment even though Liberty has asked for its return, a demand Falwell has heretofore breached

128.     On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

## COUNT TWO: DETINUE

129.     Liberty incorporates paragraphs 1 to 128 above, and also, in order to preserve issues on appeal, incorporates Count One of its Initial Complaint as considered by the Court's Order of September 10, 2021

130.     Liberty is the sole lawful owner of the property described above, including Documents and Confidential Information that Falwell created, received, or stored, at any point, on devices or systems provided by Liberty.

131.     For several reasons enumerated above, Liberty has an immediate right to possession of this property, including Documents and Confidential Information, because Falwell Jr.'s employment with Liberty terminated on August 25, 2020.

132.     Liberty's Documents and Confidential Information are easily identifiable because they are currently or were at one time located or stored on devices or systems provided by Liberty. Falwell Jr. also knows of their identity and location.

133.     Liberty's Documents and Confidential information are highly valuable to Liberty because they contain confidential and proprietary information related to a variety of deals,

strategies, and negotiations impacting Liberty's business. They are also necessary for Liberty to defend and prosecute various lawsuits, both pending and contemplated.

134.    Liberty has asked for the return of its Documents and Confidential Information, but Falwell Jr. has failed to fully return all such property that remains in his possession and/or control.

### COUNT THREE: BREACH OF FIDUCIARY DUTY

135.    Liberty incorporates paragraphs 1 to 134 above.

136.    As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

137.    Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr. if adverse conditions caused him to choose resignation knowing he was impaired by extortion threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

138.    Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

139.    Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full

circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

140.    On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

141.    Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

142.    The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

143.    Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

144.    For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

## COUNT FOUR:  STATUTORY CONSPIRACY / COMMON LAW CONSPIRACY

145.    Liberty incorporates paragraphs 1 to 144 above.

146.    Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

147.    The business of Liberty is the provision of higher education through the perspective of Christian values.  High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty

Way, and upholds the values in Liberty's foundational documents. Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

148. Up to August 2020, Falwell Jr., Becki and Granda, and potentially others, acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

149. Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

150. Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

151. Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

152. Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

153. The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

154.   By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled.  That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

155.   Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

156.   In the alternative, Falwell Jr., Becki, Granda, and potentially others, acted in concert under a preconceived plan to unlawfully conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees in violation of Falwell Jr.'s fiduciary duties.

157.   The conspiracy between Falwell Jr., Becki, and Granda injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

158.   Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

a.   Award Liberty the damages identified above;

b.   Award Liberty punitive damages;

c.   Award Liberty its statutory attorneys' fees;

d.   Award Liberty its pre-judgment and post-judgment interest;

e.   Enjoin Falwell from retaining possession of property belong to Liberty; and

f.   Provide any other relief this Court deems appropriate.

Liberty demands trial by jury of its claim.

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

R. Craig Wood (VSB # 24264)
McGUIREWOODS LLP
652 Peter Jefferson Parkway, Ste. 350
P. O. Box 1288
Charlottesville, VA 22911
(434) 977-2558
(434) 980-2274 (facsimile)
cwood@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that a copy of the First Amended Complaint was sent via electronic mail and

U.S. Mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 30th

day of September, 2021.

Scott C. Oostdyk

☰  🔍  𝕷

# Exclusive: Falwell says Fatal Attraction threat led to depression

🔍

🐦  f  in

by Paul Bedard, Washington Secrets Columnist | ✉ | August 23, 2020 09:32 PM

**Just In...**

Cuomo, top lawmakers reach deal for $212 billion New York budget, including tax hike for high earners

Those doomsday predictions for post-mask Texas? They are now coming true, but in Michigan

Majority of Michigan voters, 72%, support voter ID laws, including 58% of black voters: Poll

'Nothing is off the table' in sending vaccines and help to Michigan amid pandemic surge, Biden administration says

'Woke' hiring: Endorsing Trump is top reason for job rejection

Why corporate America is lining up against tax hikes

Daily on Energy: Carbon capture industry sees huge boost within reach

Jerry Falwell Jr., suspended as president of Virginia's Christian-focused Liberty University after a string of embarrassing acts, said that he has suffered depression caused by a former family friend who had an affair with his wife and who has been threatening to expose it.

In a statement exclusively to Secrets, Falwell revealed his wife Becki's affair for the first time and said that it was short lived and that the two reconciled quickly.

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him on a yacht with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together,



Exclusive: Falwell says Fatal Attraction threat led to depression                                    Page 2 of 5

Unaccompanied
children at Fort
Bliss regularly
tested for
coronavirus in
expanding Defense
Department role

While simultaneously trying to manage our work with this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before — including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals

Exclusive: Falwell says Fatal Attraction threat led to depression                                          Page 3 of 5

☰  🔍

Who could have alleviated this pain and suffering. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support."

**STATEMENT BY JERRY FALWELL, JR.**

Aug. 23, 2020

*My family has been blessed with the opportunity to serve Christ and our community over the past 50 years — from when my father founded Liberty in the early 1970's through today. When my father suddenly passed away in 2007, I quickly and unexpectedly went from being the lawyer working in the background on the business aspects of the school to becoming a very public person, having to overcome my fears of speaking in front of audiences of tens of thousands, with many more responsibilities to the Liberty community and to my own family.*

*My priority was to build on my father's vision and to work hard. Thanks to the help of the Board and the extraordinary Liberty faculty, executives, staff and community, we have ensured the University's sustained growth and financial health while providing the best and most modern on-campus and online educational and spiritual resources to a wider range of students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my primary focus — and while I am so grateful and thankful for our collective successes, I also realize in hindsight that there was a toll that this took on me, which extended to my family too. During this time of reflection for us and this especially challenging year, and even more so following the events of the past few weeks, my wife Becki and I agreed that this was the right time for me to share more of our story, because the Liberty community deserves to hear it directly from me and from us.*

*During a vacation over eight years ago, Becki and I met an ambitious young man who was working at our hotel and was saving up his money to go to school. We encouraged him to pursue an education and a career and we were impressed by his initiative in suggesting a local real estate opportunity. My family members eventually made an investment in a local property, included him in the deal because he could play an active role in managing it, and became close with him and his family.*

*Shortly thereafter, Becki had an inappropriate personal relationship with this person, something in which I was not involved — it was nonetheless very upsetting to learn about.*

☰   🔍

*After I learned this, I lost 80 pounds, and people who saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us— "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn— "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over*

Exclusive: Falwell says Fatal Attraction threat led to depression    Page 5 of 5

☰  ⚲

**L**time. We were doing our best to ~~de-escalate and unravel~~ this 'fatal attraction' type situation to protect our family and the University.

