2021.04.15

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG**

LIBERTY UNIVERSITY, INC.

Plaintiff,

v.

JERRY L. FALWELL, JR.,

Defendant.

Case No. CL21000354-00

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

**INTRODUCTION**

1. Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2. Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3. Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President



Exhibit 6

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4. Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5. In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6. In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family. He stated he and Becki had been "suffering in silence" over it. He confessed he had wrongly been "bearing those burdens on [his] own." The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time." The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the yearslong series of attacks the couple has faced."

7. On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.") In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012. Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.") Complaint ¶41. When Becki and Falwell Jr., first met Granda he was a 20-year old working at the high-end resort hotel at which Falwells stayed while on one of their frequent family

vacations in Miami. Complaint ¶40. Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8. Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9. In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship. Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University*." Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty. Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10. In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community…." In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda. Complaint ¶42.

11. By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint. Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12. Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement. He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

**The Liberty Way**

13. The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell. Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14. In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students. In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty. Today, as noted, Liberty trains more than double that number.

15. In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right." The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

16. At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability – was the Biblical notion of inter-accountability among the Christians who make up the Liberty community. Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17. The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle: "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ." Articles, Exhibit A at 1. The Faculty Handbook repeats this quote at paragraph 42.

18. The Liberty University honor code – the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: ***"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."***

(Emphasis in original.)

19. The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the philosophy of education which first gave rise to the university and which is summarized in the following propositions:

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.
- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.
- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20. It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college. Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual examplar. During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21. This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role. It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence." Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22. Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline. Liberty's Board of Trustees was and is obligated to espouse Biblical principles. After all, it was the Trustees that fashioned "Board policy" for Liberty. *See* Bylaws, Article II, Section 4.

23. Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007. From that point onward, Dr. Falwell's

chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles. Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees. Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board. Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty. He has since acceded to the role of campus pastor at Liberty.

24. In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty. He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25. One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty. Effective January 1, 2016, Falwell Jr. extended to his first born son Trey Falwell a key employee services agreement ("Trey's Contract"). It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26. In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195.000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits. In this new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief

Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty. Under the new agreement, Trey was an at-will employee of Liberty.

27. As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019. The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28. During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

**The Granda Allegations**

29. Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship. In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30. In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus. In a keepsake photo capturing the occasion, Granda (right) posed with the future

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.




31. By participating in close family contract, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki. He became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct.

32. According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period. For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired. Complaint ¶45. (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.) Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells. *Id.*

33. On information and belief, Falwell Jr. was able to quell this particular controversy over racy photos. According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

34. The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35. According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells. Complaint ¶46. The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way – otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.* Reuters has released the contents of one such FaceTime call. https://mobile.twitter.com/Reuters/status/1297941806970220545

36. By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47. Granda allegedly demanded hush money ranging from $600,000 to $2 million. *Id.* Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37. The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University." Complaint ¶¶43, 54, 62. To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot. Complaint ¶¶43, 54. It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38. On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

39. In addition to the sexual affair, Granda has repeatedly mentioned in media reports the Falwells' fraternization in high-energy social establishments. Such behavior was prohibited for Liberty students, who, as a condition of enrollment at Liberty, would pledge to refrain from imbibing alcohol, engaging in immodest behavior, and having sex outside of a Biblical marriage. By agreement, these rules govern the students' lives both on campus and off, and during school years and in the summer between academic years.

40. In contrast to the high behavioral standards that Falwell expected others at Liberty to follow, the Falwells frequented Miami-area clubs and were pictured at times amongst revelers, such as in the photos of Falwell Jr. and Becki below that were posted to social media.



41. The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell, Jr. who loaned the venture $1.8 million. Ownership of the enterprise was given to Becki, Trey, and Granda. Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

42. When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions. On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

43. Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

44. There is little doubt that Granda maintains a cache of material harmful to the Falwells. At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility. Granda has implied in the media that he has more such information within his possession.

45. Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material. In his Complaint, in fact, Falwell Jr. emphasizes that at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally. See Complaint ¶¶44, 45, 46, 47.

46. Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time. From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive." Complaint ¶¶42, 44, 48, 49.

47. Falwell Jr. further accumulated some third-party assessments of Granda's state of mind. In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle

that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house. Complaint ¶¶49, 50.

48. Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done. After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

**Falwell Jr.'s "Granda Plan"**

49. Instead of divulging to Liberty's Board of Truistee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct. As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

50. The Falwells knew they shared a unity of interests with Granda. They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

51. Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak. If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost. Granda's scheme for a pay day from Falwell Jr would be valueless. Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

52. Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever. Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection. He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

53. To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

54. The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan." They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

55. For six years – from 2014 to 2020 – the Granda Plan worked. Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him. Complaint ¶44. It is evident that the Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time. *Id.* According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior…."

