IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | | |
|---|---|---|
| WALTER SCOTT LAMB, | ) | |
|     Plaintiff/Counterclaim Defendant, | ) | Case No. 6:21-cv-00055 |
| v. | ) | Hon. Norman K. Moon |
| | ) | |
| LIBERTY UNIVERSITY, INC., | ) | |
| a Virginia corporation, | ) | |
|     Defendant/Counterclaim Plaintiff. | ) | |

**LAMB'S MEORANDUM IN SUPPORT OF HIS MOTION FOR DISCOVERY
SANCTIONS PURSUANT TO RULE 37**

Comes now your plaintiff/counterclaim-defendant, Walter Scott Lamb, and in support of his motion for discovery sanctions under Rule 37, states as follows.

Lamb must come before this Court yet again, this time for sanctions, because Liberty University, Inc. in several respects has deliberately attempted to skirt this Court's order compelling discovery, and uses perjury to hide additional sources of information it has at its disposal. Liberty moves for sanctions under Rule 37(b)(2).

**I.**     **Law**

Federal Rule Civil Procedure 37(b)(2) provides in relevant part:

> (A) . . . . If a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders. They may include the following:
>     (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>     (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>     (iii) striking pleadings in whole or in part;
>     (iv) staying further proceedings until the order is obeyed;
>     (v) dismissing the action or proceeding in whole or in part;
>     (vi) rendering a default judgment against the disobedient party; or
>     (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

>    . . . .
>    (C) Payment of Expenses. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

In determining how to sanction a party with default judgment under Rule 37, courts must consider these factors: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. *Davis v. United States*, 767 F. App'x 396, 397 (4th Cir. 2018).

## II. The Missing and False Information

### a. The Convocation Speech

In the defamation count of its counterclaim, Liberty has accused Mr. Lamb of severely damaging Liberty's (thoroughly tattered) reputation. How? By allegedly implying Liberty terminated Lamb for reasons related to Title IX, among other things. ECF Doc. 10 at 21 (Counterclaim ¶ 53). Liberty boldly proclaimed in its counterclaim that it wanted "to take on Lamb's defamatory claims and publicly prove them false." ECF Doc. 10 at 9 (Counterclaim ¶ 3). But then it tried to hide everything damning to the claim behind the shield of privilege.

Liberty fired Lamb on October 6, 2021, just days after Lamb challenged President Prevo, the General Counsel, and others for planning to lie to the public in a convocation speech about the University's response to allegations of Title IX violations. Trans. 9/29/22 at 24:12-28:5. Lamb pointed to it as one of the reasons for his termination in his Title IX retaliation claim. ECF Doc. 17 ¶¶ 40-44. Obviously, information about this dispute would be relevant to Liberty's defamation claim, and therefore discoverable.

Lamb requested the materials concerning this draft convocation speech in discovery served on April 1, 2022:

> Request for Production No. 14: All documents, materials, and things, including electronically stored information, pertaining to the October 1, 2020 convocation speech of President Prevo, including all documents pertaining to any draft versions of a speech for the occasion that he elected not to give.

ECF Doc. 118-1 at 10. Of course, Liberty claimed these materials were irrelevant and privileged, and refused production. ECF Doc. 96-1 at 8. When Liberty finally deigned to produce a privilege log as to these (and only these) materials, Lamb challenged the assertion of privilege. ECF Doc. 101 to 102-1. Lamb won. On November 3, 2022, after briefing, argument, and an in camera review, this Court ordered Liberty to produce the responsive records, by November 17, overruling the claim of privilege. ECF Doc. 103 at 9-13, 15.

*Liberty chose to disregard this order.* It has not produced the convocation speech materials. It simply has not produced the records.

Liberty can have no excuse for this deliberate disregard of the Court's order. It has the responsive documents. It knows what they are. It has Bates-stamped the records, listed them in the privilege log, and provided them to the Court for an in camera review. ECF Doc. 102-1 and 133 at 10. But then it disregards the Court's order to produce them. Liberty and their counsel are simply in contempt.

