IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
**Lynchburg Division**

| | | | |
|---|---|---|---|
| WALTER SCOTT LAMB, | ) | | |
| Counterclaim Defendant | ) | | |
| v. | ) | Case No. 6:21-cv-00055 | |
| | ) | Hon. Norman K. Moon | |
| LIBERTY UNIVERSITY, INC., | ) | | |
| a Virginia corporation, | ) | | |
| Counterclaim Plaintiff. | ) | | |

## LAMB'S MEMORANDUM IN RESPONSE TO LIBERTY UNIVERSITY'S MOTION TO DISMISS

Comes now the Counterclaim Defendant Walter Scott Lamb, by counsel, and in opposition to the Counterclaim Plaintiff's Rule 41(a)(2) motion to dismiss its counterclaim, requests this Court to condition the dismissal on: (1) an award of Lamb's attorney fees and costs expended in connection with the defamation claim, based on the bad faith of Liberty University, Inc. ("Liberty"), and (2) Liberty's agreement that Lamb can use the discoverable materials in any subsequent proceeding on the topic.

### I.    Introduction

When Liberty filed its defamation claim against Lamb, it knew the claim was baseless. The statements of Lamb that Liberty claimed to be "objectively false"—i.e., that Lamb had been "discussing" Title IX mishandling "all spring" and that the "Title IX accusations" made to the Baker Tilly investigators "have not been looked into"—were, in fact, absolutely true, and Liberty knew they were true. Liberty also knew that Lamb believed, in good faith, and on reasonable factual grounds, that Lamb's termination related to Title IX, thereby negating any defamatory intent.

But the truth didn't matter to Liberty. It used a baseless defamation claim filed with the Court for the immediate PR value, under the protections of judicial privilege. Just as long as

1

Liberty could hide the truth through a protective order, and evade depositions and a motion for summary judgment, it would use the judicial privilege to falsely accuse Lamb of defamation. And so, after Lamb's requests on December 2, 2022 for dates for a corporate deposition, Liberty delayed, obfuscated, attempted to cancel, and then failed to appear for the corporate deposition, and then it filed its Rule 41 motion less than 20 hours before the corporate deposition was to resume. In this, both in filing the complaint and in its conduct during the litigation, Liberty has acted in bad faith, meriting a dismissal with conditions.

## II.   <u>Legal Standard</u>

After a counterclaim defendant has answered a counterclaim, absent an agreement, a counterclaim plaintiff may only dismiss the action by court order, on terms the court considers proper. FRCP 41(a) and (c). In considering such a motion, "the district court must focus primarily on protecting the interests of the [counterclaim] defendant." *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987). The Court should usually require the counterclaim plaintiff to pay a portion of the counterclaim defendant's taxable costs and agree to the use of discoverable materials in any subsequent proceeding on the topic. *Id.*

Courts can also condition dismissal on an award of attorney fees if the moving party acted in bad faith.[1] *Andrews v. America's Living Ctrs.*, LLC, 827 F.3d 306, 311-12 (4th Cir. 2016) (citing *Davis*, 819 F.2d at 1276, *LeBlang Motors, Ltd. v. Subaru of Am., Inc.*, 148 F.3d 680, 686-87 (7th Cir. 1998), and *Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 440-41 (8th Cir. 1997)).

---

[1] The award of attorney fees under Rule 41(a)(2) for bad faith conduct does not require a showing of prejudice to the defendant, which is an independent ground to award attorney fees. *Davis*, 819 F.2d at 1276. Therefore, this brief will not analyze the prejudice factors except as they may be relevant in showing bad faith.

II.     **Relevant Background**

Liberty University filed its 140-paragraph, 28-page, 8-count[2] counterclaim on November

5, 2021, written in a style designed for publicity (e.g., using headings like "The Lion and Lamb"

and "A Wolf in Lamb's Clothes" and "A Bleating Lamb"). ECF Doc. 10 at 14, 16, 19. The lead

claim accused Lamb of making two statements to the media that Liberty claims both were

"objectively false" (ECF Doc. 10, Counterclaim ¶ 57) and implied "he was fired for reasons

related to Title IX" (ECF Doc. 10, Counterclaim ¶ 53). The statements were:

- "Here's the thing, even after I was fired, I had a Vice President call me up,
  'What's your beef?' And I said, 'Well, that. The Title IX accusations, they
  have not been looked into'."

- "The thing is, I've been discussing that [the Title IX mishandling] all
  spring."

ECF Doc. 10, Counterclaim ¶ 53; *see also* ECF Docs. 36-19 to -20 (transcripts). Liberty

expressly stated it "brings this suit . . . to take on Lamb's defamatory claims and publicly prove

them false." ECF Doc. 10, Counterclaim ¶ 3. Lamb answered on November 24, 2021, denying

the defamation allegations, and asserting his statutory immunity under Virginia Code § 8.01-

223.2, which can include an award of attorney fees attorney fees. ECF Doc. 22 at 20-23, 43.

