**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
Lynchburg Division

| | | |
|---|---|---|
| WALTER SCOTT LAMB, | ) | |
| | ) | Case No. 6:21-cv-00055 |
| Plaintiff/Counterclaim Defendant, | ) | |
| v. | ) | Hon. Norman K. Moon |
| | ) | |
| LIBERTY UNIVERSITY, INC., | ) | |
| a Virginia corporation, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## LAMB'S OBJECTIONS AND RESPONSES TO LIBERTY UNIVERSITY, INC.'S SECOND SET OF INTERROTORY REQUESTS

Comes now Walter Scott Lamb, assisted by counsel, and for these objections and responses to Liberty University, Inc.'s second set of interrogatory requests, states as follows.

**Interrogatory No. 5:**  Describe in detail all efforts made by you to obtain employment since your separation from Liberty, including the name and address for each employer with whom you have applied for employment, the position applied for, the dates you applied, the person to whom you applied, and the results of your application, including, if applicable, the start and end dates of this employment and the compensation you received from this employment.

**Objection:** The information requested is not relevant to any claims pending before this Court. Mr. Lamb will stand on this objection until the second amended complaint has been accepted by this Court and answered by Liberty University, Inc.

**Interrogatory No. 6:**  Identify any other sources of income since your separation from Liberty, including, without limitation, unemployment compensation, disability benefits, investment income, rental income, child support or alimony.

**Objection:** The information requested is not relevant to any claims pending before this Court. Mr. Lamb will stand on this objection until the second amended complaint has been accepted by this Court and answered by Liberty University, Inc. Additionally or alternatively, the request is disproportionately burdensome, vexatious, and harassing in its subject. The phrase "other sources" is ambiguous. Some of this information may be privileged. Some of this

Lamb Rule 41
Exhibit 1(A)

information is protected by third-party non-disclosure agreements. Additionally, a protective order would be necessary to protect legitimate business interests.

**Interrogatory No. 7:**     State each item of damage that you intend to claim if you are permitted leave to amend your Complaint, and include in your answer the count to which the item of damage relates, the factual basis for each item of damage, an explanation of how each item of damage was computed, including any mathematical formula used, and identify any document that supports, refutes, or relates in any way to the calculation of any damage amount claimed.

**Objection:** The information requested is not relevant to any claims pending before this Court. It is disproportionate to the needs of the case. Mr. Lamb will stand on this objection until the second amended complaint has been accepted by this Court and answered by Liberty University, Inc. Some of this information may be privileged. Some of this information is protected by third-party non-disclosure agreements. Additionally, a protective order would be necessary to protect legitimate business interests.

**Interrogatory No. 8:**     Describe in detail all communications you have had with any current or former Liberty employees or agents, members of the Liberty Board of Trustees, or members of the Liberty Executive Committee since your separation from employment with Liberty, and in your description identify anyone else who was present during these interactions.

**Objection:** This request is disproportionately burdensome because the request is not limited by the subject matter of the conversations, and there are no reasonable limitations as to the period of employment, agency, or membership for former employees, agents, or members. Mr. Lamb does not know all the present or former employees, agents, or members so as to answer this question completely. Some of this information may be privileged.

**Response (without waiving objections, and to the extent it is not objected to):** Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that the volume of the communications and the passage of time makes me likely unable to recall and be able to "[d]escribe in detail all [responsive] communications" accurately but I believe that the conversations I cannot recall were of the same general tone and tenor as the conversations that I do recall and describe below. The information given here represents my best recollection.

After my termination, Ron Sloan communicated with me about turning in my laptop and keys. I arranged for them to be handed off to him in the parking lot of the Lynchburg airport by

my son Josiah (23). When they went to make the hand-off, Sloan and Hinkley handed Josiah an envelope from LU Legal. Josiah called me immediately to tell me this. I called Sloan and asked him to turn back around and pick back up this envelope because I was not accepting it. He did so.

Later, I communicated with Ron Sloan to schedule a time to come into my office and clean it out. We scheduled a certain date about a week out, because of a funeral and family sickness. I met up at the office at the agreed upon time and cleaned out my office with the help of the men in my former department, including Ryan Helfenbein, Jared Vallorani, Christian Bedell, Christian Lasval, and Travis Witt. Richard Hinkley, head of LUPD, was also there. I did not engage in any conversations about Liberty with Sloan or Hinkley, and they walked me out the door with all the stuff from my office. The others loaded up my belongings into my vehicle and a few of their own and we drove to my house where they unloaded it into my house.

The week of my termination, several dozen Liberty University employees or former employees communicated with me to the effect that they had heard about my being terminated and that they were sorry to hear this had happened and that they would be praying for me. This would include at least: Mitzi Bible, Ryan Helfenbein, Brad Butler, Jared Vallorani, Rick Amato, Jerry Falwell, Jr., Becki Falwell, Ted Allen, Jacob Couch, Ryan Klinker, Logan Smith, Debbie Huff, Mark Serrano, Lee Beaumont, Karen Swallow Prior, Dustin Wahl, Larry Provost, Wes St. Claire, John Wesley Reid, Kristin Conrad, John Gauger, Ron Kennedy, Dave Brat, Scott Hicks, Jonathan Falwell, Mark Hine, Greg Dowell, Jim Nichols, Chris Misiano, Josh Rutledge, and many former Liberty students.

About a week after my termination, John Gauger called and we talked about things we had discussed before my termination: corruption, dishonesty, incompetency, and covering-up of injustice and criminal behavior. That is when Gauger made the comment about the plaintiffs in the Title IX lawsuit, the comment that I mentioned on-air – "What's your beef?" And Gauger asked me, "You don't really believe they're all telling the truth do you?" referencing those who have raised Title IX claims. He expressed sorrow at my firing, and frustration with Prevo. And he asked me what I was going to do next: "Where are y'all moving to?" with the assumption being that we were already packing up. I explained that I had two sons who would graduate in May and that we were in Lynchburg until at least then. And that I was considering filing a Federal lawsuit against Liberty for whistleblower retaliation. That I had given 25 hours of testimony to Baker Tilly—Gauger said he only gave a few hours at the most—and that I had tried to help the institution by telling them places where I knew corruption and cover-up was, but the Board was looking to scapegoat Junior for everything and dodge any complicity for the corruption and lack of fiduciary oversight.

Within a few weeks of my termination, I received a phone call from Jerry Falwell, Jr. in which he and Becki (who was in the background) offered me their condolences at the job loss. He told me he would do anything he could to help me. I told him he may not feel that way after I file the lawsuit. He asked why? I explained that I had whistleblown about the mishandling of sexual assault—along with many other things—and that I had indicted Prevo and the Board for their lack of oversight for him for behavior in these locations. He said he didn't know what I was

talking about, so I referenced Keith Anderson—and how nothing was ever done about him. Falwell claimed several things: that Keith had just been "fooling around" with someone (adultery, not sexual assault), and that he had demoted Anderson as a result. And besides, he claimed, Title IX issues were supposed to "go around" him and straight to David Corry and the Board. He claimed that he had no oversight or knowledge of Title IX situations.

In or around Christmas 2021 season, Easter 2022 season, and Father's Day 2022, many Liberty University employees or former employees or vendors communicated with me to wish me Merry Christmas – and many said something to the effect that they were praying for me "during this ordeal." I cannot recall precisely who did this at Christmas, but it was more or less: Mitzi Bible, Ryan Helfenbein, Brad Butler, Jared Vallorani, Rick Amato, Jerry Falwell, Jr., Ted Allen, Jacob Couch, Ryan Klinker, Logan Smith, Debbie Huff, Mark Serrano, Lee Beaumont, Larry Provost, Dustin Wahl, Karen Swallow Prior, Wes St. Claire, and John Wesley Reid.

During the weeks surrounding the death of my Father (January 6, 2022), many Liberty University employees or former employees communicated with me their condolences and prayers for me.

Since my termination, I have had dozens of Lynchburg area citizens—total strangers— come up to me in public settings, identify themselves (sometimes they would say, " I work for Liberty" or "I used to work for Liberty" or "I've done business with Liberty) and who then shared that they appreciated someone taking a stand against Liberty University. I've had my lunch paid for two times by strangers who referenced Liberty University. I let them do the talking and thanked them for their encouragement.

In the months since my termination, some current Liberty employees have reached out to communicate a word of encouragement for me, to share a Scripture passage with me, or to pray with me on the phone. They would say or I would say: "I'm not wanting to talk about the legal issues" – and then we'd get on with the praying or reminding each other of God's love and kindness and sovereignty over our lives. I let them do the talking and thanked them for their encouragement.

I am a member at a small local church with members or attendees who are employees or former employees of Liberty University. Also, I attend another church's worship as a secondary place of worship (a large church). People know me and what has happened to me vocationally. They stop and tell me a word of encouragement or that they are praying for me. Within these words will usually be some phrase about "the current situation"—like, "I'm praying for you because of all you're going through with Liberty."

Liberty Provost Scott Hicks communicated to me through my sons while at their Spring 2022 graduation. We then spoke by phone a few times and then met for the purpose of backchanneling towards the goal of ending the litigation through settlement. I understand he did so after speaking with Jerry Prevo who gave him his authorization to do this. He picked me up and we drove and talked.

On or around Commencement (both the large venue event and the smaller venue event the next day) my entire family was on campus to see two of my sons graduate. I saw and briefly interacted with several people—Liberty employees, former employees, parents, people from the community—who wished me congratulations on the graduation of my children. Many would ask me questions like "Do you still live in Lynchburg?" or "What are you doing these days for a living?" and I would share this basic information with these friendly people. I can't say that I even know the names of all the people, as I was a very public figure while at Liberty and many people knew my name without my knowing theirs (or being unable to recall it).

At some point in late spring my daughter asked me to take her to the LU ice skating rink to see the figure skating performance being held on a Saturday. I did so, and bumped into people who recognized me and who gave me greetings and friendliness. I spoke with VP Kristin Conrad on the sidewalk outside the rink, as she was taking her parents on a walk around campus.

**Privilege Log (to the extent other objections do not apply):** Mr. Lamb believes statements made in the conversations below were subject to the clergyman privilege, a.k.a. the clergy-penitent privilege, as they were statements to clergy when "seeking spiritual counsel and advice." See, e. g., Va. Code Ann. §§ 8.01-400, 19.2-271.3. Madison v. Riter, 355 F.3d 310, 320 (4th Cir. 2003):

| NAME | FREQUENCY/TYPE | NOTES |
|---|---|---|
| Mr. Stu Epperson | Frequent counseling and prayers | Owner of Truth Cristian Radio Network. Spiritual Counselor. |
| Rev. Travis Witt | Occasional prayer time via phone. Met once for prayer and walk. | Contract worker for LU. |
| Rev. Bob Travers | Occasional spiritual counseling and prayers. | Lifelong pastor friend of mine. St. Louis, Missouri. |
| Rev. Albert Mohler | Occasional spiritual counsel | Lifelong mentor. Former boss. |
| Rev. Rick Amato | Occasional prayers and spiritual counsel. | Former and/or current LU contractor. Friend and spiritual mentor. |
| Rev. Jack Barrett | Occasional spiritual counsel and prayers | Pastor of my local church |
| Larry Provost | Occasional counseling and prayers | Former LU contractor. Chaplain. |

**Interrogatory No. 9:**   Identify all persons with whom you have discussed the allegations contained in the Complaint and/or Liberty's Counterclaim, including but not limited to current or former Liberty employees, friends, acquaintances, relatives, persons listed in your Initial Disclosures and all supplements and amendments thereto, your Interrogatory answers and all supplements and amendments thereto, and individuals whose names appear in documents you produce in this action.  For each person identified, state the date and substance of your discussions.

**Objection:** This request is disproportionately burdensome because discussions related to the allegations contained in the Complaint are not relevant to any matters pending before the Court. Some of this information is privileged.

**Response (without waiving objections, and to the extent it is not objected to):** Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that the volume of the communications and the passage of time makes me likely unable to recall and be able to "[i]dentify all [responsive] persons" and the "date and substance of [the] discussions" accurately, but I believe that the conversations I cannot recall were of the same general tone and tenor as the conversations that I do recall and describe below. The information given here represents my best recollection.

See the response to Interrogatory #8.

On or about the day I filed my lawsuit – October 25, 2021 – various media contacted me to ask about the complaint. I spoke by phone to many of those reporters, many of whom simply needed to discover which court the complaint was filed in so they could obtain it online. These are listed below. I do not have a specific recollection of the statements I made to them, except that I would generally refer them to the complaint, or answer their questions by stating "As I allege in my complaint…" I did, however, provide longer interviews with Joy Reid / MSNBC (https://www.msnbc.com/transcripts/transcript-reidout-10-26-21-n1282474) and Julie Roys / The Roys Report (https://julieroys.com/podcast/fired-liberty-u-spokesman-tells-inside-story-behind-lawsuit/), and Cynthia Beasley / WSET (https://wset.com/news/abc13-investigates/liberty-university-seeks-return-of-trade-secrets-in-countersuit-against-former-vp-defamation-scott-lamb-title-ix-jane-doe-lawsuit).