Even years after the improper relationship had ended, this person continued to be aggressive with Becki and me in a variety of ways. We finally decided that we had to further withdraw completely from him, which resulted in him stepping up his threats to share more outrageous and fabricate claims about us (under the guise of that business entity). He clearly moved forward with this plan through a specific member of the media who has continued to badger us, as well as other members of the media, regarding the false claims about the nature of the relationship based on the individual's misrepresentations. Over the course of the last few months this person's behavior has reached a level that we have decided the only way to stop this predatory behavior is to go public.

We have categorically rejected this person's demands while dealing with him and this particular member of the media who seemed just as obsessed with the prurient, untrue aspects of this story, however fantastic.

Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before— including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues.

Proverbs 3:5-6 says "trust in the Lord with all your heart and lean not on thine own understanding in all your ways acknowledge him and he will guide straight thy path."

The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support.

Receipt : 20000019518

Page 1 of 1



**OFFICIAL RECEIPT**
**LYNCHBURG CIRCUIT COURT**
**CIVIL**

DATE : 10/28/2020          TIME : 15:59:18
RECEIPT # : 20000019518    TRANSACTION # : 2010280068
CASHIER : NRS              REGISTER # : C705
CASE COMMENTS : F v. L
SUIT AMOUNT : $0.00
ACCOUNT OF : F
PAID BY : F
CHECK : $86.00
DESCRIPTION 1 : COM:COMPLAINT - CATCH-ALL
2 : PLAINTIFF: F
3 : NO HEARING SCHEDULED

CHECK NUMBER : 10776

CASE # : 680CL2000010510D

FILING TYPE : COM          PAYMENT : FULL PAYMENT

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 049 | WRIT TAX (CIVIL) | $5.00 |
| 106 | TECHNOLOGY TRST FND | $5.00 |
| 123 | LEGAL AID SERVICES | $9.00 |
| 147 | INDIGENT ASSISTANCE (INA) | $1.00 |
| 170 | COURT TECHNOLOGY FUND | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 219 | LAW LIBRARY | $4.00 |
| 229 | COURTHOUSE MAINTENANCE FEE (CHMF) | $2.00 |
| 304 | CIVIL FILING FEE (LAW & EQUITY) | $50.00 |

TENDERED : $          86.00

AMOUNT PAID : $        86.00

*CLERK OF COURT : TODD SWISHER*

PAYOR'S COPY

RECEIPT COPY 1 OF 2

EXHIBIT
2
tebbles

**COVER SHEET FOR FILING CIVIL ACTIONS** COPY   Case No. ................................
COMMONWEALTH OF VIRGINIA                                            (CLERK'S OFFICE USE ONLY)

.......................................... City of Lynchburg ..................................................... Circuit Court

Jerry Falwell, Jr. ................................... v./In re: ............. Liberty University
PLAINTIFF(S)                                                DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
   [ ] Monetary Damages
   [ ] No Monetary Damages
[ ] Counterclaim
   [ ] Monetary Damages
   [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
   [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[X] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
   [ ] ABC Board
   [ ] Board of Zoning
   [ ] Compensation Board
   [ ] DMV License Suspension
   [ ] Employee Grievance Decision
   [ ] Employment Commission
   [ ] Local Government
   [ ] Marine Resources Commission
   [ ] School Board
   [ ] Voter Registration
   [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
   [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
   [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
   [ ] Complaint – Contested◆
   [ ] Complaint – Uncontested◆
   [ ] Counterclaim/Responsive Pleading
   [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
   [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
   [ ] Guardian/Conservator
   [ ] Standby Guardian/Conservator
   [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
   [ ] Impress/Declare/Create
   [ ] Reformation
[ ] Will (select one)
   [ ] Construe
   [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
   [ ] Church Trustee
   [ ] Conservator of Peace
   [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
   [ ] Reinstatement pursuant to § 46.2-427
   [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
   [ ] Correct Erroneous State/Local
[ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT
COURT OF THE CITY OF LYNCHBURG

OCT 28 2020   TIME _____

TESTE: TODD SWISHER, CLERK

BY: _____ Dep. Clerk

[ ] Damages in the amount of $ ............................... are claimed.

10/28/2020
DATE

[ ] PLAINTIFF   [ ] DEFENDANT   [X] ATTORNEY FOR   [ ] PLAINTIFF / DEFENDANT

James I. Gilbert, IV VSB #38229
PRINT NAME

310 S. Jefferson Street
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011

jgilbert@gfbsrattorneys.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

◆"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | |
|---|---|
| JERRY FALWELL, JR., | |
| Plaintiff, | Case No. _____ |
| v. | |
| LIBERTY UNIVERSITY, | JURY TRIAL DEMANDED |
| Defendant. | |

### COMPLAINT

Plaintiff Jerry Falwell, Jr., as and for his Complaint against Defendant Liberty University ("Liberty" or the "University"), by and through undersigned counsel, hereby alleges as follows:

### INTRODUCTION

1.　　　This defamation action against Liberty University by its former President and Chancellor, Jerry Falwell, Jr., is necessitated by Liberty's abdication of its legal, contractual, and moral obligations not to defame him. Jerry Falwell, Jr., has dedicated much of his adult life to Liberty University, which was founded by his father, Jerry Falwell, Sr. ("Dr. Falwell"), in 1971. Following his father's death in 2007, Jerry Falwell, Jr. stepped in as President and Chancellor of the University, saving the institution from financial collapse and developing Liberty into the world's leading evangelical university and the largest private nonprofit university in the nation. In return, Liberty set out to destroy Mr. Falwell's reputation through numerous defamatory statements that affirm the outrageous lies of an unstable individual who attempted to extort the Falwells and who, on information and belief, conspired against Mr. Falwell with politically

motivated backers, including Aaron Resnick and the political action committee The Lincoln Project.