56. The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

a. The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;

b. Granda joined the Falwells in the Florida Keys. During this trip, Falwell Jr. posed with Granda paternalistically – arm around the him, drink in hand:



c. Posing outside the Liberty jet, the Falwells took pictures with Granda and former Miami business partner Gordon Bello.



d. The Falwells also brought Granda along for other family excursions, pairing him with Trey. For example, on September 6, 2018, the Falwells arranged for Congressman Bob Goodlatte to host them on a tour of the U.S Capitol. Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah. Granda once again appeared in the family photos – one set on a rooftop vista atop the Capitol, and another of the group gathered in front of the Thomas Jefferson statute.



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

e. Finally, the Falwells befriended some of Granda's girlfriends. These proactive relationships helped the Falwells amass useful information about Granda, permitting them to understand his tendencies and manage Granda with more awareness. Complaint ¶¶ 48-50.

57. As 2019 began, Falwell had shrewdly controlled Granda for nearly five years. In that span, Granda had not disclosed externally the sensitive information about the Falwells. Given

what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

58. Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy. The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

**Outside Pressures on the Falwell Presidency**

59. While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues. But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

60. In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

61. According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant

disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

62. The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals. Falwell Jr, took steps to redress this challenge. Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

63. To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him. Like Jesus, Falwell exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

64. Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

a. In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect." Embracing evangelical doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

b. In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

c. On January 25, 2018, Falwell returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive." https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d. Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness." https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

65. As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44. In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down. At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his value to Liberty as a business asset. Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness. Falwell Jr. was wracked with "constant anxiety." *Id.* He desperately needed to cut Granda off completely, a course fraught with substantial risk. Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

66. To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty. In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty. There could come a time when the school might need to separate from Falwell Jr. for non-material actions. Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract. Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action. In 2019, Falwell Jr. acted on this undertaking.

**The 2019 Falwell Jr. Employment Agreement**

67. On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement"). This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises. It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

68. The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

69. By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's

Executive Committee did not know that fact. Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell's Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

70. True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President. Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

71. After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause." Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

72. Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement. Falwell Jr. said nothing of his belief that procuring Granda's silence

might in time require a higher price unless Granda was confronted and completely managed. To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

**<u>Falwell's Auspicious Acts of August of 2020</u>**

73. The pressure of Granda's threats was increasingly getting to Falwell Jr. With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell had an opportunity to take a firmer stand against his blackmailer.

74. Emboldened by the financial security that he had negotiated for himself, Falwell struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end. Complaint ¶¶55, 56.

75. To manage his stress, Falwell Jr. began drinking significantly. There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

76. The Falwell family took some floating vacations on yachts provided by business partners of Liberty. One such excursion took place during late July 2020. During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys*. https://www.swearnet.com/shows/trailer-park-boys. Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

77. The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke

in his hand. Julian runs illegal businesses. A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel." The little boy became nicknamed "Mo."

78. Falwell, Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing. Falwell, Jr also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip. During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy. Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition. "Julian" toted his obligatory tumbler of black liquid in his left hand.

79. Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned. Falwell, Jr. promised not to show this photo to others.

80. On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this image with his entire Instagram following. The picture went viral, and became an immediate internet sensation. It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that also went viral on the internet. https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-pictures-were-from-trailer-park-boys-themed-party/.

81. Following is Falwell Jr.'s Instragram post, and one commentator's reaction.



82. Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post, and *Politico*, and from commentators on CNN and the View.

83. One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way*. The analyst concluded there were 63 counts of potential violation, which would

conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

84. Realizing that he had made a serious mistake – Falwell, Jr. deleted the Instagram post shortly after its August 3rd release. But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up. He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

85. Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

86. At this low juncture for Falwell Jr., his wife Becki stepped in. After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol. She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions. She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

87. On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually. In the meeting, Falwell

Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions. He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

88. Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

89. On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19. Falwell conceded he had been doing silly things that he should not have let distract him. The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

90. The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one. The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

91. True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly. Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees. The Executive Committee then proceeded

toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

92. As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined. By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

93. If there was a breaking point in Falwell Jr's relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it. Falwell Jr's change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

94. Frustratingly, Falwell's indiscretions continued. On August 20, 2020, just under two weeks into his leave of absence, a video was posted online showing Falwell working out in his trainer's gym. Falwell Jr. was performing pelvic thrust exercises on a weight bench with two young women, likely Liberty students, inexplicably riding either end of the barbell as Falwell Jr. exerted himself. The photo was posted to social media after the point at which it had been taken.