   **b.   The Title IX-related Text Messages**

As noted above, in filing this Counterclaim, Liberty insisted it would prove Lamb defamed Liberty. ECF Doc. 10 at 9 (Counterclaim ¶ 3). And the two express statements it uses for its defamation claim—claiming the statements were objectively false—were a statement Lamb made in 2021 that he was discussing Title IX mishandling "all spring," and a separate

3

statement that certain Title IX allegations have not been "looked into" (by the so-called Baker-Tilly investigation). ECF Doc. 10 at 21-23 (Counterclaim ¶¶ 53, 57).

To defend himself in the defamation claims, Lamb reasonably requested, on April 1, 2022, communications to or from Lamb related to Title IX issues:

> Request No. 6: All documents, materials, and things, including electronically stored information, constituting, recording, or memorializing communications from January 1, 2020 to October 6, 2021, to or from Scott Lamb concerning Title IX compliance, Title IX violations, sexual acts, or sexual harassment by or of past or present Liberty University, Inc. employees, students, trustees, administrators, agents, faculty, volunteers, or staff, or allegations of the same.
>
> Request No. 10: All documents, materials, and things, including electronically stored information, constituting or referencing correspondences between Scott Lamb and any other employee or agent of Liberty University Inc. between January 1, 2020, and the termination of Scott Lamb's employment with Liberty University, Inc., referencing Title IX.
>
> Request No. 11: All documents, materials, and things, including electronically stored information, constituting or referencing correspondences between Scott Lamb and any other employee or agent of Liberty University Inc. between January 1, 2020, and the termination of Scott Lamb's employment with Liberty University, Inc., that reference allegations of sexual misconduct or impropriety, to include without limitation sexual assault, sexual harassment, or sexual immorality, involving any past or present student, faculty, administrator, employee, agent, or trustee of Liberty University, Inc.
>
> Request No. 19: All documents, materials, and things, including electronically stored information, constituting, recording, or memorializing correspondences or communications between Scott Lamb and the office or employees in charge of Title IX compliance from January 1, 2020 to present.

ECF Doc. 118-1 at 8-11.

Liberty claimed in its objections on May 2, 2022 that these requests were disproportionate, irrelevant, and involved privileged matters. ECF Doc. 96-1 at 5-7, 10. But it produced no timely privilege log. In a meet-and-confer and in an informal conference with Judge Ballou, Liberty promised to complete its discovery review and produce a privilege log by about July 15, 2022. ECF Doc. 113-1 at 1. It didn't meet this deadline. Instead, when confronted with

4

this failure it claimed vaguely that it would have a full privilege log "within 21 days of completion of our production" and represented that it would "continue to make those productions on a rolling basis." ECF Doc. 113-2 at 1. But it did not timely produce the information on a rolling basis, nor did it produce a privilege log.

The Court on November 3, 2022, overruled Liberty's objections to the production of these documents and ordered production by November 17, 2022. ECF Doc. 133 at 6-9, 15. This was apparently based on an exchange at the hearing for the motion, in late September. On September 29, 2022, the Court asked Liberty, "So if I direct that your document production be substantially complete by the end of . . . end of next month, it's basically 31 days, is that doable?" Counsel for Liberty responded, "Judge, I think we can try to do that. If we could have a couple more weeks, maybe the middle of November, that would be great." Trans. 9/29/22 at 47:25 to 48:8. But, consistent with its established pattern, Liberty did not meet this deadline—a deadline imposed by the Court based on Liberty's request. Instead, on November 17, Liberty provided a partial production, without a privilege log, and unilaterally decided that it would finish the production and privilege log by December 15. Exhibit A-C. This delayed review of the allegedly privileged materials once again—materials requested eight and a half months ago. And Liberty's partial production on November 15 consisted of *emails* to or from Lamb, with attachments. It did not include other forms of written communications, such as text messages, or recorded oral communications, such as the "approximately 345 audio and/or video recordings created by Lamb in its possession . . . from the shadow copy of Evernote on Lamb's Liberty computer." ECF Doc. 113-5 at 3.