In the 550 days (approximately eighteen months) since Liberty filed this defamation

claim, Lamb has engaged in substantial investigative and discovery efforts to defend himself

from these scurrilous defamation allegations—i.e., to demonstrate the following:

- that Lamb was terminated "for reasons related to Title IX," not as "the result of a
  meeting about a recent review of the area under his management" or for being
  "insubordinate, fail[ing] to obtain requisite expense approvals, and failing] to

---

[2] There are seven numbered counts but two Counts IV pled in the alternative.

conduct the business affairs of his department to the standards set by Liberty" (*cf.*
ECF Doc. 10, Counterclaim ¶¶ 52-53);

- that Lamb's statement that he has "discussing that [the Title IX mishandling] all spring" was objectively true (*cf.* ECF Doc. 10, Counterclaim ¶¶ 53, 57);

- that Lamb's statement that "The Title IX accusations, they have not been looked into" was objectively true (*cf.* ECF Doc. 10, Counterclaim ¶¶ 53, 57);

- that Lamb's statements did not "defame and diminish the reputation of Liberty" (*cf.* ECF Doc. 10, Counterclaim ¶ 57).

- that Lamb did not "ma[k]e and publish[] the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements" (*cf.* ECF Doc. 10, Counterclaim ¶ 57).

Lamb's effort and expense in connection with the defamation claim can be seen, in part, from the discovery exchanged in this case.[3] *See* ECF Doc. 96-1 (Requests for Production 1-24), 96-2 (Interrogatories 1-2, 5-7, 18-20), 113-4 (Requests for Production 27-21); Exhibit 1 (Lamb's response to Interrogatory 8-15), Exhibit 2 (Requests for Production 37, 38, 41-43, 45-47, 51, 52, 54-59; Requests for Admission 7-10). The effort and expense also involved substantial discovery motions, *see* ECF Docs. 95, 96, 100, 101, 103, 108, 109, 112, 113, 117, 118, 119, 120, 122, 133, 134, 138, 139, 140, 141, 142, 143, as well as numerous issues resolved without Court intervention. *E.g.,* Exhibit 48 at 31-40. Lamb and his counsel also expended effort and expense

---

[3] Notably, Lamb did not initiate this discovery until April 1, 2022. *See* ECF Doc. 113-1 at 1. This was a month after the Court granted Liberty's Rule 12(b)(6) motion with respect to Lamb's Title IX claims (ECF Doc. 67), and the parties both objected to providing material after that point related to Lamb's claims (*e.g.*, ECF Doc. 96-1 (Request for Production 5-12, 14, 19); Exhibit 1 at 1-2 (Interrogatories 5-7)), so the discovery was exclusively necessary to defend the defamation claim.

to collect evidence pertinent to the defamation claim, s*ee* Exhibit 3 (Lamb's Rule 26 Disclosures and Supplements), and to begin a summary judgment motion for the defamation counts, due within a month. The trial in this case was set for August 7-10, 2023, with discovery to close on May 9, and dispositive motions due on May 24. ECF Doc. 125.

In furtherance of these discovery efforts, as early as December 2, 2022, Lamb sought dates to conduct a corporate deposition of Liberty. Exhibit 48 at 46.  Liberty University's counsel repeatedly failed or refused to provide dates for the deposition until, in March 2023, it authorized Lamb's counsel to select dates in early April. Exhibit 48 at 26-30, 41, 44, 46.  Lamb's counsel selected April 4. April. Exhibit 48 at 26; *see also* Exhibit 48 at 24-25.  Essentially one business day before the deposition, Liberty unilaterally attempted to cancel the scheduled deposition, without providing new dates. Exhibit 48 at 22-23, Liberty then failed to appear for its duly noticed deposition. Exhibit 48 at 1-6, 24. Finally, after additional a broken promises to provide a date (Exhibit 49 at 3-4), Liberty agreed that on April 27 it would resume the deposition it failed to appear for. Exhibit 49 at 2, 11. But 20 hours before that deposition, it filed this Rule 41 motion, declared discovery over, and refused to appear for the scheduled deposition, even before the Court entered an order granting the motion, which the Court later rescinded. ECF Doc. 156; Exhibit 49 at 27. Once the Court rescinded the order, Liberty promptly filed for a protective order to block depositions from occurring during the pendency of this motion ECF Doc. 159.

Despite successfully evading a corporate deposition, which likely would reveal much more damaging information, the discovery in this case demonstrates indisputably that ***Liberty knew that its defamation claims were baseless from the beginning, and filed them in bad faith***:

1. Following the exposure of Jerry Falwell Jr.'s and his wife's sexual misconduct in August 2020 (*see* Exhibit 1 at 14-15), Liberty University retained Gentry Locke for an

investigation "that focuses on the University's business operations." This occurred by a letter dated August 31, 2020, signed by Gentry Locke attorney W. David Paxton. Acting President Prevo signed this letter two days later. ECF Doc. 100-1. Gentry Locke simultaneously retained Baker Tilly, a forensic accounting firm, to assist in this investigation. ECF Doc. 100-2.

2.      Even though President Prevo and select others (not including Lamb) knew the Gentry Locke/Baker Tilly representation agreements specified the focus of the investigation was to be business operations, Liberty's Executive Committee, acting on behalf of its Board of Trustees, issued a statement for release by Liberty's Office of Communications & Public Engagement on August 31, 2020, deliberately implying that the investigation would cover at least some Title IX issues. The statement spoke of the Falwells' "questionable comments . . . , worrying behavior, and inappropriate social media posts" and complained about the "lack of spiritual stewardship by our former president," and stated:

> One of the leading forensic firms in the world has been retained by Liberty University's Board of Trustees to conduct a thorough investigation into ***all facets of Liberty University operations*** during Jerry Falwell, Jr.'s tenure as President, ***including but not limited to*** financial, real estate, and ***legal matters***.