Sarah Pulliam Bailey / Washington Post

Cynthia Beasley / WSET

Julie Roys / independent Journalist

Brandon Ambrosino / Politico

Kate Shelnutt / Christianity Today

Editors at Baptist Press

Sarah Rankin / Associated Press

Hannah Dreyfuss / ProPublica

Sarah McCammon / NPR

Ruth Graham / New York Times

Gabe Sherman / Vanity Fair

Bob Smietana / Religion News Service

Rachel Mahoney / Lynchburg News & Advance

Tim Harfmann / WSLS

Shannon Bream / FOX

Joy Reid / MSNBC

Zak Levitt / Gangster Capitalism

Since my termination, I have sought to obtain new work from previous clients. They would ask how my "day job" was going (i.e., Liberty) and I would tell them that I no longer worked for Liberty. Given that this would surprise them, I would tell them I was terminated and was now involved in a Federal lawsuit.

**Privilege Log (to the extent other objections do not apply):** Mr. Lamb believes statements made in the conversations below were subject to the clergyman privilege, a.k.a. the clergy-penitent privilege, as they were statements to clergy when "seeking spiritual counsel and advice." See, e. g., Va. Code Ann. §§ 8.01-400, 19.2-271.3. Madison v. Riter, 355 F.3d 310, 320 (4th Cir. 2003):

| NAME | FREQUENCY/TYPE | NOTES |
|---|---|---|
| Mr. Stu Epperson | Frequent counseling and prayers | Owner of Truth Cristian Radio Network. Spiritual Counselor. |
| Rev. Travis Witt | Occasional prayer time via phone. Met once for prayer and walk. | Contract worker for LU. |
| Rev. Bob Travers | Occasional spiritual counseling and prayers. | Lifelong pastor friend of mine. St. Louis, Missouri. |
| Rev. Albert Mohler | Occasional spiritual counsel | Lifelong mentor. Former boss. |

| Rev. Rick Amato | Occasional prayers and spiritual counsel. | Former and/or current LU contractor. Friend and spiritual mentor. |
| Rev. Jack Barrett | Occasional spiritual counsel and prayers | Pastor of my local church |
| Larry Provost | Occasional counseling and prayers | Former LU contractor. Chaplain. |

Since the counterclaim was filed, Scott Lamb has communicated regularly with his counsel, in person, by text, and by email, to obtain legal advice, concerning the allegations contained in Liberty's Counterclaim. His counsel has included Rhoades McKee PC (including, without limitation, Ian A. Northon, E. Meaghan Clayton, and other staff and counsel), Northon Law, PLLC (including, without limitation, Ian A. Northon and other staff), and Thomas H. Roberts & Associates, P.C. (including, without limitation, Andrew Bodoh and Thomas H. Roberts). The substance of these discussions is also protected from disclosure by the work-product doctrine.

Since the counterclaim was filed, Scott Lamb has often communicated with his wife in person, privately, concerning the allegations contained in Liberty's Counterclaim, not intending those communications to be disclosure to any other person.

**Interrogatory No. 10:**   Identify and describe with particularity each and every time you communicated, either orally or in writing, with any current or former employee, agent, or representative of Liberty, or any third party, about your concern or belief that you were terminated "in retaliation for [your] opposition to the University's mishandling of Title IX sexual misconduct accusations," and in your answer state the name of any individual with whom you spoke and what you contend was communicated or stated by you and any other individual to whom you allegedly complained.

**Objection:** Some of this information is privileged. The term "individual to whom you allegedly complained" is vague. The quotes around the phrase "in relation . . . accusation" makes the request vague and ambiguous, but Mr. Lamb will interpret it broadly.

**Response (without waiving objections, and to the extent it is not objected to):**
Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, Mr. Lamb notes that the volume of the communications and the passage of time makes him likely unable to recall and be able to "[i]dentify and describe with particularity each and every time" he made a responsive communication accurately, but he believes that the conversations that he cannot recall were of the same general tone and tenor as

the conversations that he does recall and describes below. The information given here represents his best recollection.

Scott Lamb is not a lawyer, and has a lay understanding of what constitutes a Title IX sexual misconduct accusation, but responds according to his understanding.

See the responses to Interrogatories #8 and #9.

**Privilege Log (to the extent other objections do not apply):** Mr. Lamb believes responsive statements made in the conversations below were subject to the clergyman privilege, a.k.a. the clergy-penitent privilege, as they were statements to clergy when "seeking spiritual counsel and advice." See, e. g., Va. Code Ann. §§ 8.01-400, 19.2-271.3. Madison v. Riter, 355 F.3d 310, 320 (4th Cir. 2003):

| NAME | FREQUENCY/TYPE | NOTES |
|---|---|---|
| Mr. Stu Epperson | Frequent counseling and prayers | Owner of Truth Cristian Radio Network. Spiritual Counselor. |
| Rev. Travis Witt | Occasional prayer time via phone. Met once for prayer and walk. | Contract worker for LU. |
| Rev. Bob Travers | Occasional spiritual counseling and prayers. | Lifelong pastor friend of mine. St. Louis, Missouri. |
| Rev. Albert Mohler | Occasional spiritual counsel | Lifelong mentor. Former boss. |
| Rev. Rick Amato | Occasional prayers and spiritual counsel. | Former and/or current LU contractor. Friend and spiritual mentor. |
| Rev. Jack Barrett | Occasional spiritual counsel and prayers | Pastor of my local church |
| Larry Provost | Occasional counseling and prayers | Former LU contractor. Chaplain. |

Since his termination, Scott Lamb has communicated regularly with his counsel, to obtain legal advice, concerning his belief that he was terminated in retaliation for his opposition to the Liberty's mishandling of Title IX accusations. His counsel has included Rhoades McKee PC (including, without limitation, Ian Northon, E. Meaghan Clayton, and other staff and counsel), Northon Law, PLLC (including, without limitation, Ian Northon and other staff), and Thomas H. Roberts & Associates, P.C. (including, without limitation, Andrew Bodoh and Thomas H. Roberts). Scott Lamb also communicated once with Attorney Jack Larkin on this subject, to obtain legal representation. The substance of these discussions is also protected from disclosure by the work-product doctrine.

Since the counterclaim was filed, Scott Lamb has often communicated with his wife in person, privately, concerning his belief that he was terminated in retaliation for his opposition to

the Liberty's mishandling of Title IX accusations, not intending those communications to be disclosure to any other person.

**Interrogatory No. 11:**   Identify and describe with particularity each and every time you communicated, either orally or in writing, with any current or former employee, agent, or representative of Liberty about your concern or belief that Liberty was "mishandling" Title IX sexual misconduct allegations, and in your answer state the name of any individual with whom you spoke and what you contend was communicated or stated by you and any other individual to whom you allegedly complained.

**Objection:** Mr. Lamb does not know all the present or former employees, agents, or members so as to answer this question completely. The quotes around "mishandling" makes this interrogatory ambiguous, but Mr. Lamb will interpret it broadly. Some of this information is privileged. The term "individual to whom you allegedly complained" is vague, but Mr. Lamb will interpret it broadly.

**Response (without waiving objections, and to the extent it is not objected to):** Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that the volume of the communications and the passage of time makes me likely unable to recall and be able to "[i]dentify and describe with particularity each and every time" I made a responsive communication, or all the details requested, but I believe that the conversations I cannot recall were of the same general tone and tenor as the conversations that I do recall and describe below. The information given here represents my best recollection.

I am not a lawyer, and I have a lay understanding of what constitutes a Title IX sexual misconduct accusation, but I respond according to my understanding.

1.      On or around the middle of September 2019, I facilitated a phone conversation and a series of emails that Jerry Falwell, Jr. had with Washington Post journalist Sarah Pulliam Bailey about a Politico.com article by Brandon Ambrosino—a gay LU alum. Jerry Prevo, then Liberty Board Chairman, was included on the emails, and Falwell told Bailey he would need to get Prevo's approval before contents of the interview could be "on the record – permission he later received from Prevo." The Ambrosino article appears at https://www.politico.com/magazine/story/2019/09/09/jerry-falwell-liberty-university-loans-227914/. It included this segment, which involves allegations of conduct that may constitute sexual misconduct allegations:

Longtime Liberty officials close to Falwell told me the university president has shown or texted his male confidants—including at least one employee who worked for him at Liberty—photos of his wife in provocative and sexual poses.

At Liberty, Falwell is "very, very vocal" about his "sex life," in the words of one Liberty official—a characterization multiple current and former university officials and employees interviewed for this story support. In a car ride about a decade ago with a senior university official who has since left Liberty, "all he wanted to talk about was how he would nail his wife, how she couldn't handle [his penis size], and stuff of that sort," this former official recalled. Falwell did not respond to questions about this incident.

More than simply talking with employees about his wife in a sexual manner, on at least one occasion, Falwell shared a photo of his wife wearing what appeared to be a French maid costume, according to a longtime Liberty employee with firsthand knowledge of the image and the fallout that followed.

Falwell intended to send the image to his and Becki's personal trainer, Ben Crosswhite, as a "thank you" for helping his wife achieve her fitness goals, the employee said. In the course of texting, Falwell accidentally sent the message to several other people, necessitating a cleanup.

Falwell claimed the article was full of inaccuracies and lies. My impression, however, was that the some of the information Falwell provided to Bailey, including the parts related to sexual indiscretions, was false or misleading. In the end, Bailey/Washington Post published nothing from this phone call, leading Falwell to publicly berate her on Twitter and call her a liar – including publishing screen shots of text messages involving himself, Bailey, and David Corry. I received frantic phone calls from John Gauger, David Nasser, and Bailey regarding Falwell's tweets, with Gauger and Nasser saying I should talk to Falwell about taking them down. I did so, and he took them down after much arguing and telling me I "lacked balls." I vehemently pushed back to Falwell for his apparent misunderstanding of what Bailey's role was as a journalist, as he seemed to take her to be someone who would simply print whatever he gave her and consider herself lucky to have gotten such access to his story.

I spoke about some of these things to David Paxton in one of my many sessions (February-August, 2021) with him, in his role as the local interviewer for the Baker Tilly investigation.

2.      On three occasions in 2021, I was emailed scripts, written by General Counsel David Corry, intended for public dissemination. Two of these were for dissemination to the media, and these came months before any Title IX litigation. The third was a speech for President Prevo to speak to the student body as a show of support for "Teal Ribbon" activism. All three scripts would have affected in a positive way the public perception of what the University was doing in response to allegations of sexual assault on campus. But all three contained misleading or dishonest wording.

A.    A written script for Jonathan Falwell to answer a question posed by journalist Julie Roys (March-April, 2021), related to his counsel to a former student that she engage with Baker Tilly to tell her allegations of being gang-raped while a student at LU.

B.    A proposed correction to an already-published Politico article (first week of April 2021), related to whether Baker Tilly had contacted all people who requested to be interviewed by the investigation team – including victims of sexual assault and Title IX violations while students or employees of LU.

C.    A proposed speech Prevo would give to the student body and live-streamed online (last week of September - October 1, 2021), related to the Title IX investigation.

I believe that if had not been for my pushing back on these scripts, they would have gone public as is, with the misleading or dishonest statements (or both)—thus affecting the public's perception of how Liberty was handling the allegations of sexual assault. And to be clear, I refuted the truth claims of these statements, not just the tone or rhetoric of them.

First, in or around February 2021, journalist Julie Roys emailed a long series of questions to the University, including a question for Jonathan Falwell. She mentioned that a former student who alleged she was a victim of gang rape in 2005 had come to him the previous September to tell her story, and that Falwell had told her she "would have a seat at the table" – the Baker Tilly table, and that she should enter the Baker Tilly portal and tell her story to the investigators. Roys reported to us that this person – "Jane Doe #2" as she would later be known when she joined in on a multi-plaintiff Title IX lawsuit against the University – had, in fact, signed up twice to be interviewed by Baker Tilly. But they never contacted her.

Corry scripted an answer for Jonathan Falwell that had him telling Roys he didn't understand why Jane Doe 2 did not avail herself of the Baker Tilly portal. That he didn't know why she didn't report her story to the investigation. In emails I exchanged with Corry—and others who may have been on the larger email chain regarding Roys (Jonathan Falwell, Mark Hine, Laura Wallace, Richard Hinkley, Ron Sloan, Scott Hicks) —I said that I didn't think we should have Jonathan saying this, because it implies that the woman failed to enter the portal when in fact, we knew that she claimed to have done so twice but received no response. I asked this group in an email (c. April 2021), if we could obtain the facts from Baker Tilly. I told Corry, in person, that the whole point of Roys' question to Falwell was that Jane Doe 2 had not been contacted by Baker Tilly and so we shouldn't inaccurately flip that narrative by saying it is our understanding that Jane Doe 2 had not contacted Baker Tilly. To my knowledge, however, the final script we sent to Roys did in fact persist in saying that fake narrative.

I couldn't believe that Corry would be trying to get Jonathan Falwell to state publicly that everyone had been responded to by Baker Tilly because Corry had told me that he was not in position to know if Baker Tilly was responding to everyone. Therefore, I could not understand why there was this effort to mislead Roys (and ultimately, the public) into thinking that all people with allegations – including Title IX allegations – had been responded to by Baker Tilly.

Clearly, that was not happening. And during this same time, I was hearing that "Jane Doe 2" was not alone in this regard.

Though Roys sent in her questions in February, the final answers weren't returned to her until mid-May. Her piece was published June 3: "Rape Victim Says Liberty University Deceived & Betrayed Her." See https://julieroys.com/es/rape-victim-says-liberty-university-deceived-betrayed-her/. This was still a month before the lawsuit was filed by the dozen Jane Does, which ultimately grew to over twenty plaintiffs.