2.       Under Mr. Falwell's stewardship, Liberty University's stature increased exponentially by almost every metric, especially enrollment and financials. Between just 2007 and 2020 alone, attendance increased from 9,600 students in residence and 27,000 students online to 15,000 students in residence and 108,000 students studying online. And, after decades of financial hardship, Liberty now boasts a $1.6 billion endowment—one of the nation's largest. More students enrolled and more donors gave because of Mr. Falwell's tireless efforts in carrying out his father's vision for Liberty.

3.       When Mr. Falwell and his family became the targets of a malicious smear campaign incited by anti-evangelical forces, Liberty University not only accepted the salacious and baseless accusations against the Falwells at face value, but directly participated in the defamation. This action seeks redress for the damage Liberty has caused to the reputation of Mr. Falwell and his family.

4.       For years, Mr. Falwell and his wife, Rebecca Falwell, have been the victims of an ongoing extortion scheme by Giancarlo Granda—efforts which have recently been absorbed into a smear campaign by political operatives who are opposed to Mr. Falwell's support of President Trump. Granda repeatedly demanded enormous cash payments from the Falwells to stay silent about a brief affair with Mrs. Falwell that ended in 2014. Granda is an unstable and manipulative individual who saw the Falwells' kindness, and his involvement with Mrs. Falwell, as opportunities ripe for exploitation.

5.       The Falwells refused to pay, and Granda's disturbing behavior became increasingly erratic and threatening.

2

6.      On information and belief, Granda began conspiring with political operatives to defame Mr. Falwell.  Granda recently admitted in an ABC News interview that he is being represented free of charge by Kurt Bardella, a senior advisor to The Lincoln Project.  The Lincoln Project is a political action committee that has a self-described mission to "Defeat President Trump and Trumpism at the ballot box."  The Lincoln Project's animosity towards Mr. Falwell presumably arises from the fact that President Trump's evangelical support is often attributed to Mr. Falwell's early endorsement of him during the 2016 primaries.  It has been reported that Bardella is also arranging Granda's interviews with the press.  Granda further admitted to being introduced to The Lincoln Project by his attorney, Aaron Resnick, a politically prominent lawyer in Miami, Florida.  On information and belief, Resnick has been financing Granda's personal expenses.

7.      In June 2020, Mr. Falwell made clear to Granda in no uncertain terms that he would not be extorted, no payments would be forthcoming, and Granda should cease and desist from contacting him.  Shortly thereafter, Granda—backed by The Lincoln Project—embarked on a hit job against Mr. Falwell in the press.  On August 24, 2020, Granda stated publicly for the first time the outrageous, false, and defamatory lies that Mr. Falwell had "looked on" and "watched" as Granda had sex with his wife and participated in the affair.

8.      The lies had the effect that Granda and The Lincoln Project intended.  Within a day, Liberty turned on Mr. Falwell and forced his resignation as University President and Chancellor.  Liberty conducted zero investigation into Granda's lies and willfully ignored information demonstrating their falsity.  Soon after his resignation, the University began to systematically erase Mr. Falwell from Liberty University history:  scrubbing any mention of him from the University website; removing portraits of Mr. Falwell from campus (including a portrait

3

of Mr. Falwell as a boy attending a University football game with his late father); prohibiting Liberty faculty and staff members from speaking with him; and banning him from visiting campus grounds—which include the gravesites of his mother and father.

9.     The University also moved quickly to destroy Mr. Falwell's reputation in the Liberty community and nationwide.  On August 26, 2020, in its high-profile and publicly-broadcasted Community Service event, before thousands of gathered students and faculty—and the world—Liberty lent credence to Granda's lies, stating that Mr. Falwell had engaged in "disobedient" behavior "in secret" that was "shameful" and a "sin."  Liberty then repeated similar statements in a press release and its official magazine.

10.     Up until that point, Granda's lies were just that—lies, vigorously denied by Mr. Falwell.  But Liberty gave those lies an air of truth and righteousness.  With the exercise of even the slightest diligence, Liberty would have quickly confirmed that Granda's outrageous lies are false.  Instead, Liberty gave Granda's lies an air of truth by immediately forcing Mr. Falwell's resignation and publicly defaming him.

11.     Liberty's actions are antithetical to the teachings of Christ.  Liberty's conduct has damaged Mr. Falwell's standing among Liberty faculty, students, and alumni, the broader evangelical community, and beyond.  Liberty's conduct has also damaged *Liberty* itself, and the evangelical community, by playing right into the hands of sinister operatives with ulterior motives.  Liberty has rejected Mr. Falwell's attempts to reach an amicable resolution, forcing Mr. Falwell to bring this action to restore his reputation.

## THE PARTIES

12.     Plaintiff Jerry Falwell, Jr. is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell has a Juris Doctorate from the University of

4

Virginia and was a practicing lawyer for many years. Mr. Falwell began working at Liberty University in 1988 as General Counsel, a position that he held until May 2007. Following the death of Dr. Falwell in May 2007, Mr. Falwell served as the President and Chancellor of Liberty University until his August 25, 2020 resignation.