95. Although the image was not contemporaneous with its release, this weight room exhibition stirred yet another round of mockery and consternation in the media. https://julieroys.com/falwell-bizarre-video-bikini/

96. On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path. On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner*, his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters*. This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

97. Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy. The Executive Committee had expressly forbidden a post about Falwell's sabbatical. Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary. In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

98. In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family. He admitted that "the Liberty community deserved to hear" the salacious story directly. He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public." He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from

mental health professionals…." Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

99. Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

100. At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

101. On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article. https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

102. Granda hit Falwell Jr. while the Liberty President was being pilloried in the media. Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

103. Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr. These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time

the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

104. After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign. After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

105. The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

106. On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest. He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

107. While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that...I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation ... and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

**Falwell Migrates From Forgiveness-Seeker to Fighter**

108. Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO. The subject matter of the interaction with *Liberty's* chosen counsel was Falwell Jr.'s personal employment rights *against Liberty.* As Falwell knows, Virginia ethics laws do not permit such consultation.

109. Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation. Falwell improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

110. Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

111. On August 28, 2020, the Executive Committee agreed to satisfy Falwell's demand for a "Good Reason"- resignation, together with its severance payout. Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

**Falwell Jr.'s Hard Fall**

112. A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended. Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises. While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

113. Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today. On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

114. In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up. He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

**COUNT ONE: BREACH OF CONTRACT / CONVERSION**

115. Liberty incorporates paragraphs 1 to 114 above.

116. The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly

disclosed by LU ('Confidential Information.') Confidential Information remains the property of LU."

117. Falwell Jr. consistently refused to use his assigned liberty.edu email address for his communications about Liberty business, insisting instead on maintaining an email address with a third party internet service provider, for which Liberty paid.

118. While Falwell, Jr. went to great lengths to avoid storing his communications and other business data on Liberty's system, he did require Liberty to provide him with devices, computers, phones, laptops, etc. for his use, and to pay for the services charged by the third party services. Specifically, Falwell Jr. was issued by Liberty a Surface Pro 3 laptop, bearing serial number 57462443253.

119. During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty. He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above. At the same time, many key documents relating Liberty's business, including Confidential Information, is stored on devices provided by the University, or in third party systems, to which Falwell, Jr. has control and access, but he has refused to return to Liberty or provide access codes.

120. As Liberty's President and Chancellor, Falwell Jr. also had an independent duty to keep all of this information confidential, and not to use it other than on Liberty's behalf.

121. Such information was and remains at all times the property of Liberty.

122. Falwell Jr. has been put on notice repeatedly to preserve and not destroy such Confidential Information as it is necessary for Liberty Jr. to defend and prosecute various lawsuits, both pending and contemplated.

123. Upon termination of his employment Falwell, Jr. had a duty to return all of Liberty's property – including computers, devices, as well as all Confidential Information.

124. Falwell Jr. has been asked but has refused fully to return Liberty's Confidential Information and other personal property in breach of the agreement, and his fiduciary duties to Liberty.

125. In the alternative, the property mentioned in ¶¶117, 118 and 119 above is the personal property of Liberty.

126. Falwell Jr. came into control of this property, but has failed fully to return the materials and data in full.

127. Falwell Jr.'s acts of dominion have deprived Liberty of the possession of this property is in derogation of the rights and privileges of Liberty.

128. On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

**COUNT TWO: BREACH OF FIDUCIARY DUTY**

129. Liberty incorporates paragraphs 1 to 128 above.

130. As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

131. Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr.

if adverse conditions caused him to choose resignation knowing he was impaired by extortion threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

132. Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

133. Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

134. On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

135. Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

136. The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

137. Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

138. For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

## COUNT THREE: STATUTORY CONSPIRACY

139. Liberty incorporates paragraphs 1 to 138 above.

140. Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

141. The business of Liberty is the provision of higher education through the perspective of Christian values. High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty Way, and upholds the values in Liberty's foundational documents. Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

142. Up to August 2020, Falwell Jr., Becki and Granda, and potentially others, acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

143. Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

144. Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

145. Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

146. Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

147. The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

148. By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled. That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

149. Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

150. Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

a. Award Liberty the damages identified above;

b. Award Liberty punitive damages;

c. Award Liberty its statutory attorneys' fees;

d. Award Liberty its pre-judgment and post-judgment interest;

e. Enjoin Falwell from retaining possession of property belong to Liberty; and

f. Provide any other relief this Court deems appropriate.

Liberty demands trial by jury of its claim.

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

R. Craig Wood (VSB # 24264)
McGuireWoods LLP
652 Peter Jefferson Parkway, Ste. 350
P. O. Box 1288
Charlottesville, VA 22911
(434) 977-2558
(434) 980-2274 (facsimile)
cwood@mcguirewoods.com

VALIDATE CASE PAPERS
RCPT : 21000007650
DATE : 04/15/2021 TIME: 13:44
CASE : 680CL21000354-00
ACCT : LIBERTY UNIVERSITY, INC
AMT. : $346.00