And come December 15, the date of Liberty's unilaterally extended deadline, Liberty produced nothing. Not until after close of business on December 16 did it produce a privilege log

5

and portions of the approximately 1,200 pages additional documents it reviewed—mostly emails and attachments, and mostly with some sort of redaction based on claims of privilege. Exhibit D. But none of the documents provided contain responsive text messages to or from Lamb on Title IX matters, or recordings of communications with Lamb.

The total failure to provide text messages to or from Lamb concerning Title IX matters is inexcusable contempt of the Court's order of production. First, the text messages would respond to the requests, which were not limited to emails. Second, even if Lamb does not have these text messages, text messages would have counterparts in the possession of the sender or the recipients. To the extent those senders or recipients are Liberty employees, holding those records in the course of their employment, Liberty has an obligation to produce them. Third, Liberty has insisted that its policies and various legal holds require employees to preserve all text messages concerning Liberty business, and to deliver them to Liberty at or before the termination of their employment. In fact, Liberty's counterclaim represents that a legal hold exists (or existed) for Title IX communications—the exact sort of text communications Lamb has requested. Fourth, given the volume of emails to or from Lamb responsive to this request—approximately 1000 documents, inclusive of attachments—no one can reasonably believe Liberty's employees did not *also* communicate with Mr. Lamb *by text* on Title IX-related issues.

Rather, Liberty as discussed below, Liberty has invested itself in an unfounded and fundamentally misleading claim that it has no access to any of Lamb's text messages. Producing responsive text messages would undermine that claim. And so, Liberty has elected instead to deliberately limit production of documents responsive to these requests to emails, ignoring the reciprocal text messages its employees have (or Liberty has) in their possession.

As to the audio recordings, Liberty acknowledged possession of some 345 audio recordings pulled from Lamb's Evernote file. ECF Doc. 113-5 at 3. Thus far, it has produced 63 of these recordings in response to other discovery requests. And it previously represented the documents it produced as "a first (but not last) production of the documents" from the Evernote files. ECF Doc. 113-2 at 1. Any records on Title IX related issues were responsive to this motion to compel and should have been produced by November 17.

The Court cannot allow this. This information is pertinent to the defamation claim, and it is also relevant to Liberty's motion for sanctions against Lamb, and to the Court's order that Liberty examine what access it may have to the information Lamb would have had on his devices and accounts. Liberty cannot be allowed to ignore the reciprocal copies of text communications it may have that are responsive to discovery requests.

Liberty has made text messages a central matter of this case. It claims that Lamb "was afforded access to a wide variety of key Liberty documents and information, including . . . electronic records such as text messages." ECF Doc. 10 at 25. It has claimed that "Lamb's supposed Title IX protest was driven from his cell phone." ECF Doc. 85. It has a pending motion for sanctions against Lamb *inter alia* for disposing of his text messages. *See* ECF Doc. 85, 110. It is supposed to be recompiling these texts. ECF Doc. 85 at 15. It cannot now pretend as though it has no responsive text messages.

   **c. The Catalog of Documents Produced Under the Protocols**

The bulk of Liberty's claims concern Lamb's possession and use of Liberty information after the termination of his employment. ECF Doc. 10 at 23-33. On Liberty's motion concerning this data and the Court's order, the parties formulated a protocol that required Lamb to relinquish possession of all physical and electronic documents he had that might belong to Liberty—and to

7

relinquish them without review by his counsel. ECF Doc. 37, 85-2. Yet the information about what records Lamb returned was central to the prosecution and defense of several of Liberty's claims.

For that reason, Lamb issued Interrogatory 24:

With respect to the materials Liberty University asserts to own which Lamb delivered to Liberty University, Inc. under the forensic protocols, identify each document or file by title or subject, date of creation, date of last modification, file type, file size in bytes or pages, whether Liberty University claims it is privileged and the nature of the privilege, whether Liberty University claims it is confidential and the reasons, and whether Liberty University had access to a copy of the file by other means between October 7, 2021 and the time Lamb provided the materials to Liberty University pursuant to the protocols.