Exhibit 4 (emphasis added). This press release did not disclose that the "forensic firm[s]" was an accounting firm.

3.      Based on the limited information Lamb was given, Lamb told reporters that the investigators were free to investigate anything, and offered to get an official statement to that effect. Exhibit 5 (LU-7155 (audio) at 0:54-5:00). But Liberty's General Counsel David Corry then told a reporter on September 3, 2020, copying Lamb on the email, that ***no determination has been made*** about investigating allegations of Falwell's personal conduct, but still Liberty "will investigate any allegations that fall within its Title IX policies." The reporter shared this information in his story (SL-1969). Exhibit 6. Lamb sought clarification as to the process, but did

not receive a clear answer other than that the Baker Tilly investigation was independent, and could investigate what it wanted. Exhibit 1 at 14, 17, 40-41; Exhibit 7 (under seal).

4.      By a press release on October 20, 2020, Liberty finally disclosed Baker Tilly's (but not Gentry Locke's) role in the investigation. ECF Doc. 103-1 (Thus the investigation came to be known as the Baker Tilly investigation.) This press release indicated "[t]hose with information they believe might be useful to the forensic investigation into potential misconduct in business operations of the University ***and/or any improper decision or actions by current or former members of  University leadership***" could share the information through an online portal, the portal was "not ***a substitute*** for employees or students to report complaints of misconduct where the University has an established complaint procedure" (emphasis added). One may reasonably interpret this as allowing parallel complaints on Title IX issues, to Liberty and the Baker Tilly investigators. This portal, portions of which appear as ECF Doc. 100-3, was kept open for sixty days, until December 20, 2020, according to the press release.

5.      Unbeknownst to Lamb (Exhibit 1 at 17), at some point, the decision was made that the Baker Tilly and Gentry Locke investigators would actually refuse to process allegations made to the about sexual assault to Title IX issues. As counsel for Liberty stated to the Court during this case, in its first public disclosure of this template letter:

> If someone -- whether it's a Jane Doe or someone else, if someone ignored that warning [on the FAQ page] and proceeded to submit a Title IX-related complaint through the portal, that person would have received a communication from Gentry Locke saying: This is not what this investigation is about. Your complaint will not be communicated to Liberty. You need to reach out and contact Liberty separately if you want to pursue this complaint. And then those complaints, to this day, Liberty has not received those, because the procedure was for those kinds of complaints, to the extent they exist, those complainants would be told the process is not for this purpose.

7

Trans. 9/29/2022 37:14-25. Liberty agreed to produce, in discovery, what it called "a copy of the standard response that was sent to any person who submitted a report through the investigation portal related to a matter that was not within the scope of the investigation." Exhibit 2 at 4 (Request for Production 38). *See also* Exhibit 9 (under seal).

6.      On October 23, 2020, Lamb was copied on an email responding to a reporter that stated "the scope of the[] forensic investigation would have to come from Baker Tilly US," but pointing back to the FAQ page. Corry responded, highlighting language in the FAQ page stating that "this platform is not to be used to report . . . Title IX concerns and violations." Exhibit 8 (LU006936).

7.      In the spring of 2021 (i.e., March to June 2021), Lamb had significant involvement in several issues related to Title IX:

a.      First, around March 23, 2021, reporter Julie Roys of *The Roys Report* contacted Lamb with questions about an alleged gang rape of a Liberty University student in 2005, after which Liberty was accused of failure to properly report the allegations. Exhibit 10 (LU-4027 to -4031). This led to a prolonged exchange of emails, calls, and in-person meetings that continued with Roys until early May 2021, as Roys and the former student (known as "Kathy" in the resulting news story and "Jane Doe 2" in the subsequent lawsuit) worked with Lamb to collect information about the incident, some of which have been redacted or withheld as privileged.[4] Exhibit 10, Exhibit 11 (sealed); Exhibit 12 at 4-5, 11-12 (Redacted: LU-5880 to -5894, -6039 to -6040, -6044 to -6052, -6055 to -6143, -6483 to -6487; Privileged: -6144 to -6145, -6146 to -6147, -6150 to 6152, -6490 to -6511). Roys produced two long articles after this

---

[4] Except as noted below with respect to Exhibit 46, *all redactions by use of black boxes* in the attached exhibits were made by Liberty prior to the production of the records. None of these were made unilaterally by Lamb.

series of communications, released on June 1 and 3, 2021. Exhibit 13. Yet even after this, reporters from *The Roys Report* pursued additional questions with Lamb concerning allegations of sexual assaults. Exhibit 14. Lamb worked internally to address these issues. Exhibit 14 (LU-4778 to -4779); *see also* Exhibit 1 at 32-33.

      i.    Lamb had to advocate for Liberty to give the former student what she wanted in a reasonable manner. Exhibit 1 at 22.

      ii.    During these communications, Roys asked for a response from Jonathan Falwell about promising the former student that "LU's investigation [i.e., the Baker Tilly investigation] would include her case—that she'd 'have a seat at the table.' Yet that hasn't happened. Would you tell me why this happened?" Exhibit 10 (LU-4028). The final response, which came from Corry (with Lamb cc'd) on May 14, 2021 (LU-4158) appears at Exhibit 10:

> Jonathan Falwell has no understanding as to whether [redacted] took advantage of the opportunity she expressed interest in (to contact the investigators with her story) . . . . Jonathan Falwell did not and does not control the investigation so if she did participated and was never followed up with, he does not know why.