Second, a proposed correction to a Politico article (first week of April 2021). On April 2, 2021, Politico.com reporter Maggie Severns published an article titled, "They thank me: Jerry Falwell, Jr. says Liberty community still embraces him." https://www.politico.com/news/2021/04/02/jerry-falwell-liberty-comeback-478883. Within her story she reported on how it appeared the allegations of sexual assault would not be investigated by the "independent investigation" team of Baker Tilly. In the article, Severns wrote:

> Throughout the Liberty community, there's an ongoing reckoning about the direction the school should take, as well as how to address accusations from last summer that Jerry and Becki Falwell had behaved inappropriately around young people, including one former Liberty student who detailed a sexual encounter he had with Becki Falwell at the family's farm to POLITICO.

> Reformers among Liberty's staff and alumni argue that the university has overlooked the allegations. An investigation launched by the board into Falwell's tenure at the university is ongoing but appears to be narrowly focused on the question of Falwell and other administrators' use of university funds — a subject on which Falwell has long expressed confidence of his exoneration. Meanwhile, one of Falwell's close allies — Rev. Jerry Prevo, the 76-year-old former board chair — is running Liberty as president and CEO and Falwell's two sons are still employed there.

> Without a thorough investigation into allegations of misconduct and sexually predatory behavior by the Falwells, they shouldn't be allowed around students," said Dustin Wahl, co-founder of Save71, a group of pro-reform Liberty alumni. "That's the opinion of our organization, and it's also just basic logic for a university with a lot of young people."

> …Last fall, the board announced details of an investigation led by the accounting firm Baker Tilly that is probing Liberty's business dealings. People were encouraged to report information about anything "illegal, unethical from a business perspective, or improper in the context of the operation of a non-profit organization," according to information on an online portal established by the investigators. But sexual harassment complaints, allegations of discrimination or harassment or other areas where Liberty "has an established complaint process or procedure" should go through usual channels, the investigators wrote, excluding many of the allegations against Falwell and his wife from the probe.

And the crucial quote here:

> The investigation is now nearing its eighth month, and investigators have made few updates on their progress. Two people who submitted information via the online portal and requested interviews with Baker Tilly told POLITICO they were never contacted.

By the time the Politico article was published, I already knew the real identity of one of these people – "Jane Doe 2." And she had an advocate of immense integrity and credibility – former LU professor Karen Swallow Prior – who had been with her in the meeting with Jonathan Falwell and attested to me that Jane Doe 2 had, in fact, submitted her request to Baker Tilly twice, ahead of the deadline.

Weeks before the Politico article, I had been directed by President Prevo to not make any comment on the questions Severns had sent us. But after the article's release, on or around April 2 (right after the article was published), Corry emailed me, Jerry Prevo, and David Paxton (the lawyer from local firm, Gentry Locke, who served as the local investigator for Baker Tilly), and Jerry Prevo. Corry said he had talked to Prevo and Paxton and included in the email three corrections he wanted me to demand that Politico amend the article. The third so-called "correction" is relevant to Title IX and dealt directly with David Paxton of the Baker Tilly investigation. Corry wanted Politico to amend their article by stating that the University had been told by Baker Tilly that everybody who made a complaint through the portal had been responded to by Baker Tilly.

Corry and I emailed, texted, and spoke on the phone about this. I told Corry first in text and email and then Corry/Prevo/Paxton that this Politico article isn't the first time we were hearing that people who reached out to Baker Tilly with Title IX claims hadn't been contacted. Corry said he needed to talk further with Paxton, which he did immediately. Then he emailed back to say that he and Paxton were dropping this third "correction." I won the battle for truth, in part, but had I not been alert, knowledgeable, and willing to challenge Liberty's General Counsel and a local lawyer about this false script—a script which had already been given the approval of Prevo—then Politico would have amended the article with this falsehood still included.

Nothing more was ever said to me in follow-up about this. Corry never came back around to explain or amend my understanding of the big question forming in my mind and in the mind of journalists: Is the independent investigation free, willing, and able to investigate claims of past sexual assault at LU? After sticking up to Corry and Prevo, I was effectively cut out of those future discussions.

3.      Around the end of August 2020 and into the first week(s) of September 2020, I had the interactions below with Executive leadership in regard to three allegations brought to my attention by media sources, with additional details proffered by David Corry who also had sources of information separate from my own. If true, these allegations had Title IX implications.

A.      Allegations of sexual assault of a student by Becki Falwell, the then-first lady of Liberty University.

B.   Allegations of sexual relationships between Jerry Falwell, Jr. and student cheerleaders.

C.   Allegations of the statutory rape of a then-minor, Caroline Falwell, by an employee (or his son) of Liberty University; and an abortion to cover up the resultant pregnancy.

The people at the Executive level or VP level that I communicated some or all of this information to include at least: Jerry Prevo, Scott Hicks, Laura Wallace, Kenny Craig, John Gauger, Kristin Conrad, Ryan Helfenbein, David Nasser, Chris Misiano, and David Corry. I spoke about some of these things to David Paxton in one of my many sessions (February-August, 2021) with him, in his role as the local interviewer for the Baker Tilly investigation.

By way of background, Jerry Falwell, Jr. resigned on August 24, 2020. I spoke or otherwise communicated with over one hundred journalists that week, totaling several thousand separate points of communication. Many questions related to the possibility that the Falwells engaged in sexual indiscretions that, if true, would have violated Title IX. For each piece published in national news outlets, it would be fair to say that most of these reporters had contacted me either by phone or email before the story was published, and that I was in continuous communication with executive leadership (Corry, Prevo) about these media inquiries.

*First*, regarding the Becki Falwell allegations. On August 27, 2020, Politico.com published a story, "'She was the aggressor': Former Liberty student alleges sexual encounter with Becki Falwell." See https://www.politico.com/news/2020/08/27/becki-falwell-affair-liberty-university-student-band-jerry-402559. In the piece, an anonymous former student and bandmate of Trey Falwell (oldest son) claimed that when he was a student, Becki came into the guest bedroom at the Falwell's house and performed oral sex on him, and then "despite his rejection of further advances, . . .[she] continued pursuing him, offering him gifts and engaging in banter through Facebook messages." And, according to the piece, many people know and testify to the veracity of this claim.

On top of the moral implications of such behavior, there were obvious Title IX implications because Becki had been an employee of Liberty University. So not only was it necessary to find out if this happened, but also whether Becki on the payroll when it happened. To find out the answer to that question would take asking Laura Wallace, the head of HR and first-cousin to Jerry Falwell, Jr.

I spoke by phone with Provost Scott Hick on or around the afternoon of August 26, 2020, with the story about Becki set to launch the next day and with its author, Brandon Ambrosino, asking if Liberty University had any response to the allegations within his story. Hicks told me to keep him in the loop, and that we needed to respond to Ambrosino and tell him that we checked out records and have no record of any complaint from this young man that had been filed through HR or Title IX. Hicks told me he had talked to Laura and she was supposed to get some data back to him and David Corry. Hicks spoke about how the situation had to be handled the right way because Wallace was related to the Falwells. Hicks admitted he did not yet know whether or not Becki was on the payroll at the time of the alleged incident, but admitted that if

so, then we would be dealing with a much bigger issue. I asked Hicks to get back with me quickly so I would be prepared to respond to media. He said he would, but the next morning, the Becki Falwell story was published.

A few weeks later, just weeks after Prevo had become the President, I had a discussion with Hicks about these things and asked if it was possible that someone – even HR – was covering up for the Falwells. He told me — pragmatically, but not as something he was happy about — that, (paraphrased from memory): "folks around here had better keep their heads down about the Falwells. I'm not so sure that Junior won't be brought back in as President by the Board. There are some who think that is the best path forward for the institution, but I think that wouldn't work at all. But I do know this: Laura Wallace is keeping track of who sticks their head up in disloyalty to Junior. She's taking notes and there will be some heads cut off for sure if Junior comes back." To this day, I never found out from Liberty whether Becki was on the payroll during the period that allegations of sexual assault happened. Various media – including the original Politico article -- reported that she was. Liberty never gave me facts otherwise and never told me to counter this fact to the media.

In the conversations concerning this incident, it seemed to be the general opinion—not shared by me—that since the young man had never filed a complaint as a student (twelve years before), there was nothing to be done now. I asked Gauger and VP Chris Misiano — both of whom seemed to know the identity of the man, given that they attended Liberty at around the same time – with the idea of someone at Liberty reaching out to this alleged victim, to make things right with him institutionally. From the article, it is apparent that what happened to him had negatively impacted his mental health and spiritual life. I thought maybe Liberty could encourage him to talk to Baker Tilly. Nothing ever came of this suggestion.

Second, regarding allegations of sexual relationships between Jerry Falwell, Jr. and student cheerleaders and allegations of the statutory rape of Caroline Falwell by an employee.

On or around August 26-27, 2020, I received notification from credible sources within legitimate news outlets who were communicating to me other Liberty employees (David Corry, Debbie Huff of the student newspaper, The Champion) about stories that were being developed. These were "early warnings" from people (including alumni) embedded in news outlets, who were concerned about Liberty.

One such "pending story" was said to be in development by Politico.com – a news outlet with three reporters (at the time) who had covered the Liberty University scandals for several years and had developed many sources from former and current Liberty employees. I did not have any idea which reporter was working on the story, and important details of the story were missing from the news tip. But if they were working on a breaking story with original and new information, it behooved the University to get prepared. Politico always gave Liberty a chance to respond to a story before it was published—with a window of less than a day—so I needed to discover the truth before he received another time-sensitive call.

On or around August 27, 2020, I spoke with David Corry by phone, and he confirmed that he also had heard some of the same rumored pending storylines. He also told me more

specific details about the stories. I gathered that Corry had another source within Liberty or within media who had communicated with him directly. I told Corry that he should report this to Prevo and get his input on the Communications strategy. Corry agreed, but said he would text the President, as he had additional data firsthand.

Shortly thereafter, Corry texted Prevo and me. He said he received information from another vice president that Politico was about to publish three different stories by Brandon Ambrosino detailing sexual matters within the Falwell family. That Falwell, Jr. had an ongoing relationship with a Liberty cheerleader while she was a student, and that sexual activity had even taken place on University aircraft. Corry told us that the reporter allegedly had photographic evidence of this. Second, Corry told us that, allegedly, Falwell, Jr. took Caroline, his daughter, to Charlottesville for an abortion when she was 16. Corry said the reporter has medical records and that the alleged father was either Andy Barrick (then in his mid-40s and working in Liberty's development office; and kin to Divinity School Dean Ed Hindson) or Barrick's son (then in his mid-twenties) – though the reporter indicated it was Andy, the older man. I never heard any word back from Prevo on these matters.

Besides potential criminal behavior, the alleged rape had Title IX implications because not only would it have, allegedly, involved a university employee, but the victim was enrolled, as I understand it, in online education via Liberty University Online Academy (LUOA). If this allegation was false, as I hoped it was, then I could not understand why the university would want to keep me, their spokesman, in the dark about its falsehood. With Hick's admonition to me about the threat of Wallace, I determined to wait until I was called into Baker Tilly to tell of these concerns. And that's what I did—I revealed this issue to Baker Tilley.

The next week, I followed up with Corry. He told me that since these stories would be about Jerry and Becki—and since they were not employed by the University now—if media outlets chose to run the story, then we had nothing to say. That we weren't the spokesman for the Falwells.

I asked, "But what about Baker Tilly? They'll investigate this, right? That's what the media will ask me. The student allegedly assaulted by Becki is someone our people know? He's a known person. He can be interviewed, right? Becki was an employee – that's Title IX territory, right?" Corry's reply was that Baker Tilly is an independent investigation, so we don't control them. And so they are free to investigate anything they choose. Again, this was the first or second week of September. The official word from Corry to me was that Baker Tilly could and might investigate claims related to Title IX and sexual improprieties. On that fact, Corry never reversed himself to me.

Third, regarding allegations of sexual relationships between Jerry Falwell, Jr. and student cheerleaders.

This allegation seemed to me to have the most credibility because of many things I had seen and heard firsthand during my short time at Liberty. Several times as early as Spring 2018, I gave strong warning to Falwell that he was doing things that gave the optics that he was fooling around with young ladies – cheerleaders in particular. His social media showed him picking up

cheerleaders in shows of muscular strength – and other things of that nature. Falwell laughed it off and called me a Pharisee, a legalist. Becki Falwell was also present once when I said these things and she responded (paraphrase): "See Jerry, that's right. That's what I've been telling you. You need to listen to Scott."

Several times, I spoke with Kristin Conrad, VP of Marketing, about this "cheerleader situation" — because one cheerleader in particular had been given a scholarship by Falwell and an internship with Marketing, with some duties in my Department too. Conrad said that she "ran interference" between Falwell and this student, that she tried to keep this young lady out of any room Jerry will be in—because of Falwell, not the cheerleader. That young lady was not connected to the "pending Politico story" information, as the timeline was not in alignment. But the point is that VP Conrad and I were in discussion and in agreement as to the concern about Falwell's eye for cheerleaders.

By the time these allegations came to me from the media, Falwell had resigned. I do not know if Baker Tilly ever investigated these claims, other than my interviews with Paxton in which I told him about all these things.

4.      In or around November 2020 (close proximity to the Fall 2020 Trustee meeting), I spoke to Corry and learned that a large number of University-owned residential properties, located around the Lynchburg metro area, were managed by an LLC owner by Wesley Falwell (Jerry Falwell, Jr.'s son) with little or no University knowledge of  who or what goes on in these locations. This would have included, but not be limited to an ignorance about potential criminal by students and involving sexual assault. Corry indicated he had only recently come about this information about the properties and the LLC.