13.     Defendant Liberty University is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513, 8.01-328.1. Defendant is organized as a nonstock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

15.     Venue properly lies in this Court under Va. Code Ann. §§ 8.01-257 and 8.01-262 because it is a forum convenient to the parties and witnesses, where justice can be administered without prejudice or delay. Liberty University's principal office is located in Lynchburg, Virginia.

16.     Furthermore, the Employment Agreement entered into between Mr. Falwell and Liberty, which provides the basis for at least one of the claims in this action, specifies that any legal action or proceeding arising out of or relating to the Employment Agreement shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

## FACTUAL BACKGROUND

### A. The Falwell Family and the Founding of Liberty University

17.     Born on June 17, 1962 in Lynchburg, Virginia, Mr. Falwell comes from storied Virginian roots. His late father, Dr. Falwell, is among the most respected leaders in the

5

evangelical Christian community, described by The Economist as a "quintessentially American type: a poor man who won fame and fortune by preaching the Word."

18.     In 1952, Dr. Falwell decided to dedicate his life to Christ and preaching Christianity. After graduating college, he returned home to Lynchburg to start a church in a disused soda-bottling plant with a congregation consisting of just 35 adults and their families.

19.     Dr. Falwell steadily grew his congregation using nothing but his charisma, and, at first, his own two feet, visiting 100 or so homes a day to seek new congregation members, carrying only a yellow legal pad and a Bible.

20.     Dr. Falwell's breakthrough came from using the technology of the era to spread the gospel. Soon after his church opened, he began a half-hour daily radio broadcast, like the ones his mother would play on Sunday nights. And only a few months later, he began televising his services, which quickly gained him a national audience. He called the show "Old-Time Gospel Hour," and it started to skyrocket his congregation's numbers almost immediately. In the first year, his congregation grew from 35 to nearly a thousand, and that was only the beginning. By the 1970s, his church sat thousands, and Old-Time Gospel Hour was broadcast nationally to hundreds of thousands of homes.

21.     In 1971, just a few blocks from his church, Dr. Falwell founded Lynchburg Baptist College, which would eventually become known as Liberty University. The school's mission was "Training Champions for Christ," and like Dr. Falwell's church, it originally started small, with only 154 students, a tuition of $200, and four full-time faculty members. It quickly began to grow. Just 10 years after its founding, over 3,500 students were enrolled, and by 1988 it had become the largest private university in Virginia with a combined enrollment of 11,000 students from all 50 states and 30 nations.

22.    While Liberty University grew, Dr. Falwell became a titan in Christian evangelicalism as well as American politics.  In 1979, after hosting a series of "I Love America" rallies across the country to raise awareness of social issues, Dr. Falwell founded the Moral Majority, a political organization headquartered in Lynchburg, Virginia, that, at its height, claimed more than four-million members and two-million donors.

23.    Although Dr. Falwell became a national figure through his work with the Moral Majority and the Old-Time Gospel Hour, his passion lay in being a pastor and a Christian educator.  And in 1989, he disbanded the Moral Majority, allowing himself more time to concentrate his efforts on heading his church and Liberty University.  Dr. Falwell dreamed that Liberty would grow to 50,000 students and be to fundamentalist Christians what The University of Notre Dame is to Catholics and Brigham Young University is to Mormons.

**B.     Mr. Falwell's Contributions to Liberty University**

24.    Despite Dr. Falwell's best efforts, he had difficulty keeping Liberty afloat financially.  Donors and family friends had to step in to help manage the finances and arrange for companies to write-off Liberty's debt, and even with their help, by the 1990s, Liberty University was on the verge of financial collapse.

25.    Fortunately, when the school was nearing its financial nadir, facing bankruptcy and potential collapse, Jerry Falwell, Jr. was fully grown and able to assist his father in not only keeping the school alive, but achieving Dr. Falwell's dream for Liberty University.  In 1987, Jerry Falwell, Jr. was a practicing lawyer and commercial real estate developer.  In 1988, he joined Liberty as General Counsel.

26.    While Dr. Falwell focused on maintaining the school's religious education, Mr. Falwell worked to keep the creditors at bay, which was no small feat.  By 1990, the school had

7

nearly $100 million in debt. Liberty's accrediting body, the Southern Association of Colleges and Schools Commission on Colleges, had even placed it on a one-year probation and was scrutinizing its every move, going so far as to issue Liberty more than 100 "recommendations" to maintain its accreditation, most of which centered around restructuring the school's debt.

27.     With Mr. Falwell's assistance, Liberty University not only climbed out of its financial hole, but began to thrive. As Dr. Falwell himself put it, "God sent [Jerry Falwell, Jr.] to me just in time. He is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."

28.     In 2000, Mr. Falwell joined Liberty University's Board of Trustees, and in 2003 he became the school's Vice Chancellor. As a board member and Vice Chancellor, he assisted his father with running the school's day-to-day operations and managed the University's debt for years.

29.     On May 15, 2007, Dr. Falwell passed away. In accordance with his wishes, upon his passing, his two sons took control of the two pinnacles of his legacy: Jonathan took over his church, Thomas Road Baptist Church, and Jerry, Jr. became President and Chancellor of Liberty University.

30.     Mr. Falwell rose to the occasion. He has been widely recognized as having led Liberty University not only through difficult financial straits, but also for steering its transformation into the world's leading evangelical university.

31.     Dr. Falwell passed away before Liberty University achieved his dream of 50,000 enrolled students. Under Mr. Falwell's stewardship, however, Dr. Falwell's dream was achieved, and then surpassed: during his tenure as President and Chancellor, Mr. Falwell grew Liberty University's enrollment from 38,000 to 110,000 students, making it the one of the largest

8

evangelical Christian universities in the world, and one of the largest private non-profit universities in the United States.