ECF Doc. 113-5 at 5-6. Liberty objected to this request, provoking the third motion to compel. ECF Doc. 112. The Court overruled the objections and ordered Liberty to produce the requested information by November 17. ECF Doc. 133 at 13-15. Rather than complying with this order, Liberty took several improper tacts.

First, Liberty falsely asserted, "the titles of all materials produced under the forensic protocol have already been provided to Lamb by Vestigant." Exhibit C at 7. In fact, the only file names Lamb received from Vestigant were those responsive to the keywords Lamb designated in the protocols. *See* Exhibit E.

Second, Liberty produced the list of records in a format that will obviously be useless in front of a jury. Exhibit C at 18-26.

Third, Liberty failed to specify, as required, (a) what if any document Liberty claims to be privileged and the nature of the privilege, (b) what if any document Liberty claims to be confidential and the reasons, and (c) whether Liberty had access to a copy of the file by other means between October 7, 2021 and the time Lamb provided the materials to Liberty under the protocols. Exhibit C at 5-9. On the last point, it asserts, "There is no way to determine whether

8

Liberty had access to exact copies . . . because Lamb has manipulated, altered, and destroyed metadata." Exhibit C at 9. In other words, Liberty refuses to do an eyeball comparison of documents, based on (for instance) the title of the document, and will only contemplate a comparison of metadata.

Fourth, and most egregiously, Lamb *did not produce only electronic documents* under the protocol. The protocol required Lamb to return the hard copies of documents that he had. ECF Doc. 85-2 ¶ 5. Lamb complied on April 11, 2022, delivering the documents to the office of Liberty's counsel. Exhibit F. Liberty has inexcusably failed to catalogue these records pursuant to this interrogatory.

These failures unfairly prejudice Lamb. Liberty has claimed that Lamb stole records, but it will not list the records he returned in a useable format. Liberty has claimed Lamb took and used confidential or privileged documents and information (ECF Doc. 10 at 9 ¶ 3; 11 ¶ 15; 12 ¶¶ 17, 19; 14 ¶¶ 23-25; 19-20 ¶ 48; 23 ¶ 64; 24 ¶¶ 65-69; 25 ¶¶ 71, 74-75; 26 ¶¶ 76-78, 80; 27 ¶¶ 81-82, 85-87; 28 ¶¶ 87-88, 94-95; 29 ¶¶ 99-103; 31 ¶¶ 111, 116-17; 32 ¶ 118; 33 ¶¶ 131, 135; 34 ¶ 137), but it refuses to specify what documents he had that were privileged or confidential. Exhibit C at 5-9. Liberty claims that Lamb deprived it of possession of its records (ECF Doc. 10 at 29 ¶ 96), but then refuses to compare the records Lamb returned against the records Liberty already had to see if Liberty had copies. Exhibit C at 9. Liberty chooses to answer interrogatories with false editorials, under oath, claiming that Liberty's experts provided Lamb the information already, in an unfair effort to taint the use of these interrogatories for trial purposes. Liberty also ignores a box full of documents Lamb provided in physical form. This last failure is especially troubling considering the parallel order of the Court to determine what information Lamb had

9

that Liberty can access, because Liberty is disregarding its access to a large class of records Lamb provided to Liberty.

By these actions, Liberty has shown contempt for the Court's November 1 order requiring a full and complete answer to this interrogatory.

### D. Liberty University Has Committed Perjury In Response to Interrogatory 25

The Court's order of November 3, 2022 (ECF Doc. 133) required Liberty University to produce the following information by November 17:

> Interrogatory 25: Identify by category or by specific file any documents, materials, or things, including electronically stored information, that Liberty University, Inc. asserts that it owned and Lamb destroyed, excluding those documents, materials, or things that Liberty University currently has copies of or access to by other means.