*See also* Exhibit 11 (LU-6149) (sealed). Lamb opposed providing this response "because it implies that the woman failed to enter the portal, when in fact, we knew that she claimed to have no response." Exhibit 1 at 12. *See also* Exhibit 11 (sealed) (LU-5883 to -5889, -6055 to -6060, -6073 to -6074, -6087 to -6090, -6103 to -6106, -6142 to -6143) Exhibit 12 at 3, 5, 11-12 (LU-5880 to -5894, -6055 to 6145, -6490 to -6511). Notably, ***Roys's June 3, 2021 article then disclosed that "Kathy" <u>had</u> submitted information to the Baker Tilly investigators through portal, <u>and received no response</u>.*** Exhibit 13 (SL-972 to -973).

      b.    Second, on March 26, 2021, Lamb was contacted by Chris Sigel, who was preparing a podcast series to be released by *Wondery* concerning the Falwell family and Liberty University, including Title IX issues. This podcast series became *In God We Lust*, an eight-part

series released between April 13 and August 9, 2021, with the last one focusing on a sexual

assault of a Liberty student. The communications between Lamb and Seigel into July. Some of

the internal communications have been withheld as privileged by Liberty. Exhibit 1 at 31-32;

Exhibit 12 at 5-6 (LU-6153 to -6165); Exhibit 15; Exhibit 16 (sealed).

        c.      Third, beginning on March 30, 2021, Lamb was drawn into discussions

concerning Liberty's response—both in the court and to media outlets—concerning the *Hunter v.*

*Department of Education* lawsuit (a.k.a. the "REAP lawsuit") filed on March 31, 2021. This suit,

brought by a number of LGBTQ+ individuals, alleged that several religious colleges and

university were noncompliant with the Title IX. The suit included the complaints of two former

Liberty University students: Mackenzie McCann and Lucas Wilson. Exhibit 17. Lamb took

responsibility for monitoring public communications from the REAP organization. These

communications continued until June 9, 2021. Some parts have been withheld or redacted as

privileged. Exhibit 12 at 3-4 (LU-5895 to -5898, -5966 to -6004, 6034 to -6038); Exhibit 18,

Exhibit 19 (sealed). These discussions led Lamb to be concerned that the Liberty Way may

intimidate victims of same-sex sexual assault or harassment from disclosing the incidents, for

fear of discipline. When he expressed these concerns, they were generally dismissed. Exhibit 1 at

20-21.

        d.      Fourth, on April 1, 2021, Politico published an article indicating ***"Two***

***people who submitted information via the online portal and requested interviews with Baker***

***Tilly told POLITICO they were never contacted."*** Exhibit 20 (SL-1292) (emphasis added). This

led to a series of emails where Liberty scrambled to persuade Politico to change the story. Draft

emails included "misleading or dishonest wording" about "whether Baker Tilly had contacted all

people who requested to be interviewed by the investigation team." Lamb states, "Corry wanted

Politico to amend their article by stating that the University had been told by Baker Tilly that everybody who made a complaint through the portal had been responded to by Baker Tilly." Once Lamb protested, Corry indicated they were dropping this request for a correction. Exhibit 1 at 13-14; Exhibit 12 at 4 (LU-6005 to 6033); Exhibit 21 (sealed).

e.      Fifth, on or about May 6, 2021, Lamb received questions from Zak Levitt of Cadence Podcasts for season three of *Gangster Capitalism*. Internal and external communications continued intermittently for some months. Exhibit 1 at 27-30; Exhibit 22; Exhibit 23 (sealed). This series concerned the Falwells and Liberty University, including Title IX issues. It released a total of 10 episodes, between May 24, 2021 and December 8, 2021. This included episode 7 (released June 30, 2021) concerning the treatment of people with same-sex attractions at Liberty University, and episode 3 (released June 2, 2021) [SL-239 to -270] and bonus episodes 1 (released August 25, 2021) [SL-1984] and 2 (released December 8, 2021) [SL-1985] concerning sexual assaults of faculty and staff of Liberty University. Exhibit 24 (including four audio files).

f.      Sixth, throughout the spring of 2021, Lamb was pulled into several interviews with the Baker Tilly/Gentry Locke investigation team, where he was asked questions concerning potential Title IX violations, and disclosed what he knew. Exhibit 1 at 3, 11-12, 15, 17, 19, 26, 30, 39, 43.

8.      The events of early to mid-May, 2021, are of particular significance:

a.      On May 5, Lamb and Corry met via Zoom with Roys about the 2005 gang rape of "Kathy." He also learned that Roys and others were trying to collect stories of other assault victims. Exhibit 10 (LU-4753, -4914), Exhibit 25; Exhibit 26 (sealed).