In a discussion about nepotism, Corry explained that Wesley and Laura Falwell owned an LLC that was given the contract for managing these residential properties – over two hundred of them. This was on top of their day jobs at the University. I asked how this was possible and Corry rolled his eyes and smiled, saying, "You tell me." I asked Corry how we owned all these residential properties. He said that as he understood it, many were donated to the school over the years, and now were being managed by the LLC and rented or leased out. And that the LLC had some sort of arrangement with the University for presenting income to the school. I asked what that arrangement was and he said, "You got me. I don't know." I asked him who lives in these places. "I don't have any idea." I asked him how we know that everything is legitimate, or that there isn't criminal activity going on in some of these places. Corry said he didn't know. I asked what police force would get the call if a crime was taking place, LUPD or Lynchburg Police Department? Corry said that in some cases there are mutual agreements and in some cases it would just be the Lynchburg Police Department. But that LUPD might get the call alone – he just didn't know. I asked if any students live in these places; Corry said he didn't know but he assumed there would be some, as these are houses that are not far from the University. I asked, "What if a student committed a sexual assault in one of these places, or was the victim of a sexual assault? Would that go on the campus security report? Corry said, "Probably not, unless the student reported it to LUPD in a certain way." Finally, I asked if Baker Tilly was looking into these things. Corry said, "I don't know. They could be. They probably are. Maybe they are." I said that it seemed like having a management arrangement with an LLC, especially one managed by the son of the former

President who was now under investigation, seemed like a systemic way of skirting the requirements of the Clery Act.

With nothing more to go on than what Corry told me, I mentioned these things to David Paxton for the Baker Tilly investigation in hope that if these were locations where sexual assault against our students was taking place and going unreported, that this situation would be reformed.

5.      In various conversations with David Paxton in one of my many sessions (February-August, 2021) with him, in his role as the local interviewer for the Baker Tilly investigation, I spoke with him about off-campus, non-LU-owned housing and apartment complexes that are marketed by Liberty to give the impression that Liberty oversees them in some manner. I don't recall the specifics of what I communicated to Paxton on this topic, but the substance of what I knew is as follows.

I understand from talking to colleagues (Corry, Falwell) and also students that there are hundreds of housing units in several apartment complexes in close proximity to the University that are not owned by the University, but they have some sort of cooperative partnership with the University. It is not just that most of the residents of these apartments happen to attend Liberty; you have to attend Liberty to live there. LUPD has some sort of agreement too, as they will come to these places to deal with matters – according to my conversations with Richard Hinkley and Ron Sloan in March and April 2021.

Falwell once explained to me and a journalist (c. Spring 2019) the value of these types of housing arrangements as a place for students to live who come to Liberty without a desire or background desire to live on campus with all its rules. He mentioned athletes as one example – that a University cannot recruit top talent who have the chance to play at an elite University, and then expect them to live on campus or abide by the sexual ethics policies established by his father's generation.

In dozens of conversations I had with students over the course of my employment – students who live in these complexes – and from communications I have received from random parents who emailed me after showing up for surprise visits to their sons and daughter, I have heard extensive reports of illicit drug use, public inebriation and underage alcohol use, and coed overnight sleeping arrangements taking place at these apartment complexes. "It's like a frat house" one young man said, with no joy in that statement. From these conversations, I have heard anecdotal stories of sexual assault, rape, and sexual encounters that were less than consensual due to intoxication. I encouraged the students to persuade their friends to report these assaults to the proper authorities.

When I talked to Liberty University officials (Corry, Falwell, Prevo, Hinkley) about aspects of these things, they would ask "What apartments are you talking about?" and I would tell them and they would say something to the effect, "Oh, Liberty doesn't own those." Right, but if LUPD can show up in a law-enforcement capacity – and student-residents in these apartment complexes have an understanding that "The Liberty Way" applies on those properties, then it makes for a confusing situation regarding enforcement of underage drinking, illicit drugs, or consensual sexual encounters, and non-consensual sexual incidents.

This very argument and line of questions I had while employed at LU are part of the argument of a Federal lawsuit filed this Spring -- in the Fourth District Case 6:22-cv-00021-NKM-RSB Document 1. This Jane Doe alleges she was raped at the Oasis apartment complex – within eyesight of the campus. And she states that the rape occurred after a full-day of poolside, public, underage drinking at Oasis. This alleged incident happened in April 2021, literally, the same month I asked these "explain jurisdiction at off-campus apartments" questions to Corry, Sloan, and Hinkley.

During the Spring and Summer of 2021, I began monitoring the "Daily Police Blotter" emailed to me from LUPD. I noticed occasional reports of off-campus situations that, with a bit of investigating, sounded like potential sexual assault events. Or at the very least, involved illicit drugs, alcohol, and overnight co-ed visits in apartments that LUPD had a mutual aid agreement with LPD to show up at when there were issues. Also, there were residential houses owned by Liberty with reports of co-ed overnight visits and late night partying. In one instance, the person who had called in the report, a staff member of Liberty who lived next door to the house, reported being troubled by seeing the underage drinking and overnight co-ed situation he was seeing regularly. Again, I asked Hinkley, during Spring 2021, if LUPD had jurisdiction at these residences and/or apartment complexes. He affirmed that they do come when called.

Separately, I asked Corry and Hinkley/Sloan in April 2021, "If a sexual assault happens there, in Cornerstone Apartments or Oasis Apartments does it get reported on our Clery report?" All three men answered in the negative, but their answers about "why" differed. Hinkley said it would depend on if the student called LUPD. Corry said something about the student needing to report it to the Title IX office if it were to be included on Clery. I did not take these men to be dishonest in their answer, but they were not on the same page in their understanding or explanation.. And this is so important to get right and to get clear, because I was having to defend our "squeaky clean record" to the national media who scoffed at the accuracy of our Clery records.

As 2021 brought a spike in former and current students who allege they were sexually assaulted, I noticed that most of the stories I was hearing were about sexual assaults that happened "off-campus" in these apartment complexes that had some sort of marketing and security services partnership with the University.

And when I would say, "Let's forget about Clery for a moment and think about this from another angle. Are we doing all we can to protect our students who live in these complexes from sexual assault? What about the stories we are hearing that students don't report sexual assault if they believe they'll get in trouble for breaking other rules while the crime happened to them?" I asked these questions to fellow VPs (Helfenbein, Conrad) as well as Corry and Title IX Executive Director Nate Hopkins. Corry and Hopkins told me about the amnesty policy, but I countered with anecdotal evidence to prove that students don't believe in the amnesty policy.

In Spring 2021, Liberty was sued by a pro-LGBT group named REAP, seeking to force Christian Higher Education to comply fully with Federal anti-discrimination laws that protect LGBT students. REAP argues that non-compliance should mean the Federal government-backed student loans cannot be used at such institutions. I agree with Liberty and other institutions in the

argument they make that religious liberty gives them the right to believe in a traditional Christian ethic and to make hiring decisions based on those convictions.

That said, in my discussions about REAP with Helfenbein, Hicks, Corry, Prevo, and others, I asked a question related to the sexual assault of a gay student. Religious liberty values shouldn't make it impossible for a gay Liberty student to receive justice. What about a student who identifies (privately or publicly) as homosexual, and then this student is gay assaulted – off-campus or on-campus? Would the amnesty policy apply to that person? What if they had been on a date when the sexual assault happened? Does the Clery report differentiate between heterosexual assault and homosexual assault? It does not. I asked if Liberty has statistics on the number of homosexual assaults perpetrated by students. The answer was something to the effect of "those haven't happened here" or even "we've not had many homosexual students" and "homosexual students don't let it be known that they are homosexual."

That information and opinion became the basis for my contention that a gay Liberty student is, practically speaking, not capable of reporting a sexual assault – because of the culture and "The Liberty Way." There's a systemic situation at Liberty that prevents reporting of gya-on-gay assault. The answers I received in response to my questions and concerns – including at least one conversation with Prevo – led me to understand that senior leadership does not believe homosexuals even come to Liberty. Or that once they identify and act on a homosexual desire, they should leave Liberty or remain quiet. A "Don't ask. Don't tell." policy. But this kind of policy, informal or formal, prevents Title IX violation reporting by homosexual students within the student body of Liberty.

I communicated some of these things to David Paxton during my interviews for the Baker Tilly investigation. And I mentioned this opinion to Prevo in his office during at least one of the three meetings I had with him in his office the first two weeks of May 2021.

6.      On March 23, 2021 a group of us flew to Columbus, Ohio with Pastor Jonathan Falwell to experience his one day "Refuel" conference. As we drove from the airport to the local church (Falwell, Hicks, Helfenbein, Lamb, Troy Temple, and others), the topic of the Baker Tilly investigation came up in conversation. I stated my opinion that they were interviewing me a lot – more than the original 90 minutes they had asked for – but that I did not feel confident that David Paxton was probing crucial lines of discovery. I mentioned Jane Doe 2 and how Jonathan Falwell counseled her to enter the portal and tell Baker Tilly about her 2005 gang rape. Jonathan responded by saying emphatically that the investigation should just wrap up and be finished now, that it had gone on long enough, was becoming a waste of money, and that he had nothing further to say to Julie Roys about Jane Doe 2. That was the opposite of my own feeling on the subject, as I was hoping the investigation would provide an objective fact-gathering about these very matters. When Jonathan said his thoughts about Baker Tilly, Hicks and Temple orally agreed with him – though that may have been reflexive "agree with the boss" talk. I remember feeling a peer pressure of sorts to think the same thing about Baker Tilly, but that conflicted with my hopes I still felt then, that Baker Tilly could be the mechanism for true reform at Liberty and improving what I had come to believe was a pattern of covering up "bad things" that happen at Liberty – like sexual assault and crime.

7.      On or around April 7, 2021, I took part in a conference call in the office of David Corry between himself and Julie Roys. I contributed nothing to the call except to listen and record it. The call was entirely "off the record" and remained so. With great pains, Roys tried to understand why the rape was not included on the annual Clery stats – or at least not on time. Part of the answer was simply that the reporting didn't happen within the annual deadline. But part of Corry's answer was that Liberty determined that the sexual assault part of the assault had happened off campus. Roys didn't understand because the tunnel was and is part of campus. Corry explained that, according to Jane Doe 2, she had been assaulted (knocked over the head) in the tunnel, but then dragged up into the woods which at the time was off-campus. Therefore, it was accurate to say that a rape had not occurred on LU's campus. Roys was stunned and I was too. She was incredulous that a gang rape wouldn't be considered "on-campus" simply because the perpetrators allegedly drug the victim to a place where they had more privacy for the assault. Corry, who was not around in 2005, reported to Roys these facts as he understood them.

After the hour-long call was finished, I followed-up with Corry, asking him if that really was our story about the rape – that we didn't have an on-campus rape that year because it hadn't happened on campus. I said to Corry that this seemed like a very legalistic understanding of answering the question: Did you have any rapes on campus this year? Corry said that was the nature of law and legal questions. If the rape had not happened, on land owned by and part of the campus of Liberty, then it didn't happen on campus.

I later learned that Jane Doe 2 had requested "all her documents" from Liberty University, but believed that she still has not gotten "all of her documents." In a meeting with the executive team, I was told that "she got all the documents she asked for" but "she didn't ask for the 'such and such' files." (I don't remember which files she had failed to request.) I argued that she had asked for all of them and she shouldn't have to know a secret password or handshake to get all items pertaining to her sexual assault. No matter what they are called – police files, crime reports, student files, etc. – she asked for them months earlier and she still didn't have them. I pleaded with my colleagues for us to not bungle the 2021 part of this woman's tragic story. We worked through how this woman could request, again, "all her files" so as to get them all. And we worked though how this hand-off would take place. I would be involved, along with Hinkley, and we would do the hand-off at Hancock Welcome Center. It was originally stated that she would need to come back to LUPD, but I argued this would be re-traumatizing to her. I wanted us to send them to her express mail, but policies stated they needed to be picked up in person—requiring her driving back to Lynchburg from her home several hours away. She asked for three copies, and I asked the people in the meeting to make three copies. I was told that the policy stated they would only give one copy. I asked them to forgo the "one copy" policy for this woman. On the day of the hand-off, Hinkley gave her one copy of the material he was providing; I handed her three copies of the materials that came to me for her, from Corry's office. She and her roommate seemed deeply troubled, angry, and upset during the handoff. I left feeling that it did not have to be handled this way, and I wondered why my colleagues had not seen how unnecessary it was to handle it this way. We were already dealing with this woman's complaint that she had submitted her name to the Baker Tilly portal – upon the urging of Jonathan Falwell (I write about this elsewhere) – but had been ignored by the investigation team. I believed that she only wanted acknowledgment, but that our bungling would push her and others into seeking litigation against the school. This is exactly what happened.

8.     Throughout the Spring and Summer 2021, I had close to ten conversations by phone with VP Kristin Conrad about what we perceived to be a cataclysmic failure to respond properly to the #MeToo and Teal Ribbon movement, the Title IX lawsuit, the viral media and podcast stories about these matters, etc. Conrad's division heads up the social media for Liberty, so she was on the front line of responding to the firestorm happening there in regards to Title IX and sexual assault. Current policy dictated the deleting or hiding of overly offensive comments made by people on University social media accounts, but Conrad stated how that was making matters worse by playing into the idea that we were all trying to hide something. She expressed her belief that Prevo and Corry were mismanaging the situation by either incompetence or, in Corry's case, choosing to bind the University to slavishly following orders from our external lawyers dealing with the Title IX lawsuit.