32.    Under Mr. Falwell's leadership, Liberty University's finances have transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation. The University's sports teams play in Division I of the National Collegiate Athletic Association (alongside The University of Notre Dame and Brigham Young University, as Dr. Falwell always wanted). In 2017, its football team joined the Football Bowl Subdivision, college sports' most competitive level. Its sprawling campus, which overlooks Lynchburg, Virginia, comprises 7,000 acres and 17 colleges. Under Mr. Falwell's stewardship, Liberty has built a $50 million library with a high-tech robotic book-retrieval system (one of only a few in the country); renovated its 25,000-seat football stadium (Williams Stadium); and built a year-round outdoor ski slope (the only one of its kind in North America) that is free for students. In January 2017, President Donald Trump gave the commencement speech at Liberty University—one of his very first speeches as President of the United States.

**C.    Liberty Recognizes Mr. Falwell's Outstanding Leadership in the 2019 Employment Agreement**

33.    Mr. Falwell's outstanding leadership of Liberty endeared him to students, faculty, alumni, and donors alike. Indeed, Liberty students would often chant his name when he appeared at school events. And his success with donors is undeniable: as noted above, in the first ten years of Mr. Falwell's tenure as President and Chancellor, Liberty's endowment grew exponentially.

9

34.     In 2019, Liberty University and Mr. Falwell negotiated and entered into the Employment Agreement, which was intended to fairly compensate Mr. Falwell for his significant contributions and to bring his compensation in line with market compensation.

35.     In light of his proven track record as President and Chancellor, in 2019, the University took steps to ensure that Mr. Falwell was properly compensated for the success his stewardship had brought Liberty.  The University retained FW Cook, a national consulting firm with expertise in the compensation of executives in tax-exempt organizations, to review Mr. Falwell's compensation.  The University tasked FW Cook with determining whether Mr. Falwell's compensation was in line with national standards, taking into account Liberty University's growth and financial achievements and Mr. Falwell's historical compensation.  FW Cook made recommendations for program changes as needed to ensure that Mr. Falwell was retained at Liberty University for the long term and provided with a competitive and motivating compensation program.

36.     In recognition of Mr. Falwell's numerous significant contributions to Liberty University, and in an effort to compensate Mr. Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, under advisement from FW Cook, Liberty University entered into the Employment Agreement.

37.     As Liberty University specifically recognized in the Employment Agreement:

a)      In his first ten years with Liberty University, Mr. Falwell was instrumental in promoting and furthering the University's debt restructuring and returning the University to a position of financial strength by 1997 from a period of severe financial hardship.

10

b)      During Mr. Falwell's tenure with Liberty University, he was instrumental in promoting and furthering the rapid expansion and continued success of the University, especially since 2007, when Mr. Falwell became President and Chancellor.

c)      Under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's net assets increased from approximately $100 million to over $2.1 billion. During the same time period, the University's annual gross revenues increased from $231,506,554 to over $1 billion, and its surplus of revenues over expenditures increased from $52,514,469 to $331,142,834.

d)      Likewise, under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's attendance increased from 9,600 students in residence and 27,000 students online in 2007 to 15,000 students in residence and 86,000 students studying online in 2017.

e)      As a result of its strong financial performance under Mr. Falwell's leadership, Liberty University's Standard & Poor's credit rating has been AA since 2011, placing Liberty among the 80 highest rated universities nationally.

38.     The Employment Agreement includes a non-disparagement clause, which provides that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings." It further provides that the parties may, if Mr. Falwell is terminated for cause, "truthfully explain the circumstances forming the basis for the determination of cause." This non-disparagement provision expressly survives termination of the Employment Agreement.

39.     The Employment Agreement provides indemnification rights above and beyond "any and all indemnity rights and protections [Mr. Falwell] may have pursuant to statute or under

11

any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies." Section 10.1 of the Employment Agreement provides that:

> [t]o the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment.

**D.      Granda's Attempts to Extort the Falwells**

   *(i) Granda's Lies Regarding the Affair*

40.      Jerry and Rebecca Falwell have been married since 1987 and have three children together. In March of 2012, Mr. and Mrs. Falwell were on vacation with their family, as well as two other families, at the Fontainebleau Miami Beach hotel in Miami, Florida. There, they met Giancarlo Granda, who was employed at the resort as a pool attendant. At first, Granda impressed the Falwells with his entrepreneurial attitude and ambition, and the Falwells befriended him. With the Falwell's help and encouragement, Granda decided to return to college and received his bachelor's degree in finance from Florida International University.

41.      Unbeknownst to Mr. Falwell, on rare occasions between 2012 and 2014, Mr. Granda and Mrs. Falwell engaged in an affair. The Falwells later learned that Granda used his job at the Fontainebleau Miami Beach hotel to prey on hotel guests, especially women.

42.      When Mr. Falwell learned of the affair, he was heartbroken. However, after working on their marriage, he and Mrs. Falwell reconciled. Unfortunately, Mr. and Mrs. Falwell's reconciliation did not put an end to the trouble Granda would cause their family. Notwithstanding all the support the Falwell family gave to Granda, he soon revealed himself to be a deeply disturbed and unstable individual who was bent on continually threatening the

Falwells and exploiting the affair to his financial advantage. As explained below, when it became clear the Falwells would not be extorted and would never pay for his silence, he publicly unleashed falsehoods in an attempt to destroy their lives.

43.     When the affair ended in 2014, the Falwells initially attempted to distance themselves from Granda, but Granda responded with aggression and threats to publicize his relationship with Mrs. Falwell to publicly embarrass the Falwells and Liberty University.

44.     Granda's threats placed an enormous amount of strain on the Falwells' well-being—the constant anxiety contributed to Mr. Falwell losing 80 pounds over just two years. Although the Falwells wished to distance themselves from Granda completely, given the threat that he posed, the Falwells believed it best to maintain a positive relationship with him to placate his increasingly erratic behavior and manage his extortive demands while extricating themselves. Granda became obsessed, however, with the prospect of leveraging his relationship with the Falwells into a payday.