In Liberty's constant efforts to plead they have been harmed by the loss of data, it claims under the penalty of perjury:

> Liberty is unable to discern the extent (if any) to which it may currently have, or ever had, access to any of the information on these devices [e.g., Lamb's phone] by other means. At a minimum, Liberty can confirm it has never had access to Lamb's text messages . . . and cannot recover or obtain that information by any other means.

Exhibit C at 12-13. This assertion is verified under penalty of perjury by John Gauger. Exhibit C at 16. He would know better, as he is the Chief Information Officer and Executive VP of Analytics for Liberty. ECF Doc. 85-4 ¶ 2.

This assertion deliberately misrepresents the facts. Liberty would have access to many or most of Lamb's text messages, because any messages Lamb exchanged with other employees have the counterpart in the employees' possession All text messages have a counterpart copy— that's common sense. But Liberty claims it cannot locate *any* counterparts to the text messages of Lamb—almost as though it is willfully not looked for them. Exhibit C at 12-13.

> **Commented [SL1]:** Consider adding in that question I mentioned in the email:
>
> Has Liberty even collected the phones of key executives and searched them for responsive material? This would include the cell phones of at least everyone that Lamb's text records (currently in the possession of Liberty) prove that he texted with. We have no reason to believe that Liberty has even taken the first step -- the collecting of phone from key executives.

10

If these records in fact do not exist, Liberty has spoliated the evidence. After all, Liberty claims that its employees were subject to, *inter alia*, "Two Legal Holds related to litigation involving Title IX." ECF Doc. 10 at 13 ¶ 20(d). It has asserted that its employees have "committed to abide by the LU document retention system, which obligated employees to preserve and archived specified information for prescribed periods of time." ECF Doc. 10 at 13 ¶ 21. These records are, according to Liberty, property of the University and not the individual employee, and must be returned to the University on or before the employee's last day of work. ECF Doc. 10 at 12-13 ¶¶ 19-21.

But beyond text message counterparts, Liberty's prior production of documents contradicts this sworn assertion that Liberty "never had access to Lamb's text messages . . . and cannot recover or obtain that information by any other means." Specifically, before providing this verified response, Liberty already produced more than 150 separate strings of Lamb's text messages, ranging from September 18, 2018, to September 4, 2020, consisting of some 880 pages, apparently from Lamb's Evernote files. As Liberty had produced only about 5700 pages of documents at that point, a ***full 15% of the pages Liberty had produced at the time were "Lamb's text messages" that Liberty swears it "never had access to" and "cannot recover or obtain that information"***—and this calculation excludes all the duplicate text messages! A catalog of the messages, prepared by Lamb's counsel, appears as Exhibit G.

It is not as if Liberty was unaware of these materials. It produced them and even took time to review and redact some of them. Instead, Liberty deliberately misrepresented its access to records in an effort to mislead this Court as to the sanctions motion pending against Lamb and to amplify its claim of damages.

Liberty cannot honestly claim that it ***"never had access to" and "cannot recover or obtain"*** any of Lamb's text messages when it has already produce 150 text strings from Lamb over the course of two years, and it has not reviewed the counterpart text messages its employees may have. This is perjury. And it is not the first time Gauger ignored the counterparts to Lamb's texts. *See* ECF Doc. 85-4 ¶¶ 19(a), 26 (referencing texts, and claiming under the penalty of perjury, "Liberty has no way to access the data that Scott Lamb unilaterally wiped"). This must stop.

**III.     Evaluating the Appropriate Remedy**

    **A.     Liberty University Acted in Bad Faith**

Liberty University acted in bad faith in flouting the November 1 order on the motion to compel.