11

      b.     Between May 6-7, several significant events occurred concerning the allegations of Title IX cover ups, which Lamb documented in an internal email and other records. Exhibit 26 (sealed). *See also* Exhibit 1 at 27-28.

      c.     Around May 10, Lamb met Prevo, and after the meeting told Prevo privately that the Baker Tilly/Gentry Locke investigators had been asking about Title IX issues, and that Lamb's candid answers may implicate Prevo, due to his lack of adequate oversight as chairman of the Board. Exhibit 1 at 21, 30-31.

      d.     Between May 11 and 12, Lamb exchanged a series of internal emails pertaining to outstanding media requests for information about the prior purported Title IX violations. Much of this information has been withheld as privileged. Exhibit 11 (sealed) & 12 (LU-6055 to -6141 (redacted or privileged**),** -6490 to -6506 (privileged), -5769 to -5770 (privileged), -5775 to -5790 (privileged), -5791 to -5806 (privileged)).

      e.     Liberty alleges Lamb's termination arose from a Strategic Analysis Team review of Lamb's department. Exhibit 28 (Interrogatories 5-6). President Prevo initiated this review at this time. Exhibit 1 at 30; Exhibit 27 (sealed).

    9.     ***After*** the events described above, on July 20, 2021, the *Jane Does 1-12 v. Liberty University, Inc.* lawsuit was filed in New York, accusing Liberty University of pervasive failures to comply with Title IX. Exhibit 29. Lamb, again, was active in communicating internally and externally about this suit, though Liberty claims many of these communications as privileged. Exhibit 1 (Interrogatory 11 at p. 31-32); Exhibit 12 (LU-6171 to -6179, -6225 to -6239, -6241 to -6282, -6516 to -6537, -6354 to -6377, -6392 to -6399, -6549 to -6567, -6400 to -6416); Exhibit 30; Exhibit 31 (sealed).

10.     In response to the *Jane Doe* lawsuit, in the Fall of 2021, students organized on-campus campaigns, including a "Teal Ribbon" campaign. Lamb was again at the center of communications about this. Exhibit 1 at 33; Exhibit 33; Exhibit 34 (sealed). As supervisor of the student newspaper *The Champion*, he also assisted students in connection with a draft article about these issues, even into October 2021. Exhibit 35; Exhibit 36 (sealed). In connection with this issue, he engaged in overt internal advocacy, telling the Liberty executives on September 24, 2021 something to the effect of "Teal Ribbons are not our enemy. Truth is our friend" to move them toward transparency and toward an honest investigation of the allegations raised by the purported Title IX victims. Exhibit 1 at 23, 33-34; Exhibit 36 (sealed) (LU-4900).

11.     On September 30, 2021, Lamb received word of another accusation of Liberty University potentially intimidating a victim of a sexual assault using the Liberty Way. Exhibit 12 at 1, 11 (-5814 to -5815 (redacted), -5817 to -5819 (redacted), -6458 (redacted), -6459 (redacted)); Exhibit 37. He was also coordinating a CNN interview about rapist and former Liberty student Jesse Matthews. Exhibit 38.

12.     During the last full week of September, and extending to October 1, 2021, Lamb was also involved in drafting and reviewing statements and speeches concerning Title IX issues for both Liberty University Football Coach Hugh Freeze and for Jerry Prevo. Specifically,

> The wordsmithing for Freeze led to the conclusion that we shouldn't have our football coach commenting on Title IX, sexual assault, and Teal Ribbons when Prevo had not yet commented on such matters yet – at least not since the comments he made in July when the lawsuit was filed. . . . [T]he decision was made that Prevo needed to speak first, and that this would be done to the student body on Friday, October 1, 2021.

Exhibit 1 at 33-34; Exhibit 12 at 10, 13-14 (LU-6417 (privileged), -6418 to -6421 (privileged), -6568 (redacted), -6422 to -6423 (privileged), -6424 to -6425 (privileged), -6426 to -6427 (redacted), -6570 to -6572 (privileged), -6573 to -6575 (privileged), -6576 to -6582 (redacted));

Exhibit 32 (sealed). Lamb saw the draft remarks for Prevo on September 30 and objected to its contents and style, and external counsel joined Lamb in raising objections, noting a material inaccuracy in the remarks. Exhibit 1 at 33-36; Exhibit 39 (sealed).

13.     Prevo decided not to use the prepared remarks. Still, Lamb noted that social media attacked Prevo's remarks, and he alerted the Title IX office about new accusations that surfaced as a result. Exhibit 1 at 24-25, 36-37; Exhibit 12 at 11 (LU-6463 to -6464 (privileged)); Exhibit 40 (sealed); Exhibit 41.

14.     The next business day, on October 4, Lamb met with President Prevo and others.

> During the two separate meetings I had with President Prevo on the morning of October 4, 2021, I mentioned many concerns – ethical, legal, moral, political – that I believed were being covered up or were deliberately being shown indifference to. I spoke in generalities in much of that conversation, given that my concerns were with a variety of ethical lapses by University leadership. I had discussed Title IX and sexual assault several times with Prevo in the Spring months, through May. Whether or not I used the phrase "Title IX" in those meetings, I did speak about victims who were not receiving justice and that a cover-up or mishandling of sexual assault and harassment needed be looked into. I used some of the same language that I had written into the memo about the Convocation speech. That we needed an independent investigation to get to the bottom of what had really happened in situations where wrong had been done at Liberty.

Exhibit 1 at 37. Liberty acknowledges vaguely that during this meeting, when Lamb raised the issue of the Baker Tilly investigations, "There was a discussion about what had transpired, and whistleblower protections and their scope." Exhibit 28 at 7.

15.     That evening Prevo appeared to express frustration with Lamb's Title IX-related behavior by email. Exhibit 42; *see also* Exhibit 12 at 14 (LU-6586 to 6591).