On or around September 27, 2021, journalist Cynthia Beasley (WSET) emailed to ask for comments about explosion of negative sentiment hitting dozens of the Liberty University social media accounts and how negative comments were being deleted. I spoke to Kristin Conrad about this, and I believe that she and her team were doing the most exceptional job they could do in such trying circumstances. The official social media policies for the University simply were not adequate for the current crisis related to the Title IX and sex assault scandals we were facing. I encouraged Conrad to write Prevo and include me and others on the email, to inform him of what was happening on our social media channels. Conrad and I agreed that there was little that social media, News, or PR could do to fix the perception of the school on these matters, because we both believed that there was an actual mishandling of the situation: "Good PR cannot fix bad decisions" and "Pretty Instagram pictures can't change the optics of our mismanagement of sexual assault claims."

Nate Hopkins responded to me by email and stated that he thought the student-led Teal Ribbon campaign was good because it had started an earnest conversation on campus about Title IX and sexual assault.

9.     In late Spring and early Summer 2021, I began to receive media inquiries from multiple news outlets with allegations of sexual impropriety by three men:

1.  Jason Suitt
2.  Steve Snyder
3.  Chris Doyle

These allegations all spring from inquiries made to me by the media in the Spring and Summer of 2021. As was my practice, I emailed or spoke with various members of Executive or VP leadership about some or all of these inquiries: Prevo, Corry, Ritz, Kennedy, Hicks, Helfenbein, Conrad, and Gauger.

Also, David Paxton asked me questions about some parts of these matters, though I cannot remember with any certainty what I knew and what information I managed to provide him at the time he asked me.

*Jason Suitt*

Suitt was a local pastor in a church that had many Liberty students in attendance, who had been placed on the Board of Trustees in 2014 as "the youngest person to ever serve on the Board." But at some later date, Suitt lost his pastorate and was quietly removed from the Board after multiple complaints of sexual abuse by adult, female parishioners. I can only assume that was why he was removed from the Board, however, because this was done quietly and with no factual information given to me – even after we received media inquiries about this situation in 2021.

After Suitt left his pastorate, he was then was hired, allegedly by Falwell himself, into the Registrar's office, and is now in a position of leadership within the Office of the Registrar of Liberty University, which is part of the Office of the Provost.

The problem isn't that a man with moral failures could be allowed to hold down a job. The problem, as I found out about it in 2021 and shared my concerns with Liberty executives, is that in his adulteries among parishioners, at least one of them was with someone who, I believed then, had been a student at Liberty. The church Suitt pastored was large and had many Liberty students in attendance. To hire this man to be on the frontlines of dealing with collegiate students seemed to be problematic to me and something we needed to look into. But I had trepidation because Suitt had been on the Board of Trustees and undoubtedly had allies and friends there still. I spoke to Liberty employees about the situation.

Then, on October 1, 2021 – the very day that Prevo gave the Convocation speech about "Teal Ribbons," one of Suitt's victims took to Twitter in response to the speech. This tweet is still on the internet:

Lori K  @LoriK2point0  Oct 1, 2021

*Liberty board of trustees received a letter from me, stating my concern over the re-employment of my abuser (former board member) over a month ago & I have yet to receive any acknowledgment (even after a follow up). Do they "really" care?*

Scrolling through her previous tweets revealed another tweet about Suitt, from May 5, 2021 – the very week I spoke with Prevo and told him that we had a pending crisis of allegations and that I believed them and that we needed to act quickly to get to the bottom of the truth. This was all before any litigation against the University. I urged advocacy for these people who were coming out in rapid succession.

This series of tweets about Suitt is also still on the internet:

Lori K  @LoriK2point0  May 5, 2021

*My pastor used his position of spiritual authority in my life to coerce, confused, manipulate and abuse me for his own disgusting purpose. I, knowingly, gave up my life (as I knew it), to go fwd. I lost an entire community of "family". I lost real family. I lost so many friends.*

Lori K  @LoriK2point0  May 5, 2021

*I was called names. I endured so many looks of disgust. My family received threats, I was blackmailed. For over a yr and a half we were stalked by my abuser. There are more people that hate me than love me. I chose to go fwd. I desperately wanted out of that trap.*

Lori K  @LoriK2point0  May 5, 2021

*I wear no badges of honor. Instead, my only badges are PTSD, anxiety disorder, depression, suicidal thoughts, nightmares, panic attacks, paranoia and hypervigilance.*

Lori K  @LoriK2point0  May 5, 2021

*Going fwd was the hardest thing I've ever done. I wouldn't go back there for anything. But, freedom came at a very big cost. It stills costs. It still takes. 2 1/2 yrs later.*

Lori K  @LoriK2point0  May 5, 2021

*It blows my mind that victims are still not believed. The only person that would choose the post disclosure life is the person that had to live through the pre-disclosure hell.*

Again, Suitt was a Board member and is currently a high-level member of the Registrar's Office at Liberty University. And this "Lori" individual wrote these tweets on October 1, 2021 – the day of the Prevo speech about "Teal Ribbons." "Lori" states that she had sent a letter about Suitt to the Board of Trustees an entire month earlier, along with a follow-up, but no response had ever been made.

In the early evening of Friday, October 1, 2021 I remained in my office at work responding to media inquiries and social media fall-out over the Title IX remarks Prevo had made in Convocation that morning. I spoke by phone with Nate Hopkins, Executive Director of Title, about "Lori" and her tweets. I asked if we as an institution should create a plan for reaching out to people who publicly, via social media, were making Title IX or sexual assault allegations against Liberty University employees or students. This conversation with Hopkins was, literally, the last thing I did as an employee of Liberty before getting called into Prevo's office the following Monday morning for the conversation that led to my termination.

**Regarding Steve Snyder**

Steve Snyder was also put on the Board in 2004 and like Suitt, it has been stated in the media and on social media that Snyder also was a social friend of Jerry and Becki Falwell.

Snyder was removed from the Board of Trustees at some point in 2020 or 2021, but I have no idea when – though I was asked by the media. Not only did the University not mention his sudden dismissal, but nobody even told me about it.

It was only through journalists asking me questions that I learned about indiscretions by Snyder. These allegations included partying, drunkenness, and some types of sexual indiscretions. I was asked if the Board knew that Steve Snyder participated together with the Falwells in "lifestyles" that contradicted the Liberty Way – including allegations that would have involved the presence of students or student-employees.

I was also asked by the media if Liberty wanted to comment on the allegation that Steve Snyder saw an inebriated Chris Doyle grope and harass Liberty students at Wesley Falwell's wedding. And the media wanted to know if Baker Tilly was looking into this.

I passed these inquiries up to the executives, but received no guidance or response from anyone. All these questions were sent to at least Prevo and Corry, but often sent to other executives too. One time, Giancarlo Granda (the "pool boy") sent in pages of questions – and a few of them were about Snyder and Doyle. I forwarded them to Corry, Hicks, Prevo, Ritz, Ron Conrad, and Gauger. No response was ever given to me as to the veracity of the claims made.

**Regarding Chris Doyle**

A friend and business partner with Jerry Falwell, Jr. who developed real estate next to Liberty University property and has been the subject of many stories in the past three years as it relates to alleged "sweetheart deals" he may have received from the University. But the media requests in Spring 2021 alleged actions Doyle took that involved Liberty students and Title IX issues. To repeat the above, one question involved Doyle groping and sexually harassing Liberty students at Wesley Falwell's wedding in 2015.

I forwarded this question to Prevo and executives when it came to us from various media outlets and also from Giancarlo Granda and Mark Ebner in July-August 2021. An allegation of groping students at the wedding of the President's son seems like something you'd want to get to the bottom of. But to my knowledge, we did not. At least, nobody told me any information.

David Paxton asked me questions about Chris Doyle and I answered to the best of my knowledge at the time.

10.    At various times, I have spoken or emailed to all the following Liberty University employees about all or parts of this situation an apparent cover-up of alleged sexual assault and sexual harassment by key Liberty University employee Keith Anderson: Keith Anderson himself, David Paxton (lead investigator for Baker Tilly investigation), David Corry, Jerry Falwell, Jerry Prevo, Rob Ritz, Ron Kennedy, Kristin Conrad, John Gauger, Scott Hicks, Ryan Helfenbein, Mitzi Bible, Shon Muldrow, Nate Hopkins, and Larry Provost.

Larry Provost, a resident of metro Washington, D.C., held a part-time position with the University doing special projects, mostly related to registering students to vote in elections. Being a gifted writer and editor, Falwell had connected us in 2018. Though Provost directly reported to VP Mark Hine, Mr. Provost also assisted me on special projects.

On or around August 11, 2019, Mr. Provost was in Lynchburg working with me and a group of Liberty employees for a presentation to be made the next day by an external vendor,

Charlie Kirk. I asked Provost about his work experiences at Liberty, thinking it had been a seamless string of years. He confided in me that this was not the case — that he had worked for Liberty as a direct report to Keith Anderson. He said he had helped colleagues from his department report to HR on allegations of sexual harassment against Mr. Anderson. I asked Mr. Provost why nothing ever came of it, and he said that though there had been a process of taking the complaint to HR, it came to nothing. I told Provost that he needed to go back and report more about what happened in the past, if he felt like he didn't do enough originally.

Mr. Provost said he was then called up to active duty and sent to Afghanistan. While on foreign soil in defense of our nation, Keith Anderson essentially demoted his position, an act that Mr. Provost believes was directly related to his advocacy of the women in their accusation against Anderson. When Mr. Provost returned to the states, he considered filing a formal complaint with the Department of Defense, as you are not supposed to be demoted while in active service. But he was physically and emotionally exhausted and just let it go, resigning from his position with Liberty. Provost expressed remorse to me about not pressing the issue further against Anderson, especially in light of how other alleged victims of Anderson had their experiences after Provost walked away.

I asked Provost if it was the case that HR didn't believe the victims and his own corroboration of their accusation. He said, "Oh, that's not it at all. As I sat there with Laura Wallace and Steve Foster, I got to thinking that maybe they didn't believe me, and said as much. But Steve Foster (then Executive Director of HR) told him, "Larry, don't worry, I believe what you're saying. We've got a file this thick (holding up his fingers to indicate several inches) on Anderson." Laura Wallace, VP of HR and the first cousin of Jerry Falwell, Jr., was present in the room for that conversation, writing down items in her notebook.

Sometime during the summer of 2020, Falwell talked to me about Anderson's involvement in local activism related to the death of George Floyd in Minneapolis – and also Falwell's infamous "Gov. Ralph Northam KKK Mask" tweet. To his credit, Falwell said that employees have First Amendment rights and can make political protests all day long if they want – even ones that he disagreed with. Then, Falwell said, "Anyhow, you can't fire a black person around here because people already think we're racist – which we're not." When I asked Falwell about the Anderson situation that Provost had told me about, Falwell affirmed that Anderson had done something wrong and that he (Falwell) had demoted him and lowered his pay. But he did not elaborate further.

On or around May 7, 2021, I received a media inquiry from the journalist team of Cadence Podcasts / Zak Levitt / Gangster Capitalism. Levitt posed many questions to Liberty regarding Falwell, including a half dozen with direct Title IX implications. Among the twenty questions they asked, five related to Liberty University's Title IX practices – and specifically, the belief that Liberty University was either indifferent to claims of Title IX violation or had actively covered up violations. The questions focused on Jerry Falwell's sexual relationships with students, Liberty attempting to keep crimes from being reported, the situation involving the 2005 gang rape of Jane Doe #2, and the sexual harassment and Title IX complaints against Keith Anderson. This was not the first media inquiry about Anderson, as we had received some going back one and two months earlier.

Levitt mentioned, by true name, Jane Doe 2. He also mentioned the sexual harassment / Title IX complaints against Keith Anderson. I forwarded all these inquires to Prevo and the executives and also included a screen shot of a Tweet by an Liberty alum (still available online as of now) who wrote: "I have a safe contact who is collecting stories of Liberty University mishandling sexual assault instances. If you have any stories and would like to share, please DM me for her contact info."

I forwarded all the questions by email to at least Prevo, Corry, Ritz, Ron Kennedy, and Scott Hicks, for their input. I spoke on the phone or in person to Mitzi Bible, Kristin Conrad and Ryan Helfenbein, separately, about these inquiries. I warned them that there was a growing groundswell of media attention and public sentiment to the effect that Liberty was mishandling sexual assault allegations. Those words had been used by the media inquiries I was receiving.

Prevo called me the same day of my email, to discuss the questions posed by Gangster Capitalism. Prevo asked me (paraphrase) "On the Keith Anderson part – what's the rumor there?" I found it disconcerting that although Prevo had been the President of the University for nine months, on the Board of Trustees since 1996, and Chairman of the Board since 2003, he claimed he had no knowledge of the Keith Anderson situation – sexual harassment and sexual assault allegations which allegedly occurred a decade earlier.

What I found most troubling, however, was that this was the third phone call Prevo had made to me about this Keith Anderson situation in the preceding two weeks. That is to say, on three separate occasions in late April and early May 2021, Prevo phoned to ask me about the same situation, and yet each time I told him it was as if he were hearing it for the first time and stated that he had little or no knowledge of the allegations. Prevo asked me what the accusation was against Anderson and whether or not it had been dealt with. I told him it was something sexual, involving a female. And that he had been demoted or moved around to a different position. I warned Prevo that we needed to get prepared to answer questions about skeletons in the Liberty closet. That my hope had been that Baker Tilly would hear these stories and help Liberty make changes and move forward – but that didn't seem to be happening, so people were now turning to the press with their stories of sexual assault at Liberty.