45.     For example, Granda had sold intimate pictures of Mrs. Falwell to his friends, who then used those pictures to try to extort the Falwells for money. When Granda learned of his friends' extortion attempt, rather than apologize for the emotional and financial toll it took on the Falwells, Granda expressed awe that he had possessed pictures that were apparently so valuable, and that the friends to whom he had sold the pictures stood to gain more than he had from selling them to them.

46.     Granda also illegally recorded phone calls and FaceTime communications with Mrs. Falwell without her consent. On information and belief, he made these recordings to strengthen his extortion attempts and to support his later public allegations with out-of-context clips that purportedly verified his ludicrous allegations.

47.     Afterwards, in late 2014, Granda repeatedly threatened to publicize the affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million.

*(ii) Granda's History of Unstable Behavior.*

48.     Recently, Granda's ex-girlfriends, with whom the Falwells grew close in their effort to maintain a positive relationship with Granda, have confided in the Falwells that Granda was unbalanced and manipulative.

49.     On more than one occasion, Granda's (now ex) girlfriends texted the Falwells to seek their help in managing Granda's self-destructive and unbalanced behavior, stating that Granda was "crazy and verbally abusive" to his girlfriend, his family, and anyone that grew close to him; and that he exhibited frequent "rages," including virtually destroying his parents' house and "saying really [expletive] up stuff to others."

50.     One ex-girlfriend told the Falwells that Granda often hurled racist insults at her and her family.  As she put it, "he had truly unresolved psychological issues that make him hurt people who love him . . . he did the same to his family growing up and now he is doing it to me . . . his snapping and explosive behavior is legitimately scary."  She further described that he would say "the most [expletive] up things about my family" and her, and that she had "never heard such disgusting racist [expletive] in [her] life."

*(iii) Granda's Efforts to Extort The Falwells*

51.     While the Falwells were successful in placating Granda for a time, his extortive threats never stopped.  Indeed, they only became more outrageous and potentially damaging.

52.     When the Falwells eventually decided to attempt disengaging with Granda completely, it was then that Granda changed the threat behind his extortion to something more damaging.  Rather than just reveal the affair Granda had engaged in with Mrs. Falwell, Granda

14

threatened to falsely claim that Mr. Falwell had been a willing participant in the affair, even watching the two engage sexually.

53.    This was not true.  Mr. Falwell did not participate in the affair and he certainly did not watch Granda having sex with his wife.

54.    Upon information and belief, Granda had cooked up this lie hoping that it would provide him a more powerful threat for purposes of accomplishing his intended extortion of the Falwells.  He was aware of Mr. Falwell's role at Liberty University, an evangelical institution, his father's legacy as a national evangelical leader, and his involvement with the Republican Party.

55.    On June 30, 2020, Mr. Falwell communicated to Granda, in no uncertain terms, that he would not be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells.  Granda has not ceased contacting the Falwells and has continued to attempt to communicate with the Falwells though texts and calls, including in harassing communications as recently as October 2020.

56.    After receiving the June 30 communication and apparently realizing his extortion scheme would fail, rather than refrain from contacting the Falwells, Granda then set out to destroy them in public.  In other words, if the Falwells would not pay Granda to stay silent, perhaps someone else would pay him to go public.

57.    The Presidential election season and Mr. Falwell's long-standing and vocal support for the President in media and public appearances, including his early endorsement of the President in 2016, gave Granda the perfect opportunity.

58.    On information and belief, by this point Granda was no longer acting alone on his plan to publicly reveal his lies but was now conspiring with political operatives to defame Mr.

Falwell. Because of the salacious nature of Granda's false allegations, and because of Mr. Falwell's family name, reputation among evangelicals, and public and vocal support for President Trump, political operatives who are opposed to President Trump's re-election worked with Granda on his defamatory media campaign against Mr. Falwell.

59.     Among these individuals was Kurt Bardella, a Senior Advisor to The Lincoln Project—a political organization that accused President Trump of "crimes, corruption and corrosive nature" and that has dedicated its efforts to "defeating President Trump and Trumpism at the ballot box." On information and belief, Bardella and The Lincoln Project have been advising Granda in an attempt to use his defamatory statements to harm President Trump's chances at re-election. Further, Granda recently admitted in an ABC News interview that he is being represented free of charge by a senior adviser to The Lincoln Project, to whom he was introduced by his attorney. It has also been publicly reported that Bardella was organizing interviews for Granda.

60.     The Lincoln Project was reportedly brought in by Aaron Resnick, Granda's attorney, who is a politically prominent lawyer in Miami, Florida.

61.     Furthermore, on information and belief, Mr. Bardella, The Lincoln Project, and potentially other questionably motivated supporters of Granda have gone so far in their support for his false allegations that they have financially compensated Granda and paid his bills. Granda has been observed paying for expenses with a credit card that was not his own. On information and belief, this card belongs to Resnick.

62.     On August 23, 2020, faced with Granda's threat to not only his wife but his own reputation, and the reputation of Liberty University, Mr. Falwell decided that the best thing to do

was to try and explain the suffering he and his family had endured from Granda's attempted extortion over the past years. Mr. Falwell gave a statement to the Washington Examiner.

63.     Notably, Mr. Falwell's statements to the Examiner detailed the Falwells' interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were utterly false.

64.     The next day, on August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Mrs. Falwell. In a *Reuters* article titled *The Falwell Affair*, Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki Falwell and "enjoyed watching" them have sex. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

65.     Even the article's headline revealed that its purpose, and indeed the entire motive behind Granda and his co-conspirators' defamation of Mr. Falwell, was to attack Mr. Falwell *and* the institutions with which he was connected: Liberty University and President Trump. The byline reads, "[Granda] says he had sex with Becki Falwell while Jerry Falwell, Jr., *head of Liberty University and a staunch supporter of President Trump*, looked on." (emphasis added).