As for the convocation speech materials, this was a focus of the second motion to compel (ECF Doc. 101), substantial argument in the hearing (Trans. 9/29/22 at 24:12-28:5), and a large portion of the Court's decision (ECF Doc. 133 at 9-12). Liberty cannot reasonably claim to have overlooked producing this category of documents in good faith. It cannot claim that it did not know what documents were at issue, or that they needed some sort of privilege review. They already identified the responsive documents produced the documents to the Court for an in camera review, and the Court determined any privilege had been waived. ECF Doc. 133 at 9-12. The failure to produce them timely under the order shows bad faith—an attempt to delay and harass Lamb, by forcing him to appeal once more to the Court, at which time Liberty University can simply say "Oops! It was an oversight."

The failure to produce text messages to or from Lamb concerning Title IX issues shows bad faith. Liberty has focused on Lamb's text messages from the beginning, even referencing in

the counterclaim the legal holds it has for Title IX communications, and discussing its policies to preserve such data. ECF Doc. 12-13 ¶¶ 17-20. Are we to imagine, in this lawsuit largely about the use and misuse of electronic record of a former Liberty employee, that Liberty merely overlooked the counterparts to Lamb's text messages in Title IX matters in the hands of its employees? No. Liberty chose not to produce responsive records—and likely failed even to collect the records—in order to support a false narrative that it has lost access to valuable data.

      Liberty failure to produce audio recordings of Lamb's conversations concerning Title IX issues likewise shows bad faith, as Liberty has these documents in its possession from Lamb and know about these documents, and they are responsive to the requests. ECF Doc. 113-5 at 3.

      Liberty's response to Interrogatory 24 also reveals bad faith. At the very least, it selectively produced a document that has nearly 250 lines of text per page. Exhibit C at 18-26. But Liberty deliberately failed to produce some of the categories of information requested, such as whether Liberty claims the documents were privileged or confidential, which is not only responsive, but also material to their claims. In this light, any claim that the failure to catalogue the hard copies Lamb provided to be a mere oversight rings hollow. Moreover, if those records have not been catalogued eight months after Lamb provided them, how can we trust the accuracy of a catalogue produced at this point? Has the collection been reliably preserved? The lack of diligence and decrepit pace Liberty is producing its privilege log reveals Liberty's contumacious and cynical disregard for this Court's orders and the discovery process broadly.

      Finally, Liberty's perjured statements—claiming it has never had access to any of Lamb's texts when 15% of the pages it produced earlier were Lamb's texts—is inexcusably bad faith. Liberty is engaged in a series of systematic and deliberate misrepresentations under oath, to try to amplify its assertions of injury and prejudice—all while running up the tab on its former

employee. The equities and abuse of process by the larger Liberty against a single indovoudal plaintiff demand redress by this Court.

Furthermore, if Liberty was not acting it bad faith, it would have corrected these deficiencies in the extra month it unilaterally demanded for compliance with the Court's order. Or in the more than 8 months since Lamb first made the discovery requests. Liberty has not done so—and will not do so without further order from this Court.

### B.  Degree of Unfair Prejudice

Liberty's refusal to comply with the discovery order causes a substantial degree of prejudice. First, in an in camera review, Judge Ballou determined the speech materials will be pertinent in defense of the defamation claim, to establish substantial truth. He ruled any privilege has been waived as to these documents, and they must be produced. Continued denial of access to these records, therefore, is unfairly prejudicial to Lamb—and clearly so.

As for the text messages pertinent to the Title IX issues, the failure to produce records unfairly prejudices Lamb both as to a defense of the defamation claim and as to the pending sanctions motion. Though the Court's earlier finding says that Lamb would probably share responsibility if this data is wholly lost, it would be prejudicial to Lamb if he were sanctioned for spoliation of his copies of text messages, especially when Liberty likely has the records—unless Liberty is appropriately sanctioned for the spoliation of its copies of the same data.

As to the audio recordings, Liberty's awareness of these records, as evident from their discovery responses, make the failure to produce any that concern Title IX a sign of bad faith. ECF Doc. 113-5 at 3.