16.     Meanwhile, Lamb continued to deal with media inquiries concerning accusations of Title IX noncompliance. Exhibit 12 at 1 (LU-5824); Exhibit 43; Exhibit 44 (sealed).

17.     On October 5, Lamb met with Corry. Exhibit 45 (sealed).

> On October 5, 2021, David Corry came to my office, indicating he was there on the directive of Prevo to negotiate with me a resignation I would make –

or face termination. In the discussion that ensued, I spoke about my concern that Title IX was being violated and that victims of sexual assault were not going to receive justice from the University. That there was a cover-up going on, stemming from the desire to mitigate the financial risk the University faced from the multi-plaintiff "Jane Doe" lawsuit filed in July.

After the meeting, Corry went back to his office and wrote an email to Prevo and sent to one of Prevo's non-Liberty email accounts. I know this to be the case because, for reasons unknown, Corry also emailed my colleague and direct report, Ryan Helfenbein – using Ryan's Gmail account. Helfenbein showed me the email. In it, Corry summarized to Prevo the content of our meeting, and he did so very accurately. In the email, Corry told Prevo of my refusal to resign, my refusal to sign an NDA, and my belief that the University was covering up wrongdoing, including Title IX. Corry's email uses the phrase "Title IX" – accurately reporting to Prevo what I had just told Corry.

Exhibit 1 at 37-38; Exhibit 45 (sealed).

18.     On October 6, Liberty terminated Lamb's employment. ECF Doc. 10,

Counterclaim ¶ 2.

19.     On October 10, 2021 Lamb spoke with John Gauger for 39 minutes, beginning

about 4:33 p.m. Exhibit 46 (Verizon-376).[5]

John Gauger called and we talked about things we had discussed before my termination: corruption, dishonesty, incompetency, and covering-up of injustice and criminal behavior. That is when Gauger made the comment about the plaintiffs in the Title IX lawsuit, the comment that I mentioned on-air – "What's your beef?" And Gauger asked me, "You don't really believe they're all telling the truth do you?" referencing those who have raised Title IX claims. He expressed sorrow at my firing, and frustration with Prevo. And he asked me what I was going to do next: "Where are y'all moving to?" with the assumption being that we were already packing up. I explained that I had two sons who would graduate in May and that we were in Lynchburg until at least then. And that I was considering filing a Federal lawsuit against Liberty for whistleblower retaliation. That I had given 25 hours of testimony to Baker Tilly—Gauger said he only gave a few hours at the most—and that I had tried to help the institution by telling them places where I knew corruption and cover-up was, but the Board was looking to scapegoat Junior for everything and dodge any complicity for the corruption and lack of fiduciary oversight.

Exhibit 1 at 3.

---

[5] By agreement of counsel, in lieu of filing this document under seal, the redactions were made to this document. Liberty does not dispute that this was a call with Gauger.

20.     On October 27, 2021, Lamb spoke with Cynthia Beasley of WSET-TV ABC 13 News. A copy of the transcript appears at ECF Doc. 36-19.  It shows Lamb's allegedly defamatory statements about the Title IX investigations not being looked into (22:11-15) chiefly concerned the failure to investigate Title IX allegations reported to the Baker Tilly investigators—such as through the portal. ECF Doc. 36-19 at 10:20-11:17, 14:22-18:8, 19:1-11, 20:2-22:21. Beasley's article was updated the next day to report that Jonathan Falwell released a statement that in September 2020, he encouraged Jane Doe # 2 (a.k.a. "Kathy" from the Roys articles) to tell her story to the Baker Tilly investigators, and in October, he told her about the portal for submitting complaints. Exhibit 47 (SL-1396 to -1403).

21.     On October 29, 2021, Lamb gave an interview with Julie Roys of *The Roys Report*. A transcript appears at ECF Doc. 36-20. It shows that his reference to discussing the Title IX mishandling "all spring" related in large part to Lamb's communications with Julie Roys about the alleged gang-rape of "Kathy." Literally, the quote actually says:

> JULIE ROYS 11:06
> So did you discuss the Title IX mishandling as well? Tell me about that.
>
> SCOTT LAMB 11:12
> The thing is, I've been discussing that all spring. Like this 501c3 dance is small potatoes. You know, I mean, this keeps on pushing back against that kind of idea. And hey, we're doing good job over here. But the Title IX is where it all gets at, you know, ***because you and I had all that experience in the spring with Jane Doe Kathy and getting her documents. And why was that such a hassle?*** And I went into a lengthy discussion here on our local ABC affiliate. But it was[--]it was painful for me. I'm not saying that as a victim, I'm just saying, in a situation within the institution, I'm just a Coms guy. If I don't know the facts I can't communicate about something, or I can't know, well, this is something we can't communicate about yet, or I don't know, I've got to get the facts. ***And to even get those documents to the Jane Doe took two meetings, and then a third meeting to get them to her.***

ECF Doc. 36-20 at 16-17 (emphasis added). Roys and Lamb continued to discuss this collection of records for "Kathy." ECF Doc. 36-20 at 17-21.