Prevo asked me if I had included Corry in the email I had just sent out to everyone. I said yes and Prevo told me he planned to call Corry and get to the bottom of it. That was the last time Prevo brought up Keith Anderson to me.

These conversations with Prevo about Anderson all took place two months before the two alleged victims of Keith Anderson became plaintiffs in the multi-plaintiff lawsuit filed in July. This lawsuit alleging Title IX violations was filed on July 20, 2021. Within the complaint, a legal document and public, these two women accused Keith Anderson and gave disturbing detail of the exact nature of the harassment and assault they allege to have received from Anderson.

One month later, on June 2, 2021, Gangster Capitalism One month later, on June 2, 2021, Gangster Capitalism began publishing their podcast series (which went on all summer) . In one of the first episodes, the podcast dealt with the sexual assault and sexual harassment experiences alleged by two women who worked under Keith Anderson. They both gave interviews to Gangster

Capitalism, telling their stories. "Episode 3," of Gangster Capitalism also included interviews with Mr. Provost using the pseudonym "Liberty Employee." At 30:48 into the broadcast. It refers to him as an employee who resigned on April 19, 2012, and quotes from an email he sent to then-President Jerry Falwell Jr.

At 30:48 into the broadcast. It refers to him as an employee who resigned on April 19, 2012, and quotes from an email he sent to then-President Jerry Falwell Jr.

Andrew Jenks (narrator): Jennifer was never contacted by Human Resources regarding her complaint, and she resigned from Liberty in October of 2011. Three people who worked alongside Jennifer corroborated her story and the hostile work environment they each endured under Keith Anderson. Yet, another employee of Keith Anderson, after resigning from his position on April 19, 2012, referenced Anderson and sexual harassment in an email to Jerry Falwell Jr. He also copied Neal Askew, an executive vice president at the time. Gangster Capitalism obtained the email.

Liberty Employee: "Jerry, the reason which led to my departure was that I could not work any longer for Keith Anderson. There is a reason 13 or 14 people have left the Dean of Students Office in one year. In the past year, two of the female employees in the office told me that Keith had made comments of a sexually inappropriate nature to them. These and other incidents I shared with Mrs. Wallace in regard to why I could never work for this man again. My concern with this man is if he continues where he's at, some day it will come back to haunt the university in a very bad way.

Several executives at Liberty University knew of my close working relationship with Larry Provost. For example, on or around June 7, 2021 (within a week of the Gangster Capitalism broadcast), I received a call from Provost Scott Hicks, who also knows Provost well. Hicks asked about Provost and I updated him about the Larry Provost situation, as Mr. Provost had been talking to him about it, still feeling remorse about having not done more. I repeated to Hicks all I knew about Mr. Provost's experiences from a decade earlier, including the quote from Steven Foster.

After the filing of this lawsuit, I received several dozen media inquiries about it, and very often the journalists would have additional details they offered me – additional lines of inquiry. The Jane Does were telling their stories and providing evidentiary material to the journalists, who in turn would send me this material and ask for comment. I would pass these requests up to some or all of these Executives: Prevo, Corry, Hicks, Kennedy, Ritz, Wallace, as well as Liberty attorney Ian McCrary. Corry would remind me that "we don't comment on lawsuits" and I was left wishing that we had been more responsive to the victims and the journalists in the months before the lawsuit. Prior to the lawsuit, we didn't want to have the institution go on record. But after the lawsuit, the external counsel defending Liberty shut down our ability to respond to the media, in fear of hurting the mediation and risk management strategies.

Though I had no official investigatory role as Sr VP of Communications, I tried to get to the bottom of the facts of the Keith Anderson situation to do my job in media relations – and to do

so without ever passing along dishonest information supplied to him by others. In so doing, I believe I ran afoul of certain members of Executive leadership who held to the idea that whatever happened in the past had been dealt with and there was nothing to figure out or comment on. No answers about Anderson were ever given to me, except by Anderson himself that HR had looked into the situation in the past and that it was all in the past now. As was the case with many of my lines of inquiry that involved HR decisions, I was cautioned by Scott Hicks: "It's probably best you leave that one alone. You don't challenge Laura Wallace and live to tell about it."

11.     On or around May 10, 2021, I met with President Prevo in his conference room. As the meeting adjourned, I pulled him aside to talk to him privately. Standing right in the doorway of his inner private office, I told him how I was growing uncomfortable with the Baker Tilly investigation because at my last meeting with them I was asked questions that went beyond the tenure of Jerry Falwell; they asked me about "current events" of the university that would have meant giving them my thoughts on Prevo's own performance. I told them my candid thoughts, as I had been directed to do so in my whistleblower non-retaliation contract, signed by Prevo.

I then told Prevo something to this effect: "You know I follow the principle of being a man under authority and not ever acting subversively to the person I report to. Be neither a sycophant or a subversive – just be honest and tell the truth to your boss. I'm always upfront with you. Therefore, you should know that I've been asked by Baker Tilly my thoughts on how Jerry Falwell got away with so much. And I told them what Falwell told me: that he only answered to you and maybe some of the executive committee. But as long as he kept you happy, that's all that mattered. And that it was easy because you lived in Alaska and didn't even want to look over his shoulder. So, in my opinion, the Board also must share the blame – and do so publicly – for the lack of fiduciary oversight of Falwell."

I also reminded Prevo of what we had talked about earlier that week, via email and phone call – about the coming hurricane of Title IX accusations against the school, the coming articles and podcasts, and the allegations against Keith Anderson.

My goal was to prompt Prevo to lead us all – executive leadership, faculty and staff, the Board – to own up to our complicities in what had gone wrong under Falwell's leadership. And that would, of course, include reckoning with mistakes made under the heading of "sexual assault" and "sexual harassment." And that the summer would be a crucial time for working toward this end.

On or around May 14, 2021 I met with Prevo, Helfenbein, and Kenny Craig – to talk about upcoming programming and events for the Standing for Freedom Center. At the end of the meeting, Prevo asked me to stick around while the others left. We talked again about the looming articles and podcasts related to sexual assault and Title IX violations. I believe this was the last time I saw Prevo until August. After this date, we only spoke by phone, during his time out of Lynchburg.

Prevo flew out of Lynchburg and stayed in Alaska and the West Coast for nearly all of the next 2-3 months. And to my knowledge, before he left town he called for an internal audit of my department. A few weeks later, in late May or early June, after I received notification that my department was under an internal audit. I asked Provost Scott Hicks to explain what this meant.

He said that these were very positive in focus, helping departments find efficiencies – and that people consider them very helpful. Office politics didn't play a role in these audits, Hicks said, but then added that he wasn't so sure if that was the case with this audit of my department. Hicks said that just weeks after launching the audit, Prevo called him from Alaska and asked him how it was progressing. Hicks explained to Prevo the process of the audit and how it would be wrapped up in August. Prevo told Hicks that he needed the report quicker than that. Hicks said that for Prevo, there was some sort of urgency to getting the audit done. Hicks did not know what to make of that.

The internal audit began within the same week or two of my having 3 phone conversations, 3 office conversations with Prevo, emails, and texts – and each time we talked there was something mentioned to him about either Title IX, Baker Tilly, or the media inquiries related to mishandling of sexual assaults. And all this came in the context of my having regular conversations or emails with key executives and VPs about all the media inquiries and lists of questions we were getting about sexual assault and Title IX (Corry, Ritz, Conrad, Helfenbein, Kennedy, Hicks, Prevo, Muldrow, Hopkins, and others).

12.     I met with Nate Hopkins in my office during the summer of 2021 to talk about how Liberty could communicate outwardly and with more transparency about the Title IX and sexual assault situation. Hopkins said he agreed with me that greater transparency would be helpful, and he felt up to the task of being the public face of Title IX communications – instead of everything coming out of the University through a written press release. But he said that David Corry would never allow him to do that. He said that Corry would always think he was too green to handle that himself because he had worked for Corry fresh out of law school before taking the Title IX position. I told him we should work on this wrong perception because I thought he spoke eloquently, and I appreciated his desire for more transparency. He reiterated that Corry would never allow it. But I reminded him that according to the org chart, he didn't report to Corry.

13.     During the summer of 2021, I spoke with Kristin Conrad about media inquiries I was receiving and social media feedback her team was receiving about Prevo's hiring of friends and relatives – one of the very things that Falwell's administration was guilty of. When we spoke about Shon Muldrow, who Prevo hired in as Ex VP of Diversity, Equity, and Inclusion (which also oversees the Title IX office) Kristin and I agreed that, given all the speculation swirling in the media that Liberty was covering up or mishandling Title IX, it was a very poor choice for Prevo to hire in someone he had known formerly, a man who in his youth attended the high school Prevo founded in Alaska. Our thoughts were not personal against Muldrow, for we liked him. But we didn't see what his qualification was to oversee Title IX. He was very qualified for the Diversity part, having served in that role in corporate America. But  he seemed underqualified to lead Title IX here, and his long-time friendship with Prevo was not going to help the optics that the administration was being transparent.

14.     Around the end of June 2021 we received a substantial set of questions from a podcast journalist called Wondery / "In God We Lust" with several questions that were Title IX focused. He seemed to be in contact with the same group of people who were talking to other journalists, so many questions overlapped with material that eventually came to light through Gangster capitalism. I emailed the questions to Corry, Hopkins, and others. I asked them to clarify to me about our Clery reporting and other Title IX related matters Wondery brought up. Corry thought the Wondery production qualities for their earlier podcast about the University were

substandard and so they were not worth replying to. I agreed with him on that point, but I stated that I wanted answers to the questions anyway, even if we chose to ignore Wondery. I heard nothing further.

15.     On or around July 14, 2021 I received an email inquiry from a reporter who works for Julie Roys – very specific questions about women who told her about what they alleged to be Liberty's mishandling of sexual assault or sexual harassment against them while they were students or employees. This was pre-lawsuit, theme of the inquiry had a focus: Liberty is covering up sexual assaults. In person, I told Corry about this inquiry, saying that it felt like this wasn't just an echo of the recent Gangster podcast. That it felt like a lawsuit was imminent. What would our response be? Is Baker Tilly working on the Title IX complaints or not?

16.     After the "Jane Doe lawsuit" was filed in July 2021 and after we released a "Statement from Jerry Prevo" regarding the lawsuit, Board of Trustee member Penny Nance called and talked to me. She was concerned about how the statement twice used the phrase "if they are true" to describe the allegations made by the victims. I told her how Corry had written that phrase into the statement and then Prevo ordered that it be duplicated near the bottom of the statement. Nance said that in the future I need to push Prevo and Corry harder not to use language that comes even close to hinting that we don't believe the victims.

17.     On or around the last week in July, 2021 I had meetings with LUPD in their office, to discuss something unrelated to Title IX. But Liberty attorney Ian McCrary was present too, and as the meeting broke up and we exited the internal room into the broader LUPD offices, I asked McCrary how things were going regarding the recent multi-plaintiff "Jane Doe" lawsuit. I asked him for help in understanding what he thought the University's talking points would be for communicating to the media. He told me that they were trying to identify by name all the Jane Does still, but so far, he could state that the lawsuit was going "to be manageable" because he believed many plaintiffs (at the time, there were twelve plaintiffs) had complaints and allegations that he believed the University could either get tossed on a technicality – like the statute of limitations – or they could settle with out of court due to mitigating factors in the complaint. I asked who planned to do the investigation – and when would it take place – to figure out what truly happened to these plaintiffs – separate from the legal strength of their complaint. McCrary responded by saying that wasn't part of the strategy, because the goal was to mitigate the risk to the university. Though I respected McCrary for his forthright answer, I was disappointed to hear it. I told him it was my opinion that several of the Does seemed unmotivated by money and settlement. That they had been hurt while at Liberty – and then a mishandling of their hurt caused even further pain. And that I believed they just wanted Liberty to acknowledge the mistakes and change policy to make sure it didn't repeat itself for current students.

18.     In or around August 2021, I was contacted by email by Mark Ebner, collaborator of a forthcoming book by Giancarlo Granda ("the pool boy"), who brought to my attention incidents that involved both financial improprieties and Title IX allegations related to the Falwells. I spoke with Ebner on at least two occasions. Based on these inquiries, I came to understand that the Baker Tilly investigation never even responded to his request for an interview. I took this as a final piece of evidence that the independent investigation was not free to pursue any line of inquiry or to contact any respondent they chose. David Paxton asked me many questions about Granda in his interviews with me. I believed the failure to interview Granada, even after Granada requested

it, was the smoking gun of indifference or cover-up: Liberty's telling the world one thing about the "independent investigation" but secretly doing something else altogether. Ebner also sought an public apology from Liberty University for their repeating (in Liberty's suit against Falwell) Falwell's defamatory remarks about Granda.

One of Granda's emailed questions that I took to executive leadership involved LU's IT department and Becki Falwell. Something like, "Is it possible that when Becki gave oral sex to the bandmate of Trey Falwell, that the encounter was recorded and even now is stored on Liberty-owned technology?" Nobody ever gave me any information to refute or respond to that inquiry. If the First Lady gave oral sex to a student, that would be a Title IX violation. And the idea, hinted at by Granda, that he had seen a video of this encounter and that it existed on Liberty-owned computers – as far as I know, nobody ever tried to get to the bottom of that.

I also spoke about Granda to David Paxton, including my email to him (c. August 2021) wherein I forwarded him the Ebner email with all the inquiries made by Granda. Paxton had them – including Granda's accusation that Baker Tilly ignored his desire to give information. Paxton had this information from me before finishing or presenting the report to the Board (one week to the day before my termination). To my knowledge, Paxton never did reach out to Granda for information about anything.