E.     **Liberty Forces Mr. Falwell's Resignation Without Investigation of Granda's Lies**

66.     On the same day that *Reuters* published Granda's false and defamatory statements, the Executive Committee of Liberty University's Board of Trustees forced Mr. Falwell to tender his resignation as President and Chancellor of the University.

67.     On information and belief, the Board of Trustees and the Executive Committee were aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner noting that he was the subject of extortive attempts by an individual who was using an affair with Mrs.

Falwell to fabricate outrageous claims regarding Mr. Falwell to harm his reputation, as well as his categorical denial in the *Reuters* article.

68.   Moreover, at the time of Mr. Falwell's resignation, Liberty further possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and is now, a member of the University's Board of Trustees.

69.   Yet, despite this knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before forcing Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies. Liberty still has not inquired with Mr. Falwell about Granda's lies. Further, Liberty performed no investigation whatsoever into the veracity of Granda's claims before forcing Mr. Falwell's resignation or before making its defamatory statements.

70.   Upon information and belief, certain key individuals directly involved in the decisions and actions to force Mr. Falwell's resignation and then defame him were fulfilling a long-held goal to end Mr. Falwell's fruitful thirty-two-year relationship with the University. Purportedly acting in the University's interest to disassociate the University from Mr. Falwell's alleged indiscretions, these individuals had engaged, or were engaged, in various illegal, unlawful, and immoral or otherwise dubious acts in their stewardship of other institutions and otherwise which, if known to the public generally, would unquestionably tarnish the reputation of Liberty University by association. It is therefore hypocritical in the extreme for these key individuals to cast any action of Mr. Falwell as disqualifying Mr. Falwell from leading Liberty, as he had done successfully for many years.

71.     Mr. Falwell was told to tender his resignation from Liberty, or he would be forced to resign.  On August 24, 2020, Mr. Falwell provided Liberty University with written notice of his resignation for "good reason," as that term was defined in the Employment Agreement.

72.     On August 25, 2020, Liberty University accepted Mr. Falwell's resignation for good reason through a vote of its Executive Committee, which was affirmed on the same day through a full vote of the Board of Trustees, thus terminating Mr. Falwell's employment with the University.

73.     By forcing Mr. Falwell's resignation from Liberty immediately following Granda's false and defamatory statements, Liberty sent the unmistakable message to the public that Granda's false statements were, in fact, true.

F.     **Liberty University Defames Mr. Falwell Following His Resignation**

74.     After severing his relationship from Liberty, and despite Liberty's acceptance of Granda's false story, Mr. Falwell looked forward to the next chapter in his life.  Liberty, however, immediately began a campaign to tarnish, minimize, and outright destroy the legacy of the Falwell family and Mr. Falwell's reputation.

75.     The very next day, on August 26, 2020, David Nasser, Liberty University's Senior Vice President for Spiritual Development, presented a speech at the University's Community Service, an event at the start of a new school year where thousands of students and faculty were present and which Liberty also broadcasted online.

76.     Nasser helped secure a wide-spread attendance and media presence for this event by promoting it, including at Liberty's Convocation, which was held earlier that day, broadcasted online, and considered mandatory for all staff, faculty, and students.  During Liberty's

19

Convocation, Nasser told the audience that he would be discussing the events leading to Mr. Falwell's resignation that night.

77.     On information and belief, Nasser's speech later that day at Community Service was largely scripted; other Liberty employees participated in drafting the speech, and Mr. Nasser was reading from a script during his speech.

78.     Nasser began the defamatory portion of the speech by stating, "There are those who have told me to lay low and to not mention any of the things that lead to Jerry Falwell's resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna see stern and swift accountable action for sinful behavior." A moment later, he tells the audience, "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." A moment later, he tells the audience, "Your concerns, if you're concerned, are valid. If you're not concerned, you should be concerned." Later in the speech, Nasser returns to the topic, again prefacing his remarks by referring to Granda's lies: "Then the summer came to a close, and we opened the semester with a series of revelation about Jerry Falwell that can only be described as shameful. That's okay, by the way, to say it. It's okay to call sin, sin. Paul says in Ephesians. Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposed by the light becomes visible." A moment later, he proceeds to state again, "It's okay to call sin, sin." These remarks together are referred to herein as the "Defamatory Speech."

79.     The Defamatory Speech is false and defamatory. Taken together, Liberty's statements repeat, as a statement of fact, Granda's lies that Mr. Falwell watched him have sex with his wife and participated in their affair. Granda's lies were first reported in the *Reuters*

20

article two days before the speech and instantly garnered national press attention.   Upon information and belief, every or virtually every Liberty student and faculty member present for the speech was aware of Granda's lies and understood that they were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it.   Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the audience in fact understood.   By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did, in other words, that Granda's lies were "valid."

80.     The Defamatory Speech was the subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

81.     Liberty published a video of the Defamatory Speech online to its website, and it remains online as of the time of this filing.

82.     On information and belief, Nasser was authorized to speak on behalf of Liberty at the Community Service event.   In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President.   Furthermore, the Community Service event was an official Liberty University event where thousands of Liberty students were in attendance, alongside Liberty's faculty and leadership, including its acting President and Chairman Jerry Prevo.

83.     On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell.   In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example."   Liberty clearly

connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.*, when Granda's false allegations were publicized, and that while Liberty "still didn't' know the full scope of the matter, [it] had learned enough . . . ." This statement was posted online, and it remains online as of the time of this filing. These statements together are referred to as the "Defamatory Press Release."

84.     The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that, by claiming Mr. Falwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

85.     Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by a media biased against Mr. Falwell. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior. Specifically, one article republished Liberty's August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell. Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." These statements together are referred to as the "Defamatory Journal Articles."