Third, concerning the catalogue of data Lamb has returned responsive to Interrogatory 24, Liberty continues to evade answering the key questions of what data Lamb took that was

14

allegedly privileged or confidential, and whether Liberty still had access to the records by other means. This is highly probative information about both potential liability and damages in the claims of conversion, detinue, theft of trade secrets, conspiracy to harm a business, breach of fiduciary duties, and breach of contract. Lamb has also been unfairly prejudiced as to each of his claims and as to the sanction's motion by Liberty's apparent loss of these physical records after they were delivered to Liberty's counsel. Liberty used the agreed protocols to get Lamb to relinquish hard copies of documents without review of Lamb's counsel, and now fails to catalogue these records, which again is relevant to both liability and damages on the above claims.

Finally, Liberty has committed perjury as to Liberty's access to Lamb's text messages, when Liberty's access to these text messages is probative to all the claims as well as to the pending motion for sanctions. This perjurious testimony has been designed to amplify the alleged damages Liberty claims, support liability on the document-based claims, undermine the defense of truth as to the defamation claim, and amplify the sanctions motion.

This is on top of the attorney's fees incurred in connection with the successful motions to compel and this motion for sanctions.

### C. Need for Deterrence

With respect to the convocation speech materials, remediation would consist in production of the records and payment of the costs associated with this motion for sanctions. But to a multi-billion-dollar organization like Liberty, the production of records it is already obliged to produce and payment of a small amount of fees will not be an adequate deterrence against this conduct. It will be a relatively insignificant annoyance, forgotten in a moment.

With respect to the text messages responsive to Title IX, remediation would consist in at least the producing the records. But if Liberty has failed to collect the responsive records, especially from former employees, many of the text messages will likely be permanently lost. This loss would be inexcusable because Liberty has been engaged in a suit with its former President, Jerry Falwell, Jr., for nearly two years based on allegations that he inappropriately retained data, such as text messages. ECF Doc. 113-6. This suit was ongoing for almost half a year before Lamb was terminated. If, despite that lawsuit and despite this lawsuit, Liberty has still failed to correct its business practices by securing discoverable information from employees, additional deterrence is appropriate. *Cf.* ECF Doc. 85-4 (indicating the University is aware it can lose "extremely important" data from employee cell phones if it is not collected).

With respect to Interrogatory 24, remediation would consist again in production of the information and payment of the costs associated with this motion for sanctions. But again, the payment of such fees will not serve as an adequate deterrent for a multi-billion-dollar organization like Liberty. Furthermore, Lamb has serious concerns that Liberty's failure to catalogue the physical files he returned signals the loss of those records, which would be extremely prejudicial to Lamb's claims and defenses.

Finally, Liberty's perjured statements might be remedied by the statements being revoked, and payment of the fees for this motion, but that is not sufficient deterrence. It will provide Liberty little reason not to cooperate in perjury again, because it can afford the marginal costs of getting caught. Deterrence is appropriate.

### D.    Effectiveness of the Sanction

The Court must consider an appropriate, effective sanction, evaluating whether a less effective sanction would be adequate.

With respect to the failure to produce the convocation speech materials, Mr. Lamb wants the materials, and fully expects that he will prevail on the merits of this defamation claim and recover his attorney fees under Virginia Code § 8.01-232.2. He believes that the appropriate remedy would be treating the failure as civil contempt, requiring payment of Mr. Lamb's attorney fees for this motion for sanctions, plus an additional sum of $1,000 a day for each day after the date of this motion that it fails to produce the record. To ensure production, the Court should require the documents to be filed electronically in the Court record.

With respect to the failure to provide Title IX related text messages and audio recordings, the Court should require immediate production of this information, without the benefit of invoking privilege, to the extent Liberty or its current employees have possession of the records, and it should further allow additional discovery of up to ten interrogatories and a prompt corporate deposition into the question of spoliation, for appropriate additional sanctions, along with the attorney's fees arising from this additional discovery.