## II.     Arguments and Authorities

**A.      Liberty Has Acted in Bad Faith, in that It Knew, or Should Have Known, that Its Defamation Claim Was Baseless, making Attorney Fees Appropriate (See Virginia Code § 8.01-223), yet Liberty Allowed the Claim To Continue as Long as It Could While Avoiding a Corporate Deposition**

Liberty sued Lamb for defamation. Yet at the outset of the case, Liberty knew the claim was entirely baseless. And still it persisted in this claim until now, when it faces an imminent summary judgment motion exposing its bad faith claims, and when it could no longer avoid depositions. Liberty already delayed the deposition by every means possible, even failing to appear for the deposition once after a last-minute attempt to unilaterally reschedule it. Exhibit 48. And so, twenty hours before the deposition was to resume, and less than a month before summary judgment motions were due, it filed this motion for a voluntary dismissal. Exhibit 49. In short, Liberty has been acting in bad faith.

First, Liberty alleged Lamb made an "objectively false" statement that Lamb was discussing Title IX mishandling "all spring." ECF Doc. 10, Counterclaim ¶¶ 53, 57. Yet the records referenced above—the vast majority of which were produced by Liberty (all the "LU-" and "VERIZON-" Batesed documents)—demonstrate clearly and unequivocally that Lamb **_was_** discussing allegations of Title IX issues being mishandled **_all spring_**. **SOF 7.** Given the sheer volume of communications and the number of parties partaking in those communications, Liberty cannot claim in good faith that it believed Lamb's statement about communicating "all spring" to be "objectively false" when it filed the defamation suit. Furthermore, in context, Lamb's statement to Roys that he was discussing the matters "all spring" chiefly concerned Lamb's extensive efforts to work with Roys to address questions about the alleged 2005 gang rape of "Kathy," and Liberty's failure to handle the investigation appropriately. **SOF  21.** And

the records referenced above clearly demonstrate that Lamb *did* discuss this issue all spring. **SOF  7(a).** Liberty knew this, and still claimed without any adequate basis that Lamb's statements were objectively false.

Liberty also alleged Lamb made an "objectively false" statement that the Title IX issues were not being looked into. ECF Doc. 10, Counterclaim ¶¶ 53, 57. The context of the statement shows that Lamb was discussing the information reported to the Baker Tilly/Gentry Locke investigators. SOF 20. But:

- Lamb knew Liberty had initially implied the investigation would or might cover Title IX issues. **SOF 1-4.**

- In fact, Liberty decided that the investigation ***would not process*** Title IX complaints it received, or forward them to Liberty to process.  **SOF 5-6.**

- Lamb had credible and publicized reports that at least two alleged victims of assault made Title IX complaints through the Baker Tilly portal and received no response, and had seen that Liberty seemed willing to mislead the public about this. **SOF 7(a)(ii), (d)**.

- Lamb accurately reported the fact that he had the conversation with a Liberty Vice President on this topic after his termination. **SOF 19-20**.

Thus, Lamb's statements were objectively true, or a least Liberty knew that Lamb lacked defamatory intent of negligence, knowledge of falsity, or reckless disregard for truth.

Liberty also alleges that Lamb's statements imply falsely that "he was fired for reasons related to Title IX." ECF Doc. 10, Counterclaim ¶ 53. Assuming arguendo this is a fair

implication from the actual statements (which it isn't),[6] Liberty knew it would not be able to show that the statements were made with the requisite defamatory intent.

- Lamb's conduct and advocacy with President Prevo and the other Liberty executives in connection with the Teal Ribbon campaign in end of September and the first days of October 2021, in addition to his frequent reports of new or forthcoming Title IX issues and how they should be addressed, provided Lamb a reasonable basis to believe that "he was fired for reasons related to Title IX." **SOF 10-13**.

- The SAT review that was the purported basis of the termination was initiated by Prevo in mid-May 2021 after a series of incidents that supported Lamb's reasonable belief that it was conducted to generate a pretext for terminating him for his Title IX related conduct, including but not limited to making reports to the Baker Tilly investigators about Prevo's responsibility for the lack of oversight, which is a conversation he reported to Prevo. **SOF 8**.

- The October 4, 2021 meeting indisputably included "a discussion about . . . whistleblower protections and their scope," which reflected Lamb's reasonable belief that the SAT review was a pretext for terminating him *inter alia* for his statements to the Baker Tilly investigators. **SOF 14**.

- Lamb's belief that he was being terminated for Title IX related activities found further support in Prevo's email on the evening of October 4, and in the fact that his Title IX-

---

[6] "Where, as here, a plaintiff alleges that he has been defamed not by statements of fact that are literally true but by an implication arising from them, ***the alleged implication must be reasonably drawn from the words actually used***." *Webb v. Virginian-Pilot Media Co.*, LLC, 287 Va. 84, 89, 752 S.E.2d 808, 811 (2014) (emphasis added).

related comments with Corry on October 5 were reported to Prevo prior to Lamb's

termination on October 6. **SOF 15-18**.

Individually and collectively, these demonstrate a non-negligent factual basis (even if erroneous)

for Lamb's alleged implication that he was terminated for a Title IX-related issue.

Virginia Code § 8.01-223.2 provides, in relevant part:

> A. A person shall be immune from civil liability for . . . a claim of defamation based solely on statements (i) regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party . . . . The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

> B. Any person who has a suit against him dismissed or a witness subpoena or subpoena duces tecum quashed pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs.