19.     On or about September 24, 2021 Liberty journalism student Robert Locklear Tweeted and Instagrammed a video where he spoke about "18 Jane Does" and the growing "Teal Ribbon" campaign on campus – a show of solidarity with victims of sexual assault. His video got retweeted by the national media. His point was that Liberty was not responding to mistakes the institution had made in dealing with victims of sexual assault. I emailed VPs and Execs (Conrad, Corry, Falwell, Prevo, Kennedy, Hicks, Hine, and others) about this and about the Teal Ribbon campaign. I wrote something like, "Teal Ribbons are not our enemy. Truth is our friend" – nudging my colleagues to consider that we needed transparency and a willingness to find out what had really happened to alleged victims. The pressure seemed to be building to a climax.

20.     On or around September 29, 2021, I met for an hour, off-campus at Starbucks with Josh Rutledge, VP of Spiritual Life. We each expressed grave concerns about the real and perceived mismanagement of the sexual assault victims – including, but not limited to, those victims who were then in a lawsuit against the school. The musicians and singers who are on stage in the highly visible Convocation had taken to wearing Teal Ribbons as a show of solidarity with victims, and Rutledge told me he could not and would not try sway his direct reports from supporting the cause. I agreed with his judgment. We spoke about how awful the summer had been, with one media report after another coming out about the past and present sexual assault situation at Liberty – and how Prevo and the administration seemed to be ignoring it, at best, or mishandling/covering it up at worst. We realized we would be allies in the cause of greater transparency and committed to taking actions along that line. I was terminated within a week.

21.     During my last full week of employment at the end of September and extending into Friday, October 1, about ten different people were involved in activity related to speechmaking or script making – about Title IX and sexual assault – on behalf of two people: (1) LU football coach Hugh Freeze (2) Jerry Prevo. The wordsmithing for Freeze led to the conclusion that we shouldn't have our football coach commenting on Title IX, sexual assault, and Teal

Ribbons when Prevo had not yet commented on such matters yet – at least not since the comments he made in July when the lawsuit was filed. So after working back and forth on comments Freeze could publish on his social media – to respond to allegations that the football team had on its active roster one or two players who were under investigation for rape or sexual assault (I do not recall the specific details about those players, but I know that is the context for why Freeze wanted to be vocal) – the decision was made that Prevo needed to speak first, and that this would be done to the student body on Friday, October 1, 2021.

This communication involved phone calls, emails, and texts. People would be cc-d and then dropped off email threads and then picked back up again, so I cannot say that every person took part in every communication. The people I remember participating in these communications either actively (i.e., they were listed as recipients in the emails) or passively (i.e., Hugh Freeze communicated to Athletic Director Ian McCaw, who then told us what Freeze had said to him) include at least: Jerry Prevo, David Corry, Ian McCaw, Ian McCrary, Candace McLaren (external counsel for the Jane Doe lawsuit), some other person(s) with McLaren's law firm, Kristin Conrad, Ron Kennedy, and Jonathan Falwell, Nate Hopkins, and Shon Muldrow. I also spoke about these things to my department colleagues, VP Ryan Helfenbein and News Executive Editor Mitzi Bible – whose team writes all the news pieces about Convocations.

To my remembrance, Corry and external counsel McLaren finalized with Prevo the strategy to postpone Freeze's making a statement and instead to have Prevo make a speech on Friday. And when this was communicated, via email, to me and others, it came with the text of the speech, as written by Corry and McLaren (though I don't know who did what). I was asked to give my input and I said I would do so that evening (Thursday, September 30). When I first read the speech in the late evening on September 30, I was shocked by it, for two reasons.

First, the tone was awful: condescending, chirpy, patriarchal, platitudinal, spiritually abusive, etc. I knew that on the merits of tone alone, this speech would go viral – negatively – as soon as Prevo spoke the words. And because I had written many speeches for Prevo in the past year, I knew that his style was to take what had been written for him and essentially use the material but also add more flourish. In the past, he would take speech drafts I gave him and use the material, but expand on it. He doesn't retract or pull back from the drafted material – he just adds more Prevo to the supplied theme and thrust. And Corry explicitly told us all that Prevo wouldn't be reading the text verbatim but would extemporaneously deliver the material. Given the extreme volatility of the Title IX situation and Teal Ribbon campaign, I thought that speaking extemporaneous remarks – especially if launching off the Corry-McLaren draft – would be a disaster for Prevo and for the University.

Second, and most importantly, it was and is still my contention that the Corry-McLaren draft lied in one of the most important paragraphs of the speech. All the platitudes aside, everyone would be listening to hear an answer to the question: What action is Liberty taking about the problem? The Teal Ribbon campaign had set up a website for their talking points, and they advocated for Liberty to hire an independent, third-party, investigation team that specializes in discovering what truly happened to victims within an institution. The Teal Ribbon activists referenced Boz Tchividjian (former Liberty law professor) and Rachael Denhollander (lawyer and the best-known sexual assault activist, sexual victim of Larry Nasser) as the model for what they

wanted to see Liberty do: a true investigation. But the Corry-McLaren speech had Prevo saying that he had hired a law firm to look into the situation of sexual assault and find out what happened. The speech had him saying that he hired this law firm after the Jane Doe lawsuit had been filed that July, and that he had not been briefed yet. So all of that is a distortion of what had actually happened – to the point of it being more than a misunderstanding. This was a lie. We had not hired a law firm to investigate claims of sexual assault at Liberty. We had hired (a law firm (McLaren's firm) to help us mitigate the risk of the claims brought by the dozen (and maybe two dozen, ultimately) plaintiffs – the Jane Does. McLaren was there to lessen the financial pain – to get us to mediation and settlement, or to get some of the Jane Does' complaints tossed on technicalities. I had been explicitly told that since July. But now Prevo would tell everyone that we had a law firm investigating the claims to find out what really happened – and maybe we'd fire some people – and we'd make things right.

I was disturbed and emailed everyone, late in the evening, to say that the speech was wrong and should not be used as is. Jonathan Falwell emailed me to ask something like, "Can you tell me what you see in the speech that isn't right?" Given that Convocation was only twelve hours away at that point, I realized that I alone would be sending up a warning that this speech was both tone-deaf and more importantly – dishonest. At that point, everyone else was done with the draft, and again – Prevo takes speeches and runs with them or expands on them further.

I sat down and began writing a memo in which I critiqued the speech line by line. I added as much praise as I could where the text got something right, but there were hardly any bright spots. It was as if Corry-McLaren had been asleep during the past five years of #MeToo, the sex abuse scandals within the Southern Baptist Convention, Harvey Weinstein, etc. The speech focused almost exclusively on the lawsuit, which missed the larger point of Liberty's complicity in mishandling sexual assault on campus for countless victims who never would join in on a lawsuit. In my memo, I pleaded with them to see the larger picture of the Teal Ribbon campaign and not just focus on the litigation. The lawsuit-focus of leadership meant that everything we said about sexual assault in the current context would have to go through external counsel McLaren for permission. But I argued that was short-sighted because the Teal Ribbon campaign wasn't just about the lawsuit, and that the lawsuit would be over one day and if we didn't make some real changes then people would still be in danger and the cycle would continue.

To the point of the lie written into the speech, I challenged that directly with the truth. I wrote that we had not hired an outside law firm to investigate and get to the facts and truth of the victim's claims.

As the sun came up on Friday, I emailed the entire group – around 8-10 people – a memo of around 8 pages. I waited for a response. Jonathan Falwell emailed to say he would be meeting with Prevo before Convocation and would have a chance to talk to him about the speech – and, I assumed, get Prevo to change.

Then, external counsel Candace McLaren emailed the group. She thanked me, saying that I had given excellent feedback. Then, McLaren wrote that she and her team wanted to be very clear about something I had written, because I was right. She said that her team was definitely not at Liberty to investigate the claims made by litigants in the lawsuit. They weren't there to discover

when and what had happened to who. That's an investigatory process. Her team was there to mitigate the risk of the lawsuit on behalf of the University. I was happy to read McLaren's clarity and forthrightness. But I was left wondering how those lines could have ever been drafted or finalized by David Corry in the first place.

On Friday, I told Ryan Helfenbein my sense that because I had crossed Corry in such manner on an email trail involving so many peopleand on such an important topic as Title IX and sexual assault, that I had probably endangered my job – given the realities of office politics and the powerful position Corry holds within executive leadership

That morning, Prevo gave remarks about Title IX in Convocation, lasting under two minutes. If you watch the video, it seems he almost forgot saying anything about the Teal Ribbon campaign in the midst of talking about many other things. His remarks were innocuous and platitudinal. He did not lie though. The social media blowback that day could best be summarized as: "Actions speak louder than words. What are you going to actually do?"

On Friday, I carried out a full day of responding to the media and social media buzz about what outsiders were calling "Liberty's mishandling of Title IX claims." I emailed back and forth (mentioned elsewhere in this document) with Corry, Hopkins, Muldrow, and others all day and into the evening Friday about Title IX related issues.

I did not see Prevo on Friday. The following Monday, October 4, I was called at 9:15 AM by Amanda Stanley with instructions to report to Prevo's office at 10:00 for a meeting–the meeting that led to my termination. Literally, the last piece of wordsmithing I did in direct service to Prevo, my boss and the person I directly reported to, was to challenge the honesty of words he was set to speak to the world in just hours – falsehood about what his response to sexual assault and Title IX violations had been up to that point.

22.    Luke Wilson tweeted out an allegation on Friday. October 1, 2021. This is the same day as the "Teal Ribbon" speech by Prevo. Luke Wilson, a gay alumnus of Liberty, is involved in a multi-plaintiff lawsuit against Liberty University and several dozen religious institutions of higher learning. The lawsuit is called REAP: Religious Exemption Accountability Project (https://www.thereap.org/lawsuit). No matter what one thinks about the merits of this lawsuit, Wilson's tweet about his experience at Liberty is troubling. This tweet is still online.

Luke Wilson   @wilson_fw   8:54 AM · Oct 1, 2021

"One time at @LibertyU, a male worship studies professor repeatedly propositioned sex with me, and after I refused him, he low-key threatened to implicate my cousin, w/ whom he went to church, in the situation (it was as bizarre and uncomfortable as it sounds).

On the afternoon of October 1, I sent a screenshot to Corry, Nate Hopkins (Executive Director of Title IX), VP Shon Muldrow (Prevo's new hire to head up Equity, Diversity and Inclusion – also overseeing Title IX; and Ian McCrary from the General Counsel's office.

With the screenshot, I asked if I should cc- McCrary on all these kinds of emails related to Title IX – revealing that I thought this Tweet was related to a Title IX violation. I looked to inform all these people of this high-profile alumni and his allegation, thinking we could reach out to him, hear his story, and somehow make amends for what he alleges happened. Though we were in litigation with the REAP lawsuit, that litigation is about Federal law pertaining to religious institutions discriminating against LGBT on the basis of religious conviction. There is nothing in the REAP lawsuit that pertains to individual claims of sexual assault or the type of recrimination Mr. Wilson was alleging in his tweet. I did not, and still do not, believe this was a legal matter or that it was in any way connected to the REAP lawsuit – except for the presence of Wilson.

Corry responded that same Friday afternoon, asking if Wilson's tweet was an official Liberty site – one we could control. I replied to the group that this was an alum's personal social media page. My goal wasn't to shut down Wilson's tweet, but that I was informing the group about Wilson's claim– a claim that if true would have violated Title IX. I spoke by phone to Nate Hopkins and asked if Liberty goes back and seeks further information from people, even if they had not filed a Title IX complaint originally. My opinion was that if alumni or former students are stating on public forums that they were victims of sexual assault or harassment at Liberty, the university should reach out and communicate with them about their experiences: be proactive.

As mentioned before, literally the last piece of work I did as an employee of Liberty – prior to the Monday meeting – was this exchange with Title IX leadership and David Corry, urging them to consider proactively looking into this alumni's claim of sexual harassment, by a male professor against this man.

This tweet by Luke Wilson is only one of dozens and dozens that I saw in 2021 along similar lines and that I used in conversations with executives, to warn them that we needed to act quickly and righteously, or we would soon be overwhelmed with Title IX allegations that would be in the public arena – as these social media postings already were.

23.     During the two separate meetings I had with President Prevo on the morning of October 4, 2021, I mentioned many concerns – ethical, legal, moral, political – that I believed were being covered up or were deliberately being shown indifference to. I spoke in generalities in much of that conversation, given that my concerns were with a variety of ethical lapses by University leadership. I had discussed Title IX and sexual assault several times with Prevo in the Spring months, through May. Whether or not I used the phrase "Title IX" in those meetings, I did speak about victims who were not receiving justice and that a cover-up or mishandling of sexual assault and harassment needed be looked into. I used some of the same language that I had written into the memo about the Convocation speech. That we needed an independent investigation to get to the bottom of what had really happened in situations where wrong had been done at Liberty.

24.     On October 5, 2021, David Corry came to my office, indicating he was there on the directive of Prevo to negotiate with me a resignation I would make – or face termination. In the discussion that ensued, I spoke about my concern that Title IX was being violated and that victims of sexual assault were not going to receive justice from the University. That there was a cover-up going on, stemming from the desire to mitigate the financial risk the University faced from the multi-plaintiff "Jane Doe" lawsuit filed in July.