86.     Liberty published this issue of the *Liberty Journal* online, and it remains online as of the time of the filing of this Complaint. The *Liberty Journal* is also distributed publicly by mail, nationwide.

87.     The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

88.     The Defamatory Speech, Defamatory Press Release, and Defamatory Journal Articles are herein referred to as the "Defamatory Statements."

89.     In tandem with their attempts to savage Mr. Falwell's reputation, Liberty has engaged in a campaign to erase history and blot out the Falwell family's legacy at Liberty. Liberty has prohibited Mr. Falwell from speaking to its staff; prohibited faculty from speaking to Mr. Falwell; and banned Mr. Falwell from visiting campus, despite the fact that both of Mr. Falwell's parents are interred on Liberty's grounds. The University has even gone so far as to take down photos of Mr. Falwell, including a portrait of a young Mr. Falwell standing with his father, Dr. Falwell, on the sidelines of Liberty University's first football game in 1973.

90.     Again, prior to making the Defamatory Statements and taking these actions, on information and belief, Liberty was aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner and categorical denial in the *Reuters* article. Indeed, at the time of the Defamatory Statements, Liberty was even aware of the fact that Mr. Falwell was receiving therapy for stress-induced depression, which Mr. Falwell incurred in part because of the anxiety Granda's attempted extortion was causing. Yet, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's allegations, and on information and belief, Liberty never undertook its own investigation.

23

91.     In fact, for Liberty the issue has never actually been about whether Mr. Falwell did anything wrong. On information and belief, Liberty forced Mr. Falwell's resignation and issued these statements because certain high-ranking individuals (for reasons known only to themselves now but are to become known broadly during this litigation) wanted him replaced as President and Chancellor of Liberty University. Upon information and belief, Liberty engaged in this defamatory campaign to seal the deal and ensure the permanent termination of Mr. Falwell's relationship with the school his father founded.

92.     Yet, as recently as October 23, 2020, Liberty's acting President and Chairman, Jerry Prevo, noted that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]." Nevertheless, despite acknowledging that there had not been any wrongdoing, Liberty apparently stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

**G.     Harm to Mr. Falwell As a Result of Liberty's Defamation**

93.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

94.     Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty University community, the evangelical community, the real estate industry, the academic field, the political world, and media outlets.

95.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business

and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

96.     For instance, prior to Liberty's statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics.   Indeed, Mr. Falwell has considered becoming a recurring contributor on news outlets.  Since Liberty's Defamatory Statements, Mr. Falwell has received no such invitations and has lost any prospect of becoming a contributor.

97.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns.  In the past, Mr. Falwell has attended a number of such conferences per year.

98.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend community social events, such as events at his relatives' school and with his neighborhood association, without a real and justifiable fear that any people he meets will have knowledge of the Defamatory Statements and associate him with such statements.

99.     Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

100.   That Mr. Falwell now rarely speaks or appears publicly on behalf of the businesses and charity organizations he supports—a form of support that Mr. Falwell formerly enjoyed—has also caused Mr. Falwell significant anguish.   In addition, the Defamatory Statements have caused Mr. Falwell immense anguish as he now is deeply concerned that third parties will hold horribly false impressions of him.

101.   As a direct and proximate result of Liberty's statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements.   Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

### COUNT ONE: DEFAMATION

102.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 101 with the same force and effect as if fully stated herein.

103.   Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell.   These statements are false and exposed Mr. Falwell to contempt, ridicule, hatred, and obloquy.

104.   The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

105.   Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the world.

106.   Liberty made and published the Defamatory Statements without any applicable privilege.

107.   Liberty made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

108.   As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT TWO: BREACH OF CONTRACT

109.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 with the same force and effect as if fully stated herein.

110.   On July 1, 2019, Mr. Falwell and Liberty University executed the Employment Agreement.

111.   Pursuant to Section 3.7 of the Employment Agreement, Liberty University was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

112.   Liberty breached the foregoing provision by making and publishing the Defamatory Statements.

113.   Furthermore, pursuant to Section 3.7 of the Employment Agreement, Liberty University was permitted to discuss the reasons for the conclusion of Mr. Falwell's employment only if Mr. Falwell was terminated for cause.

114.   Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause and therefore Liberty was not allowed to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

115.   The terms of Section 3.7 survive termination of the Employment Agreement.

116.   As a direct and proximate result of Liberty's breach of contract, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish; lost business opportunities; and suffered other pecuniary damage.

### PRAYER FOR RELIEF

117.   WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully requests this Honorable Court:

a)   Enter judgment in Mr. Falwell's favor;

b)   Award Mr. Falwell damages for Liberty's acts in defaming him and breaching the Employment Agreement;

c)   Award Mr. Falwell punitive damages;

d)   Award Mr. Falwell pre-judgment interest;

e)   Award Mr. Falwell his attorney's fees and costs incurred in prosecuting this action pursuant to Section 10 of the Employment Agreement;

f)   Enjoin Liberty University from repeating the Defamatory Statements regarding Mr. Falwell; and

g)   Provide any other relief this Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

Respectfully submitted,

**GBSR ATTORNEYS, LLP**

Dated: October 28, 2020
Lynchburg, VA

James J. Gilbert, IV (VSB #38229)
Timothy S. Bird (VSB # 38139)
Jordan K. Sharpes (VSB #79394)
13595 Booker T. Washington Highway
Moneta, VA 24121
phone - 540-721-5110
fax- 540-721-5112
jgilbert@gbsrattorneys.com
tsbird@gbsrattorneys.com
jsharpes@gbsrattorneys.com

### QUINN·EMANUEL URQUHART & SULLIVAN LLP

Robert L. Raskopf
    (pro hac vice application pending)
Julia M. Beskin
    (pro hac vice application pending)
robertraskopf@quinnemanuel.com
juliabeskin@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

*Attorneys for Plaintiff Jerry Falwell, Jr.*

29