With respect to the failure to provide information responsive to Interrogatory 24 as to which documents or files Liberty claims to be confidential or privileged, the Court should deem the records identified in response to Interrogatory 24 as non-confidential and non-privileged. This is appropriate, as Liberty has withheld the information that is necessary for Lamb's defense. A lesser sanction, such as a monetary penalty, would encourage Liberty to measure disobedience as a business cost, and this penalty is not as severe as, for instance, striking the associated claims or dismissing the action in whole or in part.

With respect to the failure to catalogue the physical documents Mr. Lamb returned, and disregard the court order to provide this information the Court should require prompt production of this information, deeming the records not to be privileged or confidential, and it should further

allow additional discovery of up to ten interrogatories and a prompt deposition of the corporation and its counsel into the question of spoliation, for appropriate sanctions, along with the attorney fees arising from this additional discovery.

With respect to the perjurious response to Interrogatory 25, Liberty should be prohibited from supporting its claims for conversion, detinue, misappropriation of trade secrets, breach of contract, breach of fiduciary duties, Virginia computer crimes, or statutory conspiracy by reference to text messages Lamb sent or received, on top of paying the costs of this motion. This sanction is measured and appropriate, blocking Liberty from benefiting from its perjury and preventing Lamb from incurring any additional expenses in association with this subject matter of text messages. Additionally, or alternatively, since the bad faith of Liberty here unfairly prejudices Lamb in connection with the pending motion for sanctions, the court can and reasonably should dismiss that motion for sanctions, if only on the ground of unclean hands.

**IV.    Conclusion**

For these reasons, Walter Scott Lamb request this Court to enter appropriate sanctions against Liberty pursuant to Federal Rule Civil Procedure 37(b)(2), including but not limited to:

(1)    Order the production of the 17 documents withheld from production in response to Request No. 14, with a civil judgment of $1,000 per day from the date of the filing of this motion until the records have been produced to Lamb by filing electronically in the Court record.

(2)    Order the immediate production of text messages and audio recordings in Liberty's or its employees' possession responsive to Requests for Production 6, 10, 11, or 19, without the benefit of invoking privilege.

(3) Allow additional discovery of up to ten interrogatories and a prompt corporate deposition into the question of spoliation of text messages Requests for Production 6, 10, 11, or 19, for appropriate additional sanctions, along with the attorney's fees arising from this additional discovery.

(4) Deem the records identified in response to Interrogatory 24, or any amendments thereto, as non-confidential and non-privileged, for purposes of this case.

(5) Provide an amended response to Interrogatory 24 with the catalogue of information in at least font size 10, and inclusive of the physical records Lamb returned to Liberty.

(6) Allow additional discovery of up to ten interrogatories and a prompt corporate deposition into the question of spoliation into the question of spoliation, for appropriate sanctions concerning the physical records Lamb returned pursuant to the protocols, along with the attorney fees arising from this additional discovery.

(7) Prohibit Liberty University from supporting its claims for conversion, detinue, misappropriation of trade secrets, breach of contract, breach of fiduciary duties, Virginia computer crimes, or statutory conspiracy by reference to text messages Lamb sent or received.

(8) Dismiss Liberty's pending motion for sanctions. ECF Doc. 84.

(9) Award attorney fees for the costs of this motion.

And all other further relief as may be appropriate.

> Respectfully submitted,
> WALTER SCOTT LAMB
>
> THOMAS H. ROBERTS & ASSOCIATES, P.C.
> By: /s/ Andrew T. Bodoh, Esq.
> Thomas H. Roberts, Esq. (VSB 26014)

19

tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-2105

Ian A. Northon, Esq.
*Admitted Only Pro Hac Vice*
Michigan—P65082
Pennsylvania—207733
Florida—101544
Northon Law, PLLC
4850 Tamiami Trail N, Ste 301
Naples, FL 34103
ian@northonlaw.com
service@northonlaw.com
(239) 784-7940

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2022, I presented the foregoing document(s) to the Clerk of the Court for filing and uploading to the CM/ECF system, which will provide electronic notice and copies of such filing(s) to counsel of record.

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000 / Fax: 804-783-2105
ATTORNEYS FOR PLAINTIFF