The statements of Lamb to the media concerning Liberty's Title IX-related conduct were clearly

"matters of public concern that would be protected under the First Amendment to the United

States Constitution." *E.g., Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1689 (1983)

(racial discrimination a matter of public concern); *Adams v. Sch. Bd. of St. Johns Cty.*, 57 F.4th

791, 820 (11th Cir. 2022) (Title IX compliance a matter of public concern); *Whitney v. City of

Milan*, 677 F.3d 292, 297 (6th Cir. 2012) ("Allegations of . . . discrimination are, therefore,

inherently of public concern."). Lamb's statements were not made "with actual or constructive

knowledge that they are false or with reckless disregard for whether they are false." As such,

attorney fees for the suit would be warranted upon a dismissal of this claim pursuant to Virginia

Code § 8.01-223.2. Liberty's delay until near the close of discovery before attempting a

voluntary dismissal of this case appears to be an attempt in part to evade a statutory award of

attorney fees for a claim that was meritless and filed in bad faith from the beginning.

Lamb notified Liberty, by his answer and affirmative defenses, that he denied the defamation allegations, and that he was asserting statutory immunity under Virginia Code § 8.01-223.2. ECF Doc. 22 at 20-23, 43. Liberty demanded the documents necessary to support his defense, and Liberty attempted to evade production of some of the most relevant documents, only to be directed by the Court to produce many them. ECF Doc. 133. And Liberty demanded detailed information from Lamb about his Title IX related conduct. Exhibit 1. Liberty then delayed, and delayed, and attempted to cancel, and failed to appear for a corporate deposition on the topic, and then launched this motion in a further attempt to avoid going under oath on these topics. Exhibit 48-49; ECF Doc. 156.

Liberty filed this defamation claim for the sake of appearances only. It claimed that it "brings this suit . . . to take on Lamb's defamatory claims and publicly prove them false." ECF Doc. 10, Counterclaim ¶ 3. It was part of a press campaign by Liberty to discredit Lamb. *See* ECF Doc. 10, Counterclaim ¶ 52 (discussing Liberty's statements to *Politico* in advance of the Lamb's suit). And though it claimed that "Lamb falsely stated that he was fired for reasons related to Title IX," the only statements it could produce in support of that allegation were a truthful statement about discussing Title IX mishandling months before ("all spring") and Lamb restating what was already public knowledge (that the Baker Tilly investigation was not investigating the Title IX allegations). ECF Doc. 10, Counterclaim ¶ 53, **SOF 7**. And despite knowing these statements were true, Liberty falsely claimed the statements were "objectively false." ECF Doc. 10, Counterclaim ¶ 57.

Courts in this Circuit and division have recognized that an award of attorney fees is an appropriate condition of a voluntary dismissal for claims that were groundless or where the plaintiff acted in bad faith. *Andrews v. America's Living Ctrs.*, LLC, 827 F.3d 306, 311-12 (4th

Cir. 2016) (citing *Davis*, 819 F.2d at 1276); *Harsell v. Va. Motor Lodges, Inc.*, Civil Action No. 7:17-cv-00389, 2018 U.S. Dist. LEXIS 78766, at *5 n.1 (W.D. Va. May 10, 2018); *Metro Media Entm't, LLC v. Steinruck*, Civil Action No. DKC 12-0347, 2014 U.S. Dist. LEXIS 120474, at *10 (D. Md. Aug. 27, 2014); *Patrick Collins, Inc. v. Osburn*, No. PWG-12-1294, 2014 U.S. Dist. LEXIS 58342, at *13 (D. Md. Apr. 25, 2014); *Visual Mining, Inc. v. Ziegler*, No. PWG-12-3227, 2014 U.S. Dist. LEXIS 21839, at *13 (D. Md. Feb. 21, 2014); *C-Tech Corp. v. Aversion Techs.*, Civil Action No. DKC 11-0983, 2012 U.S. Dist. LEXIS 127440, at *24-26 (D. Md. Sep. 7, 2012). That is certainly the circumstance here. The fact that Mr. Lamb could be awarded attorney fees from the defense of his claim under Virginia Code § 8.01-223.2, and notified Liberty of this in his affirmative defenses, further justifies an award of attorney fees as a condition of a voluntary dismissal, even in the absence of prejudice to Lamb.

Finally, as noted in *Davis v. USX Corp.*, 819 F.2d at 1273, this Court should impose, as a matter of course, the requirement that the counterclaim plaintiff pay a portion of the counterclaim defendant's taxable costs and agree to the use of discoverable materials in any subsequent proceeding on the topic.

Wherefore, Counterclaim Defendant Walter Scott Lamb, by counsel, requests this court to condition the dismissal on: (1) an award of Lambs attorney fees and costs expended in connection with the defamation claim, based on the bad faith of Liberty University, Inc. ("Liberty"), and (2) Liberty's agreement that Lamb can use the discoverable materials in any subsequent proceeding on the topic.

Respectfully submitted,
WALTER SCOTT LAMB

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)

tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-2105

Ian A. Northon, Esq.
*Admitted Only Pro Hac Vice*
Michigan—P65082
Pennsylvania—207733
Florida—101544
Northon Law, PLLC
4850 Tamiami Trail N, Ste 301
Naples, FL 34103
ian@northonlaw.com
service@northonlaw.com
(239) 784-7940

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2023, I presented the foregoing document(s) to the Clerk of the Court for filing and uploading to the CM/ECF system, which will provide electronic notice and copies of such filing(s) to counsel of record.

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000 / Fax: 804-783-2105
ATTORNEYS FOR PLAINTIFF