After the meeting, Corry went back to his office and wrote an email to Prevo and sent to one of Prevo's non-Liberty email accounts. I know this to be the case because, for reasons unknown, Corry also emailed my colleague and direct report, Ryan Helfenbein – using Ryan's Gmail account. Helfenbein showed me the email. In it, Corry summarized to Prevo the content of our meeting, and he did so very accurately. In the email, Corry told Prevo of my refusal to resign, my refusal to sign an NDA, and my belief that the University was covering up wrongdoing, including Title IX. Corry's email uses the phrase "Title IX" – accurately reporting to Prevo what I had just told Corry.

On October 6, 2021, I had a phone call with Laura Wallace and Steve Foster. After they confirmed that I was being terminated, I spoke to them about my belief that bad things were being covered up at Liberty University, including Title IX violations.

On October 6, 2021, about an hour after I was terminated, I spoke with Scott Hicks on the phone. I told him about my termination. I related to him my conversation with David Corry from the previous day, reiterated my concerns about Title IX and other University misdeeds, and I told him how Corry had bcc- emailed a summary of the meeting to Helfenbein. On or around October 8, Helfenbein told me that Corry called him and told him that he had emailed him a few days earlier and that Helfenbein should delete it.

**Privilege Log (to the extent other objections do not apply):** Mr. Lamb believes responsive statements made in the conversations below were subject to the clergyman privilege, a.k.a. the clergy-penitent privilege, as they were statements to clergy when "seeking spiritual counsel and advice." See, e. g., Va. Code Ann. §§ 8.01-400, 19.2-271.3. Madison v. Riter, 355 F.3d 310, 320 (4th Cir. 2003):

| NAME | FREQUENCY/TYPE | NOTES |
|---|---|---|
| Mr. Stu Epperson | Frequent counseling and prayers | Owner of Truth Cristian Radio Network. Spiritual Counselor. |
| Rev. Travis Witt | Occasional prayer time via phone. Met once for prayer and walk. | Contract worker for LU. |
| Rev. Bob Travers | Occasional spiritual counseling and prayers. | Lifelong pastor friend of mine. St. Louis, Missouri. |
| Rev. Albert Mohler | Occasional spiritual counsel | Lifelong mentor. Former boss. |
| Rev. Rick Amato | Occasional prayers and spiritual counsel. | Former and/or current LU contractor. Friend and spiritual mentor. |
| Rev. Jack Barrett | Occasional spiritual counsel and prayers | Pastor of my local church |
| Larry Provost | Occasional counseling and prayers | Former LU contractor. Chaplain. |

**Interrogatory No. 12:**  State all facts concerning your allegation, during an October 27, 2021 interview with WSET, that "[t]he Title IX accusations, they have not been looked into," including in your answer (1) each and every alleged Title IX accusation you were referring to; (2) the identity of the alleged complainant for each alleged Title IX accusation; (3) the specific Title IX allegations made by each complainant; (4) the manner in which you learned about each of the Title IX accusations; and (5) all facts forming the basis for your belief that the alleged Title IX accusation had "not been looked into;" and (6) who at Liberty you believe to have knowledge about each alleged Title IX allegation.

**Objection:** "[C]oncerning" is vague, ambiguous, and unduly burdensome. Mr. Lamb will state the facts reasonably related to the allegation, to a reasonable degree of specificity.

**Response (without waiving objections, and to the extent it is not objected to):**
Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that this isolated statement was made as part of a long, free, and frank discussion, and I do not have a precise recollection of my exact frame of mind when I made this statement.

Yet as near as I can recall, and consistent with my review of the transcript, the chief "Title IX accusations" I referenced with this statement were those that were communicated to the Baker-Tilly investigators in person, or by the portal, or those where Baker-Tilly otherwise knew people would speak if the investigators arranged an interview with them. In particular, I was speaking of the apparent failure of the Baker-Tilly investigators to look into the accusations of "Jane Doe #2" made through the portal, and those I communicated to Paxton in person or by email, though these incidents led me to believe there was likely other Title IX accusations provided to Baker Tilly that had not been investigated. See Interrogatory 11 # 1, 2, 3, 4, 5, 6, 9, 10, 16, 17, 18.

The general behavior of the Executive leadership team also strengthened by belief that the Title IX issues presented to the Baker Tilly investigators were not looked into, and deliberately so. Liberty announced the Baker Tilly investigation in a press release dated October 20, 2020, and available at https://www.liberty.edu/news/2020/10/20/liberty-reveals-forensic-investigation-firm-and-launch-of-website-for-reporting-misconduct/. This press release stated (with emphasis and underlining added):

Liberty reveals forensic investigation firm ***and launch of website for reporting misconduct***

October 20, 2020 : By Office of Communications & Public Engagement

Liberty University confirmed today that Baker Tilly US, a global forensic accounting firm, has commenced the comprehensive review of University business operations that was announced on August 31, 2020. *In an email to the University community, Liberty announced the launch of a website to facilitate <u>the reporting of potential misconduct</u> to the investigative team.*

The web-based portal is hosted on encrypted services.  It permits confidential submission of sensitive information from current and former Liberty University employees, contractors and business affiliates.  The website was developed and is hosted by a third-party vendor independent of Liberty University.

Those with information they believe might be useful to the forensic investigation into potential misconduct in business operations of the University *and/or any improper decisions or actions by current or former members of University leadership*, are encouraged to visit the portal at https://lu.integrityline.org/index.php to learn more and file a confidential report.

To properly scope and timely complete the forensic investigation, the web-based platform will be available for submitting reports for sixty days (until December 20, 2020). The Liberty Board and the independent investigative team are encouraging anyone with pertinent information to not delay in submitting a report through the platform.

Since the platform is independent of Liberty University, it is not a substitute for employees or students to report complaints of misconduct where the University has an established complaint procedure. Frequently asked questions about what should and should not be reported through the web portal can be found on the FAQ tab on the landing page along with other information on the process.

The launch of the website represents the first public phase of the forensic investigation. Baker Tilly US has been quietly working on the investigation since early September, conducting interviews and collecting documents and other data.

This press release therefore invited disclosure of "any improper decisions or actions by current or former members of University leadership," and although "it is not a substitute for employees or students to report complaints of misconduct where the University has an established complaint procedure," it appeared to be a parallel channel. And Liberty repeatedly offered statements that suggested the public could and should submit information about sexual misconduct or mismanagement of Title IX issues by Liberty leadership through the portal. See Interrogatory 11 # 2, 3, 4, 6, 7, 9, 15.

Further, in the Fall of 2020, around November and the Fall Trustee meetings, I talked to Corry in his office, to clarify what type of investigation Baker Tilly would be conducting. What subject matters? I was seeing media focus in on Baker Tilly's qualifications in financial matters and opining that there might not be specialization in sexual assault or sexual harassment issues. I asked Corry if Baker Tilly would be free to investigate matters relating to sexual assault and

harassment? He said that Baker Tilly was "truly independent" and were free to investigate anything they chose to. I asked whether this would be limited to sexual indiscretions of Falwell, or could it go broader, to the entire University? Corry affirmed again that Baker Tilly was free to investigate anything. People just needed to enter the portal and submit their information to Baker Tilly.

**Interrogatory No. 13:**   State all facts concerning your allegation, during an October 29, 2021 podcast with Julie Roys, that "I've been discussing that [the Title IX mishandling] all spring," and in your answer (1) identify with specificity each instance you allegedly discussed the "Title IX mishandling" in the spring of 2021; (2) identify each and every person with whom you allegedly discussed the "Title IX mishandling;" (3) identify the date on which you had each discussion; (4) for each discussion, identify the method by which you had the discussion, whether in person, by telephone, via email or text message, or any other means; and (5) identify all witnesses present during each such discussion.

**Objection:** "[C]oncerning" is vague, ambiguous, and unduly burdensome. Mr. Lamb will state the facts reasonably related to the allegation, to a reasonable degree of specificity.

**Response (without waiving objections, and to the extent it is not objected to):** Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that the volume of the communications and the passage of time makes me likely unable to recall and be able to "[s]tate all [responsive] facts" accurately, but I believe that the conversations I cannot recall were of the same general tone and tenor as the conversations that I do recall and describe below. The information given here represents my best recollection.

I am not a lawyer, and I have a lay understanding of what constitutes a Title IX sexual misconduct accusation, but I respond according to my understanding. See the response to Interrogatory 11, and particularly items # 1, 2, 5, 6, 7, 8, 9, 10, 11, and 23.

**Interrogatory No. 14:**   State whether you contend that your alleged opposition to Liberty's handling of Title IX matters is the sole reason your employment with Liberty was terminated.  If not, identify and describe with particularity all other reasons you contend led to your termination.

**Objection:** The information requested is not relevant to any claims pending before this Court. Mr. Lamb will stand on this objection until the second amended complaint has been accepted by this Court and answered by Liberty University, Inc.

**Interrogatory No. 15:**   Identify and describe with particularity each and every statement related to Liberty's handling of Title IX matters that you made that you believe caused or contributed to your termination from Liberty, including in your answer (1) the exact statements you communicated; (2) the identity of the person(s) to whom you made the statement; and (3) the date that you made each statement.

**Response:** Instruction 2 states, "If any of these Interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you do have concerning the unanswered portion." Consistent with that instruction, I note that the volume of the communications and the passage of time makes me likely unable to recall and be able to "[i]dentify and describe with particularity each and every [responsive] statement" accurately, or all the details requested, but I believe that the conversations I cannot recall were of the same general tone and tenor as the conversations that I do recall and describe below. The information given here represents my best recollection.

I am not a lawyer, and I have a lay understanding of what constitutes a Title IX sexual misconduct accusation, but I respond according to my understanding.

I believe that my communication about Liberty's handling of Title IX matters on October 5, 2021 with David Corry caused or contributed to my termination. See Interrogatory 11 # 24.

I believe that my communication about Liberty's handling of Title IX matters on October 4, 2021 with David Corry and President Prevo caused or contributed to my termination. See Interrogatory 11 # 23.

I believe that my communication about Liberty's handling of Title IX matters on October 1, 2021 with David Corry and others caused or contributed to my termination. See Interrogatory 11 # 9, 22.

I believe that my communications with David Corry and others about Corry's proposed remarks for President Prevo, concerning Liberty's handling of Title IX matters for the October 1, 2022 caused or contributed to my termination. See Interrogatory 11 # 21.

I believe my communication with David Corry and others on September 24, 2021 about Liberty's handling of Title IX matters caused or contributed to my termination. See Interrogatory 11 # 19.

I believe my communications with David Paxton in the Baker Tilly investigation about Liberty's handling of Title IX matters caused or contributed to my termination. See Interrogatory 11 # 2, 3, 4, 5, 6, 9, 10, 16, 17, 18.

I believe my communications with the executive leadership team about Granada and Liberty's handling of Title IX matters may have contributed to my termination. See Interrogatory 11 # 18.

I believe several of my other communications about Liberty's handling of Title IX matters may have contributed to my termination. See Interrogatory 11.


## DECLARATION

I declare, under the penalty of perjury, that the responses given above are true and accurate to the best of my knowledge and belief.


_____
WALTER SCOTT LAMB

Dated: _____/_____/_____

                                        Respectfully submitted:

                                        THOMAS H. ROBERTS & ASSOCIATES, P.C.
                                        By: /s/ Andrew T. Bodoh, Esq.
                                        Thomas H. Roberts, Esq. (VSB 26014)
                                        tom.roberts@robertslaw.org
                                        Andrew T. Bodoh, Esq. (VSB 80143)
                                        andrew.bodoh@robertslaw.org
                                        105 South 1st Street
                                        Richmond, Virginia 23219
                                        Tel: 804-783-2000
                                        Fax: 804-783-2105


                                        Ian A. Northon, Esq.
                                        Admitted Only Pro Hac Vice
                                        Michigan—P65082

Pennsylvania—207733
Florida—101544
Northon Law, PLLC
4850 Tamiami Trail N, Ste 301
Naples, FL 34103
ian@northonlaw.com
service@northonlaw.com
(239) 784-7940
Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2022, I electronically filed the foregoing document using the CM/ECF system, which will provide electronic notice and copies of such filing(s) to counsel of record.

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000 / Fax: 804-783-2105
ATTORNEYS FOR PLAINTIFF

I believe that my communications with David Corry and others about Corry's proposed remarks for President Prevo, concerning Liberty's handling of Title IX matters for the October 1, 2022 caused or contributed to my termination. See Interrogatory 11 # 21.

I believe my communication with David Corry and others on September 24, 2021 about Liberty's handling of Title IX matters caused or contributed to my termination. See Interrogatory 11 # 19.

I believe my communications with David Paxton in the Baker Tilly investigation about Liberty's handling of Title IX matters caused or contributed to my termination. See Interrogatory 11 # 2, 3, 4, 5, 6, 9, 10, 16, 17, 18.

I believe my communications with the executive leadership team about Granada and Liberty's handling of Title IX matters may have contributed to my termination. See Interrogatory 11 # 18.

I believe several of my other communications about Liberty's handling of Title IX matters may have contributed to my termination. See Interrogatory 11.


## DECLARATION

I declare, under the penalty of perjury, that the responses given above are true and accurate to the best of my knowledge and belief.

WALTER SCOTT LAMB

Dated: **08** / **19** / **2022**

Respectfully submitted:

THOMAS H. ROBERTS & ASSOCIATES, P.C.
By: /s/ Andrew T. Bodoh, Esq.
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-2105


Ian A. Northon, Esq.
Admitted Only Pro Hac Vice
Michigan—P65082

Lamb Rule 41
Exhibit 1(B)